**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



JOE SIMON-WHELAN, Individually And On
Behalf Of All Others Similarly Situated,

Case No.

Plaintiff,

-against-

THE ANDY WARHOL FOUNDATION FOR
THE VISUAL ARTS, INC., THE ESTATE OF
ANDY WARHOL, VINCENT FREMONT,
Individually and Successor Executor For the
Estate of Andy Warhol, VINCENT FREMONT
ENTERPRISES, THE ANDY WARHOL ART
AUTHENTICATION BOARD, INC., JOHN
DOES 1-20, JANE DOES 1-10, and RICHARD
ROES 1-10,

Defendants.

**CLASS ACTION COMPLAINT AND**
**JURY DEMAND**

**07 CV 6423**

---

Plaintiff Joe Simon-Whelan ("Plaintiff"), individually and on behalf of all others similarly

situated, by his attorneys, Dreier LLP and Redniss & Associates LLC, as and for his Class Action

Complaint, alleges the following:

### STATEMENT OF THE CASE

1.     This action arises out of a 20-year scheme of fraud, collusion, and manipulation by,

between, and among defendants to control the market in works of art by the late Andy Warhol

("Warhol"), one of the most prolific and innovative artists of the 20th century. Plaintiff is one victim

of this conspiracy as the owner of a Warhol painting (referred to herein as "Double Denied") whose

authenticity was denied *twice* by the individuals who controlled the conspiracy after being previously

authenticated *multiple times* by these same individuals.

2.      Since Warhol's death in 1987, sales of his artwork have dominated the multi-billion dollar market for contemporary fine art.  In May 2007, a single Warhol silkscreen painting, his 1963 Green Car Crash, sold for $71.7 million dollars.  Another Warhol, Lemon Marilyn, sold for $28 million on the same day.  Warhol's Factory-style production of art is well documented in various books, documentaries, films and art exhibits.  In contrast to many fine artists, Warhol viewed himself as the head of a company whose product was art.  In his own words, "making money is art and working is art and good business is the best art."

3.      At the time of his death, Warhol had succeeded – his "business" had assets in excess of one-half billion dollars, consisting mostly of artwork he had produced in his Factory.  At this time, two men, Fred Hughes (the executor of Warhol's Estate, who himself died in 2001) and Vincent Fremont (who oversaw the sale of Warhol's paintings), controlled these assets and were also in the unique position of being asked to authenticate other works attributed to Warhol before they would be sold.

4.      Months after Warhol died, Hughes, as required by Warhol's will, formed The Andy Warhol Foundation for the Visual Arts, Inc. (the "Foundation") as a not-for-profit corporation. The Foundation was to receive hundreds of millions of dollars in Warhol art from the Warhol Estate.  Fremont became the Foundation's exclusive sales agent for paintings – determining who could buy a Warhol (and at what price) and commanding a lavish ten percent commission on each and every sale (plus substantial expenses, etc.).  For the years that followed, Fremont and Hughes (before his death) were also able to control who could sell a Warhol by authenticating – or by failing to authenticate – works that were submitted to the Foundation for examination.  At all times since its formation, the Foundation has maintained substantial holdings of Warhol artwork from Warhol's Estate and

2

exercised tremendous leverage over the market for Warhol artwork by deciding which galleries will get to exhibit, and which dealers will get to sell, works from the Foundation's substantial and valuable collection.

5.      In 1995, the Foundation and Fremont, through their lawyers, Carter Ledyard & Milburn ("Carter Ledyard"), caused The Andy Warhol Art Authentication Board, Inc. (the "Authentication Board" or the "Board") to be formed, also as a not-for-profit entity.  The Authentication Board's stated purpose is to examine works attributed to Warhol and to determine their authenticity.  So powerful is the art world's reliance on the Authentication Board's opinion that, in today's art market, no one can sell a Warhol that does not have the Board's opinion of authenticity.  As such, it indisputably dominates and controls the Warhol market.  Yet, when the Authentication Board was formed and funded by the Foundation under the direction of Carter Ledyard, there was not a single Warhol expert included.  Instead, and in sharp contrast to how the authentication committees of other prestigious artists operate, obscure figures in the art world and Fremont, the Foundation's exclusive sales agent for paintings, were named trustees of the Board.

6.      The Foundation and the Authentication Board, two of the main players in this conspiracy, are not your average non-profits.  Rather, they provide a façade of corporate credibility obscuring a deeply corrupt enterprise that enables defendants to benefit from Warhol's art and reputation.

7.      One of the principal tools that defendants rely on to further their conspiracy is a non-negotiable submission agreement that anyone who wants to sell a Warhol is forced to sign.  The submission agreement contains a sweeping (and, as described below, unenforceable) indemnity clause that purports to protect not just the Authentication Board and the Foundation, but anyone who

3

has ever acted in any capacity for the Foundation or Warhol's Estate from any and all liability associated with the Board's rulings. Even more insidiously, the submission agreement gives the Authentication Board the right to *deface* the artwork it rejects with a physical stamp of "DENIED." Perhaps most bizarrely, however, the agreement gives the Authentication Board the total discretion to *reverse* its opinion at any time and for no apparent reason – even after it has defaced a painting. Because no auction house, dealer or collector will purchase a Warhol without the Authentication Board's stamp of approval, owners of Warhol works have no choice but to sign the agreement and give the Authentication Board a perpetual veto right over its authenticity. In short, the submission agreement forces owners to forfeit all rights while reserving any and all discretion for the Authentication Board.

8.      This means that anyone who has purchased a Warhol that has been "authenticated" by the Board pursuant to the submission agreement – including the purchaser who recently paid $71.7 million for "Green Car Crash" in 2007 – risks having the Warhol's "authenticity" revoked at any time.

9.      While the Authentication Board was ostensibly created as a not-for-profit corporation that would be independent from the Warhol Foundation that funds it, in reality, the Authentication Board is completely dominated and controlled by Fremont, and the Foundation, who routinely exploit the Board's purported independence to further their fraudulent and manipulative scheme and for significant personal benefit. The Authentication Board is utilized to remove competing Warhol artwork from the marketplace by falsely declaring it to be inauthentic, thereby raising the value of the Foundation's own holdings. In many cases (such as the case with Double Denied), the manufacturing of artificial scarcity even requires reversing prior judgments of authenticity by

4

Fremont himself, which is when the Authentication Board's purported "independence" proves especially advantageous.

10.    The Foundation's motives are similarly clear. Since its creation, the Foundation has been dogged by charges of financial mismanagement that attracted a high-profile investigation by the New York State Attorney General during the mid-1990s. Though no charges were ever filed, the Foundation continues to have disproportionately high administrative costs relative to most charities. The Foundation thus depends upon getting top dollar for the sale of works in its collection to pay for its substantial overhead, and to provide grants (as called for in Warhol's will).

11.    Aside from the increase in value of its own Warhol works generated by artificial scarcity, the Foundation also receives revenue as a result of the Authentication Board's willingness to reverse prior judgments of authenticity. When faced with the choice of buying artwork from an outside dealer or the Warhol Foundation, museums and galleries will often opt for the latter as protection against such reversals of judgment by the Authentication Board. Fremont naturally earns a commission on sales of Foundation artwork. Museums, galleries, and dealers participate because their ability to have future pieces authenticated, as well as the value of existing Warhol inventory, is dependent on their relationship with the individuals who dominate the Foundation and the Authentication Board.

12.    The effects of this fraudulent and manipulative scheme are equally apparent. The Foundation and the Authentication Board exercise effective veto power over each and every sale of Andy Warhol artwork in New York, New York, the remainder of the United States, Europe, and anywhere else in the world that Warhol's artwork is bought and sold. Since its creation, the

Foundation has sold well over $150 million in Warhol's artwork at artificially inflated prices. Fremont has personally earned millions in connection with these sales.

