Gary D. Sesser
Ronald D. Spencer
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, New York 10005
(212) 732-3200
*Attorneys for The Andy Warhol Foundation for the Visual Arts, Inc.,*
*Vincent Fremont, Vincent Fremont Enterprises, and The Andy Warhol*
*Art Authentication Board, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

JOE SIMON-WHELAN, Individually and on     :     Index No. 07 CV 6423 (LTS) (AJP)
Behalf of All Others Similarly Situated,     :

                          :     <u>ECF CASE</u>

              Plaintiff,     :

             - against -     :

                          :

THE ANDY WARHOL FOUNDATION FOR     :
THE VISUAL ARTS, INC., THE ESTATE OF     :
ANDY WARHOL, VINCENT FREMONT,     :
Individually and Successor Executor for the     :
Estate of Andy Warhol, VINCENT FREMONT     :
ENTERPRISES, THE ANDY WARHOL ART     :
AUTHENTICATION BOARD, INC., JOHN     :
DOES 1-20, JANE DOES 1-10, and RICHARD     :
ROES 1-10,     :

                          :

             Defendants.     :

-------------------------------------------------------------X

## <u>MEMORANDUM OF LAW</u>
## <u>IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

6219618.8

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

FACTS ...............................................................................................................2

    The Foundation and The Board ........................................................................3

    Simon and His Work......................................................................................5

    The Complaint .............................................................................................7

LEGAL STANDARD.............................................................................................8

ARGUMENT .....................................................................................................10

    POINT ONE

    SIMON'S ANTITRUST CONSPIRACY CLAIMS ARE IMPLAUSIBLE AND
    MUST BE DISMISSED UNDER THE   SUPREME COURT'S DECISION IN
    *BELL ATLANTIC V. TWOMBLY* ......................................................................10

        1.    The Complaint Fails to Show that the Alleged Conspiracy Could
            Possibly Have Inflated the Price of Warhol Works ...........................11

        2.    The Allegations in the Complaint Are Inconsistent with a Conspiracy to
            Inflate the Price of Warhol Works .................................................13

        3.    The Complaint Offers No Plausible Motive for the Supposed
            Conspirators to Engage in the Alleged Conspiracy ...........................15

        4.    The Complaint Fails to Show That the Activities of the Supposed
            Conspirators Are Inconsistent with Non-conspiratorial Conduct....................18

    POINT TWO

    SIMON HAS INSUFFICIENTLY PLED THE  ANTITRUST CLAIMS IN
    COUNTS ONE AND TWO.................................................................................20

        1.    The Complaint Fails to Sufficiently Allege a Relevant Market ......................20

        2.    The Complaint Fails to Show that Simon Has Standing to Assert
            Antitrust Claims........................................................................24

        3.    The Complaint Fails to Plead Required Elements of Claims Under the
            Sherman Act and Donnelly Act .....................................................26

    POINT THREE

    THE ANTITRUST CLAIMS ARE TIME-BARRED .................................................28

    POINT FOUR

    THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE LANHAM ACT.......31

    POINT FIVE

    THE FRAUD AND ANTITRUST CLAIMS  ARE NOT PLED WITH
    PARTICULARITY  AS REQUIRED BY FED. R. CIV. P. 9(B) ....................................34

i

POINT SIX

    THE COMPLAINT MUST BE DISMISSED BECAUSE SIMON TWICE
    AGREED IN WRITING NOT TO SUE BASED UPON THE
    AUTHENTICATION BOARD'S OPINION ....................................................39

POINT SEVEN

THE CLAIMS FOR PUNITIVE DAMAGES, BREACH OF IMPLIED COVENANT
    AND BREACH OF CONTRACT MUST BE DISMISSED............................41

    1.    The Claim for Breach of Implied Covenant of Good Faith and Fair
        Dealing Is Duplicative of the Breach of Contract Claim and Must Be
        Dismissed............................................................................................41

    2.    The Claim for Breach of Contract Must Be Dismissed Because the
        Authentication Board Fully Performed Its Obligations Under the
        Submission Agreements.......................................................................42

    3.    The Claim for Punitive Damages Must Be Dismissed .....................43

CONCLUSION............................................................................................................44

## TABLE OF AUTHORITIES

### FEDERAL CASES

*A&E Prods. Group L.P. v. Accessory Corp.*, No. 00 Civ. 7271, 2001 WL
1568238 (S.D.N.Y. Dec. 7, 2001)...............................................................27

*AD/SAT, A Division of Skylight, Inc., v. Associate Press*, 181 F.3d 216 (2d Cir.
1999) ............................................................................................. 21, passim

*Action House, Inc. v. Koolik*, 54 F.3d 1009 (2d Cir. 1995) ...............................44

*Armstrong v. McAlpin*, 699 F.2d 79 (2d Cir. 1983)...........................................31

*Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir. 1994)................................................24

*Barnum v. Millbrook Care Ltd. P'ship*, 850 F. Supp. 1227 (S.D.N.Y. 1994).....................9

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ....................... 1, passim

*Boule v. Hutton*, 328 F.3d 84 (2d Cir. 2003) ...................................................33

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)...........11

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ......................................11

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) .........................11, 24

*Computech Int'l, Inc. v. Compaq Computer Corp.*, 02 Civ. 2628, 2002 U.S. Dist.
LEXIS 20307 (S.D.N.Y. Oct. 28, 2002).........................................................42

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) ...............................10

*In re Crude Oil Commodity Litig.;*, No. 06 Civ. 6677, 2007 WL 1946553
(S.D.N.Y. June 28, 2007).................................................................. 9, passim

*Daniel v. Am. Bd. of Emergency Med.*, 269 F. Supp. 2d 159 (W.D.N.Y. 2003) ...............24

*DeWeerth v. Baldinger*, 836 F.2d 103 (2d Cir. 1987), *on remand*, 804 F.Supp.
539, *rev'd on other grounds*, 38 F.3d 1266 (2d Cir. 1994)...................................3, 14

*Discon Inc. v. NYNEX Corp.*, 86 F. Supp. 2d 154 (W.D.N.Y. 2000) ...............................23

*Donahue v. Pendleton Woolen Mills, Inc.*, 633 F. Supp. 1423 (S.D.N.Y. 1986) ........29–31

*E & G Gabriel v. Gabriel Brothers, Inc.*, No. 93 Civ. 894, 1994 WL 369147
(S.D.N.Y. July 13, 1994) ................................................................22, 24

*In re Elevator Antitrust Litig.*, 06-CV-3128, 2007 WL 2471805 (2d Cir. Sept. 4, 2007) .................................................................................................2, 17

*First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)................................17

*Flair Zipper Corp. v. Textron Inc.*, No. 78 Civ. 5643, 1980 WL 1901 (S.D.N.Y. Sept. 7, 1980) ....................................................................................................27

*Galerie Gmurzynska v. Hutton*, 355 F.3d 206 (2d Cir. 2004) ......................................33, 34

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004) .................21

*Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701 (S.D.N.Y. 1997).................................................................................22, 24

*Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219 (2d Cir. 2006)...........................21

*Inn Chu Trading Co., Ltd. v. Sara Lee Corp.*, 810 F. Supp. 501 (S.D.N.Y. 1992) .....35, 37

*Kirby v. Wildenstein*, 784 F. Supp. 1112 (S.D.N.Y. 1992).............................................3, 14

*Klickads Inc. v. Real Estate Bd. of New York Inc.*, No. 04 Civ. 8042, 2007 WL 2254721 (S.D.N.Y. Aug. 6, 2007) ...............................................................15

*Klos v. Polskie Linie Lotnicze*, 133 F.3d 164 (2d Cir. 1997)..............................................41

*Kramer v. Pollock-Krasner Foundation*, 890 F. Supp. 250 (S.D.N.Y. 1995) ...............................................................16, 26, 21

*Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523 (S.D.N.Y. 2007).............................9

*Lovely Peoples Fashion, Inc. v. Magna Fabrics, Inc.*, No. 95 Civ. 8450, 1996 WL 732634 (S.D.N.Y. Dec. 19, 1996)..................................................................9

*Mallon Res. Corp. v. Midland Bank plc*, 96 Civ. 7458, 1997 U.S. Dist. LEXIS 10346 (S.D.N.Y. July 17, 1997) ...................................................................9

*Martin v. Dickson*, 100 Fed. Appx. 14 (2d Cir. 2004)......................................................44

*Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465 (S.D.N.Y. 2001) ..................11, passim

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)................................................................................................ 12, passim

*Medinol, Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575 (S.D.N.Y. 2004)..............40

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litigation*, 289 F. Supp. 2d 429 (S.D.N.Y. 2003) ..................................................................................31, 43

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993)...........................................34

*Monsanto v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984) ............................................15

*Moviecolor Ltd. v. Eastman Kodak Co.*, 288 F.2d 80 (2d Cir. 1961)................................31

*Naso v. Park*, 850 F. Supp. 264 (S.D.N.Y. 1994) ................................................. 11, passim

*Nay v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 05 Civ. 10264, 2006 U.S. Dist. LEXIS 52074 (S.D.N.Y. July 25, 2006) ..........................................................43

*Papason v. Allain*, 478 U.S. 265 (1986) .........................................................................8, 16

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002) .....................................21, 27

*Prince v. Madison Square Garden*, 427 F. Supp. 2d 372 (S.D.N.Y. 2006)...................8, 42

*Rose v. Goldman, Sachs & Co., Inc.*, 163 F. Supp. 2d 238 (S.D.N.Y. 2001)................8, 42

*Rozsa v. May Davis Group, Inc.*, 187 F. Supp. 2d 123 (S.D.N.Y. 2002) ............................9

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) ................................34, 35

*Soc'y for the Advancement of Educ., Inc. v. Gannett Co., Inc.*, 98 Civ. 2135, 1999 U.S. Dist. LEXIS 700 (S.D.N.Y. Jan. 21, 1999)..........................................................39

*Solow v. Stone*, 994 F. Supp. 173 (S.D.N.Y. 1998) ...........................................................30

*Stolow v. Greg Manning Auctions, Inc.*, 258 F. Supp. 3d 236 (S.D.N.Y. 2003) ..............28

*Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90 (2d Cir. 1998)..........................27

*United States v. Connecticut National Bank*, 418 U.S. 656 (1974) ...................................23

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) ............................21

*In re Visa Check/Mastermoney Antitrust Litigation*, No. 96 CV 5238, 2003 WL 1712567 (E.D.N.Y. Apr. 1, 2003)...................................................................................26

*Vitale v. Marlborough Gallery*, No. 93 Civ. 6276, 1994 WL 654494 (S.D.N.Y. 1994) .................................................................................................................................28

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55 (2d Cir. 1988) ................................................................................................24

*W.S.A., Inc. v. ACA Corp. & Westchester Fire Insurance Co.*, 94 Civ. 1868, 1996 U.S. Dist. LEXIS 14198 (S.D.N.Y. Sept. 27, 1996)....................................................41

*Wexner v. First Manhattan Co.*, 902 F.2d 169 (2d Cir. 1990)....................................36, 37

*Wolf v. Wagner Spray Tech Corp.*, 715 F. Supp. 504 (S.D.N.Y. 1989) ......................28–30

*Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co.*, No. 00 CIV. 5663, 2001 WL 1468168 (S.D.N.Y. Nov. 19, 2001)................................................. 11, passim

## STATE CASES

*Canster v. J.A. Jones Construction Co.*, 212 A.D.2d 452 (1st Dep't 1995)......................41

*In re Determination of Legal Fees Payable by the Estate of Andy Warhol*, 1994 N.Y. Misc. LEXIS 687 (Surr. Ct. N.Y. County 1994)................................................2, 5

*Lariviere v. Thaw*, Index. No. 100627/99, 2000 WL 33965732 (Sup. Ct. N.Y. County June 26, 2000) ................................................................................. 4, passim