13.     These substantial profits have come at the expense of innocent victims like Plaintiff, who is merely one in a long line of individuals injured by defendants' fraudulent and manipulative scheme. As set forth below, Double Denied, the painting that Plaintiff purchased originally for $195,000 in 1989 and ultimately submitted to the Board, is one of several created in or about 1964 at Warhol's direction, from an acetate personally created and chosen by Warhol. Plaintiff's painting had been authenticated (prior to his acquisition of the work) on multiple occasions by the Foundation and Warhol's Estate – including by Hughes and Fremont – and had passed through several major dealers as well as Christie's auction house, each of whom had carefully vetted the painting's authentication. Nevertheless, when Plaintiff submitted Double Denied in December 20, 2001 in preparation for its sale for $2 million, the Authentication Board stamped it "DENIED" with no explanation. At Fremont's urging, Plaintiff subsequently spent more than a year documenting the painting's origin and history. Yet, when Plaintiff submitted his painting a second time in 2003 with the substantial fruits of this research that demonstrated Warhol's personal role in the creation and use of the series, the Authentication Board stamped it "DENIED" a second time.

14.     Defendants' conduct has attracted significant media coverage, including a BBC documentary (*Warhol: Denied*) and numerous articles in newspapers and magazines, including VANITY FAIR. Plaintiff came to realize that both submission processes were a sham – the first designed to remove Plaintiff's competing Warhol from the marketplace and the second to insulate the Board from any liability for its acts.

6

15.     Further evidence of defendants' conspiracy was recently revealed in the July-August 2007 ART NEWSPAPER which reported that the "secretive Andy Warhol Art Authentication Board may now accept certain Warhol prints as genuine that it has previously rejected." Upon information and belief, the Foundation owns thousands of such prints, and this reversal of standards enables them to effectively produce more Warhol artwork and therefore print more money for themselves.

16.     Plaintiff now brings suit on behalf of himself and the class defined herein to end defendants' fraudulent and monopolistic conduct, and on behalf of himself to recover the value and reputation of his painting, which rightly is worth millions of dollars.

## **PARTIES**

17.     Plaintiff Joe Simon-Whelan is a film writer and producer. He is a United States citizen who resides in London, England.

18.     Defendant The Andy Warhol Foundation for the Visual Arts, Inc., is a New York corporation with its principal place of business in New York, New York. The Foundation was incorporated as a not-for-profit charitable trust. The Internal Revenue Service treats the Foundation as a "Private Foundation."

19.     Defendant the Estate of Andy Warhol (the "Warhol Estate" or the "Estate") is located in New York, New York. The executor of the Warhol Estate was originally Frederick Hughes ("Hughes").

20.     Upon information and belief, Defendant Fremont is a citizen of the State of New York and resides in New York, New York.

21.     Upon information and belief, Defendant Fremont Enterprises has its principal place of business at 1 Union Square West, New York, NY 10003.

22.     Defendant The Andy Warhol Art Authentication Board, Inc. is a New York corporation, with its principal place of business in New York, New York. The Authentication Board was incorporated as a not-for-profit corporation.

23.     John Does 1-20 are past and present officers, directors and employees of the Foundation who have knowingly participated in, or willfully ignored, the fraudulent and manipulative acts alleged herein. Any such officers, directors and employees so named are citizens of New York State.

24.     Jane Does 1-10 are past and present members of the Authentication Board who have knowingly participated in, or willfully ignored, the fraudulent and manipulative acts alleged herein. Any such members so named are citizens of New York State.

25.     Richard Roes 1-10 are past and present agents of the Foundation and/or the Authentication Board, who have knowingly participated in, or willfully ignored, the fraudulent and manipulative acts alleged herein. Any such members so named are citizens of New York State.

26.     As further described in this Complaint, during the past 20 years, Fremont, the Foundation, the Authentication Board, John Does 1-20, Jane Does 1-10, and Richard Roes 1-10 (collectively, the "Warhol Conspiracy") have combined and conspired to control the market for, and defraud the public with respect to, the authenticity of artwork by the late Andy Warhol. Upon information and belief, the Warhol Conspiracy has sought to influence, control, and monopolize the market for works of art attributed to Warhol to thereby inflate the value of the thousands of works of art left in the Warhol Estate that were thereafter transferred to the Warhol Foundation.

## **VENUE AND JURISDICTION**

27.     Venue lies in this District pursuant to 28 U.S.C. §1391(a) and (b).

8

28.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1337(a) because Plaintiff's antitrust claims arise under §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and are brought pursuant to §§ 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

29.     This Court also has subject matter jurisdiction over this action because Plaintiff's Lanham Act claims arise under 15 U.S.C. § 1125(a).

30.     Plaintiff further invokes the pendent jurisdiction of this Court to consider claims arising under state law.

## CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

32.     The class consists of all persons who signed submission agreements and submitted Warhol artwork to the Authentication Board for review with claims that are timely (the "Class").

33.     Excluded from the Class are defendants, their affiliates and subsidiaries, all of their present and former officers, directors, and employees, and any federal, state, or local governmental entity.

34.     This action is properly maintainable as a class action. The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.

35.     Questions of law and fact common to all members of the Class predominate over any questions that may affect individual members, because defendants have acted on grounds generally applicable to the Class. Among the questions of law and fact common to the Class are:

    a.     Whether defendants and their co-conspirators engaged in a contract,

    combination, or conspiracy to fix or maintain the price of artwork by Warhol, to

control the volume of artwork by Warhol available to the market, and to dominate the market for authentication of artwork by Warhol.

b.     Whether the alleged contract, combination, or conspiracy violated Section 1 of the Sherman Act.

c.     Whether the alleged contract, combination, or conspiracy violated Section 2 of the Sherman Act.

d.     The duration, scope, and extent of the alleged contract, combination, or conspiracy.

e.     Whether defendants and their co-conspirators took affirmative steps to conceal the alleged contract, combination, or conspiracy.

f.     Whether each of the defendants was a participant in the alleged contract, combination, or conspiracy.

g.     Whether defendants' conduct has eliminated all competition for the authentication of artwork by the Warhol.

h.     Whether defendants' conduct has substantially lessened competition for the purchase and sale of artwork by Warhol.

i.     Whether defendants' conduct caused auction and other prices for of artwork by Warhol to be maintained at artificially high and non-competitive levels.

j.     What is the effect of defendants' contract, combination, or conspiracy upon interstate commerce.

10

k.      Whether defendants agreed to cease or limit competition in the market for authentication of artwork by the late Andy Warhol.

l.      Whether Fremont and the Authentication Board committed fraud against Plaintiff and the Class.

m.      Whether Fremont and the Authentication Board committed fraud against Plaintiff, individually.

n.      Whether Plaintiff and the Class are entitled to declaratory and/or injunctive relief.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### Subject Matter of This Lawsuit

36.    Double Denied, the artwork that is the subject of plaintiff's claim is a 24" by 20" Warhol self-portrait created in or about 1964 that was "DENIED" twice by the Authentication Board, despite its indisputable authenticity – including *written acknowledgment by Hughes and Freemont*, as further detailed herein.  Double Denied is silkscreen ink on synthetic polymer paint on canvas measuring 24" by 20".  Double Denied bears the stamped signature of Andy Warhol twice on the upper right edge, and once on the lower left edge.  The left edge also bears the following certification of authenticity, which was written and signed by Hughes:  "I certify that this is an original painting by Andy Warhol completed by him in 1964."  A reproduction of Double Denied is attached hereto as Exhibit A.

### The Warhol Estate

37.    Hughes was the sole executor of Warhol's Estate.  He died in 2001.  Upon information and belief, a successor executor has never been named.

38.     After certain specific bequests, Warhol's will left the remainder and bulk of his Estate to the Foundation, which had not been formed at the time of his death.