*Newsday, Inc. v. Fantastic Mind, Inc.*, 237 A.D.2d 497 (2d Dep't 1997).........................21

*Rocanova v. Equitable Life Assurance Soc'y of the United States*, 83 N.Y.2d 603 (1994)..............................................................................................................39

*Seltzer v. Morton*, 154 P.3d 561 (Mont. 2007) ............................................................29, 41

*Skluth v. United Merchandise & Manufacturers, Inc.*, 163 A.D.2d 104 (1st Dep't 1990) ................................................................................................................39

*Watts v. Clark Associate Funeral Home, Inc.*, 234 A.D.2d 538 (2d Dep't 1996)..............21

## FEDERAL STATUTES

Fed. R. Civ. Pro. 9(b) .................................................................................. 9, passim

Fed. R. Civ. Pro. 12(b)(6) ........................................................................... 1, passim

15 U.S.C. § 2 ...............................................................................................26

15 U.S.C. § 15(b) ....................................................................................28, 31

15 U.S.C. § 1125(a)(1)................................................................................32

26 U.S.C. § 6104(d) ..........................................................................................10

**STATE STATUTES**

N.Y. Gen. Bus. Law § 340.............................................................................21, 28

**OTHER**

1 *Andy Warhol Catalogue Raisonné: Paintings and Sculpture 1961–1963* (Georg
    Frei & Neil Printz, eds., 2001)......................................................................4

2A–2B *Andy Warhol Catalogue Raisonné: Paintings and Sculpture 1964–1969*
    (Georg Frei & Neil Printz, eds., Sally King-Nero, exec. ed., 2004)...............4

The Andy Warhol Foundation for the Visual Arts, Inc.,
    http://www.warholfoundation.org....................................................................4

*Andy Warhol Prints: A Catalogue Raisonné 1962–1987* (Frayda Feldman & Jorg
    Schellman eds., 4th ed. 2003) (revised and expanded by Frayda Feldman and
    Claudia Defendi) ...........................................................................................4

Calder Foundation, http://www.calder.org .........................................................4

Jessica L. Darraby, *Art, Artifact & Architecture Law* § 2.13[1] ........................3

Benjamin Genocchio, *Scam Artists*, N.Y. TIMES, May 27, 2007 .......................7

*Jackson Pollock Catalogue Raisonne of Paintings, Drawings, and Other Works:
    Supplement No. 1* (Francis V. O'Connor, ed., 1995)....................................12

Randy Kennedy, *David Whitney, 66, Renowned Art Collector*, N.Y. TIMES, June
    14, 2005........................................................................................................5

The Noguchi Museum, http://www.noguchi.org .................................................4

Roy Lichtenstein Foundation, http://www.lichtensteinfoundation.org.................4

Samuel Sachs II, *Right or Wrong, Real or Fake: Who Cares?*, 8 IFAR
    (International Foundation for Art Research) Journal Nos. 3 & 4 (2006)....................19

Carol Vogel, *A Warhol and Others Break Records in a Vigorous Sale that Itself
    Makes Auction History*, N.Y. TIMES, May 17, 2007 ...................................12

5C Wright & Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed.
    2004) .............................................................................................................8

Defendants The Andy Warhol Foundation for the Visual Arts, Inc., Vincent Fremont, Vincent Fremont Enterprises, and The Andy Warhol Art Authentication Board, Inc. (collectively "Defendants")[1] submit this memorandum in support of their motion to dismiss the Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state claims upon which relief can be granted.

## INTRODUCTION

This past May, when the U.S. Supreme Court rendered its opinion in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007) ("*Twombly*"), it sent an unmistakable message that speculative and implausible allegations of conspiracy would no longer suffice to impose the burden and expense of discovery on antitrust defendants, even defendants who are "some of the wealthiest corporations in our economy." *Id.* at 1989 (Stevens, dissenting). In this case, a disappointed art collector seeks to bludgeon a *charitable* organization, with the blunt instrument of class action litigation, into coercing a panel of independent art experts to change their opinion concerning the authenticity of his purported Warhol self-portrait. The theory offered up by Plaintiff Joe Simon-Whelan ("Simon") is that the art experts comprising the Andy Warhol Art Authentication Board, Inc. ("the Board"), for no apparent economic benefit to themselves, conspired to refuse to authenticate legitimate Warhol works in order to create an "artificial scarcity" of Warhol art. The purpose of this alleged conspiracy, according to the Complaint, was to inflate the value of Warhol works held by The Andy Warhol Foundation for the Visual Arts, Inc. ("The Foundation"), a non-profit institution which exists to support artistic causes through

---

[1] Fremont is named in the caption as "Successor Executor For the Estate of Andy Warhol," yet the Complaint alleges that no successor executor of the Warhol Estate was named after Fred Hughes' death, Compl. ¶37, and does not allege that Fremont was successor executor. Based on this admission in the Complaint, Fremont should be dismissed from this action in the capacity as successor executor.

cash grants and gifts of artwork. In short, this is a classic case for the rigorous scrutiny of pleadings mandated by the Supreme Court in *Twombly*.

Concerned about the unusually high cost of discovery in antitrust cases, the Supreme Court in *Twombly* held that pleadings must cross a threshold of plausibility before a district court should allow a potentially massive factual controversy to proceed. 127 S.Ct. at 1966–67. Thus, a complaint seeking recovery based upon an alleged antitrust conspiracy must contain "allegations plausibly suggesting (not merely consistent with) agreement." *Id.* at 1959, 1966. It must contain enough factual support to show that the asserted claims are not just "possible" or "conceivable" but actually plausible. *See id.* at 1965–66, 1974; *see also In re Elevator Antitrust Litig.,* 06-CV-3128, 2007 WL 2471805, at *8–9 (2d Cir. Sept. 4, 2007) (citing *Twombly* in granting motion to dismiss claim of antitrust conspiracy, and holding that *Twombly* applies to conspiracy claims asserted under both Sections 1 and 2). In this case, the Complaint fails to show that Simon's central premise of a vast conspiracy to create an "artificial scarcity" of artwork by Andy Warhol is even *possible*, much less plausible.

## FACTS

The Complaint alleges that the late Andy Warhol was "one of the *most prolific* and innovative artists of the 20th century." Compl. ¶1 (emphasis added). At his death, Warhol's estate contained nearly 100,000 works of art. ¶39. In the estate valuation litigation referenced in the Complaint, ¶¶40–43, Surrogate Preminger noted that the estate contained 4,118 paintings, 5,103 drawings, 19,086 prints, and 66,512 photographs. *In re Determination of Legal Fees Payable by the Estate of Andy Warhol,* 1994 N.Y. Misc. LEXIS 687 at *4 (Surr. Ct. N.Y. County 1994). These numbers obviously do not include works sold or given away by Warhol in the 30 years prior to his death in 1987. Indeed, Surrogate Preminger stated that Warhol works were

actively sold by dealers and at auction, including "hundreds of worldwide auction sales of Warhol's art over a twenty year period." *Id.* at *10.

### The Foundation and The Board

The Foundation was formed in 1987 as a not-for-profit corporation shortly after Warhol's death, pursuant to his will, and received hundreds of millions of dollars of Warhol's artwork from his estate. Compl. ¶¶4, 18. The purposes and activities of the Foundation include "to advance the visual arts, including ... the study, creation, preservation, exhibition and public understanding and appreciation thereof."[2]  In fiscal year 1999, the Foundation donated over 3,000 works of art valued at more than $62 million to the Andy Warhol Museum in Pittsburgh. Sesser Decl., Ex. G. The Foundation funds its charitable activities by selling artwork, investing the proceeds, and earning income on its financial investments, as well as through licensing activities. Sesser Decl., Ex. F. (Foundation Form 990-PF for the fiscal year ending April 30, 2006). According to the Complaint, the Foundation has sold over $150 million in Warhol artwork since its formation. Compl. ¶12.

One of the more costly activities of the Foundation is to fund the creation of the Andy Warhol Catalogues Raisonné ("Catalogues Raisonné"), to which the Complaint makes passing references. ¶¶112, 116, 164.[3] A catalogue raisonné of Warhol's prints has been completed (now in its fourth edition), and the catalogue raisonné of Warhol's paintings and sculpture is in

---

[2] Foundation Certificate of Incorporation, attached as Declaration of Gary Sesser (hereafter, "Sesser Decl."), Ex. B. As discussed more fully in the section entitled *Legal Standard*, pp. 9-10, all documents attached to the Sesser Declaration are materials either publicly available or already referenced in the Complaint, and therefore are properly considered upon a Rule 12(b)(6) motion to dismiss.

[3] A catalogue raisonné is a comprehensive listing of all of an artist's known works. *DeWeerth v. Baldinger*, 836 F.2d 103, 112 (2d Cir. 1987), *on remand*, 804 F.Supp. 539, *rev'd on other grounds*, 38 F.3d 1266 (2d Cir. 1994) ("A catalogue raisonné is a definitive listing and accounting of the works of an artist."); *Kirby v. Wildenstein*, 784 F. Supp. 1112, 1113 (S.D.N.Y. 1992) ("A catalogue raisonné is regarded as a definitive catalogue of the works of a particular artist; inclusion of a painting in a catalogue raisonné serves to authenticate the work."); Jessica L. Darraby, *Art, Artifact & Architecture Law* § 2.13[1] ("Endorsement of an object in the catalogue raisonné by a cataloguer indicates that the cataloguer believes the work described to be authentic.").

progress, with the second volume, covering the period from 1964 through 1969, having been published in 2004.[4] The painting and sculpture catalogue raisonné lists thus far 2,110 works by Warhol for the period 1961 through 1969 alone.[5] *See* Sesser Decl., Ex. C, D.

The Board was formed as a not-for-profit entity in 1995. Compl. ¶¶5, 22. Authentication boards are not unusual in the art world; the Complaint acknowledges the existence of "authentication committees of other prestigious artists." ¶¶5, 84. There are authentication boards for famous artists such as Alexander Calder, Jackson Pollock, Roy Lichtenstein, and Isamu Noguchi which have been set up to protect the artist's legacy and assure correct attribution of the artist's work.[6] Along with catalogues raisonné, authentication boards serve the salutary purpose of preventing fakes and forgeries from being passed off as authentic works of the artist, thereby protecting the artistic legacy of the artist as well as the investment of owners of genuine works and the integrity of the marketplace. *See* ¶¶140–43. The Board provides its authentication services for free. *See* Compl., Ex. B.

The allegation in the Complaint that the Warhol Board was populated by "obscure figures in the art world" who did not possess "expertise in the authentication of Warhol Works," ¶¶5, 65, is demonstrably false, as shown by other allegations in the Complaint. For example, the

---

[4] *Andy Warhol Prints: A Catalogue Raisonné 1962–1987* (Frayda Feldman & Jorg Schellman eds., 4th ed. 2003) (revised and expanded by Frayda Feldman and Claudia Defendi); 1 *Andy Warhol Catalogue Raisonné: Paintings and Sculpture 1961–1963* (Georg Frei & Neil Printz eds., 2001); 2A–2B *Andy Warhol Catalogue Raisonné: Paintings and Sculpture 1964–1969* (Georg Frei & Neil Printz eds., Sally King-Nero exec. ed., 2004).

[5] The Foundation's web site features a simple form for owners to submit information about artwork they would like reviewed for possible inclusion in the catalogue raisonné. *See* http://www.warholfoundation.org/catrais.htm.