39.     Warhol's Estate originally contained nearly 100,000 Warhol Works, including paintings, sculptures, collaborations, drawings, prints, and photographs.

40.     The value of the Warhol Estate was the subject of contentious litigation in the New York County Surrogate's Court between and among the Estate, Hughes, and Ed Hayes ("Hayes") who served as the first attorney for both the Estate and the Foundation simultaneously.

41.     In the aforementioned proceedings before Surrogate Preminger, the Warhol Estate argued that the value of the Warhol Works in the Estate was only $95 million, after applying a so-called "blockage discount" that is typically applied in the case of one-time mass sales of artwork. Hayes, by contrast, argued that the Estate's Warhol Works were worth in excess of $700 million.

42.     The Foundation endorsed the Estate's lower appraisal pursuant to blockage discounts even though the Foundation's business plan called for controlled sales of Warhol Works over time, to maximize its value. Upon information and belief, the Foundation did so to minimize costs such as Estate tax payments and annual charitable contributions, which were calculated as a percentage of the total value of the Estate.

43.     Ultimately, Surrogate Preminger found that the Estate's Warhol Works had a fair market value of just under one-half billion dollars (i.e., $489,907,625) prior to application of a blockage discount for Estate tax purposes. After applying that discount, Surrogate Preminger determined that the total fair market value of the Estate's Warhol Works was $390,979.278

## The Warhol Foundation

44.    The Foundation was incorporated on May 26, 1987, three months after Warhol's death.

45.    The Foundation received, among other things, virtually all of the nearly one-half-billion dollars of Warhol Works in the Warhol Estate.

46.    Pursuant to Warhol's will, the first trustees of the Foundation were Hughes, Fremont, and John Warhola (one of Warhol's brothers).

47.    Upon information and belief, Fremont and Hughes handled all sales of the Foundation's Warhol Works, receiving substantial commissions on each sale.

48.    Upon information and belief, in or about October 1990, to avoid accusations of conflict, Fremont had to choose between remaining as a trustee of the Foundation and acting as a sales agent for the Foundation's Warhol Works.

49.    In or about October 1990, Fremont resigned as a trustee of the Foundation.  Upon information and belief, as *quid pro quo*, Fremont entered into a five-year contract with the Foundation that made him the exclusive agent for all sales of Warhol Artwork anywhere in the world, and granting him a commission of 10% on each sale.

50.    During a high-profile investigation in the mid-1990s by the New York State Attorney General into the Foundation's administration and practices, the Foundation reduced Fremont's commission to 6%.

51.    Upon information and belief, as of the date of this Complaint, Fremont remains the exclusive sales agent for the Foundation's Warhol paintings and wields enormous influence over the standards and practices that govern the authentication and sale of Warhol Works.

13

52.    Upon information and belief, the Foundation has sold well in excess of $150 million in Warhol Works since appointing Fremont as exclusive sales agent for paintings in December 1990.

53.    Upon information and belief, in the course of Fremont's exclusive sales agency, the Foundation has paid Fremont in excess of $10,000,000. According to the Foundation's Form 990 for 2006, the Warhol Foundation paid defendant Vincent Fremont Enterprises, an entity controlled by Fremont, compensation of $950,000 in calendar year 2006 alone.

54.    Upon information and belief, the Foundation has long suffered from financial mismanagement. As stated previously, the New York State Attorney General investigated the Foundation's administration and practices in the mid-90s.

55.    Upon information and belief, the Foundation has long struggled to control its administrative costs. In fiscal 1998, for example, the Foundation reportedly had administrative costs of $5.3 million but paid out only $2.9 million in grants. According to the Foundation's IRS Form 990-PF for 2006, the Foundation reported administrative expenses of six million dollars and paid out eight million dollars in grants. Upon information and belief, the ratio of grants to overhead for most charities is closer to ten to one.

56.    The Foundation depends upon, among other things, the sale of its Warhol Works to fund its substantial administrative costs and to pay out grants. Upon information and belief, the Foundation's substantial financial obligations have motivated the Foundation to participate in the Warhol Conspiracy's fraudulent and manipulative scheme.

**Authentications of Warhols**

57.    Upon information and belief, during the period between Warhol's death on February 22, 1987 and December 1990, Hughes and Fremont were the persons who authenticated Warhol Works on behalf of the Estate and the Foundation.

58.    Upon information and belief, when Fremont became the exclusive sales agent for the Foundation's painted and drawn Warhol Works in December 1990, Fremont ceased having any official role in authenticating Warhol Works, though he remains an unofficial "consultant" to the Authentication Board.

59.    In or about January 1995, the Foundation caused the formation of the Authentication Board, which was incorporated on or about January 20, 1995 as a not-for-profit corporation under the laws of the State of New York.

60.    Though ostensibly an independent body, the Board is, upon information and belief, completely dominated and controlled by the Foundation.

61.    Upon information and belief, the very same outside counsel from Carter Ledyard who represented the Foundation in the valuation proceeding in Surrogate Court, advocated the formation of the Authentication Board and filed the non-profit incorporation papers on behalf of the Authentication Board.

62.    Upon information and belief, the Authentication Board is, for all practical purposes, funded by the Foundation, which depends upon the sale of its substantial collection of Warhol Works to fund its own operations.

63.     Upon information and belief, Carter Ledyard attorney Ronald D. Spencer, who serves as the public face of the Authentication Board in media interviews, purports to represent both the Board and Foundation simultaneously.

64.     Upon information and belief, in or about 1995, Fremont resigned from the Authentication Board to avoid accusations of conflict and create the illusion of the Board's independence from the Estate and Foundation.

65.     By 1996, the Authentication Board consisted of four individuals: Neil Printz, Robert Rosenblum, Sally-King Nero and David Whitney.  Upon information and belief, none of these individuals possessed expertise in the authentication of Warhol Works and no such experts were even considered at the time.

66.     Upon information and belief, Fremont has continued to be a "consultant" to the Authentication Board and has participated in, and influenced decisions ostensibly made by, the Authentication Board.

67.     Upon information and belief, the Authentication Board modifies its rejection policies for certain favored dealers on good terms with the Foundation and Fremont.

68.     Upon information and belief, the Authentication Board has authenticated works submitted by these favored dealers, while rejecting works from the same series that were submitted by other less influential dealers.

69.     Upon information and belief, for example, Rupert Smith (whom Warhol employed to make his paintings) made hundreds of paintings and thousands of prints *after Warhol's death*. Upon information and belief, Fremont made a deal with Fred Dorfman, a gallery owner and Smith's

executor, to authenticate a third of these pictures in return for Dorfman handing over a third to the Foundation and destroying the other third.

70.    Upon information and belief, the Authentication Board has no written standard of what constitutes an authentic Warhol artwork.

71.    Upon information and belief, the Authentication Board has applied various definitions of what constitutes an authentic Warhol artwork.

72.    Upon information and belief, the vast majority of Warhol Works were created in various outside studios with little or no supervision by Warhol, who would conceive and authorize a work (by selecting an acetate for example) and review the finished product, intentionally avoiding any personal role in the production itself. Upon information and belief, however, the Authentication Board has approved the majority of works so produced.

### The Submission Agreement

73.    Some time after Double Denied was originally submitted to Hughes for authentication in 1988, and prior to July 1990, the Warhol Estate implemented a policy requiring that persons seeking authentication of works attributed to Warhol must sign a submission agreement that limits the Estate's liability for its opinions.

74.    Upon information and belief, the submission agreement contained provisions designed and drafted by counsel from Carter Ledyard to unlawfully insulate the Estate from litigation resulting from its authenticity rulings.

75.    Upon information and belief, the submission agreement was initially created in response to a fiasco surrounding the authentication of a painting submitted by Robert Miller

17

("Miller"), a New York art-dealer who had substantial business dealings with the Foundation and Estate.