[6] Similar foundations have established authentication procedures. *See Lariviere v. Thaw*, Index. No. 100627/99, 2000 WL 33965732, *3 (Sup. Ct. N.Y. County June 26, 2000) (discussing Pollock-Krasner Authentication Board); Calder Foundation, http://www.calder.org (noting that Calder Foundation's authentication service has examined 3600 works since 1993); Roy Lichtenstein Foundation, http://www.lichtensteinfoundation.org/frames.htm (stating that Lichtenstein Foundation "hopes to assist the public in the confirmation of correct attribution and provenance of the artist's extensive oeuvre" through the operation of the Lichtenstein Authentication Committee); The Noguchi Museum, http://www.noguchi.org/catalogue_raisonne.html (discussing authentication process for Isamu Noguchi works).

Complaint acknowledges that George Frei, allegedly a founding member of the Board, was editor of the Andy Warhol Catalogue Raisonné project. ¶112. Robert Rosenblum, described in the Complaint as having "no expertise" in the authentication of Warhol Works, ¶65, was described by Surrogate Preminger as a "prominent art historian" who wrote essays for the book prepared as an adjunct to the famous Warhol retrospective held at the Museum of Modern Art in 1989. *In re Determination of Legal Fees Payable by the Estate of Andy Warhol*, 1994 N.Y. Misc. LEXIS 687 at *6–7. Likewise, Board members Sally King Nero and Neil Printz, also described as having "no expertise" in Warhol authentication, Compl. ¶65, are the Executive Editor and an Editor, respectively, of the painting and sculpture catalogue raisonné. Board member David Whitney, also alleged to lack expertise, ¶65, organized the Warhol exhibit at the Whitney Museum of American Art and was a close friend of Warhol.[7]

### Simon and His Work

Simon is a film writer and producer who purchased an alleged Warhol self-portrait from a private dealer for $195,000 in 1989. ¶¶17, 106. Simon's work was "one of several created in or about 1964." ¶¶13, 94. The Complaint alleges "upon information and belief" that this "small series of paintings" was arranged by a person named Richard Ekstract "under Warhol's express authorization." ¶¶94–95.

Prior to formation of the Board in 1995, Fred Hughes, the executor of Warhol's estate, authenticated certain works of art including, apparently, the work ultimately purchased by Simon in 1989. ¶¶102–03. However, in 1990, the estate declined to authenticate another work from this same series submitted by Richard Ekstract. ¶¶107–08. The Complaint also notes that in 1989 Hughes authenticated "Superman Works" which turned out to be fake. ¶¶75–77.

---

[7] Randy Kennedy, *David Whitney, 66, Renowned Art Collector*, N.Y. TIMES, June 14, 2005, obit.

In the course of attempting to sell his work for $2 million in 2001, Simon submitted his work to the Board for authentication. ¶¶115, 118. At that time he signed a submission agreement dated December 21, 2001. ¶118 & Ex. B. The agreement provides that the Board "will endeavor to form an opinion as to the authenticity of the Work as a work created by Andy Warhol." Compl., Ex. B, p.2. It states that upon the conclusion of its analysis, the Board would affix a stamped or written legend to the Work indicating the Board's opinion of the authenticity of the Work or that the Board could form no opinion as to authenticity. Compl., Ex. B, p. 2. In signing the agreement, Simon specifically acknowledged that "forming an opinion as to the authenticity of a work purporting to be by Andy Warhol is often very difficult and will in most cases depend upon subjective criteria which are not capable of proof or certainty, and that the conclusion, if any, reached by the Authentication Board respecting the Work is an opinion only." Compl., Ex. B, pp. 2–3. Having made that acknowledgment, Simon agreed not to sue the Board, its members, or the Foundation based, *inter alia*, on any claim that the opinion expressed by the Board "is not correct." ¶81 & Ex. B, p. 3.

On February 7, 2002, the Board sent a letter to Simon expressing its opinion that his work was not the work of Andy Warhol. ¶120 & Ex. D. In response to this "unexpected rejection" of his work, Simon contacted the assistant secretary to the Board, who informed him that he could re-submit his work if he had additional documentation to support his position. ¶122. Simon resubmitted his work with additional documentation in February 2003. ¶125. Once again, Simon signed an agreement specifically acknowledging the difficulty of opining on the authenticity of works attributed to Warhol and promising not to sue based on his dissatisfaction with the Board's opinion, whatever that opinion might be. ¶185. On July 14, 2003, the Board sent Simon a letter in which it adhered to its initial opinion that his work is not an authentic work

by Warhol. ¶127. Some time thereafter the Board provided Simon with a written explanation for its opinion. ¶129 & Ex. E.

Four years after the Board issued its second opinion, Simon brought this lawsuit, in violation of his "double promise" not to sue.

**The Complaint**

Simon's Complaint purports to state nine causes of action: two claims under federal and state antitrust laws, ¶¶133–61; a Lanham Act claim, ¶¶162–67; two fraud claims, ¶¶168–88; a "punitive damages" claim, ¶¶189–90; a claim for a declaratory judgment that the agreement he twice signed is unenforceable, ¶¶191–96; a claim for breach of contract, ¶¶197–200; and a claim for breach of an implied covenant of good faith and fair dealing, ¶¶201–06. The antitrust claims are predicated on an alleged conspiracy to create an "artificial scarcity" of works by Andy Warhol in order to "inflate the value" of works held by the Foundation. *See, e.g.,* ¶¶9, 11, 26, 35i, 110, 116, 170.

The Complaint is denominated as a class action and Simon purports to represent a class consisting of "all persons who signed submission agreements and submitted Warhol artwork to the Authentication Board." ¶32. This class, as defined, would include, among others, persons who presented *fake* Warhols to the Board[8] and persons whose works were found to be *authentic* in the opinion of the Board (who are the majority and who actually would *benefit* from any alleged conspiracy to inflate the prices of Warhol works). Simon seeks damages in excess of two million dollars plus punitive damages in excess of $20 million, in addition to injunctive and declaratory relief.

---

[8] Presumably Simon is not taking the position that every work presented to the Board in the past twelve years has been an authentic Warhol. The existence of fake Warhols is well documented. *See, e.g.,* Benjamin Genocchio, *Scam Artists,* N.Y. TIMES, May 27, 2007, at sec. 14, p. 11 (describing fake Warhol portrait of Mao included in exhibit of notable forgeries).

## LEGAL STANDARD

While the well-pleaded allegations of the complaint are generally accepted as true on a motion to dismiss under Fed.R.Civ.P. 12(b)(6), courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 127 S.Ct. at 1965 (citing *Papason v. Allain*, 478 U.S. 265, 286 (1986)). "[B]ald assertions and conclusions of law will not suffice" in resisting a motion to dismiss. *Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 344 (2d Cir. 2006). The factual allegations in a complaint must be enough to raise the right to relief above the speculative level. *Twombly*, 127 S.Ct. at 1965, citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004). The complaint must contain something more than a statement of facts that creates a suspicion of a legally cognizable right of action. *Twombly*, 127 S.Ct. at 1965. When the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court. *Id.* at 1966 (citations omitted).

The Complaint in this action alleges facts "upon information and belief" no fewer than 72 times. Allegations may be pled on information and belief only if they are "accompanied by a statement of the facts upon which the belief is founded." *Prince v. Madison Square Garden*, 427 F. Supp. 2d 372, 385 (S.D.N.Y. 2006). If such facts are lacking, the pleadings will be considered conclusory and will not survive a motion to dismiss. *Id.* at 384; *see Rose v. Goldman, Sachs & Co., Inc.*, 163 F. Supp. 2d 238, 242 (S.D.N.Y. 2001) (dismissing allegations based on information and belief where complaint failed to provide supporting facts); *Lovely Peoples Fashion, Inc. v. Magna Fabrics, Inc.*, No. 95 Civ. 8450, 1996 WL 732634, at *5 (S.D.N.Y. Dec. 19, 1996) (same).

Moreover, allegations of fraud in a complaint must be stated with particularity. Fed.R.Civ.P. 9(b). This applies not only to fraud claims but also to any claims alleging a "manipulative scheme." *See In re Crude Oil Commodity Litig.*; No. 06 Civ. 6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007) ("manipulative scheme" sounding in fraud must be pled with the particularity called for in Rule 9(b)).

In evaluating a motion to dismiss, the Court may consider the complaint and any documents that have been attached to or incorporated by reference in the complaint. *Rozsa v. May Davis Group, Inc.*, 187 F. Supp. 2d 123, 128 (S.D.N.Y. 2002); *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 528 (S.D.N.Y. 2007). A court is not required to accept as true "conclusory allegations that are clearly contradicted by documentary evidence incorporated into the pleadings by reference." *Labajo*, 478 F. Supp. 2d at 528; *Barnum v. Millbrook Care Ltd. P'ship*, 850 F. Supp. 1227, 1232–33 (S.D.N.Y. 1994); *Mallon Res. Corp. v. Midland Bank plc*, 96 Civ. 7458, 1997 U.S. Dist. LEXIS 10346, at *9–10 (S.D.N.Y. July 17, 1997). It is well settled that where the allegations of the complaint are contradicted by documents attached to or referenced in the complaint, "the document controls and the court need not accept as true the allegations of the complaint." *Barnum*, 850 F. Supp. at 1232–33; *Mallon Res.*, 1997 U.S. LEXIS 10346 at *9–10.

Finally, a court may take judicial notice pursuant to Rule 201(b) of the Federal Rules of Evidence of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." The public availability of published books, certificates of incorporation, and tax filings of a nonprofit organization is generally known, and the existence of specific published books, certificates of incorporation and tax filings readily verifiable. Thus, this Court may also consider public filings such as the Foundation's publicly

available tax returns in connection with this motion to dismiss. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (court "may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC," especially "where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint"). Like filings with the SEC, the Foundation's federal tax returns are publicly disclosed. *See* 26 U.S.C. § 6104(d).

Furthermore, the Foundation's tax returns for the fiscal years ending April 30, 1998 and April 30, 2006 are cited and relied upon in the Complaint, an independent basis for the Court to consider those documents. *See* Compl. ¶¶55–56.[9]

## ARGUMENT

## POINT ONE

### SIMON'S ANTITRUST CONSPIRACY CLAIMS ARE IMPLAUSIBLE AND MUST BE DISMISSED UNDER THE SUPREME COURT'S DECISION IN *BELL ATLANTIC V. TWOMBLY*

Because the Board owns no Warhol artwork and the Foundation makes no authentication decisions, the premise of the antitrust claims in the Complaint is that the Board and Foundation conspired to restrict the supply of authentic Warhol art, by refusing to authenticate legitimate Warhol art, in order to artificially inflate the price of such art. *See* ¶¶9, 11–12, 26, 35, 110, 116. Although the Complaint alleges a "20-year scheme" of collusion, ¶1, it fails to plausibly allege that there *is* a "scarcity" of Warhol art, artificial or otherwise, which has affected or could affect the prices for such art. Assuming for the sake of argument that there is a relevant market limited to the sale of Warhol art, as alleged in the Complaint, that market would include in excess of

---

[9] In *Twombly*, for example, the Supreme Court held that where "[t]he complaint quoted a reported statement" of defendant Qwest's CEO to suggest that the defendants declined to compete with each other "the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn." *Twombly*, 127 S.Ct. at 1773 n.13.

100,000 works.  ¶39.  The Complaint does not state how many legitimate Warhol works the Board has refused to authenticate, so as to establish that an "artificial scarcity" has been created. It does not even attempt to approximate a number.  Yet it is obvious that literally *tens of thousands* of legitimate works would have to be eliminated from the relevant market in order to create an "artificial scarcity" of the sort alleged in the Complaint.