76.     Upon information and belief, in the summer of 1989, Miller called upon Hughes to authenticate a Superman collage – purportedly created by Warhol – that was one of 15 works (the "Superman Works") being offered by a seller for $175,000.

77.     Upon information and belief, Hughes authenticated the Superman Works in exchange for one of the Superman Works, but Miller subsequently discovered that they were fakes and sought reimbursement from the Estate. Upon information and belief, the Estate and Foundation agreed to reject Miller's request.

78.     Upon information and belief, Miller opted not to pursue legal action against the Estate and Foundation to preserve his substantial business relationship with both. Upon information and belief, shortly thereafter, Miller's own gallery was awarded a huge showing of Warhol photographs from the Foundation's collection.

79.     Upon information and belief, at the time of the Authentication Board's formation in 1995, it continued the Estate's policy of requiring all persons submitting works for authentication to sign a submission form, the terms of which are non-negotiable (the "Submission Form). A copy of the Submission Form, as used in 2001, is annexed hereto as Exhibit B.

80.     Upon information and belief, the Authentication Board has utilized a Submission Form that is substantially similar to the form in Exhibit B at all times since the Board's creation and continues to do so as of the filing of this Complaint. Upon information and belief, the Submission Form was drafted by the same outside counsel from Carter Ledyard who represents the Foundation and who previously represented the Estate and Hughes.

81.     The Submission Form contains the following coercive indemnity clause (the "In Terrorem Clause"):

"By signing this letter Owner:

(iii)     hereby indemnifies the Authentication Board, the Foundation, the Estate of Andy Warhol (the "Estate"), and all members of and officers, directors, agents, representatives, employees and others at any time acting for the Authentication Board, the Foundation or the Estate (collectively, the "Indemnitees"), and agrees to defend and hold each Indemnitee, based upon any claim or liability asserted (a) by Owner or by any person or entity acquiring the Work, or any interest in the Work from Owner (a "Buyer") or any person or entity from whom Owner or any predecessor in interest acquired the Work which is based directly or indirectly on the legend or endorsement. If any, affixed to the Work, or on any letter herein referred to, or any other action by, the Authentication Board or any other Indemnitee in connection herewith, including without limitation any claim that the opinion expressed therein is not correct, or (b) by any other person to whom Owner or the Buyer has made any statement or representation respecting the authenticity of the Work or any action of the Authentication Board or any other Indemnitee in connection therewith, and hereby agrees to pay or reimburse each Indemnitee for all costs and expenses incurred by the Indemnitee in connection with any such asserted claim or liability, including without limitation the fees and expenses of legal counsel."

82.     The Warhol Conspiracy uses this sweeping In Terrorem Clause to insulate its participants from liability arising from their misconduct. The Clause purports to protect not just the Authentication Board and its members and employees, but also the Foundation, the Warhol Estate and "all members of and officers, directors, agents, representatives, employees and others at any time acting for . . . the Foundation or the Estate."

83.     To further conceal the Warhol Conspiracy, the Authentication Board adopted a policy of never explaining to owners or the public either the reasons for its rejection of works or the requisite level of involvement by Warhol for works to be deemed authentic.

84.    Upon information and belief, the Authentication Board's policy of refusing to explain the reasons for its rejections contrasts markedly to the practice of other art authentication boards such as Alexander Calder's.

85.    To further control the Warhol market on behalf of the Warhol Conspiracy, the Submission Form explicitly authorizes the Authentication Board to damage submissions by placing a mark on the work that indicates the Board's rejection.

86.    In practice, the Authentication Board physically stamps "DENIED" prominently in red on the back of Warhol Works it has determined (with no stated reason) are not authentic. A copy of the rejection stamp affixed to the back of Double Denied is attached hereto as Exhibit C. In the case of Double Denied, the ink from this stamp has bled through and is visible from the front.

87.    To further manipulate and control the Warhol market, the Submission Form permits the Authentication Board to change its ruling at any time, for any reason. Owners are obliged to notify any buyers or subsequent owner if the Authentication Board changes its mind about a work it has previously authenticated.

88.    The Submission Form also permits the Authentication Board to provide copies of rejection letters to third parties, but **only** "at the request of persons who the Authentication Board in its discretion determines to have an appropriate interest."

### The Enforcers

89.    The Warhol Conspiracy has many enforcers, most notably Vincent Fremont, who routinely leverages his power as the exclusive agent for the Foundation's substantial collection of paintings to exert control over the Warhol Art Market. This influence brings the Foundation business and raises the prices of it own Warhol Works.

90.     The foregoing influence also contributes to the Authentication Board's monopoly over authentication of Warhol Works generally.  The Board maintains this monopoly, *inter alia*, through the efforts of John Does 1-20, Jane Does 1-10 and Richard Roes 1-10, who patrol the art world on behalf of the Warhol Conspiracy.

91.     These enforcers do not simply wait for people to submit works for authentication – they target known Warhol owners in an attempt to get them to submit even when those works have been previously authenticated by Fremont and/or Hughes on behalf of the Foundation and/or Estate.

92.     When, for example, the Warhol Conspiracy learns that an auction house, gallery or dealer has a work that has not been submitted, its enforcers "recommend" by telephone, letter, and in person that the work be submitted.

93.     The members of the Warhol Conspiracy are well aware that the Authentication Board will ostracize any auction house, gallery or dealer that does not submit a work at the Warhol Conspiracy's request, further cementing the Board's stranglehold on authentication.

### Double Denied

94.     Double Denied is one of a small series of paintings created by Warhol in or about 1964.  Warhol, who often traded his art when he was short of cash, and Paul Morrissey, provided Richard Ekstract ("Ekstract") an acetate with Warhol's self-portrait, and Warhol personally authorized Ekstract to create a few paintings in exchange for then very rare and expensive video cameras, video recorders, and related equipment that Ekstract obtained for Warhol's filmmaking.

95.     Upon information and belief, Ekstract, under Warhol's express authorization and instruction, arranged for this series of self-portrait paintings to be created from the acetate that Warhol provided (the "Ekstract Paintings").  This method of production is typical of Warhol.

96.    Upon information and belief, as evidence of authentication, Warhol intended the Ekstract Paintings to be valuable consideration for his sole and exclusive use of the aforementioned video equipment, which Ekstract estimates was then worth approximately $16,000.  In so doing, Warhol implicitly acknowledged his authorship, thereby exercising a right of paternity that was subsequently recognized in New York by statute and is currently codified as § 14.03 of the New York Arts and Cultural Affairs Law.  At no time during the balance of Warhol's life did he ever disclaim this authorship of the paintings.

97.    Upon information and belief, Herman Myers was the recipient of Double Denied from Ekstract. On or about July 23, 1987, Myers sought to auction the painting through Christie's in New York.

98.    Upon information and belief, a Christie's representative took Double Denied to the Warhol Estate for authentication, per Christie's practice for all unsigned Warhol Works.

99.    Upon information and belief, Fremont stamped Double Denied three times with the signature "Andy Warhol"– twice on the upper right edge and once on the lower left edge.  Upon information and belief, Fremont did so in his capacity as agent for the Estate and a trustee of the Foundation.

100.    On or about November 4, 1987, following authentication, Christie's auctioned Double Denied.  At the time of the auction, Double Denied bore the three "Andy Warhol" signature stamps on the upper-right and lower-left edges.

101.    Upon information and belief, a French art-dealer, Daniel Templon, purchased Double Denied for $28,600, then offered Double Denied to Ronald Feldman of the Ronald Feldman Gallery in early 1988. Feldman commissioned thousands of Warhol prints and was the main print dealer for

Hughes and Fremont, making both an enormous amount of money, especially in the years immediately after Warhol's death.

102.    Prior to purchasing Double Denied, in or about March 1988, Feldman requested that Hughes examine Double Denied's authenticity in Hughes' capacity as executor of the Estate and Chairman of the Foundation's board.