### 1.    The Complaint Fails to Show that the Alleged Conspiracy Could Possibly Have Inflated the Price of Warhol Works

However aggrieved Simon may feel about the Board's opinion of his work, elimination of his work from an alleged relevant market of over 100,000 Warhol works does not create "an artificial scarcity" or affect prices or competition.  The purpose of the antitrust laws is for "the protection of *competition*, not *competitors*."  *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)) (emphasis in original); *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (same).  To show antitrust injury, Simon must demonstrate "more than individual loss or exclusion" from the market.  *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 480 (S.D.N.Y. 2001); *see Yellow Page Solutions, Inc. v. Bell Atl. Yellow Pages Co.*, No. 00 CIV. 5663, 2001 WL 1468168, at *11 (S.D.N.Y. Nov. 19, 2001) ("[A]n antitrust plaintiff must prove more than harm to its own business or the loss of a competitor.").  Rather, the plaintiff must show that the alleged harm resulted in "a demonstrable impact on the market."  *Mathias*, 152 F. Supp. 2d at 480; *see Yellow Page Solutions*, 2001 WL 1468168, at *11; *Naso v. Park*, 850 F. Supp. 264, 271 (S.D.N.Y. 1994).  The Complaint utterly fails to show that a sufficient *number*

of authentic Warhol works were eliminated from the alleged relevant market by action of the Board such that prices could plausibly be affected.[10]

Not only does the Complaint not allege, or even estimate, the number of works of art the Board has declined to authenticate, it does not allege that the percentage of works rejected by the Board is particularly high, or unusual, or differs materially from the percentage of works rejected by the authentication boards of other artists.[11]    While the Complaint makes conclusory allegations about "inflated prices" of Warhol works, it does not allege that those prices are any different from the prices of works of art by other "deceased famous artists" whose works have not been affected by an alleged 20 year conspiracy to create an artificial scarcity.[12]   In fact, the Complaint admits that the value of works by such artists "regularly ranges into the millions of dollars (or more)."  Compl. ¶138.  The Complaint makes no showing that prices of Warhol art are in any way a function of scarcity.

Where the factual context renders a claim implausible, a plaintiff must present more persuasive proof to support a conspiracy claim than would otherwise be necessary.  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In *Matsushita*, the Supreme Court found it implausible that Japanese television manufacturers had engaged in a longstanding conspiracy to drive competitors from the U.S. market through predatory pricing, given the unlikelihood that they would be able to recoup their losses from below-cost pricing in

---

[10] This deficiency in the Complaint is relevant both to whether the conspiracy alleged is plausible and to whether Simon suffered "antitrust injury" and has standing to assert an antitrust claim.  *See* Point Two, *infra.*

[11] The 1995 supplement to the 1978 Jackson Pollock Catalogue Raisonne authenticated 28 works after reviewing more than 260 submissions, for a rejection rate of nearly 90% of works submitted for review.  *Jackson Pollock Catalogue Raisonné of Paintings, Drawings, and Other Works: Supplement No. 1*, at xiv (Francis V. O'Connor, ed., 1995).

[12] During the same week in May 2007 that a Warhol painting entitled *Green Car Crash* sold for $71 million and another Warhol painting entitled *Lemon Marilyn* sold for $28 million, as noted in the Complaint, ¶2, a work by contemporary artist Mark Rothko sold for $72.84 million, and works by Jasper Johns, Willem de Kooning and others greatly exceeded auction estimates.  Carol Vogel, *A Warhol and Others Break Records in a Vigorous Sale that Itself Makes Auction History*, N.Y. TIMES, May 17, 2007, at B5; *see* Compl. ¶2 (noting Warhol auction prices).

the future. *Id.* Significantly, the Court found that "(t)he alleged conspiracy's failure to achieve its ends in the two decades of its asserted operation is strong evidence that the conspiracy does not in fact exist." *Id.* at 592. Here, the Complaint alleges a relevant market of in excess of 100,000 works at the time of Warhol's death and fails to make any factual showing whatsoever that an "artificial scarcity" of Warhol works has been created in the two decades of the alleged conspiracy's operation.

### 2.    The Allegations in the Complaint Are Inconsistent with a Conspiracy to Inflate the Price of Warhol Works

Many of the factual allegations contained in the Complaint are inconsistent with a conspiracy to create an "artificial scarcity" of Warhol works. For example, the Complaint alleges that the "majority" of works created in outside studios "with little or no supervision by Warhol" were approved by the Board. Compl. ¶72. Approval of works that easily could be disapproved, based on Warhol's lack of involvement, is quite inconsistent with a conspiracy to create an artificial scarcity. Likewise, an allegation that paintings and prints made *after Warhol's death* were authenticated is wholly inconsistent with a conspiracy to create an "artificial scarcity" of Warhol works. ¶69. Citing undated and unspecified newspaper articles from the UK, the Complaint alleges that "some 15% of previously authenticated Warhol Works that were re-submitted have had their judgment of authenticity reversed." ¶131. In other words, 85% of what has to be a very small number of previously authenticated works "re-submitted to the Board" were found to be authentic, in the Board's opinion.

Other allegations in the Complaint are inconsistent with a conspiracy to artificially inflate the value of Warhol works. The Complaint alleges that the Board "bizarrely" retains the right "to reverse its opinion at any time and for no apparent reason." It notes that the purchaser who acquired *Green Car Crash* for $71.7 million in 2007 "risks having the Warhol's 'authenticity'

revoked at any time." ¶¶7–8.  This  allegation would be more consistent with an attempt to *depress* prices than to artificially *inflate* them.  Art collectors and dealers would not buy if the value of their purchases could be eliminated suddenly and for no apparent reason, reducing demand and depressing prices.[13]

To be clear, the issue for purposes of the antitrust conspiracy claims is not whether Simon and his work were disfavored or discriminated against or treated unfairly in some fashion (all of which is denied), but rather whether he was the victim of a 20-year conspiracy to create an *artificial scarcity* of Warhol works for the purpose of *artificially inflating* prices of such works. The Complaint is utterly devoid of the factual showing required by the Supreme Court under *Twombly* to establish that it is plausible that such a conspiracy existed, particularly given the sheer numbers of Warhol works; and to the extent the Complaint has anything specific to say, its allegations are inconsistent with the conspiracy theory alleged.

Furthermore, it is not an answer for Simon to insist that he needs discovery to substantiate his allegation of a vast 20-year conspiracy to create an "artificial scarcity" of Warhol works.  *Twombly* made it absolutely clear that the plausibility standard enunciated by the Supreme Court in *Matsushita* has been brought forward to the pleading stage.  *See Twombly*, 1955 S.Ct. at 1964–68.  The dissent in *Twombly* acknowledged as much.  *Id.* at 1982–83.  A complaint needs more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action" in order to make it to the discovery stage.  *Id.* at 1964–65.  The mere possibility of recovery is not enough to prevent a case from being dismissed for failure to state a

---

[13] Obviously, the sophisticated collector who acquired *Green Car Crash* for $71.7 million was not too concerned that the authenticity of his newly-acquired work could be "revoked" at any time "for no apparent reason" as alleged in the Complaint.  Compl. ¶2.  In fact, both of the works mentioned in the Complaint, *Green Car Crash* and *Lemon Marilyn*, are in the Warhol Catalogue Raisonné (numbers 425 and 255, respectively).  *See* Sesser Decl., Ex. C (Index from catalogue raisonné of Warhol paintings and sculpture).  Inclusion in a catalogue raisonné implicitly authenticates artwork.  *See, e.g., DeWeerth*, 836 F.2d at 112; *Kirby*, 784 F. Supp. at 1113, discussed at n. 3, *supra*.

claim. Rather, a complaint must set forth factual allegations "plausibly suggesting" an entitlement to relief. *Twombly*, 127 S.Ct. at 1966.

There is, of course, no direct evidence of the conspiracy identified in the Complaint. The question, therefore, is whether the *facts* alleged in the Complaint — not the conclusory allegations about "artificial scarcity" and "inflated prices" — are sufficient to plausibly support the conspiracy claims and justify the enormous expense of antitrust discovery.[14] In making that evaluation, it is important to recognize that the range of permissible inferences that can be drawn from ambiguous evidence is limited in an antitrust case. *Matsushita*, 475 U.S. at 588; *Klickads Inc. v. Real Estate Bd. of New York Inc.*, No. 04 Civ. 8042, 2007 WL 2254721, at *3 (S.D.N.Y. Aug. 6, 2007). Conduct which is as consistent with independent action as with illegal conspiracy does not support an inference of conspiracy. *Matsushita*, 475 U.S. at 588 (citing *Monsanto v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984)). A plaintiff needs evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. *Matsushita*, 475 U.S. at 588. Conspiracy claims under the Sherman Act will fail where "the defendants' allegedly conspiratorial actions could equally have been prompted by lawful, independent goals which do not constitute a conspiracy." *Twombly*, 127 S.Ct. at 1971 (quoting *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 256 (S.D.N.Y. 1995)).

### 3. The Complaint Offers No Plausible Motive for the Supposed Conspirators to Engage in the Alleged Conspiracy

A significant obstacle facing Simon's antitrust conspiracy claims is the issue of motive. The absence of a plausible motive to enter into the alleged conspiracy is a telling factor. *See*

---

[14] Even the dissent in *Twombly* recognized that "[p]rivate antitrust litigation can be enormously expensive" and requires special measures to prevent abuse. 127 S.Ct. at 1975. Justice Stevens, in his dissenting opinion, made it clear that if he had been the trial judge in *Twombly* he also "would not have permitted the plaintiffs to engage in massive discovery based solely on the allegations in [the] complaint." 127 S.Ct. at 1986. The factual support for the conspiracy claim in *Twombly* was far beyond anything contained in Simon's complaint in this action.

*Matsushita*, 475 U.S. at 587, 593, 595–97. "Lack of motive bears on the range of permissible conclusions that can be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Id.* at 596–97.

The Complaint suggests no plausible motive for members of the Board to enter into a conspiracy to create an "artificial scarcity" of Warhol art. It does not show that Board members benefit in any way by fraudulently rejecting works of art that they believe to be authentic. It does not allege that Board members are paid more for issuing negative opinions than for positive opinions concerning authenticity. The conclusory allegation that the Board "is completely dominated and controlled by Fremont, and the Foundation," Compl. ¶9, is plainly insufficient to establish a motive for Board members to conspire. Courts "are not bound to accept as true a legal conclusion couched as a factual allegation" on a motion to dismiss. *Twombly*, 127 S.Ct. at 1965, citing *Papason v. Allain*, 478 U.S. 265, 286 (1986).

Thus, the Complaint utterly fails to explain why a distinguished panel of art experts (whose composition has changed over the 12 year period since the Board was formed) would jeopardize their professional reputations and credibility by entering into a conspiracy for no identifiable economic benefit to themselves. The plausibility of an alleged conspiracy to monopolize a market or otherwise restrain trade "turns on the suggestions raised by [defendant's] conduct when viewed in light of common economic experience." *Twombly* at 1971; *see Matsushita*, 475 U.S. at 587 (assessing whether defendants had rational economic motive to engage in alleged conspiracy); *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 278–79 (1968) (same).

Equally senseless is the motive ascribed to the Foundation. According to the Complaint, the Foundation's motives for entering into the alleged conspiracy are "similarly clear" and involve "getting top dollar for the sale of works in its collection to pay for its substantial overhead, *and to provide grants* (as called for in Warhol's will)." Compl. ¶10 (emphasis added). In addition to grants made annually to support artistic causes, it is a matter of public record that the Foundation has donated over $67 million dollars worth of Warhol art to the Andy Warhol Museum in Pittsburgh, in addition to millions of dollars in donations to other museums. Sesser Decl., Ex. G (excerpts of Foundation's 1994–2006 tax returns). With all due deference to Robin Hood, it is implausible, to say the least, for a non-profit to enter into an illegal conspiracy with the objective of inflating the price of works of art it is either giving away or the proceeds of which it is donating to charity. At least in *Twombly* the defendant telecommunications providers had the usual economic motive to maximize profits.