103.    Hughes advised Feldman that Double Denied was indeed authentic and wrote on its left edge: "I certify that this is an original painting by Andy Warhol completed by him in 1964." At this point, Double Denied had been authenticated by both Fremont and Hughes (and thus the Estate and Foundation) as evidenced by the foregoing written certification and three "Andy Warhol" signature stamps.  Upon information and belief, Hughes himself owned a similar self portrait on linen.

104.    Assured by these repeated authentications, Feldman purchased Double Denied, which he subsequently sold to Aldis Browne Gallery in California.

105.    Upon information and belief, Aldis Browne Gallery sold Double Denied to Richard Polsky, a dealer who specializes in works by Warhol.  Polsky is also well known in the Warhol community for his book "I Bought Andy Warhol" detailing how Fremont has leveraged his power as exclusive sales agent for the Foundation's paintings to manipulate the market in Warhol Works.

106.    After speaking with Hughes, who assured Plaintiff of the work's authenticity, Plaintiff purchased Double Denied for $195,000 from dealers Michael Hue-Williams and Lang and O'Hara on August 25, 1989.

107.    In or about June 1990, Ekstract submitted another of the Ekstract Paintings to the Warhol Estate for authentication. Unlike Double Denied, this particular portrait from the series had never been certified or authenticated by the Estate or Foundation.

108.    The Warhol Estate rejected Ekstract's submission, despite acknowledging by letter dated October 23, 1990 that the painting "was made from an acetate transparency created by Andy Warhol" and admitting that the Board had "no basis on which to doubt that the silkscreening of the work onto canvas was authorized by Andy Warhol as stated in your letter."

109.    Upon information and belief, Fremont and Hughes, who examined the Ekstract painting on behalf of the Estate, offered no justification for their contradictory treatment of Ekstract's submission and Double Denied, which were both from the same series.

110.    Upon information and belief, Fremont and Hughes rejected Ekstract's submission because the Foundation and Estate had adopted a policy of rejecting as many works as possible so as to induce artificial scarcity in the market for Warhol Works, thereby maintaining and increasing the value of the Foundation's own substantial holdings.

111.    Upon information and belief, other owners of Ekstract Paintings have since submitted them to the Estate, the Foundation, and/or the Authentication Board – all of which have been rejected. Upon information and belief, the Warhol Conspiracy have refused to provide any explanation for these rejections.

112.    In or about 1995, Georg Frei, a director of the Thomas Ammann Gallery photographed Double Denied for the Andy Warhol Catalogue Raisonne project (the "Warhol Catalogue Raisonne"), which Frei was responsible for editing. At the time, Frei was also a founding member of the Authentication Board and stressed to Plaintiff the importance of Double Denied.

113.    During the summer of 2001, Plaintiff decided to sell Double Denied, unaware of the Estate's denial of Ekstract's submission.

114.    At the time of Plaintiff's decision, the United States Post Office was issuing a first class stamp depicting the same Warhol self-portrait image as in Double Denied, increasing the significance and importance of the image.

115.    Plaintiff offered to sell Double Denied in or about July 2001 for approximately $2 million.

116.    Around this same time, during the period from August through October 2001, Plaintiff had several meetings with Fremont wherein he repeatedly urged Plaintiff to submit Double Denied to the Authentication Board. Fremont also contacted various third parties in an effort to enlist them in this campaign for submission. Fremont did not disclose his knowledge of Double Denied's history or the aforementioned review (and rejection) of Ekstract's submission of a painting from the same series in 1990. Nor did Fremont disclose that the Foundation had adopted a policy of inducing artificial scarcity in the market for Warhol Works, making denial of Double Denied a foregone conclusion. Around this time Fremont also advised Plaintiff that Double Denied was appropriate for photograph and inclusion in the Warhol Catalogue Raisonne.

117.    Plaintiff advised a prospective buyer of Double Denied of Frei's statements concerning the painting's importance. Upon information and belief, however, when this prospective buyer contacted Frei, he advised the buyer to submit the painting to the Authentication Board.

118.    On or about December 20, 2001, Plaintiff acceded to Fremont's campaign and submitted Double Denied to the Authentication Board (the "First Submission"). Pursuant to the Board's requirement, Plaintiff signed a Submission Form (*see* Exhibit B hereto).

119.    As part of the First Submission, Plaintiff provided the Authentication Board with a number of documents that confirmed the authenticity of Double Denied, including:

    a.    Plaintiff's original bill of sale.

    b.    A letter from Jonathan O'Hara, one of the dealers who sold Double Denied to Plaintiff.

    c.    A letter from Feldman confirming that Hughes had authenticated Double Denied prior to Feldman's purchase in 1988.

    d.    A letter from Michael Hue-Williams describing a conversation with Hughes in which the latter confirmed his authentication of Double Denied.

120.    By letter dated February 2, 2002 the Authentication Board rejected Double Denied (the "First Rejection") without providing a reason for its ruling. A copy of the First Rejection letter is attached hereto as Exhibit D.

121.    Upon information and belief, the Authentication Board never physically examined Double Denied, and not all members of the Board participated in the decision to deny. Upon information and belief, Fremont was among those who made that decision.

122.    Following the unexpected rejection of Double Denied, Plaintiff contacted the Authentication Board. He reached assistant secretary Claudia Defendi, who informed Plaintiff that he was welcome to resubmit Double Denied with more documentation.

123.    A few days later, when Plaintiff went to retrieve Double Denied from the Authentication Board, he encountered Fremont, who was leaving with other Board members and invited Plaintiff to lunch. At that lunch, Fremont urged Plaintiff to resubmit Double Denied after

researching and documenting its history more fully. Once again, Fremont failed to mention that he was already quite familiar with Double Denied's relevant history.

124.    Spurred by Ms. Defendi's and Fremont's statements, Plaintiff spent more than a year following the First Rejection accumulating as much information as possible about Double Denied. Plaintiff devoted hundreds of hours to this research, which he pursued at great professional detriment and financial sacrifice.

125.    During the first week of February 2003, Plaintiff resubmitted Double Denied to the Authentication Board (the "Second Submission"). As part of the Second Submission, Plaintiff supplied the Authentication Board with a wealth of additional documentation that he had assembled during the previous year, including:

      a.    A letter from Paul Morrissey, Warhol Factory's film director in the 1960s, supporting Double Denied's authenticity.

      b.    A letter from Billy Name, the Factory's photographer at that time, corroborating Morrissey's account.

      c.    A letter from Ron Cutrone, a Warhol Factory assistant who helped the artist produce many of his early silkscreened paintings, that supported Double Denied's validity as a Warhol Work.

      d.    Transcripts from the Andy Warhol Museum in Pittsburgh of Warhol himself discussing the making of Double Denied.

126.    On or about February 12, 2003, Plaintiff received a telephone call from Paul Morrissey. According to Morrissey, Fremont had informed him over dinner the night before that Plaintiff's painting had been denied a second time. Upon information and belief, the Authentication

27

Board had not yet met to consider Plaintiff's Second Submission at the time of Fremont's conversation with Morrissey.

127.    By letter dated July 14, 2003, the Authentication Board rejected Double Denied a second time (the "Second Rejection"), refusing once again to explain its rejection.

128.    Upon information and belief, the Authentication Board's reconsideration of Double Denied was a sham designed to insulate the Board from a lawsuit for its failure to examine the painting prior to the First Rejection. Upon information and belief, the Authentication Board made sure that all of its members physically examined Double Denied, even though denial was a *fait accompli*.

129.    Following the Second Rejection, by letter dated May 18, 2004, the Authentication Board finally purported to explain the reasons for its rejections. The May 18, 2004 letter, which is attached hereto as Exhibit E, listed a series of physical characteristics that supposedly rendered Double Denied inauthentic, including:

> a.    "The background of the painting you submitted and the backgrounds of the nine identical examples are printed, not hand-painted."