The allegations concerning "financial mismanagement" and "disproportionately high administrative costs relative to most charities" are woefully weak motives to enter into the conspiracy alleged. Compl. ¶¶10, 54–56. These allegations are primarily based on an alleged "high profile investigation" that Simon concedes went nowhere and found no wrongdoing. *Id.*; *see In re Elevator Antitrust Litig.*, 2007 WL 2471805, at 8-9 (*pending antitrust investigations* in Europe held insufficient to raise a plausible inference of conspiracy in the U.S.). Since most charities do not undertake expensive activities such as funding the creation and publication of a multi-volume catalogue raisonné of Warhol works, an allegation that the Foundation's administrative costs are high "relative to most charities" is essentially meaningless and, in any event, hardly furnishes a compelling motive to conspire.[15] The Complaint does not (and cannot)

---

[15] The Complaint also alleges that the Foundation's "substantial financial obligations" motivated the Foundation to engage in this alleged conspiracy. Compl., ¶56. The Complaint refers not to any debts or adverse judgments, but to

allege that the Foundation lacks funds or that Warhol works — unlike those of other "deceased famous artists" — are unable to fetch good prices without the creation of an "artificial scarcity."[16]

Thus, even if the factual allegations in the Complaint demonstrated that it were *possible* to create an "artificial scarcity" in an alleged relevant market of in excess of 100,000 Warhol works — which (as shown above) they do not — the Complaint does not suggest a plausible motive for the Board and the Foundation to conspire to do so.

### 4.    The Complaint Fails to Show That the Activities of the Supposed Conspirators Are Inconsistent with Non-conspiratorial Conduct

The activities condemned in the Complaint are in no way inconsistent with legitimate, independent conduct. Certainly the fact that the Board issued a negative opinion on Simon's work is in no way inconsistent with independent conduct. Authentication boards, authentication committees and art experts do reject works of art. The fact that Simon's work previously had been authenticated by the estate, as alleged in the Complaint, does not mean that the Board could not have a different opinion. The Complaint alleges that a work from the same series as Simon's was rejected by the estate in 1990. ¶¶107–08. The Complaint also recounts how Hughes, as executor, erroneously authenticated fakes on behalf of the estate. ¶¶76–77. Thus, the suggestion that the alleged "*written acknowledgment by Hughes and Fremont*" establishes the "indisputable authenticity" of Simon's work is really just wishful thinking, contradicted by the allegations of the Complaint itself. ¶36, emphasis in original.

---

the Foundation's expenditures and programs beyond making grants, thereby arguing, in effect, that any such programs or activities provide a "motive" to engage in illegal activity. The tax returns cited in the Complaint demonstrate that the Foundation's expenses include art storage, insurance, the catalogue raisonné, licensing activities, and curatorial staff. *See* Sesser Decl. ¶¶ 7–8 & Ex. E, F.

[16] Awareness and appreciation of Warhol's artwork (and, as a consequence, the value of his art) no doubt have been enhanced by the Foundation's charitable activities, such as its role in establishing and underwriting the Andy Warhol Museum.

Moreover, for all its bombast, the Complaint never explains why the Board's reasons for its opinion about the authenticity of Simon's work are not entirely correct.[17] *See* Compl., Ex. E. These reasons, essentially unrebutted in the Complaint, are facially reflective of thoughtful and informed critical analysis, and entirely consistent with independent, non-conspiratorial conduct by the Board and its members. The fact that the Board does not typically provide reasons for its authentication opinions is also not inconsistent with independent conduct. Publication of reasons and standards can provide a roadmap for the forgers who plague the art world. *Cf.* Samuel Sachs II, *Right or Wrong, Real or Fake: Who Cares?*, 8 IFAR (International Foundation for Art Research) Journal Nos. 3 & 4 (2006) at 6 (discussing catalogues raisonné, and noting that "we must never forget that excessive detail can produce a book that becomes a forger's handbook.").

Likewise, the covenant not to sue and indemnity in the submission agreement, twice signed by Simon, are both reasonable under the circumstances and consistent with the legitimate function of the Board. This case amply demonstrates that a good deal of money may turn on the authenticity opinions of art experts. Recruiting qualified experts to serve on authentication boards for modest compensation would be difficult or impossible if those experts ended up spending their lives in court defending lawsuits brought by disappointed collectors like Simon.[18] By the same token every dollar the Foundation spends defending such lawsuits means less money for the artistic causes Andy Warhol sought to support in his will. Thus, it is not surprising that such contractual provisions have been held enforceable in similar circumstances.[19]

---

[17] The Board's reasons are misquoted in paragraph 129 of the Complaint. Those reasons are accurately set forth in the Board's letter dated May 18, 2004, attached as Exhibit E to the Complaint. A more legible copy is attached as Sesser Decl., Ex. A.

[18] For a good example of abusive litigation filed against an art appraiser based on an authentication opinion, see *Seltzer v. Morton*, 154 P.3d 561 (Mont. 2007), in which the court stated that the lawsuit — intended to coerce an art appraiser to change his negative authentication opinion — amounted to "legal thuggery."

[19] In *Lariviere*, the plaintiff, owner of a painting allegedly painted by Jackson Pollock, sued the Pollock Authentication Board for failing to authenticate the painting. 2000 WL 33965732, at *1. The court dismissed the

Certainly the inclusion of these provisions in the submission agreement is in no way indicative of the conspiracy alleged in the Complaint.

Finally, the antitrust conspiracy theory alleged in the Complaint wholly ignores the Warhol Catalogues Raisonné, which essentially authenticate tens of thousands of Warhol works listed in those volumes, completely without reference to the Board and its authentication procedures. Sesser Decl. ¶¶4–5 & Ex. C, D. The painting and sculpture catalogue raisonné identifies owners for many of the works listed therein, information that would tend to make the market for Warhol works more transparent. *Id.* The print catalogue raisonné identifies approximately 80,000 published prints, and, where known, the printer and publisher, as well as representative examples of unpublished prints. *Id.* This project, financially supported by the Foundation, documents Warhol's prolific career of more than 30 years and is patently inconsistent with a conspiracy to create an "artificial scarcity" of Warhol works.

Because the conspiracy to manufacture an "artificial scarcity" of Warhol works is implausible and defendants' conduct described in the Complaint is fully consistent with lawful, non-conspiratorial conduct, the antitrust claims set forth in the Complaint must be dismissed in accordance with the Supreme Court's decision in *Twombly.*

## POINT TWO

### SIMON HAS INSUFFICIENTLY PLED THE ANTITRUST CLAIMS IN COUNTS ONE AND TWO

### 1.    The Complaint Fails to Sufficiently Allege a Relevant Market

A plaintiff asserting a claim under either section 1 or 2 of the Sherman Act is required to define the relevant product and geographic markets in which competition has been harmed.

---

complaint on the grounds that the submission agreement signed by plaintiff prior to submitting the painting to the Pollock Authentication Board contained a provision in which plaintiff agreed to indemnify the Authentication Board against such claims. *Id.* at *2.

*Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227–29 (2d Cir. 2006); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002); *Mathias*, 152 F. Supp. 2d at 481 (S.D.N.Y. 2001).[20]  The relevant market "is the area of effective competition," *AD/SAT, A Division of Skylight, Inc., v. Assoc. Press*, 181 F.3d 216, 227 (2d Cir. 1999); *See also Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004); *Mathias*, 152 F. Supp. 2d at 480.

A product market "is composed of products that have reasonable interchangeability for the purposes for which they are produced — price, use and qualities considered." *AD/SAT*, 181 F.3d at 227 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956)); *see Geneva Pharm.*, 386 F.3d at 496.  Under the "reasonably interchangeable" standard, products "need not be identical to be part of the same market." *AD/SAT*, 181 F.3d at 227.  Rather, products are considered "reasonably interchangeable where there is sufficient cross-elasticity of demand" such that "consumers would respond to a slight increase in the price of one product by switching to another product." *Id.*; *see Yellow Page Solutions*, 2001 WL 1468168, at *12.

The Complaint mentions no fewer than nine product or service "markets" in the course of 206 paragraphs: the "market for Warhol artwork," Compl. ¶¶1, 4; "the market for contemporary fine art," ¶2; "the authentication of Warhol Works," ¶¶26, 35k, 90, 144; "the market for works of art attributed to Warhol," ¶26; "the offering and sale at auction of Warhol Works," ¶134b; "the offering and sale other than by sale at auction of Warhol Works," ¶134c; "the investment market for Warhol Works," ¶134d, "the fine art market," ¶¶137–42, and the market for "works of fine art by deceased famous artists," ¶147e.  None of these potential markets is sufficiently defined in

---

[20] Count One of the Complaint also alleges a violation of the Donnelly Act.  N.Y. Gen. Bus. Law § 340.  The pleading requirements for a claim of conspiracy to monopolize under the Donnelly Act are the same as those under section 1 of the Sherman Act.  *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 254 (S.D.N.Y. 1995).  For example, a plaintiff must sufficiently allege a relevant market under the Donnelly Act.  *See, e.g., Newsday, Inc. v. Fantastic Mind, Inc.*, 237 A.D.2d 497 (2d Dep't 1997); *Watts v. Clark Assoc. Funeral Home, Inc.*, 234 A.D.2d 538 (2d Dep't 1996).  As discussed herein, the Complaint fails to meet this requirement.

the Complaint as a relevant market for antitrust purposes.    A plaintiff cannot merely assert, without explanation, that a particular product or service constitutes the relevant market:

> [A] complaint in an antitrust case must allege a basis for finding that the product alleged to have been monopolized is in some way unique, that it is a market unto itself.  Plaintiffs must explain why the market they allege is in fact the relevant, economically significant market.
>
> *          *          *
>
> Where a complaint fails to allege facts regarding substitute products, or to allege other pertinent facts relating to cross-elasticity of demand, as the complaint here fails to do, a court may grant a Rule 12(b)(6) motion.

*Yellow Page Solutions*, 2001 WL 1468168, at *12; *see Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F.Supp. 701, 705 (S.D.N.Y. 1997) ("Plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal."); *E & G Gabriel v. Gabriel Bros., Inc.*, No. 93 Civ. 894, 1994 WL 369147, at *3 (S.D.N.Y. July 13, 1994) (same).

The Complaint does not explain *why* the identified markets are relevant markets for antitrust purposes; it does not explain *what* distinguishing characteristics or features of the products or services in question makes them substitutes for each other and not substitutes for other seemingly similar products or services; and it does not even address the cross-elasticity of demand among the various media in which Warhol and other "deceased famous artists" worked, such as paintings, sculptures, prints, photographs, drawings, lithographs, or wall-hangings.  For example, is a Warhol painting reasonably interchangeable with a Warhol print or sculpture?  Or is a Rothko painting a closer substitute?  The conclusory references to various relevant markets in the Complaint fall well short of what is required at the pleading stage in an antitrust case. *See generally Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) ("To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes — analysis of the interchangeability of

6219618.8                                    22

use or the cross-elasticity of demand, and it must be plausible." (citations and internal quotations omitted)).

A geographic market is "the precise geographic boundaries of effective competition," which must be assessed "in order to reach a more informed conclusion on potential harm to the market." *Mathias*, 152 F. Supp. 2d at 481. It has also been described simply as "the geographic area where competition occurs" or "the area to which consumers can practically turn for alternative sources of the product." *Discon Inc. v. NYNEX Corp.*, 86 F. Supp. 2d 154, 160 (W.D.N.Y. 2000). Since the "failure to define a geographic market with precision makes it impossible to assess the potential harm to competition," the mere assertion of a geographic market, without explanation, is insufficient to survive a motion to dismiss. *Mathias*, 152 F. Supp. 2d at 483.