> b.    "The eyes, skin tones, and hair in the work you submitted and in the nine identical examples are printed, not hand-painted."

> c.    "The only aspect of the self-portraits that Warhol made in early 1964 that is painted is the black silkscreen impression, printed over the areas of hand-painted color. Each impression varies among the works made by Warhol, as does the registration of the black screen over the areas of hand-painted color. This is

not the case with respect to the work you submitted and the nine identical

examples."

d.     "The work you submitted and the nine identical examples were made of

cotton."

e.     "The density of the halftone in the work you submitted for our review and

in the nine identical examples is reduced, as compared to the density of the

halftones in Warhol's early 1964 canvases...."

f.     "Finally, as part of its research, the Board learned that the work you

submitted and the nine identical examples were painted by a commercial printer in

1965.  The printer claimed that he received materials and specifications from

another party, and had never had any contact with Warhol himself.

130.    The second rejection of Double Denied attracted significant media coverage,

including a television documentary by the BBC entitled "Warhol: Denied," and numerous articles in

newspapers and magazines, including a VANITY FAIR piece entitled "Judging Andy."

131.    According to newspaper articles in THE INDEPENDENT ON SUNDAY and THE SUNDAY

TELEGRAPH in the UK, some 15% of previously authenticated Warhol Works that were re-submitted

to the Board have had their judgment of authenticity reversed.  The owners of these rejected works

have reportedly considered filing suit themselves.

132.    Upon information and belief, there are numerous persons or entities that are similarly

situated to Plaintiff, having submitted a work previously authenticated by either Hughes or Fremont

and, sometime later, having had their works rejected by the Authentication Board.

## COUNT ONE

### Violation of § 1 of the Sherman Act and New York Donnelly Act
### Against All Defendants
### (Joe Simon-Whelan, Individually and on Behalf of Those Similarly Situated)

133.    Plaintiff repeats and re-alleges allegations set forth in paragraphs 34 through 132, as if fully set forth herein.

### The Relevant Market

134.    The relevant product and service markets that have been, and are being, unlawfully dominated and unreasonably restrained by defendants' activities are:

        a.    The authentication of Warhol Works;

        b.    The offering and sale at auction of Warhol Works;

        c.    The offering and sale other than by sale at auction of Warhol Works; and

        d.    The investment market for Warhol Works.

135.    The relevant geographic markets that have been, and are being, unlawfully dominated and unreasonably restrained by defendants' activities are:

        a.    New York, New York and, alternatively,

        b.    The United States, and

        c.    Each of the major cities in the United States, Europe, and elsewhere in the world in which major art auctions are conducted.

### Trade and Commerce

136.    Defendants' acts, as alleged herein, have resulted in the restraint of interstate commerce in New York City, the United States, Europe, and elsewhere, and have tended to and actually created a monopoly in the line of interstate commerce within such geographic areas; and

Plaintiff and the Class herein have been injured in their business and property by reason of the performance of those acts in violation of the antitrust laws.

## The Fine Art Market

137.    Fine Art includes the actual and purported works of famous deceased artists such as Rembrandt, Gauguin, van Gogh, and Andy Warhol.

138.    The value of Fine Art regularly ranges into the millions of dollars (or more) because the supply of artwork from a given deceased artist is fixed, prospective buyers of a given work are brought together in one room at one time for the auction, and bidders can be numerous with substantial funds to bid.

139.    Auctions are held in various cities around the world, including New York and London, and prospective bidders from many countries are often in attendance, either personally or by proxy, to bid at the auction of a specific work of art.

140.    The persons who bid for and buy fine art, whether privately or at auctions, are typically unable to ascertain by themselves the authenticity of a work they wish to buy. Bidders and buyers thus rely heavily upon the opinion of one or more experts to guide their decisions.

141.    Institutions such as museums, galleries, and auction houses routinely arrange for inspections and opinions from art experts before offering a work of art for sale, particularly if the work is newly discovered and not previously recognized as a work by the artist whose name or style appears on the painting.

142.    By reason of these opinions, vast sums of money (again, in the millions of dollars or more) are paid for works of art for which an acknowledged expert renders a convincing opinion of authenticity or probable authenticity.

143.    The persons buying such art are, in fact, buying not just the opinion and reasoning behind it, but the credentials and expertise of the authenticating expert(s), as well.

144.    Any unreasonable limitation on the use of qualified experts to inspect, employ their expertise, and render their reasoned opinions on the authenticity of major works of art would significantly affect the market for such paintings by denying valuable information that the buying and investing public depends upon when determining whether to buy, and how much to pay, for a given work of art.

### Claims Alleged

145.    Beginning in or about 1987, and continuing up to the date of this complaint, the Warhol Conspiracy has restrained trade, monopolized and attempted to monopolize said trade and commerce in the offering and sale of Warhol Works in New York, the United States, and Europe, in violation of §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2).  These violations are continuing and will continue unless the relief prayed for herein is granted.

146.    Pursuant to, and in furtherance of, the aforementioned restraint of trade, actual and attempted monopolization, and conspiracy to monopolize, defendants have sought to prevent various Warhol Works from being offered and sold, at auction or otherwise, by among other things:

a.    Maintaining an Authentication Board that supposedly investigates and renders an unbiased opinion on the origin of the artwork brought before the Board for authentication, when in reality the Board neither investigates nor renders an opinion based on its findings.

b.    Requiring a favorable opinion of authenticity from the Board before permitting artwork to be offered or sold as a Warhol Work, whether at auction otherwise.

c.    Requiring the owner of a Warhol Work to accept the Board's determination or denial of authenticity through imposition of a Submission Form and In Terrorem Clause that, among other things, permits the Board to physically damage works with a permanent mark displaying the Board's determination, and that purportedly waives any legal claims arising out of the Board's opinions or conduct.

d.    Targeting known Warhol owners in an attempt to get them to submit their works for authentication even when those works have been previously authenticated by Fremont and/or Hughes on behalf of the Foundation and/or Estate.

e.    Using the ruse of artwork thefts overseas to convince owners to submit (or resubmit) their paintings for authentication when denial is a foregone conclusion, thereby removing Warhol Works from the market.

f.    Employing different standards for the inspection and authentication of paintings owned by Defendants and their co-conspirators than those of Plaintiff and others similarly situated.

**Effects**

147.    The foregoing combination of conspiracy and violations have had the following effects, among others:

33

a.      Competition for the authentication of Warhol Works has been eliminated.

b.      Competition for the purchase and sale of Warhol Works has been substantially lessened.

c.      Owners of authentic works by Warhol will not submit their work to the Authentication Board for fear of an unlawful denial.

d.      Auction and other prices for Warhol Works have been maintained at arbitrary, non-competitive levels for paintings authenticated by Defendants – and at no significant value whatsoever for paintings not authenticated by Defendants.

e.      Plaintiff and Class Members, investors, museums, art owners, and purchasers all have been denied the benefits of a competitive market for Warhol Works and other works of fine art by deceased famous artists.

f.      Restraining trade in the tens and hundreds of millions of dollars in interstate transactions and commerce relating to the offering and sale of Warhol Works.

### Fraudulent Concealment

148.    Defendants engaged in a successful, illegal conspiracy to restrain trade in the sale, and competition in the authentication, of Warhol Works that was, by its very nature, inherently self-concealing.

149.    From at least January 20, 1995 until at least July 14, 2003, defendants fraudulently concealed their continuing unlawful combination and conspiracy from Plaintiff and Class members.