Here, Simon seeks to define the geographic market for Warhol works as New York City and "alternatively" the United States, and "[e]ach of the major cities in the United States, Europe, and elsewhere in the world in which major art auctions are conducted." Compl. ¶135. These allegations of potential geographic markets are unaccompanied by explanation and therefore inadequate. "[P]olitical boundaries, such as state and municipal boundaries, cannot be used artificially to circumscribe a relevant market, because relevant markets are defined in terms of economic realities, not political divisions." *Global Discount*, 960 F.Supp. at 162; *see United States v. Connecticut Nat'l Bank*, 418 U.S. 656, 670–71 (1974) (rejecting attempt to define geographic market in terms of towns, and stating that it is "fair to assume that the area of significant competitive influence" extends across town boundaries).

The failure to properly allege a relevant market is a fatal deficiency which alone requires dismissal of the antitrust claims in the Complaint. *See, e.g., Mathias*, 152 F. Supp. 2d at 481–82;

6219618.8

23

*Yellow Page Solutions*, 2001 WL 1468168, at \*12; *Global Discount*, 960 F.Supp. at 704–05; *E & G Gabriel*, 1994 WL 369147, at \*3.

### 2.     The Complaint Fails to Show that Simon Has Standing to Assert Antitrust Claims

In order to state a claim for a violation of the Sherman Act, a private plaintiff must allege that he or she suffered an "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp.*, 429 U.S. at 489 (emphasis added); *Yellow Page Solutions*, 2001 WL 1468168, at \*11; *Naso*, 850 F. Supp. at 271; *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 66 (2d Cir. 1988); *see Matsushita*, 475 U.S. 584.[21]  The requirement to show antitrust injury "exists independently of the elements of an antitrust violation and becomes itself a pleading requirement." *Mathias*, 152 F. Supp. 2d at 478.

With respect to certain relevant markets mentioned (but not adequately defined) in the Complaint, it is obvious that Simon has no standing to sue.  For example, one relevant market alleged is "the offering and sale at auction of Warhol Works."  Compl. ¶134b.  However, since Simon neither bought his work at auction, ¶106, nor sought to sell it at auction, ¶¶115, 117, he could not have suffered antitrust injury from any conduct affecting that alleged relevant market. Thus he has no standing to sue.

Similarly, Simon has no standing to pursue claims relating to the so-called  market for authentication of the works of Andy Warhol because he has not — and cannot — allege that he has suffered antitrust injury.  Unlike the market for sale of Warhol works, Simon does not purport to be a competitor in the market for authenticating Warhol works.  He does not claim that

---

[21] Likewise, a plaintiff must allege an antitrust injury when proceeding under the Donnelly Act.  *See, e.g., Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir. 1994); *Daniel v. Am. Bd. of Emergency Med.*, 269 F. Supp. 2d 159 (W.D.N.Y. 2003). As discussed herein, the Complaint fails to meet this requirement.

he has been prevented from authenticating Warhol works himself. Nor, as a consumer of authentication services, did Simon pay any anticompetitive "overcharge" for the Board's opinion. "The prototypical example of antitrust injury" is that consumers have had to pay higher prices due to monopolistic conduct by the defendant. *Mathias*, 152 F. Supp. 2d at 478. Here, the Board provides its authentication services for free. *See* Compl., Ex. B.

Simon's "injury" is that the Board provided him with its opinion that his work is not an authentic Warhol. That "injury" in no respect depends on the state of competition in the so-called authentication market. Simon does not allege that he was prevented from getting an opinion from someone else. In fact, he claims that he *has* the opinion from Hughes and, on information and belief, from Fremont. ¶¶36, 99. He also claims that others support his view that his work is authentic. ¶125.

In reality, Simon's claim is that the Board's opinion is necessary to sell his work in the *Warhol market* — regardless of what anyone else thinks about authenticity.[22] Hence, his argument is that authentication by the Board is an "essential facility" to participate in the Warhol market. However, in order to assert a monopolization claim under the "essential facilities" doctrine, the plaintiff must be a competitor of the defendant monopolist whose facility it seeks to employ. *Kramer*, 890 F. Supp. at 257. Here, as stated, Simon is not a competitor in the so-called authentication market (and therefore has no standing to sue), but is merely claiming that he was excluded from the "Warhol market" *by means of* the Board's authentication opinion. Accordingly, his antitrust claims, if any, relate to the "Warhol market" and not to the so-called authentication market.

---

[22] This argument ignores the fact that tens of thousands of Warhol works are implicitly authenticated by their listing in the Warhol Catalogues Raisonné. Owners of such works (including *Green Car Crash* and *Lemon Marilyn*, discussed in paragraphs 2 and 8 of the Complaint) would have no reason to seek Board authentication.

To have standing to assert antitrust claims related to the so-called Warhol Market, Simon would have to establish, among other things, that his work is actually authentic. The owner of a fake Warhol cannot complain that he has been excluded from the Warhol Market. However, since the reasons for the Board's opinion, Compl., Ex. E, are unrebutted in the Complaint, Simon would not have standing to sue, even if his "artificial scarcity" conspiracy theory could pass the plausibility test of *Twombly*.

3.    **The Complaint Fails to Plead Required Elements of Claims Under the Sherman Act and Donnelly Act**

Section 2 of the Sherman Act prohibits monopolization, attempted monopolization and conspiracy to monopolize. 15 U.S.C. § 2. As the Complaint fails to sufficiently plead the necessary elements of any of these claims, Count Two must be dismissed for failure to state a claim on which relief may be granted.

A claim for monopolization under section 2 of the Sherman Act cannot survive a motion to dismiss unless it sufficiently alleges a relevant market and control of that market by the defendants. *See Naso*, 850 F. Supp. at 272 n.6; *see also Yellow Page Solutions*, 2001 WL 1468168, at *12 (stating that if plaintiff has failed to sufficiently allege a relevant market, "it is impossible for the court to determine if the defendants possess monopoly power in the relevant market" (internal quotation marks omitted)). As demonstrated above, Simon has not adequately pled a relevant market.

In order to state a claim for conspiracy to monopolize, a plaintiff must sufficiently allege specific intent  to monopolize, which can be shown through the defendant's own words or inferred from a showing of anticompetitive conduct. *In re Visa Check/Mastermoney Antitrust Litig.*, No. 96 CV 5238, 2003 WL 1712567, at *7 (E.D.N.Y. Apr. 1, 2003); *A&E Prods. Group L.P. v. Accessory Corp.*, No. 00 Civ. 7271, 2001 WL 1568238, at *5 (S.D.N.Y. Dec. 7, 2001);

*see Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 101–02 (2d Cir. 1998). The Complaint does not allege any statements by the Defendants that would suggest an intent to monopolize. Nor do the conclusory allegations of conspiracy contained in the Complaint amount to an adequate showing of anticompetitive conduct from which an intent to monopolize could be inferred. *See Flair Zipper Corp. v. Textron Inc.*, No. 78 Civ. 5643, 1980 WL 1901, at *2 (S.D.N.Y. Sept. 7, 1980) (holding that no inference of specific intent to monopolize arose where plaintiff provided "insufficient evidence of the kind of conduct proscribed by the Sherman Act").

The requirements of sufficiently alleging specific intent to monopolize, defining a relevant market, and demonstrating the defendant's market power are also applicable to claims for attempted monopolization. *See, e.g., AD/SAT*, 181 F.3d at 226; *Mathias*, 152 F. Supp. 2d at 478, 481; *Naso*, 850 F. Supp. at 271–72; *Yellow Page Solutions*, 2001 WL 1468168, at *11–*12. The issue of market power is especially important because "a defendant's market share is the primary indicator of the existence of a dangerous probability of success," without which a claim of attempted monopolization must fail. *AD/SAT*, 181 F.3d at 226; *see also PepsiCo*, 315 F.3d at 105; *Naso*, 850 F.Supp. at 272 n.6. Since Simon has not sufficiently alleged specific intent to monopolize, has not adequately defined the relevant market, and has not demonstrated the Defendants' share of that market, any claim of conspiracy to monopolize must be dismissed.

For each of these claims — monopolization, conspiracy to monopolize, and attempted monopolization under section 2 of the Sherman Act — a plaintiff must also allege that he or she suffered antitrust harm. *Yellow Page Solutions*, 2001 WL 1468168, at *11. As discussed above, Simon has failed to show that he suffered antitrust harm. Any claims arising under section 2 of the Sherman Act should therefore be dismissed.

## POINT THREE

## THE ANTITRUST CLAIMS ARE TIME-BARRED

There is a four-year statute of limitations applicable to claims under the Sherman Act. *See* 15 U.S.C. § 15(b). The statute states that "[a]ny action to enforce any cause of action under sections 15 or 15a of this title shall be forever barred unless commenced within four years after the cause of action accrued." *Id.* A cause of action accrues under the Sherman Act "when a defendant commits an act that injures a plaintiff's business." *Wolf v. Wagner Spray Tech Corp.*, 715 F.Supp. 504, 508 (S.D.N.Y. 1989).[23]

Here, the alleged injury to Simon's business — the elimination of Simon's work from the "Warhol market" — occurred on February 7, 2002, when the Board first issued its opinion concerning the authenticity of that work. Compl. ¶120 & Ex. D. The Complaint alleges that the first rejection by the Board was "designed to remove Plaintiff's competing Warhol from the marketplace." ¶14. Hence the four-year statute of limitations commenced to run on February 7, 2002, and expired well before this action was commenced on or about July 13, 2007. Although this action was commenced within four years after Simon received his *second* negative opinion from the Board, the second rejection is irrelevant for statute of limitations purposes. As the Court found in *Vitale v. Marlborough Gallery*, the statute begins to run upon the initial refusal to authenticate a work of art. Subsequent refusals merely restate the initial decision. No. 93 Civ. 6276, 1994 WL 654494 at *5 & n.6 (S.D.N.Y. 1994).

Simon seeks to circumvent his statute of limitations problem by invoking the "fraudulent concealment" doctrine. *See* Compl. ¶148–51. However, fraudulent concealment must be pled

---

[23] Claims under the Donnelly Act must also be brought within four years after the cause of action has accrued. N.Y. Gen. Bus. L. § 340(5). A cause of action accrues under the Donnelly Act "when a defendant commits an act that injures plaintiff's business in violation of the antitrust statute[]." *Stolow v. Greg Manning Auctions, Inc.*, 258 F. Supp. 3d 236, 251 (S.D.N.Y. 2003).

with particularity under Fed.R.Civ.P. 9(b).  *See Donahue v. Pendleton Woolen Mills, Inc.*, 633 F.Supp. 1423, 1443 (S.D.N.Y. 1986) (rejecting fraudulent concealment claim where plaintiff failed to provide "specific allegations of acts by defendant to conceal the antitrust violation that forms the basis of plaintiffs' antitrust claim").  Here, the Complaint fails to sufficiently allege each of the elements of a fraudulent concealment claim with the particularity required by Rule 9(b).

A plaintiff seeking to toll the statute of limitations based on fraudulent concealment must establish "(1) wrongful concealment of their actions by defendants, (2) failure of the plaintiff to discover the operative acts that are the basis of his cause of action within the limitations period and (3) plaintiff's due diligence until discovery of the facts." *Wolf*, 715 F.Supp. at 508.  The burden of establishing these elements rests upon the party seeking to toll the statute of limitations.  *Id.*; *Donahue*, 633 F.Supp. at 1443.  Simon has completely failed to meet this burden.

Simon bases his claim of fraudulent concealment on vague and unsupported allegations of "secret meetings," "surreptitious communications," "separate files" and their "concealment," the alleged "policy of never explaining the reasons for [the Board's] rejection of competing Warhol Works," the requirement that those submitting artwork to the Board for evaluation "sign a non-negotiable Submission Form with a sweeping In Terrorem Clause," and false representations by unnamed defendants to the effect that "the Foundation would consider any evidence that Plaintiff submitted in support of Double Denied's authenticity," that the Board "is a non-for-profit corporation that is completely independent of the Foundation" and that "the Foundation is not motivated by profit."  Compl. ¶150.