150.    Plaintiff and Class members had no knowledge of this combination and conspiracy, and could not have discovered the alleged combination prior to at least July 14, 2003 by the exercise

34

of reasonable due diligence.  The combination and conspiracy have been fraudulently concealed by defendants by various means and methods, including but not limited to the following:

      a.      The holding of secret meetings among members of the Warhol Conspiracy.

      b.      Surreptitious communications between the members of the Warhol Conspiracy by the use of telephone and meetings to avoid written records.

      c.      The creation and maintenance of separate files concerning the Warhol Conspiracy.

      d.      The concealment of the separate files from government officials, Plaintiff, and Class members.

      e.      For Defendants adopted a policy of never explaining the reasons for their rejection of competing Warhol Works, claiming that to do so would aid art forgers.

      f.      Defendants also adopted a practice of requiring that anyone submitting artwork to the Authentication Board sign a non-negotiable Submission Form with a sweeping In Terrorem Clause designed to prevent anyone from challenging its rulings and authentication policies by lawsuit.

      g.      Defendants repeatedly and falsely represented that the Foundation would consider any evidence that Plaintiff submitted in support of Double Denied's authenticity.

> h.   Defendants repeatedly and falsely represented that the Authentication Board is a not-for-profit corporation that is completely independent of the Foundation that controls it.
>
> i.   Defendants repeatedly and falsely represented that the Foundation is not motivated by profit.

151.   By virtue of the fraudulent concealment by defendants and their co-conspirators, the commencement of the running of any statute of limitations had been tolled and suspended until at least July 14, 2007 with respect to any claim that Plaintiff and other Class members have as a result of the combination and conspiracy alleged in this complaint.

### Injury to Plaintiff and Class Members

152.   As a direct and foreseeable result of the above-mentioned violations of the antitrust laws, defendants have completely destroyed the value of Double Denied and countless other Warhol Works owned by Class members that were previously authenticated by Hughes, Fremont, and/or the Authentication Board itself, then subsequently rejected by the Board.

### Irreparable Injury and Injunctive Relief

153.   Alternatively, if Plaintiff cannot establish the market value of Double Denied due to lack of access to the market for Warhol Works, Plaintiff alleges irreparable injury by reason of Defendants' activities and seeks preliminary and permanent injunctions prohibiting Defendants and those acting in concert with them from:

> a.   Using the Authentication Board as a purportedly independent, unbiased, truth-seeking group that endeavors to provide an honest expert opinion concerning the authenticity of Warhol Works submitted to the Board for authentication.

b.  Failing to provide a written opinion for all submissions of works for authentication, setting forth the reasons in reasonable detail why a particular Warhol Work is deemed authentic or inauthentic, or why the Authentication Board declines to make such a determination.

c.  Refusing to recognize a Warhol Work as "authenticated" when the painting is submitted to Defendants with an opinion of authenticity from one or more reputable sources not associated with Defendants.

## COUNT TWO

### Violation of § 2 of the Sherman Act Against All Defendants
### (Joe Simon-Whelan, Individually and on Behalf of Those Similarly Situated)

154.  Plaintiff repeats and re-alleges allegations set forth in paragraphs 34 through 132, as if fully set forth herein.

155.  The relevant market is defined above in paragraphs 133 through 134, relating to the offering and sale of Warhol Works in the alternative geographic markets of New York, New York, the United States, Europe, and elsewhere in the world where major art auctions are conducted.

156.  Defendants possess the power to arbitrarily exclude the offering and sale of Warhol Works in said market. Upon information and belief, all of the Warhol Works offered and sold at auction in the relevant geographic market must obtain a letter or opinion of authenticity from the Authentication Board before any sale, by auction or otherwise, can take place. Thus, as for any specific Warhol Work, defendants have total domination of the market to prohibit such painting from being offered and sold either at auction or through leading art galleries in the relevant geographic market.

157.    The reason for defendants' overt activities as alleged was to restrain competition unreasonably, to maintain their unlawful market domination, and, alternatively, to monopolize the market. Indeed, even if defendants have not yet attained monopoly power, their success in doing so is probable.

158.    Defendants' activities affect many tens or hundreds of millions of dollars in interstate transactions and commerce.

159.    This power to exclude persons from the relevant market has been, and continues to be, exercised by defendants through their combination and conspiracy.

160.    The activities of defendants constitute a violation of § 2 of the Sherman Act, 15 U.S.C. § 2 and the New York Donnelly Act, § 340 of the New York General Business Law.

161.    By reason of these activities by defendants, Plaintiff has been unable to sell Double Denied in the relevant market and has suffered damages of $2 million or more, an amount Plaintiff will prove at trial.

## COUNT THREE

### Lanham Act
### (Joe Simon-Whelan Against All Defendants)

162.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 34 through 132 with the same force and effect as though more fully set forth herein again at length.

163.    Defendants have falsely advertised and publicized that Double Denied is not a Warhol Work by twice stamping it "DENIED," disclosing to anyone who inspects Double Denied that the Board has judged it inauthentic.

164.    Defendants have also falsely advertised and publicized that Double Denied is not a Warhol Work by excluding Double Denied from the most recent publication of the Warhol Catalogue Raisonne in 2002.

165.    Defendants have also falsely advertised and publicized that Double Denied is not a Warhol Work by failing to withdraw and counteract the adverse information that defendants themselves disseminated to the marketplace.

166.    Defendants' activities constitute a violation of the Lanham Act, 15 U.S.C. § 1125(a).

167.    Plaintiff has suffered damages in the amount of $2 million or more as to Double Denied, an amount Plaintiff will prove at trial.

## COUNT FOUR

### Fraud
### (Joe Simon-Whelan, Individually and on Behalf of Those Similarly Situated, Against the Authentication Board)

168.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 34 through 132 with the same force and effect as though more fully set forth herein again at length.

169.    Commencing in 1987 and 1988, Fremont and Hughes authenticated numerous Warhol Works as officers and representatives of the Estate and the Foundation.

170.    Commencing in or about 1989, the Authentication intentionally failed to disclose to the public that the Warhol Conspiracy had adopted a policy of raising the value of the Foundation's Warhol Works by rejecting many valid authentications by Hughes/Fremont and Estate/Foundation if submitted to the Board for re-authentication.

171.    Commencing in or about 1995, the Authentication Board concealed its ongoing frauds by adopting a procedure intended to prevent anyone from litigating its authentication policies. The heart of that procedure was and is the Submission Form and the In Terrorem Clause.

172.    The Authentication Board intentionally failed to disclose that denial was a foregone conclusion in the case of submissions by Plaintiff and those similarly situated.

173.    Plaintiff and those similarly situated relied upon the integrity of the submission process in submitting their previously authenticated Warhol Works to the Board for authentication.

174.    As a result of the Board's fraudulent conduct, Plaintiff and the Class have been damaged in a sum to be determined at trial, but which is an amount in excess of $2 million.

### COUNT FIVE

**Fraud**
**(Joe Simon-Whelan Against Fremont and the Authentication Board)**

175.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 34 through 132 as if fully set forth herein.

176.    In July 2001, Fremont, then the exclusive sales agent for the Foundation's paintings, personally intervened and interfered with Plaintiff's sale of Double Denied.

177.    Fremont sought to cause Plaintiff to submit Double Denied to the Authentication Board, despite knowing full well the history of Double Denied and that Double Denied was from the same series as the Ekstract painting that Fremont had personally rejected on behalf of the Warhol Estate in October 1990.

178.    In conversations with Plaintiff during the period from August through October 2001, Fremont insisted that Double Denied had to be submitted to the Authentication Board.

179.    Upon information and belief, during this same period, Fremont had conversations with other persons in an effort to have Plaintiff submit Double Denied to the Authentication Board.

180.    Fremont knew full well that the Authentication Board would reject Double Denied, despite his and Hughes' previous authentications.

181.    Nevertheless, upon information and belief, Fremont lied to certain third parties, claiming that Double Denied might have been stolen in Germany, in an effort to enlist them in the campaign to cause Double Denied to be submitted for re-authentication.