The Complaint provides no information whatsoever with regard to the alleged secret meetings, communications and files. There is no suggestion as to which defendants were involved, when the alleged meetings and communications took place, what the subject of those conversations were, or what information might be concealed in the allegedly secret files. These allegations are clearly not pled with the specificity required by Rule 9(b) of the Federal Rules of Civil Procedure. The terms of the submission agreement, including the fact that it is not the usual practice of the Board to provide reasons for a denial, were known to Simon as of December 20, 2001, when Simon submitted his work to the Board and signed the submission agreement, because samples of the types of opinion letters the Board typically issues are attached to that submission agreement. Compl., Ex. B. No claim of fraudulent concealment can survive where the plaintiff was aware of the facts on which his cause of action rests. *Wolf*, 715 F.Supp. at 508. Finally, the various "false representations" alleged to have been made are not attributed to any specific defendants and no information is provided as to when those representations may have been made. Nor is there any showing that such representations, if made, were in fact false. Again, such cursory allegations are not pled with specificity and therefore do not meet the standard set forth in Rule 9(b). *Donahue*, 633 F.Supp. at 1443.

Simon also fails to identify which of the Defendants' alleged acts underlying his cause of action he failed to discover until after the statute of limitations had run. Nor does he state when such allegedly fraudulently concealed information came to light. He simply alleges that the Defendants "fraudulently concealed their continuing unlawful combination and conspiracy from Plaintiff and Class members." Compl. ¶149. Such a "naked assertion" of fraudulent concealment is not sufficient to satisfy Rule 9(b). *Solow v. Stone*, 994 F. Supp. 173, 182 (S.D.N.Y. 1998). Rather, the plaintiff "must make 'distinct averments as to the time when the

fraud, mistake, concealment, or misrepresentation was discovered, and what the discovery is, so that the court may clearly see, whether, by the exercise of ordinary diligence, the discovery might not have been before made.'" *Armstrong v. McAlpin*, 699 F.2d 79, 89 (2d Cir. 1983) (quoting *Moviecolor Ltd. v. Eastman Kodak Co.*, 288 F.2d 80, 88 (2d Cir. 1961)). A court will not toll the statute of limitations simply because a defendant failed to reveal purportedly illegal conduct to the plaintiff. *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 433 (S.D.N.Y. 2003). Thus, Simon's antitrust claims are barred by the four-year statute of limitations. 15 U.S.C. § 15(b).

## POINT FOUR

### THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE LANHAM ACT

Count Three of the Complaint claims that Defendants have "falsely advertised and publicized that Double Denied is not a Warhol work" by: (1) stamping "Denied" on the back of the work after each time Simon submitted the work to the Board for authentication and the Board determined that the work was inauthentic; (2) excluding his work from the most recent publication of the Warhol Catalogue Raisonné in 2002; and (3) "failing to withdraw and counteract the adverse information that defendants themselves disseminated to the marketplace." Compl. ¶¶163–65. These Lanham Act claims must be dismissed because the statements allegedly made by Defendants clearly are not statements of fact made for the purpose of commercial advertising or promotion.

Under § 1125(a)(1) of the Lanham Act, a person is liable in a civil action for using in commerce "any word, term, name symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact" in connection with any goods or services, which

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

15 U.S.C. § 1125(a)(1). In order to have standing to bring an action under this Section, a plaintiff must be likely to be damaged by the false or misleading descriptions, designation of origin or representations of fact made by defendant about the goods or services in question. *Id.*

To sustain a Lanham Act claim in a case involving the authentication of artwork, the owner must prove that the statements made by the defendant declaring the artwork to be inauthentic are false and either were made "in commercial advertising or promotion" or are likely to cause confusion as to the origin of the artwork. *Boule v. Hutton*, 328 F.3d 84, 90–91 (2d Cir. 2003). Under the test adopted by the Second Circuit, a statement is considered "commercial advertising or promotion" only if the statement is commercial speech made for the purpose of influencing consumers to buy the defendant's goods or services and the statements are sufficiently disseminated to the relevant purchasing public. *Id.*; *Galerie Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004). Opinions solicited from art experts as well as statements in public interest articles and documentaries have been found by the Second Circuit not to be commercial advertising or commercial promotion. *See, e.g., Galerie Gmurzynska*, 355 F.3d at 210; *Boule*, 328 F.3d at 91–92. Moreover, the Second Circuit has stated that a plaintiff, to show that the defendant's statements denying the authenticity of the artwork are false, must establish that the artwork in question is authentic. *Id.*

The Complaint does not allege that the statements made by Defendants are statements or representations of fact made for the purpose of commercial advertising or promotion.[24]  The "statements" made by the Board concerning the authenticity of Simon's work were expressly stated to be the Board's *opinion* and not statements or representations of fact.  The Submission Agreement twice signed by Simon clearly states that the decision of the Board as to the authenticity of the work of art submitted is merely the Board's "opinion."  The letter sent by the Board to the owners of the artwork submitted after the Board has completed its review (including Simon) clearly states in bold face type that "THE FOREGOING IS MERELY AN OPINION BASED UPON INSPECTION OF THE WORK AND CIRCUMSTANCES KNOWN TO THE AUTHENTICATION BOARD AT THIS TIME, AND IS NOT A WARRANTY OF ANY KIND."  Compl., Ex. B.  Even Simon refers to the Board's statements of inauthenticity as "the Authentication Board's opinion."  ¶¶5, 7.  This opinion is not commercial advertising or commercial promotion because it was not made for the purpose of "influencing consumers to buy defendant's goods or services."  *Galerie Gmurzynska*, 355 F.3d at 208–09 (finding that the opinions of the art experts were not "commercial advertising or promotion" because they were neither solicited by Hutton nor for the purpose of creating business for Hutton Galleries).  The Board does not sell works of art; it merely examines those works upon request to render an opinion, if possible, concerning authenticity.

Because the Complaint fails to allege facts which, if true, establish that Defendant's statements are statements or representations of fact made for the purpose of commercial advertising or commercial promotion, the Court should dismiss Simon's Lanham Act claims.

---

[24] Although the Lanham Act allegations are made against all Defendants, most of the statements referred to were really only attributable to one of the defendants — the Board. Compl. ¶163.

## POINT FIVE

### THE FRAUD AND ANTITRUST CLAIMS
### ARE NOT PLED WITH PARTICULARITY
### AS REQUIRED BY FED. R. CIV. P. 9(B)

Simon's fraud claims on behalf of the alleged class (Count Four), Compl. ¶¶168–74, and on behalf of Simon as an individual (Count Five), ¶¶175–88, must be dismissed for failure to plead fraud with particularity. Similarly, because Simon's antitrust claims in Count One and Two are alleged to be based on a "fraudulent and manipulative scheme," ¶9, those also must meet the particularity requirement of Fed.R.Civ.P. 9(b). *See In re Crude Oil Commodity Litig.*; 2007 WL 1946553 ("manipulative scheme" sounding in fraud must be pled with the particularity called for in Rule 9(b)). Because the antitrust claims are based on the same allegations of fraud as the common law fraud claims, the antitrust claims must also be pled with particularity. Since they are not, they must be dismissed.

A cause of action for fraud must allege (1) misrepresentation of an existing material fact, (2) known to be untrue by the offending party, and (3) made with intent to deceive and for the purpose of inducing the other party to act upon it. *Inn Chu Trading Co., Ltd. v. Sara Lee Corp.*, 810 F. Supp. 501, 506 (S.D.N.Y. 1992). These elements must be pleaded with particularity. Fed. R. Civ. Pro. 9(b).

A complaint alleging fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128–29 (2d Cir. 1994) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)) (noting plaintiffs' technique, in contrast, is "to couple a factual statement with a conclusory allegation of fraudulent intent."). A plaintiff must provide "adequate circumstantial evidence to indicate conscious misconduct." *Shields*, 25 F.3d at 1130.

The purposes of the particularity requirement are to provide defendants with notice, to safeguard a defendant's reputation from unfounded fraud allegations, and to protect defendants from strike suits. *Shields*, 25 F.3d at 1130. Thus, "[o]n certain subjects understood to raise a high risk of abusive litigation, a plaintiff must state factual allegations with greater particularity than Rule 8 requires." *Twombly*, 127 S.Ct. at 1973 n.14. These rationales fully apply to the Complaint in this case, which alleges — with no direct or plausible circumstantial evidence — that the Defendants have joined together in a two decades long conspiracy to defraud the worldwide art market and that Defendants' conduct is "criminal." Compl. ¶188.

To the extent that the allegations of the Complaint do not state specifically when or where various alleged statements or material omissions were made, or by whom or to whom they were made, or set forth any of circumstances with respect to such statements, they are not sufficiently particularized and cannot form the basis for a fraud action. Fed. R. Civ. Pro. 9(b). For example, Simon alleges:

- "Plaintiff advised a prospective buyer of Double Denied of Frei's statements concerning the painting's importance. Upon information and belief, however, when this prospective buyer contacted Frei, he advised the buyer to submit the painting to the Authentication Board." Compl. ¶117.

- "In July 2001, Fremont . . . personally intervened and interfered with Plaintiff's sale." ¶176.

- Fremont "sought to cause" Simon to submit his work to the Board "knowing full well" the history of his work and that it was from the same series as the work submitted by Richard Ekstract "that Fremont had personally rejected." ¶177.

- "[D]uring this same period, Fremont had conversations with other persons" in an effort to have Simon submit his work to the Board. ¶179.

- Fremont "lied to certain third parties, claiming that Double Denied might have been stolen in Germany." ¶181.

These allegations do not state with any particularity what was said. They do not state when the alleged statements were allegedly made. Except for the statements to Simon, they do

not state to whom the statements were made. Nor do Simon's allegations state where or how these alleged statements were made. None of the above allegations satisfies Rule 9(b).

Moreover, pleadings alleging fraud generally may not be based on information and belief. *See Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990) (affirming dismissal of complaint "pleaded largely on information and belief"). There is an exception when facts are exclusively within the defendant's knowledge, but even then the "allegations must be accompanied by a statement of the facts upon which the belief is founded." *Inn Chu Trading Co.*, 810 F. Supp. at 507 (finding allegations of representations failed to satisfy Rule 9(b) because they "do not provide a viable basis" for the claim that the defendant intended to induce the plaintiff to provide financing). A plaintiff "must adduce *specific facts supporting a strong inference of fraud* or it will not satisfy even a relaxed pleading standard." *Wexner*, 902 F.2d at 172 (emphasis supplied). "Mere suspicions that a fraud may have occurred are not sufficient." *Inn Chu Trading Co.*, 810 F. Supp. at 507.

Simon argues that because the Defendants failed to "disclose" an alleged conspiracy, numerous otherwise unremarkable statements by individuals associated with the Foundation and the Board constitute material omissions, and are therefore fraudulent. Such bootstrapping does not satisfy Rule 9(b) — to allow any statement to be considered a material misstatement solely because it does not disclose an alleged fraud would effectively nullify Rule 9(b). In *Wexner*, the Second Circuit evaluated a customer's allegations that a securities firm had sold a large block of the customer's securities at too low a price and that various representations were part of a "cover-up."

> Wexner claims that the defendants made the misrepresentations in an attempt to
> cover-up their fraudulent conduct. There is no question that Wexner has
> adequately identified the statements alleged to be misrepresentations ... The
> amended complaint nonetheless fails to allege circumstances that give rise to a

> strong inference that the defendants knew the statements to be false ... Clearly, an inference that the defendants knew their statements to be false cannot be based on allegations which are themselves speculative.

902 F.2d at 174. (internal citations omitted). Here, Simon argues that the covenant not to sue is part of a cover-up, but alleges no facts in support of the underlying misconduct. As in *Wexner*, such an allegation does not satisfy Rule 9(b). Specifically, the court in *Wexner* noted that the fact that "sellers of large blocks of stock command less than the quoted market price is not a sufficient factual basis from which an inference of fraud can be drawn" especially when "First Manhattan disclosed this information to her prior to the transaction." *Id.* at 173.