182.    Upon information and belief, Fremont knew and intended that Plaintiff, as part of the submission process, would be required to sign the Submission Form, which purported to insulate Fremont and his fellow co-conspirators from liability for any wrongdoing.

183.    Following the First Rejection in February 2002, Fremont urged Plaintiff to conduct further research into the authenticity of Double Denied, and to resubmit the painting to the Authentication Board, despite knowing that any re-submission would automatically be denied.

184.    Fremont did so knowing and intending that Plaintiff would rely upon his statements, which Plaintiff did, at great personal and professional cost.

185.    Upon information and belief, Fremont knew and intended that Plaintiff, as part of the submission process, would be required to sign another Submission Form, further insulating Fremont and his fellow co-conspirators from liability for any wrongdoing.

186.    Following the First Rejection in February 2002, the Board's assistant secretary Claudia Defendi represented to Plaintiff that the Board would consider any further evidence that Plaintiff submitted in support of the authenticity of Double Denied.

187.    Defendi, who acted on behalf of the Authentication Board, did so knowing and intending that Plaintiff would rely upon her statements, which Plaintiff did, at great personal and professional cost.

188.    As a result of Fremont and the Board's fraudulent conduct, Plaintiff has been damaged in an amount to be determined at trial, but in an amount no less than $2 million and is further entitled to exemplary damages in an amount in excess of Twenty Million Dollars ($20,000,000) as Defendants' actions demonstrate such reprehensible motives as to imply a criminal indifference to civil obligations.

## COUNT SIX

### Punitive Damages Against All Defendants
### (Joe Simon-Whelan, Individually and on Behalf of Those Similarly Situated)

189.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 34 through 132 above as if fully set forth herein.

190.    Defendants' acts and conduct were willful, malicious and oppressive, and were intended to cause, and did cause, injury to Plaintiff and Class members in conscious disregard of their rights.

## COUNT SEVEN

### Declaratory Judgment Against the Authentication Board
### (Joe Simon-Whelan, Individually and on Behalf of Those Similarly Situated)

191.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 34 through 132 as if fully set forth herein.

192.    The Submission Form is a contract of adhesion, the enforcement of which would be unconscionable.

42

193.    The Submission Form is a mechanism used to perpetuate the fraudulent conduct of the Warhol Conspiracy, the enforcement of which would contravene public policy.

194.    The Submission Form is unenforceable for failure of consideration because the Authentication Board's promise to "endeavor to form an opinion as to the authenticity" of submissions following "completion of its examination" was fraudulent. In fact, the Authentication Board conducted no examination prior to the First Rejection because the Board's judgment as to Plaintiff's painting was a foregone conclusion.    Upon information and belief, the Board's examination prior to the Second Rejection was similarly a sham designed to cover for its prior failure to examine because the Board's judgment as to Plaintiff's painting was, as before, a foregone conclusion.

195.    The Submission Form is unenforceable for failure of consideration because the Authentication Board's promise to "endeavor to form an opinion as to the authenticity" of submissions is illusory. As the remainder of the Submission Form makes clear, the agreement lacks mutuality because the Board reserves absolute and unfettered discretion not only to "form no opinion" regarding a work's authenticity, but also to reverse its grant or denial of authenticity at any point in the future.

196.    For all of the foregoing reasons, the Submission Form should be declared to be unenforceable against Plaintiff and the Class.

### COUNT EIGHT

### Breach Of Contract
### (Joe Simon-Whelan Against the Authentication Board)

197.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 34 through 132 above as if fully set forth herein.

43

198.    If the Submission Form is declared enforceable against Plaintiff, then Defendants have violated the contract by, among other matters, failing to "endeavor to form an opinion as to the authenticity" of submissions following "completion of its examination."

199.    Upon information and belief, the Authentication Board conducted no examination prior to the First Rejection because the Board's judgment as to Plaintiff's painting was a foregone conclusion.  Upon information and belief, the Board's examination prior to the Second Rejection was similarly a sham designed to cover for its prior failure to examine because the Board's judgment as to Plaintiff's painting was, as before, a foregone conclusion.

200.    As a result of this breach, Plaintiff has suffered damages in an amount to be proven at trial, but in no event less than $2 million, plus costs and interest.

## COUNT NINE

### (Breach of Implied Covenant of Good Faith & Fair Dealing
### (Joe Simon-Whelan Against the Authentication Board)

201.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 34 through 132 above as if fully set forth herein.

202.    The Authentication Board breached the implied covenant of good faith and fair dealing contained in the Submission Form by, among other things, failing to disclose to Plaintiff that the Warhol Conspiracy had adopted a policy of raising the value of the Foundation's Warhol Works by rejecting many valid authentications by Hughes/Fremont and Estate/Foundation if submitted to the Board for re-authentication.

203.    The Authentication Board breached the implied covenant of good faith and fair dealing by prejudging the authenticity of Plaintiff's Painting prior to conducting any authentication examination or rendering any opinion.

44

204.    The Authentication Board breached the implied covenant of good faith and fair dealing by failing to examine Plaintiff's Painting prior to the First Rejection.

The Authentication Board breached the implied covenant of good faith and fair dealing by requesting that Plaintiff spend substantial time and energy, at great personal and professional cost, researching and documenting Double Denied's authenticity.

205.    The Authentication Board breached the implied covenant of good faith and fair dealing by examining Plaintiff's Painting prior to the Second Rejection solely for the purpose of covering for its earlier failure to examine prior to the First Rejection.

206.    As a result of these breaches, plaintiff has suffered damages in an amount to be proven at trial, but in no event less than $2 million, plus costs and interest.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that:

1.    The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiff be certified as Class representative, and that his attorneys be appointed Class counsel.

2.    The Court enter a judgment and decree that:

a.    Each of the defendants violated Section 1 of the Sherman Act and the New York Donnelly Act by unlawfully attempting and conspiring to restrain trade.

b.    Each of the defendants violated Section 2 of the Sherman Act and the New York Donnelly Act by unlawfully attempting and conspiring to monopolize, and actually monopolizing, the relevant markets.

c.    Each of the defendants violated the Lanham Act.

   d.  Each of the defendants is liable to Plaintiff and the Class for fraud.

   e.  The Submission Agreement is unenforceable or, alternatively, that the Authentication Board is liable to Plaintiff for breach of contract and breach of implied covenant of good faith and fair Dealing.

3.  The Court award actual damages to Plaintiff and the Class in an amount to be trebled pursuant to 15 U.S.C. § 15(a).

4.  The Court award attorneys' fees for Plaintiff and the Class.

5.  The Court award pre- and post-judgment interest to Plaintiff and the Class.

6.  The Court award Plaintiff's costs incurred litigating this suit.

7.  The Court enjoin defendants, individually and collectively, and all persons working with them from:

   a.  Participating in the actual or purported authentication, or the offering or sale by auction or otherwise of Warhol Works while any defendants who participate in the authentication process, whether formally or informally, has any financial interesting any Warhol Works.

   b.  Refusing to permit the market for Warhol Works to have access to or consider opinions on authenticity (together with the reasons offered in support of them) rendered by any art experts not approved by defendants to authenticate Warhol Works.

   c.  Further antitrust violations of the kind alleged in this complaint.

8.  The Court award plaintiff and the Class such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial of all claims for relief that may be tried before a jury.

Dated: New York, New York
      July 13, 2007

                              Respectfully submitted,

                              **DREIER LLP**

                              Lee A. Weiss (LW-1130)
                              Brian C. Kerr (BK-6074)
                              499 Park Avenue
                              New York, New York 10022
                              212.328.6100

                              **REDNISS & ASSOCIATES LLC**

                              Seth Redniss (SR-7988)
                              185 Franklin Street, 5th Floor
                              New York, New York 10013
                              212.334.9200

                              *Counsel for Plaintiff and the Proposed Class*