Simon relies upon an alleged conflict of interest due to the connection between the Board and the Foundation, the Foundation's ownership and sale of works by Warhol, and Fremont's role as an agent in such sales. However, these facts have long been in the public domain. The Board is described on the Foundation's web site, making the association between the two entities clear (although the Board's decision-making process is wholly independent). The Foundation's sales of artwork and fees paid to Fremont and other sales agents representing the Foundation are disclosed on the tax returns for the Foundation, which are public documents readily accessible.[25] Significantly, Simon does not allege that Defendants failed to disclose these business relationships. As such, none of the allegations about the fully disclosed business relationships among Defendants can serve as the factual basis from which an inference of fraud may be drawn.

Finally, because the antitrust claims in Counts One and Two of the Complaint are allegedly based on a "20-year scheme of fraud," Compl. ¶1, but do not meet the particularity requirements of Rule 9(b), they also must be dismissed. As the Southern District has recently

---

[25] *See* Foundation Center, http://foundationcenter.org/findfunders/990finder/ (federal tax returns for private foundations).

clarified, a "manipulative scheme" sounding in fraud must be pled with the particularity called for in Rule 9(b). *In re Crude Oil Commodity Litig.*, 2007 WL 1946553 at *4–5.

The plaintiff in *Crude Oil* alleged that the defendants were part of a "market manipulation" conspiracy to raise the price of crude oil trading in a particular commodities futures market. *Id.* Although the plaintiff apparently tried to avoid using the word "fraud" in the complaint, the court held that the alleged manipulative scheme sounded in fraud and therefore had to be pled with the particularity required under Rule 9(b). *Id.* The court's holding rested on the fact that the alleged scheme purportedly involved efforts to conceal relevant facts and the making of false or misleading statements by the defendants. *Id.* at *5.

Here, the alleged conspiracy to monopolize clearly sounds in fraud. The very first paragraph of the Complaint alleges "*fraud*, collusion and manipulation by, between, and among [D]efendants to control the market in works of art by the late Andy Warhol." Compl. ¶1 (emphasis added). The Complaint also alleges that Fremont and the Foundation "routinely exploit the Board's purported independence to further their *fraudulent* and manipulative scheme . . . to remove competing Warhol artwork from the marketplace by *falsely declaring* it to be inauthentic." ¶9 (emphasis added). The Complaint repeatedly refers to the alleged conspiracy as the "fraudulent and manipulative scheme." ¶¶12, 13, 23–25, 56; *see also* ¶16 (referring to "fraudulent and monopolistic conduct"). Indeed, an entire subheading under Count One, encompassing four paragraphs and numerous subparagraphs, is entitled "Fraudulent Concealment." ¶¶148–51. As such, the claims of fraud underlying the alleged conspiracy must be pled with the specificity called for by Rule 9(b). *In re Crude Oil*, 2007 WL 1946553, at *4–5.

Because the same allegedly fraudulent acts underlying the common law fraud claims in Counts Four and Five of the Complaint also underlie the Sherman Act claims in Counts One and

Two, and those have not been pled with particularity, all four counts must be dismissed for failure to state a claim.

## POINT SIX

### THE COMPLAINT MUST BE DISMISSED BECAUSE SIMON TWICE AGREED IN WRITING NOT TO SUE BASED UPON THE AUTHENTICATION BOARD'S OPINION

It is undisputed that Simon twice agreed in writing not to sue based upon the Board's opinion of the authenticity of his work. Compl. ¶¶118, 125 & Ex. B, p. 3 ("releases, waives, and covenants not to sue").[26] Under New York law, a release or covenant not to sue in an agreement, validly entered into by the parties, is enforceable according to its terms. *Soc'y for the Advancement of Educ., Inc. v. Gannett Co., Inc.*, 98 Civ. 2135, 1999 U.S. Dist. LEXIS 700, at *15 (S.D.N.Y. Jan. 21, 1999); *see Rocanova v. Equitable Life Assurance Soc'y of the United States*, 83 N.Y.2d 603, 616 (1994); *Skluth v. United Merch. & Mfrs., Inc.*, 163 A.D.2d 104, 106 (1st Dep't 1990).

An indemnification agreement has been enforced to preclude a lawsuit in the context of art authentication. In *Lariviere v. Thaw*, the owner of a painting allegedly painted by Jackson Pollock sued the Pollock Authentication Board for failing to authenticate the painting. No. 100627/99, 2000 WL 33965732, at *1 (Sup. Ct. N.Y. County June 26, 2000). The court dismissed the complaint on the grounds that the submission agreement signed by plaintiff prior to submitting the painting to the Pollock Authentication Board contained a provision in which plaintiff agreed "to hold the Authentication Board and its directors and officers in their representative and individual capacities harmless from any liability towards me or others because of rendition of an opinion (or its refusal to render any opinion)." *Id.* at *2. The indemnity

---

[26] Simon's quotation from the submission agreement in paragraph 81 of the Complaint omits the language "releases, waives, and covenants not to sue" contained in Simon's submission agreement.

language in *Lariviere* is quite similar to the indemnity quoted in paragraph 81 of the Complaint. In addition to the indemnity language similar to *Lariviere*, the submission agreement in this case also contains a *release* and a *covenant not to sue*. Compl., Ex. B, p. 3.

Although Simon complains that the submission agreement is a "contract of adhesion" and therefore should not be enforced, the Complaint is completely devoid of any allegation that Simon actually tried to negotiate its terms. Contracts of adhesion, unlike the submission agreement, are typically "standard-form contracts offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis, with no opportunity to change the contract's terms." *Medinol, Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575, 623 (S.D.N.Y. 2004); *see also Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997).

What is clear is that after acknowledging the difficulty of authenticating Warhol works, Simon *induced* the Board to render an opinion by his *express* agreement not to sue based upon any disagreement with the opinion the Board might render.    The submission agreement contained no promise that the Board would authenticate Simon's work — quite the contrary.  It did not promise to set forth reasons for the Board's opinion.  In fact, it attached samples of the form of letter that might be sent, depending on the conclusion reached by the Board.

Furthermore, after the Board's first authentication opinion, Simon, a sophisticated businessman, *again* agreed in writing not to sue.  The Complaint contains no allegation that he objected to this provision.  Clearly he understood the risk that he could receive a negative opinion.  The allegations suggesting that the Board did not act in good faith are flimsy and unsubstantiated, clearly undermined by the reasons provided by the Board, Compl., Ex. E, which in turn are unrebutted by any contrary analysis in the Complaint.

It is obvious that qualified art experts will not serve on authentication boards if they are subjected to lawsuits from disappointed art collectors who often have considerable financial resources as well as an incentive to second-guess their opinions. *See Seltzer v. Morton*, 154 P.3d 561 (Mont. 2007) (lawsuit to coerce art expert to change authentication opinion amounted to "legal thuggery"). Having been warned that rendering an opinion can be difficult and subjective, and having induced the Board to render an opinion by promising not to sue, Simon should not be permitted to pursue this lawsuit in violation of his promise.

## POINT SEVEN

### THE CLAIMS FOR PUNITIVE DAMAGES, BREACH OF IMPLIED COVENANT AND BREACH OF CONTRACT MUST BE DISMISSED

**1.     The Claim for Breach of Implied Covenant of Good Faith and Fair Dealing Is Duplicative of the Breach of Contract Claim and Must Be Dismissed**

"Every court" faced with a complaint brought under New York law alleging both breach of contract and breach of implied covenant of good faith and fair dealing has dismissed the latter claim as duplicative, unless the damages sought for breach of the implied covenant of good faith and fair dealing are not "intrinsically tied to the damages" allegedly resulting from the breach of contract. *W.S.A., Inc. v. ACA Corp. & Westchester Fire Ins. Co.*, 94 Civ. 1868, 1996 U.S. Dist. LEXIS 14198, at \*30–31 (S.D.N.Y. Sept. 27, 1996); *see also Computech Int'l, Inc. v. Compaq Computer Corp.*, 02 Civ. 2628, 2002 U.S. Dist. LEXIS 20307, at \*10–11 (S.D.N.Y. Oct. 28, 2002); *Canster v. J.A. Jones Constr. Co.*, 212 A.D.2d 452, 453 (1st Dep't 1995). Simon alleges in the Complaint that the Board breached the implied covenant of good faith and fair dealing contained in the submission agreement by allegedly prejudging the work as inauthentic prior to examination. Compl. ¶¶ 202–05. This claim is substantially the same as the breach of contract claim and the damages sought for both the breach of implied covenant of good faith and fair

dealing and the breach of contract claims are identical. Compl., Counts 8 & 9. Therefore, the Court should dismiss this claim as duplicative.

### 2. The Claim for Breach of Contract Must Be Dismissed Because the Authentication Board Fully Performed Its Obligations Under the Submission Agreements

The submission agreement signed by Simon both times he submitted his work to the Board, required that the Board "endeavor to form an opinion as to the authenticity of the Work as a work created by Andy Warhol" and deliver to the owner of the work a letter, substantially in the form of one of the letters attached to the submission agreement, following completion of the Board's examination of the work. Compl., Ex. B. It is undisputed that on both occasions Simon submitted the work to the Board, the Board formed an opinion of the work's authenticity, as evidenced by the letter delivered to Simon, substantially in the form of Exhibit B attached to the submission agreement, declaring that, in the Board's opinion, the work is not a genuine work created by Warhol. ¶¶120, 127, Ex. D.

Simon alleges, "upon information and belief," that the Board did not conduct an examination of the work the first time Simon submitted it to the Board and that the Board's opinion after the second submission of the work, again "upon information and belief," was a "foregone conclusion." ¶199. As stated previously, an allegation pled "upon information and belief" is considered conclusory and will not survive a motion to dismiss when it is not accompanied by a statement of the facts upon which the belief is founded. *Prince*, 427 F. Supp. 2d at 384–85; *see Rose*, 163 F. Supp. 2d at 242. These allegations are conclusory and should be disregarded on this motion to dismiss.

In fact, it is Simon, not the Board, who has breached the submission agreement, by bringing the instant lawsuit in violation of the indemnification, release and covenant not to sue

provision. Compl., Ex. B. Because Simon has brought the instant action in direct violation of the release and covenant not to sue, Defendants, in accordance with the clear and unequivocal language of the submission agreement, should be awarded the cost of litigation, including attorneys' fees.

### 3.    The Claim for Punitive Damages Must Be Dismissed

In New York, there is no separate cause of action for punitive damages. *Martin v. Dickson*, 100 Fed. Appx. 14, 16 (2d Cir. 2004); *Action House, Inc. v. Koolik*, 54 F.3d 1009, 1016 (2d Cir. 1995); *Nay v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 05 Civ. 10264 (RMB), 2006 U.S. Dist. LEXIS 52074, at *19 (S.D.N.Y. July 25, 2006). Because the Complaint lists punitive damages as a separate cause of action, the claim for punitive damages must be dismissed. Compl., Count 6.

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that the Complaint must be dismissed, with costs, including reasonable attorneys' fees, awarded to Defendants.

Dated:  New York, New York
          September 14, 2007


CARTER LEDYARD & MILBURN LLP

By:
    Gary D. Sesser
    Ronald D. Spencer
    2 Wall Street
    New York, New York  10005
    (212) 732-3200

    *Attorneys for Defendants The Andy Warhol*
    *Foundation For The Visual Arts, Inc., Vincent*
    *Fremont, Vincent Fremont Enterprises, and The Andy*
    *Warhol Art Authentication Board, Inc.*

 On the brief:
Kenneth S. Levine
Laura A. Reeds
Pamela J. Shelinsky
Judith Wallace