**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

# COPY

JOE SIMON-WHELAN, Individually And On Behalf Of All Others Similarly Situated,

Plaintiff,

-against-

THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC., THE ESTATE OF ANDY WARHOL, VINCENT FREMONT, Individually and Successor Executor For the Estate of Andy Warhol, VINCENT FREMONT ENTERPRISES, THE ANDY WARHOL ART AUTHENTICATION BOARD, INC., JOHN DOES 1-20, JANE DOES 1-10, and RICHARD ROES 1-10,

Defendants.

Case No. 07 Civ 6423 (LTS)

**AMENDED CLASS ACTION COMPLAINT**



RECEIVED
NOV 0 7 2007
U.S.D.C. S.D.N.Y
CASHIERS

**DREIER LLP**
Lee A. Weiss (LW-1130)
Brian C. Kerr (BK-6074)
Andrew Wilmar
499 Park Avenue
New York, New York 10022
212.328.6100

**REDNISS & ASSOCIATES LLC**
Seth Redniss (SR-7988)
185 Franklin Street, 5th Floor
New York, New York 10013
212.334.9200

*Counsel for Plaintiff and the Proposed Class*

# TABLE OF CONTENTS

INTRODUCTION................................................................................................................... 1

PARTIES ............................................................................................................................... 8

FACTUAL ALLEGATIONS................................................................................................ 10

    The Hundreds of Millions of Dollars in Warhol Works Owned by The Estate................ 10

    The Foundation's Serious Mismanagement and Crushing
    Financial Obligations ..................................................................................................... 11

    Defendants' Illegal Procedures for the Authentication of Warhol Works........................ 14

    Defendants' Creation and Use of The Submission Agreement
    To Further Their Scheme ................................................................................................ 19

    The Enforcers of Defendants' Conspiracy....................................................................... 22

    Many Warhol Works Have Been Wrongfully Denied Authentication by Defendants ..... 24

VENUE AND JURISDICTION ............................................................................................ 39

CLASS ACTION ALLEGATIONS....................................................................................... 39

CAUSES OF ACTION ......................................................................................................... 41

RELIEF REQUESTED......................................................................................................... 53

JURY DEMAND .................................................................................................................. 55

i

Plaintiff Joe Simon-Whelan, by his undersigned attorneys, on behalf of himself and the class he seeks to represent, for his Amended Class Action Complaint, makes the following allegations against defendants The Andy Warhol Foundation for the Visual Arts, Inc. (*The Foundation*), The Estate of Andy Warhol (*The Estate*), Vincent Fremont (individually and as successor executor for The Estate), Vincent Fremont Enterprises (*Fremont Enterprises*), The Andy Warhol Art Authentication Board, Inc. (*The Authentication Board* or *The Board*), John Does 1-20, Jane Does 1-10, and Richard Roes 1-10 (collectively, *defendants*), based upon the investigation conducted by and under the supervision of plaintiff and his counsel, which included reviewing information from numerous public sources concerning the subject matter of the claims alleged below – including, among other things, government filings, magazines, books, newspapers and other media reports – in order to sufficiently plead plaintiff's claims. The investigation also included interviewing a significant number of people who are knowledgeable about defendants' conspiracy (including individuals who worked closely with Warhol during the relevant time period). Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after reasonable discovery.

## INTRODUCTION

1.      This action arises out of a 20-year scheme of fraud, collusion and manipulation by, between and among defendants to control the market in works of art by the late Andy Warhol, one of the most prolific and innovative artists of the 20th century. Plaintiff is one of many victims of this conspiracy. He owns a Warhol painting (referred to herein as *Double Denied*), the authenticity of which was denied *twice* by the orchestrators of this conspiracy – *despite having been previously authenticated multiple times by the same individuals*. A reproduction of *Double Denied* is attached hereto as Exhibit A.

2.      Since Warhol's death in 1987, sales of his artwork have dominated the multi-billion dollar market for modern and contemporary art.  For example, in May 2007, a single Warhol silkscreen painting, his 1963 *Green Car Crash*, sold for $71.7 million.  Another Warhol, *Lemon Marilyn*, sold for $28 million on the same day.

3.      Warhol's *factory*-style of art production is well-documented in various books, documentaries, films and art exhibits.  In contrast to many modern and contemporary artists, Warhol viewed himself as the head of a company whose product was art.  In his own words, "making money is art and working is art and good business is the best art."

4.      By the time of his death, Warhol had successfully attained his goal – his "business" had assets in excess of *$500 million*, consisting mostly of artwork he had created in his production facility that, quite appropriately, was named the *Factory*.  At this time, two men, Fred Hughes (the executor of Warhol's Estate, who himself died in 2001) and Vincent Fremont (the alternate executor) controlled these extremely valuable assets.  However, Hughes and Fremont were also in the unique (and conflicted) position of being asked to authenticate other works attributed to Warhol before they would be sold.

5.      Months after Warhol's death, as stipulated in his will, Hughes and Fremont formed The Foundation as a not-for-profit corporation.  The Foundation was to receive hundreds of millions of dollars in Warhol art from The Estate.  Fremont became The Foundation's exclusive sales agent for paintings, determining who could buy a Warhol – and at what price – and commanding a lavish 25% commission on each and every sale (plus substantial expenses).

6.      In the years that followed, Fremont and Hughes were also able to control who could sell a Warhol by authenticating – or by failing to authenticate – works that were submitted to The Foundation for examination.  At all times since its formation, The Foundation has maintained

2

substantial holdings of Warhol artwork from The Estate and exercised tremendous leverage over the market for Warhol artwork by deciding which galleries will get to exhibit, and which dealers will get to sell, works from The Foundation's substantial and valuable collection.

7.      In 1995, The Foundation and Fremont, together with their lawyers, Carter Ledyard & Milburn (*Carter Ledyard*), caused The Authentication Board to be formed – also as a not-for-profit entity. The Authentication Board's stated purpose was to examine works attributed to Warhol and to determine their authenticity. So powerful is the art world's reliance on The Authentication Board's opinion that, in today's art market, *no one* can sell a Warhol if The Board questions its authenticity. As such, The Board wields disproportionate power over the Warhol market.

8.      Yet, since The Authentication Board's formation by The Foundation under the direction of Carter Ledyard, its composition has been controversial. The first two members were Fremont and Georg Frei, two of the world's largest Warhol dealers, who had obvious conflicts of interest. After the ensuing uproar, they were replaced by a series of obscure figures in the art world, many of who are employed by The Foundation itself (i.e., an entity that owns more than $500 million in Warhol artwork). The Board's practices contrast sharply with those of authentication committees of other prestigious artists, which are populated by well-qualified and well-known independent experts.

9.      The Foundation and The Authentication Board, two of the main players in this conspiracy, are not your average non-profit entities. Rather, they provide a façade of non-profit corporate credibility that obscures a deeply corrupt enterprise that enables defendants to reap financial and reputational benefit from Warhol's art and legacy.

10.      One of the principal tools that defendants rely on to further their conspiracy is a non-negotiable submission agreement that anyone who wants to sell a Warhol is forced to sign (the

3

*Submission Agreement*). The Submission Agreement contains a sweeping (and, as described below, unenforceable) indemnity clause that purports to protect not just The Authentication Board and The Foundation, but anyone who has ever acted in any capacity for The Foundation or The Estate, from any and all liability associated with The Board's rulings (including defendant Fremont).

11.    Equally problematic, the agreement gives The Authentication Board the complete discretion to *reverse* its opinion at any time and for no apparent reason – even after it has defaced a painting by physically stamping it ***DENIED*** – which is The Board's equivalent of a scarlet letter. Because no auction house, dealer or collector will purchase a Warhol without The Authentication Board's stamp of approval, owners of Warhol works have no choice but to sign the Submission Agreement and give The Authentication Board a perpetual veto right over its authenticity. In short, the Submission Agreement wrongfully forces owners to forfeit all rights while reserving any and all discretion for The Authentication Board.

12.    This means that anyone who has purchased a Warhol – including the buyer who recently paid $71.7 million for *Green Car Crash* in 2007 – risks having the Warhol's "authenticity" revoked at any time, for any reason.  This risk exists irrespective of any prior judgment of authenticity or listing in the Warhol Catalogue Raisonné, which is published by The Foundation and edited by The Board, and purports to be an authoritative listing of all authentic artwork by Warhol. Even then, buyers may find themselves the target of a coordinated campaign by some of the world's most powerful galleries and dealers to re-submit their purchase to The Authentication Board, which reserves the right under the Submission Agreement to *deface* artwork it rejects with a physical stamp of ***DENIED***.

13.    The Authentication Board was ostensibly created as a not-for-profit corporation that would be independent from The Foundation that funds it.  In reality, however, The Board is

completely dominated and controlled by Fremont and The Foundation, who routinely exploit The Board's purported independence to further their fraudulent and manipulative scheme and for significant personal benefit. Some members and employees of The Authentication Board are paid large salaries by The Foundation for their complicity in the scheme. Others are motivated to turn a blind eye by the prestige they gain from a position on such a high-profile board.

14.     The Authentication Board is utilized to remove competing Warhol artwork from the marketplace by falsely declaring it to be inauthentic, thereby raising the value of The Foundation's own holdings. In many cases (such as the case with *Double Denied*), the manufacturing of artificial scarcity even requires reversing prior judgments of authenticity by Fremont himself, which is when The Authentication Board's purported "independence" proves especially advantageous.

15.     The Foundation's motives are similarly clear. Since its creation, The Foundation has been dogged by charges of financial mismanagement. These charges attracted a high-profile investigation by the New York State Attorney General during the mid-1990s. Though The Foundation eventually settled these charges – after incurring millions in legal fees – it continues to have disproportionately high administrative costs relative to most charities. The Foundation thus depends upon getting top dollar for the sale of works in its collection to pay for its substantial overhead, and to provide grants (as called for in Warhol's will and required by law).

16.     Aside from the increase in value of its own Warhol works generated by artificial scarcity, The Foundation also benefits financially as a result of The Authentication Board's willingness to reverse prior judgments of authenticity. When faced with the choice of buying artwork from an outside dealer or The Foundation, museums and galleries will often opt for the latter as protection against such reversals of judgment by The Authentication Board. Fremont naturally earns a substantial commission on sales of Foundation artwork. Museums, galleries and dealers dare

5

not challenge this arrangement because their ability to have future pieces authenticated, as well as the value of existing Warhol inventory, is dependent on their relationship with the individuals who dominate The Foundation and The Authentication Board.

17.    The effects of this fraudulent and manipulative scheme are easily apparent. Aside from The Authentication Board, which formally authenticates Warhol artwork, the only other arbiter of authenticity is currently The Foundation itself, which publishes the Warhol Catalogue Raisonné. The Foundation and The Authentication Board thus exercise effective veto power over each and every sale of Warhol artwork anywhere in the world. This veto power permits defendants to systematically exclude Warhol artwork from the marketplace – artwork that would otherwise compete with The Foundation's own holdings in auctions and private sales.

18.    The controversial Submission Agreement, which purports to bar any and all lawsuits relating to The Authentication Board's judgments, coupled with The Board's policy of never explaining the reasons for its denials, shield The Board's determinations from scrutiny and liability. As a result, defendants and their co-conspirators are free to abuse the authentication process in pursuit of their naked self interest. In fact, since its creation, The Foundation has sold well over $150 million in Warhol's artwork at artificially inflated prices, while defendant Fremont has personally earned millions in connection with these sales.

19.    These substantial profits have come at the expense of innocent victims like plaintiff, who is merely one in a long line of individuals injured by defendants' fraudulent and manipulative scheme. As set forth below, _Double Denied_, the painting that plaintiff purchased originally for $195,000 in 1989 and ultimately submitted to The Board for authentication, is one of several created in August 1965 at Warhol's direction, through his employee Paul Morrissey, from an acetate personally created and chosen by Warhol. Indeed, plaintiff's painting had been authenticated (prior

6

to his acquisition of the work) on multiple occasions by The Foundation and The Estate – including by Hughes and Fremont themselves – and had passed through several major dealers as well as Christie's, each of whom had carefully vetted the painting's provenance.

20.    Nevertheless, when plaintiff submitted *Double Denied* on December 20, 2001 in preparation for its sale for $2 million, The Authentication Board stamped it ***DENIED*** without any explanation. At the urging of Fremont and The Authentication Board, plaintiff subsequently spent more than a year documenting the painting's origin and history. Yet, when plaintiff submitted his painting a second time in 2003, with the substantial fruits of his research that demonstrated Warhol's personal role in the creation and use of the series that the painting was from, The Authentication Board inexplicably stamped it ***DENIED*** for a second time.

21.    Plaintiff came to realize that both submission processes were a sham. The first was designed to remove plaintiff's competing Warhol from the marketplace by declaring it inauthentic. The second was to insulate The Authentication Board from any liability for its acts by actually inspecting plaintiff's painting – something The Board failed to do during plaintiff's first submission – and by forcing plaintiff to sign a second Submission Agreement with its sweeping (but unenforceable) legal release.

22.    Even prior to the filing of this lawsuit, defendants' conduct has attracted significant media coverage, including a BBC documentary (*Warhol: Denied*) and numerous articles in newspapers and magazines, including VANITY FAIR, TIME MAGAZINE, ARTNEWS and THE ART NEWSPAPER.

23.    Further evidence of defendants' conspiracy was also revealed in the July-August 2007 issue of THE ART NEWSPAPER, which reported that the "secretive Andy Warhol Art Authentication Board may now accept certain Warhol prints as genuine that it has previously rejected." (The

7

Foundation owns thousands of such prints.) Now that defendants have successfully manufactured scarcity in the market for Warhol's artwork, this reversal of standards by The Board allows them to cash in by basically creating new works for buyers hungry for more. Those who buy directly from The Foundation, of course, need not worry about the "provenance" of their purchase.

24.     Plaintiff brings this action on behalf of himself and the class defined herein to end defendants' fraudulent and monopolistic conduct, and to recover the value and reputation of his painting, which rightly is worth millions of dollars.

## PARTIES

25.     Plaintiff Joe Simon-Whelan is a film writer and producer. He is a citizen of the United States, who currently resides in London, England.

26.     Defendant The Andy Warhol Foundation for the Visual Arts, Inc., is a New York corporation with its principal place of business in New York, New York. The Foundation was incorporated as a not-for-profit charitable trust. The Internal Revenue Service treats the Foundation as a "Private Foundation."

27.     Defendant The Estate of Andy Warhol is located in New York, New York. The executor of the Warhol Estate was originally Frederick Hughes. Warhol's will named Vincent Fremont as alternate executor.

28.     Defendant Vincent Fremont, who is named in his individual capacity and also as successor executor for the Estate, is a citizen of the State of New York and resides in New York, New York.

29.     Defendant Fremont Enterprises has its principal place of business at 1 Union Square West, New York, NY 10003.

8

30.    Defendant The Andy Warhol Art Authentication Board, Inc. is a New York corporation, with its principal place of business in New York, New York. The Authentication Board was incorporated as a not-for-profit corporation.

31.    John Does 1-20 are past and present officers, directors and employees of The Foundation who have knowingly participated in, or willfully ignored, the fraudulent and manipulative acts alleged herein. Any such officers, directors and employees so named are citizens of New York State.

32.    Jane Does 1-10 are past and present members of The Authentication Board who have knowingly participated in, or willfully ignored, the fraudulent and manipulative acts alleged herein. Any such members so named are citizens of New York State.

33.    Richard Roes 1-10 are past and present agents of The Foundation and/or The Authentication Board, who have knowingly participated in, or willfully ignored, the fraudulent and manipulative acts alleged herein. Any such members so named are citizens of New York State.

34.    As further described in this Complaint, during the past 20 years, Fremont, The Foundation, The Authentication Board, John Does 1-20, Jane Does 1-10, and Richard Roes 1-10 (collectively, the *Warhol Conspirators*) have combined and conspired to control the market for, and defraud the public with respect to, the authenticity of artwork by the late Andy Warhol.

35.    The Warhol Conspirators have sought to influence, control, and monopolize the market for works of art attributed to Warhol in order to inflate the value of the thousands of works of art left in The Estate that were thereafter transferred to The Foundation.

9

## FACTUAL ALLEGATIONS

### *The Hundreds of Millions of Dollars in Warhol Works Owned by The Estate*

36.    Hughes was the sole executor of The Estate until he died in 2001.  According to Warhol's will, Fremont is the alternate executor of The Estate.

37.    After certain specific bequests, Warhol's will left the remainder (and bulk) of his Estate to The Foundation, which was to be created upon his death.

38.    The Estate originally contained nearly 100,000 works of art by Warhol, including paintings, sculptures, collaborations, drawings, prints and photographs (*Estate Works*).

39.    The value of The Estate was the subject of contentious litigation in the New York County Surrogate's Court between The Estate, executor Hughes, and attorney Ed Hayes, who served as counsel for both The Estate and The Foundation simultaneously.

40.    In the aforementioned proceedings before Surrogate Preminger, The Estate argued that the value of the Estate Works was only $95 million, after applying a so-called "blockage discount," which is typically applied in the case of one-time mass sales of artwork to a single buyer (under the assumption that the value of the collection will decline over time).  Hayes, who was seeking to be awarded compensation by the court for work in connection with The Estate, argued, by contrast, that the Estate Works were worth in excess of $700 million.

41.    The Foundation endorsed The Estate's lower appraisal pursuant to blockage discounts – even though The Foundation's business plan called for controlled sales of the Estate Works *over time,* to maximize their value, rather than a one-time mass sale to a single purchaser at a significant loss.

10

42.    The Foundation endorsed the lower appraisal in order to minimize costs such as estate tax payments and annual charitable contributions, which were calculated as a percentage of the total value of The Estate. As summarized by Hayes:

> Gillies [former President of The Foundation] and the Warhol Foundation . . . have an interest in a lowball appraisal. As a nonprofit organization, the foundation will have to give away an average of 5 percent of the value of the estate *every year*; to do so involves an enormous amount of administrative work, and the more there is that has to be distributed, the more work will be required to give it away. In general, higher valuation would entail greater scrutiny, which Gillies and the foundation, who are busy currying favor with museums to whom they have sold paintings at a substantial discount, do not want.[1]

43.    Ultimately, Surrogate Preminger found that the Estate Works had a fair market value of just under one-half billion dollars (i.e., $489,907,625) prior to application of a blockage discount for estate tax purposes. After applying that discount, Surrogate Preminger determined that the total fair market value of the Estate Works was *$390,979,278*.

### *The Foundation's Serious Mismanagement and Crushing Financial Obligations*

44.    The Foundation was incorporated on May 26, 1987, three months after Warhol's death.

45.    The Foundation received, among other things, virtually all of the nearly one-half-billion dollars of Estate Works.

46.    Pursuant to Warhol's will, the first trustees of The Foundation were Hughes, Fremont and John Warhola (one of Warhol's brothers).

47.    Fremont and Hughes handled all sales of the Estate Works, receiving substantial commissions on each sale. This arrangement proved highly lucrative. In fact, although Hughes was

---

[1] Edward Hayes, MOUTHPIECE 195 (Broadway Books 2006).

officially paid a salary of $70,000 per year, he was nonetheless able to afford $7 million in antiques in 1990 alone.

48.    In or about October 1990, to avoid accusations of a conflict of interest, Fremont had to choose between remaining as a trustee of The Foundation and acting as a sales agent for The Foundation's paintings, drawings and sculptures.

49.    In or about October 1990, Fremont resigned as a trustee of The Foundation.

50.    As a quid pro quo for his resignation, Fremont entered into a five-year contract with The Foundation that made him the exclusive agent for all sales of The Foundation's paintings, drawings and sculptures anywhere in the world, and granting him a commission of 10% on each sale.

51.    In the mid-1990s, the New York State Attorney General launched an investigation into The Foundation's financial administration and practices. Specifically, the NYS Attorney General investigated allegations of waste and financial mismanagement, including excessive salaries paid to The Foundation's employees, and the exorbitant 10% commission paid to Fremont for sales of Estate Works by The Foundation. Formal charges were averted only after an intensive series of negotiations resulting in a deal whereby The Foundation agreed, among other things, to reduce Fremont's commission to six percent. The Foundation reportedly spent millions in legal fees to establish their "innocence."

52.    As of the date of this Amended Complaint, Fremont remains the exclusive sales agent for The Foundation's Warhol paintings and wields enormous influence over the standards and practices that govern the authentication and sale of Warhol works.

53.    The Foundation has sold well in excess of $150 million in Estate Works since appointing Fremont as exclusive sales agent for paintings in December 1990.

54.    In the course of Fremont's exclusive sales agency, The Foundation has paid Fremont in excess of *$10,000,000*.

55.    In addition, according to The Foundation's Form 990 for 2006, filed with the IRS as a tax-exempt organization, The Foundation paid defendant Fremont Enterprises, an entity controlled by Vincent Fremont, compensation of $950,000 in calendar year 2006 alone.

56.    The Foundation has long-suffered from financial mismanagement.  As stated previously, the NYS Attorney General investigated The Foundation's administration and practices in the mid-90s with the cooperation of James McCauley, The Foundation's former controller.  In addition to reducing Fremont's sales commission, The Foundation agreed to implement the following changes (among others) in order to avoid charges: the implementation of new financial controls, including the creation of an audit committee; the hiring of a new chief financial officer; and the introduction of stricter accounting and bookkeeping procedures.  The Foundation was also required open its books to the Attorney General's office for review four times a year.

57.    The Foundation has long struggled to control its administrative costs.  As summarized by Mr. Hayes (former attorney for The Estate):

> Though it once had $25 million in its accounts, the foundation [in 1991] now has just $6 million in cash and securities. And though the foundation, under Gillies's leadership, will spend $7.2 million in administrative costs (including $170,000 worth of furniture for the foundation's offices) in the fiscal year ending in April 1994, it will give away just $1.1 million, an embarrassingly substandard amount; *similar groups routinely spend just eleven cents for every dollar they donate.*[2]

58.    In fiscal 1998, The Foundation reportedly paid out only $2.9 million in grants but had administrative costs of $5.3 million.  According to its IRS Form 990-PF for 2006, The Foundation

---

[2] Edward Hayes, MOUTHPIECE 200 (Broadway Books 2006) (emphasis added).

paid out $8 million in grants and reported administrative expenses of $6 million. As indicated above, the ratio of grants to overhead for most comparable charitable non-profits is closer to ten to one.

59.     The Foundation has paid well over $10 million in legal fees to Carter Ledyard, an equal amount to Fremont in commissions, and a further substantial sum to former President Archibald Gillies in his retirement package. These expenditures far exceed The Foundation's grants to any of the charities that it was originally created to support.

60.     The Foundation depends upon, among other things, the sale of the Estate Works to fund its substantial administrative costs (including salaries) and to pay out grants. The Foundation's poor management and crushing financial obligations have motivated the Foundation to participate in the Warhol Conspirators' fraudulent and manipulative scheme.

### *Defendants' Illegal Procedures for the Authentication of Warhol Works*

61.     During the period between Warhol's death on February 22, 1987 and December 1990, Hughes and Fremont were the only people who authenticated Warhol works on behalf of The Estate and The Foundation.

62.     When Fremont became the exclusive sales agent for The Foundation's painted and drawn Estate Works in December 1990, Fremont ceased having any official role in authenticating Warhol works, though he remains an unofficial "consultant" to The Authentication Board to this day.

63.     In or about January 1995, The Foundation caused the formation of The Authentication Board, which was incorporated on or about January 20, 1995 as a not-for-profit corporation under the laws of the State of New York.

64.     The Authentication Board rates submissions either: "A" for "the work of Andy Warhol," "B" for "not the work of Andy Warhol," or "C" for "not able at this time to form an opinion."

14

65.     Beyond The Board's formal process, the only other way of authenticating Warhol works is currently through The Foundation itself, which informally authenticates Warhol works by inclusion in the Warhol Catalogue Raisonné. The Catalogue Raisonné, which is published by The Foundation, purports to be a comprehensive listing of all authentic Warhol works in existence.

66.     Though ostensibly an independent body, The Authentication Board is completely dominated and controlled by The Foundation.

67.     The Authentication Board is (for all practical purposes) funded by The Foundation, which depends upon the sale of its substantial collection of Estate Works to fund its own operations.

68.     The Authentication Board's offices are located in the same building where The Foundation stores a substantial portion of its collection of Estate Works.

69.     The Foundation and The Authentication Board share the same email address (i.e., "__@warholfoundation.org").

70.     Many of the same people work simultaneously for both The Foundation and The Authentication Board. For example, Claudia Defendi (curator of The Foundation's collection of Estate Works), Sally King Nero (curator of drawings and photography for The Foundation), Neil Prinz (editor of the Catalogue Raisonné, which is published by The Foundation), and Bibi Khan (an assistant curator for The Foundation), all work for The Authentication Board.

71.     The very same outside counsel from Carter Ledyard who represented The Foundation in the valuation proceeding in Surrogate Court, recommended the formation of The Authentication Board and filed the non-profit incorporation papers on its behalf.

72.     Carter Ledyard attorney Ronald D. Spencer, who serves as the public face of The Authentication Board in media interviews, purports to represent The Board, The Foundation and apparently Vincent Fremont – all simultaneously.

15

73.    In or about 1995, Fremont resigned from The Authentication Board to avoid accusations of a conflict of interest, and to create the illusion of The Board's independence from The Estate and The Foundation. Georg Frei of Thomas Ammann Fine Art also resigned from The Board around this same time to prevent accusations of a conflict of interest given his status as a major of dealer of Warhol works.

74.    By 1996, The Authentication Board consisted of four individuals: Neil Printz, Robert Rosenblum, Sally-King Nero and David Whitney. None of these individuals possessed expertise in the authentication of Warhol works and no such experts were even considered at the time.

75.    The Foundation bought the loyalty of The Board members. For example, Rosenblum was paid large fees to write introductions to various Warhol catalogues and given a position at The Foundation. Rosenblum also received a substantial discount on a Warhol self-portrait from 1986 valued at several million dollars – a purchase that would otherwise have been well-beyond his financial means.

76.    Fremont has continued to be a "consultant" to The Authentication Board and has participated in, and influenced decisions ostensibly made by, The Authentication Board.

77.    The Authentication Board modifies its rejection policies for certain favored galleries dealers on good terms with The Foundation and Fremont.

78.    The Authentication Board has authenticated works submitted by these favored dealers, while rejecting works from the same series that were submitted by other less influential dealers.

79.    .For example, Rupert Jasen Smith (Warhol's printer from 1977 to 1987) made hundreds of paintings and thousands of prints *after Warhol's death*. Fremont made a deal with Fred

Dorfman, an influential gallery owner and Smith's executor, to authenticate one-third of these prints in return for Dorfman handing over a third to The Foundation and destroying the other third.

80.    Another example of such selective authentication is described in a 2003 expose of The Authentication Board's activities by VANITY FAIR, entitled "Judging Andy":

> And so charges of favoritism arose, charges which one dealer outside the circle decided to put to the test. He bought a Flower painting in Italy, he says, and paid $120,000 for it – "today it would be worth $500,000" – on the condition that the board approve it. He brought it back to New York and submitted it; it was returned with a B rating. So the dealer showed the painting to a more powerful dealer in New York, one who has frequent dealings with the estate. The second dealer agreed it was real, and offered to become a half-owner of it for $60,000. The painting was then submitted under the second dealer's name.

_It came back an A._[3]

81.    The Foundation punishes those who refuse to cooperate with the Warhol Conspirators' illegal manipulation of the market (i.e., refuses to authenticate their legitimate works).

82.    For example, both the 2003 VANITY FAIR piece and a 2004 article by Kelly Devine Thomas in ART NEWS (entitled "Authenticating Andy") describe the experience of Horst Weber von Beeren, who worked extensively with the aforementioned Rupert Smith, producing thousands of prints for Warhol. As a result of this association, von Beeren had some 300 Warhols in his possession, some of which were "unpublished" prints (i.e., unique), with the remainder being "excess" prints (i.e., left over from limited editions commissioned by dealers from Warhol).

83.    In or about 1996, The Foundation's then-President Archibald Gillies offered von Beeren $100,000 for all 300 of the prints. Mr. von Beeren declined, estimating the value of his Warhol works to be $2.4 million.

---

[3] Michael Shnayerson, "Judging Andy," VANITY FAIR (November 2003).

84.    The Foundation made a second proposal to von Beeren, offering to split the unpublished prints with him if he would turn over all excess prints to The Foundation. Mr. von Beeren again rejected The Foundation's offer after learning that he would still have to submit his unpublished prints to The Authentication Board for approval.

85.    Mr. von Beeren subsequently submitted his prints to The Authentication Board in small batches, sometimes under other dealers' names. The 2004 ART NEWS article summarizes the results of von Beeren's submissions:

> According to letters from the board that were provided to ARTnews, between June 1999 and early 2000, the board approved five of the paintings. Eight months later, it rejected three additional canvases. At the same time, the board approved seven prints and reversed its opinion about the five paintings it had previously approved. When one of the paintings it had reversed its opinion about was exhibited at New York's Tony Shafrazi Gallery in 2001, the authentication board's attorney, Ronald Spencer, sent a letter to Shafrazi alerting him to the fact that the work had been deemed inauthentic.

86.    The Board routinely denies authentication to a certain percentage of Warhols as a matter of course, particularly when one owner submits several paintings from the same series. As described in the 2003 VANITY FAIR article:

> "I bought 14 Warhol's from a major wholesaler," recounts one dealer. "These were 70s silkscreens. I bought and paid for them without written agreement because the works were not only purchased from the Andy Warhol estate but stamped with the Andy Warhol stamp – a circle - and with serial numbers from the estate. I submitted five to the authentication board. Four of the five got an A. But the fifth got a B. Now what do I do about the other nine?"

87.    The Foundation and The Board follow a related policy of purposefully excluding a certain number of works from the Catalogue Raisonné to increase scarcity. For example, Warhol himself states in the original Catalogue Raisonné, which was published in 1970, that some 900 "Flower" paintings were created. By contrast, The Board and The Foundation's version of the Catalogue Raisonné inexplicably recognizes only *half* that number.

18

88.     The Authentication Board has no written standard of what constitutes authentic Warhol artwork. Rather, The Authentication Board has applied various ad hoc definitions for authenticity. The only feature common to these shifting – and often conflicting – criteria is that the interests of defendants or their co-conspirators are always somehow served.

89.     Recently, for example, in or about March 2007, The Board reversed its prior policy of categorically rejecting all unsigned and unnumbered trial prints. The Board implemented this change because of The Foundation's desire (as well as certain favored galleries and dealers) to sell such unsigned and unnumbered trial prints from their own collections. To prevent this influx of Warhol works from disrupting the market, however, The Authentication Board has adopted a policy of limiting submissions to 300 prints at a time.

90.     The Board has further adopted a policy that submissions must be made pursuant to reservations, with The Foundation's favored galleries and dealers receiving first priority. In this way, defendants and their co-conspirators ensure that their own unsigned and unnumbered trial prints are the only ones that can be sold.

### *Defendants' Creation and Use of The Submission Agreement To Further Their Scheme*

91.     Some time after *Double Denied* was first submitted to Hughes for authentication in 1988, and prior to July 1990, The Estate implemented a policy requiring persons seeking authentication of works attributed to Warhol to sign the Submission Agreement, which attempts to limit The Estate's liability for its opinions. Over the years, the Submission Agreement has been used by defendants to hide a multitude of sins.

92.     The Submission Agreement was initially created in response to a fiasco surrounding the authentication of a painting submitted by Robert Miller, a New York art-dealer who had substantial business dealings with The Foundation and The Estate.

19

93.    In the summer of 1989, Miller called upon Hughes to authenticate a Superman collage — purportedly created by Warhol – that was one of 15 works (the *Superman Works*) being offered by a seller for $175,000.

94.    Hughes authenticated the 15 *Superman Works* in *exchange* for one of them. However, Miller subsequently discovered that they were fakes and sought reimbursement from The Estate. The Estate and The Foundation rejected Miller's request.

95.    Miller threatened legal action against The Estate and The Foundation, but opted ultimately not to sue so as to preserve his substantial business relationship with both.

96.    Shortly thereafter, Miller's gallery was awarded a huge showing of Warhol photographs from The Foundation's collection.

97.    Since the time of The Authentication Board's formation in 1995, it has continued The Estate's policy of requiring all persons submitting works for authentication to sign the Submission Agreement, the terms of which are non-negotiable. A copy of the Submission Agreement (as used in 2001) is annexed hereto as Exhibit B.

98.    The Submission Agreement attached as Exhibit B is substantially similar to the form utilized by The Authentication Board at all times since The Board's creation.

99.    The Submission Agreement contains the following coercive indemnity clause (the *In Terrorem Clause*):

> By signing this letter Owner:
>
> (iii)    hereby indemnifies the Authentication Board, the Foundation, the Estate of Andy Warhol (the "Estate"), and all members of and officers, directors, agents, representatives, employees and others at any time acting for the Authentication Board, the Foundation or the Estate (collectively, the "Indemnitees"), and agrees to defend and hold each Indemnitee, based upon any claim or liability asserted (a) by Owner or by any person or entity acquiring the Work, or any interest in the Work from Owner (a "Buyer") or

20

any person or entity from whom Owner or any predecessor in interest acquired the Work which is based directly or indirectly on the legend or endorsement. If any, affixed to the Work, or on any letter herein referred to, or any other action by, the Authentication Board or any other Indemnitee in connection herewith, including without limitation any claim that the opinion expressed therein is not correct, or (b) by any other person to whom Owner or the Buyer has made any statement or representation respecting the authenticity of the Work or any action of the Authentication Board or any other Indemnitee in connection therewith, and hereby agrees to pay or reimburse each Indemnitee for all costs and expenses incurred by the Indemnitee in connection with any such asserted claim or liability, including without limitation the fees and expenses of legal counsel.

100.    The Warhol Conspirators use this sweeping In Terrorem Clause in an attempt to insulate them from liability arising from their misconduct. In fact, the Clause purports to protect not just The Authentication Board and its members and employees, but also The Foundation, The Estate, and "all members of and officers, directors, agents, representatives, employees and others at any time acting for . . . the Foundation or the Estate."

101.    To further conceal defendants' conspiracy, The Authentication Board adopted a policy of never explaining to owners or the public either the reasons for its rejection of works or the requisite level of involvement by Warhol for works to be deemed authentic.

102.    The Authentication Board's policy of refusing to explain the reasons for its rejections contrasts markedly to the practice of other art authentication boards, such as sculptor Alexander Calder's.

103.    To further control the Warhol market on behalf of the Warhol Conspirators, the Submission Agreement explicitly authorizes The Authentication Board to damage submissions by placing a mark on the work that indicates the Board's rejection.

104.    In practice, The Authentication Board physically stamps the word ***DENIED*** prominently in red on the back of Warhols it has unilaterally determined are not authentic (with no

21

stated reason). A copy of the rejection stamp affixed to the back of *Double Denied* is attached hereto as Exhibit C. In the case of *Double Denied*, the ink from this stamp has bled through and is actually visible from the front.

105. To further manipulate and control the Warhol market, the Submission Agreement permits The Authentication Board to change its ruling at any time, for any reason. In fact, owners are obliged to notify any buyers or subsequent owner if The Authentication Board changes its mind about a work it has previously authenticated.

106. The Submission Agreement also permits The Authentication Board to provide copies of rejection letters to third parties, "at the request of persons who the Authentication Board in its discretion determines to have an appropriate interest."

107. Between the Submission Agreement and The Board's policy of never explaining the reasons for its decisions, defendants have carte blanche to base authentication decisions on their own self-interest, which they have repeatedly done.

108. The Submission Agreement was drafted by the same lawyers at Carter Ledyard who currently represent The Foundation, and who previously represented The Estate and Hughes.

109. Carter Ledyard designed and drafted certain provisions in the Submission Agreement in an attempt to insulate The Estate from litigation resulting from its authenticity rulings.

### *The Enforcers of Defendants' Conspiracy*

110. The Warhol Conspirators include many enforcers, most notably Vincent Fremont, who routinely leverages his power as the exclusive agent for The Foundation's substantial collection of paintings to exert control over the market for Warhol works. This influence brings The Foundation business and raises the prices of its own Estate Works.

22

111.    Aside from Fremont, defendants also enforce their control over the market for Warhol works through a select group of powerful galleries and dealers who enjoy a special relationship with Fremont, The Foundation and The Authentication Board.

112.    These elite galleries and dealers enjoy the privilege of buying Warhol works directly from The Foundation at a substantial discount, with Fremont acting as the sales agent. Buyers agree, in return, not to sell the artwork for two years. After this non-competition agreement expires, the works may be resold at a large profit without any fear that The Board will challenge their authenticity.

113.    Defendants are able to manipulate the supply of Warhol works in the market to their financial advantage by carefully timing these transactions with favored galleries and dealers.

114.    As described by Richard Polsky in his book *I Bought Andy Warhol*, these favored galleries and dealers blackball those who break the non-competition agreement by selling within two years of purchase.

115.    Defendants further enforce their power to compel formal and informal authentication of Warhol works, through (among other things) the efforts of John Does 1-20, Jane Does 1-10 and Richard Roes 1-10, who patrol the art world on behalf of the Warhol Conspirators.

116.    These enforcers do not simply wait for people to submit works for authentication. Rather, they target known Warhol owners in an attempt to get them to submit works that have even been previously authenticated by Fremont and/or Hughes on behalf of The Foundation and/or The Estate.

117.    When, for example, the Warhol Conspirators learn that an auction house, gallery or dealer has a work that has not been submitted, its enforcers "recommend" by telephone, letter or in person, that the work be submitted.

23

118.    The Warhol Conspirators are well-aware that The Authentication Board will ostracize any auction house, gallery or dealer that does not submit a work at their request, further cementing The Board's stranglehold on formal authentication.

119.    The Warhol Conspirators will even go so far as to contact owners of competing Warhols that have previously been authenticated, attempting to lure them into submitting their works for re-authentication when denial is a foregone conclusion. As described in the above-cited 2003 VANITY FAIR exposé:

> One well-known New York dealer recounts getting an unsolicited letter recently from the authentication board about a Warhol painting the dealer had bought in the 1980s and kept in her personal collection. The letter advised that the painting had been overlooked in the first volume of the catalogue raisonné. "However, if I wanted to resubmit, I was welcome to do that," the dealer recounts. "The next thing I knew, the painting was stamped DENIED on top of Fred Hughes authentication!

### *Many Warhol Works Have Been Wrongfully Denied Authentication by Defendants*

120.    As set forth above, *Double Denied* is a Warhol self-portrait created in or about 1965 that was "DENIED" twice by The Board, despite its indisputable authenticity – including *written acknowledgment by Hughes and Fremont,* as detailed herein. *Double Denied* is silkscreen ink on synthetic polymer paint on canvas measuring 24″ by 20″. *Double Denied* bears the stamped signature of Andy Warhol twice on the upper right edge, and once on the lower left edge. The left edge also bears the following certification of authenticity, which was written and signed by Hughes: "I certify that this is an original painting by Andy Warhol completed by him in 1964."

121.    *Double Denied* is one of a series of 12 identical paintings. Warhol, who often traded his art when he was short of cash early in his career, and Paul Morrissey, provided Richard Ekstract an acetate with Warhol's self-portrait. Warhol and Morrissey personally authorized Ekstract to create these 12 paintings in exchange for very rare and expensive video cameras, video recorders,

24

and related equipment that Ekstract had obtained. Warhol subsequently used this video equipment to make several films, including the well-regarded *Outer and Inner Space* (1965).

122.    Ekstract, under the express authorization and instruction of Warhol and his employees, arranged for this series of self-portrait paintings to be created from the acetate that Warhol provided. This method of production was typical of Warhol.

123.    As evidence of authentication, Warhol intended these paintings to be valuable consideration for his sole and exclusive use of the video equipment, which Ekstract estimates was then worth approximately $16,000. In so doing, Warhol implicitly acknowledged his authorship, thereby exercising a right of paternity that was subsequently recognized in New York by statute and is currently codified as § 14.03 of the New York Arts and Cultural Affairs Law.

124.    Herman Myers was the first recipient of *Double Denied*. On or about July 23, 1987, Myers sought to auction the painting through Christie's in New York.

125.    Christie's representative Susan Dunne took *Double Denied* to the Warhol Factory (which was then on East 33rd Street in New York) for authentication by The Estate and The Foundation, per Christie's practice for all unsigned Warhols.

126.    Fremont stamped *Double Denied* three times with the signature "Andy Warhol"– twice on the upper right edge and once on the lower left edge. Fremont did so in his capacity as agent for The Estate and a trustee of The Foundation.

127.    On or about November 4, 1987, following this authentication, Christie's auctioned *Double Denied*. At the time of the auction, *Double Denied* bore the three "Andy Warhol" signatures on the upper-right and lower-left edges.

128.    A French art-dealer, Daniel Templon, purchased *Double Denied* for $28,600. Mr. Templon then offered *Double Denied* to Ronald Feldman of the Ronald Feldman Gallery in early

1988. Mr. Feldman commissioned and published thousands of Warhol prints and was the main print dealer for Hughes and Fremont, making the two men an enormous amount of money, especially in the years immediately after Warhol's death.

129.    Prior to purchasing *Double Denied*, in or about March 1988, Feldman requested that Hughes examine the authenticity of *Double Denied* in his capacity as executor of The Estate and Chairman of The Foundation's board.

130.    Hughes advised Feldman that *Double Denied* was indeed authentic and that Hughes was well aware of the series since both he and The Foundation owned a similar image on linen. Hughes then wrote on the left edge: "I certify that this is an original painting by Andy Warhol completed by him in 1964." At this point, *Double Denied* had been authenticated by both The Estate and The Foundation, as evidenced by the foregoing written certification from Hughes and three "Andy Warhol" signature stamps by Fremont.

131.    Following these repeated authentications, Feldman purchased *Double Denied* in or about May 1988, which he subsequently sold to Aldis Browne Gallery in California later that same year.

132.    Also in 1988, Aldis Browne Gallery sold *Double Denied* to Richard Polsky, a dealer who specializes in works by Warhol. Polsky is also well-known in the Warhol community for his book *I Bought Andy Warhol*, which details how Fremont has leveraged his power as exclusive sales agent for The Foundation's paintings to manipulate the Warhol market.

133.    After noting the signature of Andy Warhol and speaking with Hughes, who assured the work's authenticity, plaintiff purchased *Double Denied* for $195,000 from dealers Michael Hue-Williams and Lang & O'Hara on August 25, 1989.

26

134.    That same year, gallery owner Michael Kohn advised his clients to purchase another of the Ekstract-related paintings, which they did for $22,000. Kohn's advice was based on his research, which revealed that two other paintings from the series (one of which was *Double Denied*) had been authenticated by The Estate and sold at auction – one by Sotheby's, the other by Christie's.

135.    However, when Kohn submitted photographs of his clients' print to Fremont for authentication, The Estate suddenly reversed its stance regarding the authenticity of the Ekstract-related paintings.

136.    The Estate offered no justification for its contradictory treatment of Kohn's submission and *Double Denied*, which were both from the same series.

137.    By letter dated December 5, 1989, The Estate expressed doubts about the authenticity of the print Kohn had submitted, but offered nonetheless to purchase it for $22,000. Kohn and his clients were offered the option to buy the painting back within two years if The Estate confirmed its authenticity. They rejected The Estate's offer for failing to provide them with a long-term option to repurchase the painting in the event The Estate ever decided it was authentic.

138.    In or about June 1990, Ekstract submitted another of the Ekstract-related paintings to The Estate for authentication. Unlike *Double Denied*, this particular portrait from the series had never been certified or authenticated by The Estate or The Foundation.

139.    The Estate rejected Ekstract's submission, despite acknowledging by letter dated October 23, 1990 that the painting "was made from an acetate transparency created by Andy Warhol," and admitting that The Estate had "no basis on which to doubt that the silkscreening of the work onto canvas was authorized by Andy Warhol as stated in your letter."

27

140.    Fremont and Hughes, who examined the Ekstract painting on behalf of The Estate, offered no justification for their contradictory treatment of Ekstract's submission and *Double Denied*, which were each from the same series.

141.    A former lawyer for The Estate and The Foundation (Ed Hayes) has suggested that Fremont and Hughes rejected Ekstract's submission because The Foundation and The Estate had adopted a policy of rejecting as many works as possible in order to induce artificial scarcity in the Warhol market, thereby maintaining and increasing the value of The Foundation's own similar holdings.

142.    That same year, another owner of an Ekstract-related painting named Susan Mearns submitted her painting to The Estate, which rejected it as a C (i.e., "not able at this time to form an opinion"). Like Ekstract, Mearns was informed that her submission had been rejected despite The Estate's acknowledgment, by letter dated October 31, 1990, that the painting "was made from an acetate transparency created by Andy Warhol," and that The Estate had "no basis on which to doubt that the silkscreening of the work onto canvas was authorized by Andy Warhol."

143.    Those who examined Mearns' submission on behalf of The Estate offered no justification for their contradictory treatment of her painting and *Double Denied*, which were both from the same Ekstract series.

144.    Other owners of Ekstract-related paintings have since submitted them to The Estate, The Foundation and/or The Authentication Board – all of which have been rejected. The Warhol Conspirators have refused to provide any explanation for these rejections.

145.    In or about 1995, Georg Frei, a director of the Thomas Ammann Gallery, photographed *Double Denied* for the Andy Warhol Catalogue Raisonné, which Frei was responsible

for editing. At the time, Frei was a founding member of The Authentication Board and one of the world's largest Warhol dealers. He stressed to plaintiff the historical importance of *Double Denied*.

146. In July 2001, plaintiff decided to sell *Double Denied*, unaware of The Estate's denial of Ekstract's and Kohn's respective submissions.

147. At the time of plaintiff's decision, the United States Post Office was issuing a first class stamp depicting the same Warhol self-portrait image as in *Double Denied*, increasing the significance and importance of the image.

148. Plaintiff offered to sell *Double Denied* in or about July 2001 for approximately $2 million.

149. Around this same time, during the period from July through December 2001, plaintiff communicated repeatedly with Fremont by telephone, email, and in a face-to-face meeting in Los Angeles. In these communications, Fremont repeatedly urged plaintiff to submit *Double Denied* to The Authentication Board.

150. Fremont also contacted various third-parties in an effort to enlist them in this campaign for submission. Fremont did not disclose his knowledge of the history of *Double Denied* or the aforementioned review (and rejection) of submissions of paintings from the same series (e.g., by Ekstract, Mearns and Kohn). Nor did Fremont disclose that The Foundation had adopted a policy of inducing artificial scarcity in the market for Warhols, making denial of *Double Denied* a foregone conclusion. Around this time, Fremont also advised plaintiff that *Double Denied* was appropriate for photograph and inclusion in the Warhol Catalogue Raisonné.

151. Plaintiff advised a prospective buyer of *Double Denied* of Frei's statements concerning the painting's importance. However, when this prospective buyer contacted Frei, he advised the buyer to submit the painting to The Authentication Board. Calls to The Foundation met

much the same response – The Foundation would not stand by its prior authentication and they insisted that the painting had to be submitted to The Board.

152.    Plaintiff was informed by Tony Shafrazi Gallery that _Double Denied_ had been "burned" all over town – due to the collusive campaign waged by Fremont, Frei and The Foundation. No collector would touch plaintiff's painting until it went to The Board.

153.    On or about December 20, 2001, plaintiff acceded to Fremont's campaign and submitted _Double Denied_ to The Authentication Board (the _First Submission_). Pursuant to The Board's requirement, plaintiff signed the Submission Agreement (_see_ Ex. B).

154.    As part of the First Submission, plaintiff provided The Authentication Board with a number of documents that confirmed the authenticity of _Double Denied_, including:

   a.    plaintiff's original bill of sale;

   b.    a letter from Jonathan O'Hara, one of the dealers who sold _Double Denied_ to plaintiff;

   c.    a letter from Feldman confirming that Hughes had authenticated _Double Denied_ prior to Feldman's purchase in 1988; and

   d.    a letter from Michael Hue-Williams describing a conversation with Hughes in which Hughes confirmed his authentication of _Double Denied_.

155.    By letter dated February 7, 2002, The Authentication Board rejected _Double Denied_ (the _First Rejection_), without providing a reason for its ruling. A copy of the First Rejection letter is attached hereto as Exhibit D.

156.    The Authentication Board never physically examined _Double Denied_, and not all members of The Board participated in the decision to deny.

157.    Fremont was among those who made the decision.

30

158.   Following the unexpected rejection of *Double Denied*, plaintiff contacted The Authentication Board directly. He reached assistant secretary Claudia Defendi, who informed plaintiff that he was welcome to resubmit *Double Denied* with more documentation.

159.   A few days later, when plaintiff went to retrieve *Double Denied* from The Authentication Board, he encountered Fremont, who was leaving to go to lunch with other Board members and invited plaintiff to join them. At that lunch, Fremont urged plaintiff to resubmit *Double Denied* after researching and documenting its history more fully. Once again, Fremont failed to mention that he was already quite familiar with the history of *Double Denied* as a result of Kohn's, Ekstract's and Mearns' submissions.

160.   Spurred by Ms. Defendi's and Fremont's statements, which were communicated by telephone, email and various third-parties, plaintiff spent the following year accumulating as much information as possible about *Double Denied*. Plaintiff devoted hundreds of hours to this research, which he pursued at great professional detriment and financial sacrifice.

161.   During the period from February 2002 through July 2003, plaintiff communicated repeatedly with Fremont and various employees of The Board, including Sally King Nero, Claudia Defendi and Bibi Khan. In telephone conversations and emails, Fremont and these Board employees deliberately prolonged plaintiff's wild goose chase, including sending him questionnaires that sought information about *Double Denied* that The Board already knew.

162.   During the first week of February 2003, plaintiff resubmitted *Double Denied* to The Authentication Board (the *Second Submission*). As part of the Second Submission, plaintiff supplied The Authentication Board with a wealth of additional documentation that he had assembled during the previous year, including:

31

a.   a letter from Paul Morrissey, the Factory's film director and full-time manager in the 1960s, supporting the authenticity of *Double Denied*;

b.   a letter from Billy Name, the Factory's photographer at that time, corroborating Morrissey's account;

c.   a letter from Ron Cutrone, a Factory assistant who helped the artist produce many of his early silkscreened paintings, which supported the validity of *Double Denied* as being a Warhol work;

d.   transcripts from the Andy Warhol Museum in Pittsburgh of Warhol himself discussing the making of *Double Denied*; and

e.   a letter from Sam Green, curator of Warhol's "1965 Retrospective," to whom Warhol had shown the Ekstract-related paintings and explained the process by which they were created.

163.   On or about February 12, 2003, plaintiff received a telephone call from Paul Morrissey. According to Morrissey, Fremont had informed him over dinner the night before that plaintiff's painting had been denied a second time.

164.   The Authentication Board had not yet met to consider plaintiff's Second Submission at the time of Fremont's conversation with Morrissey since one Board member was in London and another in Colorado.

165.   By letter dated July 14, 2003, The Authentication Board notified plaintiff that it had rejected *Double Denied* a second time (the *Second Rejection*), refusing once again to explain its decision. This Second Rejection was far more than a mere affirmation of the First Rejection. Rather, it was a separate act with a related but distinct purpose – to attempt to insulate defendants from liability for their complete failure to conduct any examination whatsoever of *Double Denied* prior to the First Rejection. The Authentication Board made sure that all of its members physically examined *Double Denied* prior to the Second Rejection, even though denial was a fait accompli.

166.   The effects of the Second Rejection were also distinct from the First Rejection. While the First Rejection cost plaintiff his sale of *Double Denied*, the second effectively blackballed

32

him within the community of Warhol collectors. Plaintiff found himself unable to sell _any_ of the Warhols he owned without first submitting them to The Authentication Board. Ultimately, plaintiff was forced to use third-parties to sell his Warhols at a fraction of their fair market value.

167.    The Second Rejection of _Double Denied_ attracted significant media coverage, including a television documentary by the BBC entitled "_Warhol: Denied,_" and numerous articles in newspapers and magazines, including the aforementioned VANITY FAIR piece, "Judging Andy."

168.    Following the Second Rejection (in a letter dated May 18, 2004), The Authentication Board finally purported to explain the reasons for its rejections. This letter, too, was no mere reaffirmation of the First Rejection, containing several misleading statements about _Double Denied_, and several statements about Warhols generally that are unequivocally false.

169.    The May 18, 2004 letter, which is attached hereto as Exhibit E, listed a series of physical characteristics that supposedly rendered _Double Denied_ inauthentic, including:

    a.    "The background of the painting you submitted and the backgrounds of the nine identical examples are printed, not hand-painted."

    b.    "The eyes, skin tones, and hair in the work you submitted and in the nine identical examples are printed, not hand-painted."

    c.    "The only aspect of the self-portraits that Warhol made in early 1964 that is painted is the black silkscreen impression, printed over the areas of hand-painted color. Each impression varies among the works made by Warhol, as does the registration of the black screen over the areas of hand-painted color. This is not the case with respect to the work you submitted and the nine identical examples."

    d.    "The work you submitted and the nine identical examples were made of cotton."

    e.    "The density of the halftone in the work you submitted for our review and in the nine identical examples is reduced, as compared to the density of the halftones in Warhol's early 1964 canvases. . . ."

    f.    "Finally, as part of its research, the Board learned that the work you submitted and the nine identical examples were painted by a commercial

33

printer in 1965. The printer claimed that he received materials and specifications from another party, and had never had any contact with Warhol himself."

170.    The foregoing references to physical characteristics of *Double Denied* may have been literally true, but they were nonetheless fraudulent and misleading because they were selected to serve defendants' interests (e.g., to distinguish the physical characteristics of similar Warhol self-portraits owned by The Foundation) and had zero relevance to the actual authenticity of *Double Denied*.

171.    For example, the May 18, 2004 letter specifically mentioned that *Double Denied* was made of "cotton" because The Foundation and Georg Frei's gallery, Thomas Ammann Fine Art, each owned a similar competing Warhol self-portait on *linen* from the same time period as *Double Denied*.

172.    The May 18, 2004 letter went on to conclude that the foregoing physical characteristics of *Double Denied* established that the painting was inauthentic:

> This contradicts the way Warhol worked. To be as precise as possible, during the 1960s Warhol's paintings were made in his studio. Only the screens that he used to make his paintings were fabricated outside the studio. However, these silkscreens were reproduced from a paste-up mechanical that was made by Warhol; the silkscreens were fabricated by printers whom Warhol had worked with on a regular basis, and were then printed in Warhol's studio. Moreover, the silkscreen printing was part of a more complex process of making a painting that characteristically included areas of hand-painting. These paintings were made by Warhol himself or by Warhol with the help of a studio assistant, who worked directly under his supervision. The Board knows of no independently verifiable documentation from the period in question, 1964 through 1965, to indicate or to suggest that Warhol sanctioned or authorized anyone to make the work that you submitted for review or the nine identical examples [from the series of Ekstract Paintings].

173.    The foregoing conclusion of the May 18, 2004 letter was false and misleading since, as defendants were well aware, plaintiff had submitted statements from Morrissey, Name and

34

Cutrone, as well as transcripts of statements by Warhol himself, all of which independently verified the authenticity of _Double Denied_.

174.   The Estate, moreover, admitted in its letter dated October 23, 1990 to Richard Ekstract that the Ekstract-related paintings were made "from an acetate transparency created by Andy Warhol." Acetates are like photo negatives, making the Ekstract-related paintings more authentic than many of the other Warhols that The Board has chosen to authenticate.

175.   The conclusion of the May 18, 2004 letter was also false and misleading because, as defendants were equally well aware, many early Warhols were screened on cotton. Each of the _Campbell's Soup Cans_ series, for example, was painted or screened on various materials such as cotton canvas, linen, and even shopping bags.

176.   The conclusion of the May 18, 2004 letter was further false and misleading because, as defendants were also well aware, Warhol worked in precisely the manner that the letter denies – both at the time that _Double Denied_ was created and with increasing frequency until his death in 1987.

177.   It is widely accepted among art historians that the period from 1961-65 was one of transition for Warhol, as he moved away from a personal approach to art-making, in favor of the more mechanized, mass-production model that featured minimal supervision and extensive outsourcing. In fact, by 1965, most of Warhol's works were being made off-site, without his personal supervision.

178.   _Double Denied_ specifically, and the series of Ekstract paintings generally, are so significant and rare precisely because they are among the earliest examples of the aforementioned "factory" mass-production technique for which Warhol would eventually become famous.

35

179.    The vast majority of Warhols were created in various outside studios with little or no supervision by Warhol, who would conceive and authorize a work (by selecting an acetate for example) and review the finished product, *intentionally* avoiding any personal role in the production itself. For example, Warhol's famous *Cow* wallpaper was made in 1966 offsite, without Warhol's supervision, at Bill Miller's wallpaper studio. Similarly, for Warhol's 1968 exhibition in Sweden, the artist had the Brillo factory in Brooklyn print 500 boxes and ship them directly to Stockholm.

180.    Many of Warhol's male portraits from the 1980s were made using one black silkscreen over a white or silver background with no hand painting – just like *Double Denied*. These paintings would fail the criteria set forth in the May 18, 2004 letter, yet The Authentication Board has chosen to acknowledge their authenticity.

181.    Warhol's printer, Jean Paul Russell, underscores the absurdity of The Authentication Board's claims, explaining in a November 1, 2002 letter to the Board:

> This process was very similar to the way that Warhol's printer Rupert Smith and I painted the last series of self portraits that Andy Warhol ever made. In fact, all of Andy Warhol's last self portraits were made in this exact way. None of them had any hand painting whatsoever and they were just screen-printed from an image of Andy Warhol.There were some self-portraits, which we screened on a camouflage background, but they were on a pre-printed canvas, not painted by Warhol. A few did have solid color backgrounds, either mopped, pre-printed or just on a raw background. There really is no difference whatsoever to the way that the paintings made by Richard Ekstract from Andy Warhol's transparencies in 1965 or the last series of self-portraits that Rupert Smith and I had made. Andy Warhol worked this way, with either Rupert Smith, myself, Richard Ekstract or many other people that I know of such as Alex Heinrici. I don't see any difference at all. Warhol gave direction but always left an opening for input from others. He was very open to experimentation.

182.    According to two newspaper articles published on October 26, 2003, in THE INDEPENDENT ON SUNDAY and THE SUNDAY TELEGRAPH, some *15%* of previously authenticated

36

Warhols that were re-submitted to The Board have had their judgment of authenticity reversed. However, many former employees of The Board estimate that the figure is ***closer to 50%***.

183.    Other prints from the Ekstract series have been systematically targeted for removal from the Warhol market. Some, like Richard Ekstract's submission in 1990 and/or the "nine identical examples" mentioned in the May 18, 2004 letter, were formally rejected by The Authentication Board.

184.    Other owners are deterred from even submitting their works by the highly publicized rejections of works from the series like ***Double Denied***. Even then, however, the result remains the same – competing Warhols are removed from the market, enhancing the value of any similar holdings by The Foundation.

185.    For example, defendants contacted Susan Mearns, another owner of an Ekstract-related painting, suggesting that she submit her print for review, even though it had already been rejected in 1990 by The Estate.

186.    Defendants' letter, dated March 23, 2004, made no reference of The Board's prior systematic rejection of other paintings from the same series, including ***Double Denied***. Instead, it stated ambiguously that "additional information has come to the attention of the Board since the date of the Estate's opinion letter. Therefore you may wish to submit this painting to the Board for its opinion."

187.    Ms. Mearns' brother, David, contacted The Board by telephone and email in an effort to learn what "additional information" had come to The Board's attention. Between March and April 2004, Mr. Mearns placed several calls to Sally King Nero that were neither taken nor returned. Mr. Mearns also spoke several times with Claudia Defendi, who spoke on behalf of Ms. King Nero specifically, and The Authentication Board generally. Initially, The Board refused to provide any

37

clarification. Finally, by email dated April 13, 2004, Ms. King Nero admitted that doubts had been raised about whether Warhol had authorized the creation of Ms. Mearns' Warhol work but would not explain further.

188.    During this same period, David Mearns began researching the provenance of his sister's Warhol work. In or about April 2004, his representative approached Georg Frei about the possibility of authenticating Ms. Mearns' Warhol work. Frei was initially receptive to inspecting the painting and rendering an informal opinion of its authenticity. Frei's willingness abruptly vanished after he spoke with The Authentication Board. By email dated April 27, 2004, Frei admitted that he "did talk with the people from the authentication board and they all recommended you should send the painting to [New York]."

189.    During this same period, Ms. Mearns and her brother learned of the rejections of other prints from the Ekstract series, including *Double Denied*. Accordingly, Ms. Mearns refused to submit her print for fear that rejection by The Authentication Board was a foregone conclusion. The price of her refusal, however, is steep since the painting will never be authenticated by The Board, so long as defendants are in charge, its market value is effectively nil.

190.    There are numerous other persons or entities that are similarly situated, having submitted a work previously authenticated by either Hughes or Fremont and, sometime later, having had their works rejected by The Authentication Board.

## VENUE AND JURISDICTION

191.    Venue lies in this District pursuant to 28 U.S.C. §1391(a) and (b).

192.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1337(a) because plaintiff's antitrust claims arise under §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and are brought pursuant to §§ 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

193.    This Court also has subject matter jurisdiction over this action because plaintiff's Lanham Act claims arise under 15 U.S.C. § 1125(a).

194.    Plaintiff further invokes the pendent jurisdiction of this Court to consider claims arising under state law.

## CLASS ACTION ALLEGATIONS

195.    Plaintiff brings this action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

196.    The class consists of all persons who purchased Warhol works at artificially inflated prices (the *Class*) during the period February 22, 1987 through such time in the future as the effects of defendants' illegal conduct, as alleged, have ceased (the *Class Period*).

197.    Excluded from the Class are defendants, their affiliates and subsidiaries, all of their present and former officers, directors and employees, their co-conspirators, and any federal, state, or local governmental entity. Also excluded from the Class are all persons or entities who sold their Warhol works during the Class Period.

198.    This action is properly maintainable as a class action. The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.

39

199.    Questions of law and fact common to all members of the Class predominate over any questions that may affect individual members, because defendants have acted on grounds generally applicable to the Class. Among the questions of law and fact common to the Class are:

a.    Whether defendants and their co-conspirators engaged in a contract, combination or conspiracy to fix or maintain the price of artwork by Warhol, to control the volume of artwork by Warhol available to the market, and to dominate the market for authentication of artwork by Warhol;

b.    Whether the alleged contract, combination or conspiracy violated Section 1 of the Sherman Act;

c.    Whether the alleged contract, combination or conspiracy violated Section 2 of the Sherman Act;

d.    The duration, scope and extent of the alleged contract, combination or conspiracy;

e.    Whether defendants and their co-conspirators took affirmative steps to conceal the alleged contract, combination or conspiracy;

f.    Whether each of the defendants was a participant in the alleged contract, combination or conspiracy;

g.    Whether defendants' conduct has eliminated all competition for the authentication of artwork by the Warhol;

h.    Whether defendants' conduct has substantially lessened competition for the purchase and sale of artwork by Warhol;

i.    Whether defendants' conduct caused auction and other prices for of artwork by Warhol to be maintained at artificially high and non-competitive levels;

j.    What is the effect of defendants' contract, combination or conspiracy upon interstate commerce;

k.    Whether defendants agreed to cease or limit competition in the market for authentication of artwork by the late Andy Warhol;

l.    Whether defendants were unjustly enriched by their contract, combination or conspiracy to cause auction and other prices for artwork by Warhol to be maintained at artificially high and non-competitive levels; and

m.     Whether plaintiff and the Class are entitled to declaratory and/or injunctive relief, among other things, rendering the Submission Agreement unenforceable.

## CAUSES OF ACTION

## COUNT ONE

### Violation of § 1 of the Sherman Act and New York Donnelly Act Against All Defendants (Joe Simon-Whelan, Individually and on Behalf of All Others Similarly Situated)

200.    Plaintiff repeats and re-alleges allegations set forth in paragraphs 36 through 190, as if fully set forth herein.

**The Relevant Market**

201.    The relevant market being unlawfully dominated and unreasonably restrained by the activities of defendants and their alleged co-conspirators is the offering and sale, at auction or otherwise, of Warhol artwork worldwide.

202.    The market for Warhols is actually a subset of the broader global market for modern and contemporary art, which includes approximately 500 artists, including Warhol, Pollock, Picasso, Miro and Rothko. Each of these individual artists comprises his or her own distinct submarket within the general global market for modern and contemporary art.

203.    This limitation of the relevant submarket specifically to Warhol artwork finds support in the following facts, among others:

a.     Warhols are typically included in the category of "modern and contemporary artists" in auctions, museum showings, dealer and gallery advertising and sales literature, and newspaper and magazine articles;

b.     Warhols are advertised for sale, whether privately or at auction, by specific reference to the name Andy Warhol, rather than by generic reference to "modern and contemporary art";

c.     Showings and exhibitions often feature multiple Warhols to the exclusion of all other modern and contemporary artists;

41

    d.    Expertise is defined not only in terms of the overall category of modern and contemporary artists, but also for each specific artist. Thus, an expert in Warhols may know substantially less about other artists in the category, such as Rothko, Pollock and Chagall. Similarly, an expert in modern and contemporary art generally, may lack expertise in the specific subcategory of Warhols;

    e.    Artists themselves are conscious of, and often influenced by, the style represented by specific artists, as opposed to the styles of modern and contemporary artists generally;

    f.    Prospective buyers and sellers estimate the value of Warhols primarily by reference to other Warhols, as opposed to the hundreds of other artists included in the general category of modern and contemporary art; and

    g.    Warhols are not interchangeable with works by other modern and contemporary artists because major art purchases are motivated by highly subjective tastes, indicating a lack of cross-elasticity of demand.

204.    The value of modern and contemporary art generally, and Warhols specifically, regularly ranges into the millions of dollars (or more) because the supply of artwork from a given deceased artist is fixed, prospective buyers of a given work are brought together in one room at one time for the auction, and bidders can be numerous with substantial funds to bid.

205.    Auctions are held in various cities around the world, including New York and London, and prospective bidders from many countries are often in attendance, either personally or by proxy, to bid at the auction of a specific work of art.

206.    Although the market for artwork is distinct from the market for its authentication, the two are nonetheless closely and inextricably linked. This is because the persons who bid for and buy modern and contemporary art, whether privately or at auctions, are typically unable to ascertain by themselves the authenticity of a work they wish to buy. Bidders and buyers thus rely heavily upon the opinion of one or more experts to guide their decisions.

207.    Institutions such as museums, galleries and auction houses routinely arrange for inspections and opinions from art experts before offering a work of art for sale, particularly if the

work is newly discovered and not previously recognized as a work by the artist whose name or style appears on the painting.

208.    By reason of these opinions, vast sums of money (again, in the millions of dollars or more) are paid for works of art for which an acknowledged expert renders a convincing opinion of authenticity or probable authenticity.

209.    The persons buying such art are, in fact, buying not just the opinion and reasoning behind it, but the credentials and expertise of the authenticating expert(s), as well.

210.    Any unreasonable limitation on the use of qualified experts to inspect, employ their expertise, and render their reasoned opinions on the authenticity of major works of art, would significantly affect the market for such paintings by denying valuable information that the buying and investing public depends upon when determining whether to buy, and how much to pay, for a given work of art.

**Trade and Commerce**

211.    Defendants' acts, as alleged herein, have resulted in the restraint of interstate commerce in New York City, the United States generally, and elsewhere, and have tended to create, and actually created, a monopoly in the line of interstate commerce within such geographic areas.

212.    Plaintiff and the Class have been injured in their business and property by reason of the performance of those acts in violation of the antitrust laws.

**Claims Alleged**

213.    Beginning in or about 1987, and continuing up to the date of this Amended Complaint, the Warhol Conspirators have restrained trade, monopolized and attempted to monopolize said trade and commerce in the offering and sale of Warhols in New York, the United States generally, and the rest of the world, in violation of §§ 1 and 2 of the Sherman Act (15 U.S.C.

§§ 1 and 2). These violations are continuing and will continue unless the relief prayed for herein is granted.

214.    Pursuant to, and in furtherance of, the aforementioned restraint of trade, actual and attempted monopolization, and conspiracy to monopolize, defendants have sought to prevent various Warhols from being offered and sold, at auction or otherwise, by among other things:

    a.    Maintaining an Authentication Board that supposedly investigates and renders an unbiased opinion on the origin of the artwork brought before The Board for authentication, when in reality The Board neither investigates nor renders an opinion based on its findings;

    b.    Requiring a favorable opinion of authenticity from The Board before permitting artwork to be offered or sold as a Warhol, whether at auction or otherwise;

    c.    Requiring the owner of a Warhol to accept The Board's determination or denial of authenticity through imposition of a Submission Agreement and an In Terrorem Clause that, among other things, permits The Board to physically damage works with a permanent mark displaying The Board's determination, and that purportedly waives any legal claims arising out of The Board's opinions or conduct;

    d.    Targeting known Warhol owners in an attempt to get them to submit their works for authentication even when those works have been previously authenticated by Fremont and/or Hughes on behalf of The Foundation and/or The Estate;

    e.    Using various ruses to convince owners to submit (or resubmit) their paintings for authentication when denial is a foregone conclusion, thereby removing Warhols from the market; and

    f.    Employing different standards for the inspection and authentication of paintings owned by defendants and their co-conspirators than those of plaintiff and others similarly situated.

**Effects**

215.    The foregoing combination of conspiracy and violations have had clear and substantial effects upon the market for Warhols. Defendants' general efforts to induce artificial scarcity have proven successful. According to Leslie Prouty, now a Senior Vice President of

Contemporary Art at Sotheby's, Warhols "are selling so well because they are hard to find these days." Tyler Maroney, *Much More Than Fifteen Minutes*, 101 ART NEWS (January 2002).[4] This characterization is echoed by Robert Mnuchin, now the owner of L&M Gallery in New York, who has put on Warhol shows: "There is a small percentage of what we consider quality work. _When supply gets taken out of the market, prices go up_." *Id.* (emphasis added).

216.   In addition to successfully inducing scarcity in the relevant market, the Warhol Conspirators have had the following effects, among others:

  a. Competition for the purchase and sale of Warhols has been substantially lessened;

  b. Competition for the authentication of Warhols has been eliminated;

  c. Owners of authentic Warhols will not submit their work to The Authentication Board for fear of an unlawful denial;

  d. Auction and other prices for Warhols have been maintained at arbitrary, non-competitive levels for paintings authenticated by defendants – and at no significant value whatsoever for paintings not authenticated by defendants;

  e. Plaintiff and other Class members, investors, museums, art owners and purchasers all have been denied the benefits of a competitive market for Warhols and other works of modern and contemporary by deceased famous artists; and

  f. Hundreds of millions of dollars in interstate transactions and commerce relating to the offering and sale of Warhols have been restrained.

**Fraudulent Concealment**

217.   Defendants engaged in a successful, illegal conspiracy to restrain trade in the sale, and competition in the authentication, of Warhols that was, by its very nature, inherently self-concealing.

---

[4] Available at: http://artnews.com/issues/article.asp?art_id=1047

218.    From at least February 22, 1987 until at least July 14, 2003, defendants fraudulently concealed their continuing unlawful combination and conspiracy from plaintiff and the other Class members.

219.    Plaintiff and the other Class members had no knowledge of this combination and conspiracy, and could not have discovered the alleged combination prior to at least July 14, 2003 by the exercise of reasonable due diligence.  The combination and conspiracy have been fraudulently concealed by defendants by various means and methods, including but not limited to the following:

      a.    Holding secret meetings between the Warhol Conspirators;

      b.    Communicating surreptitiously between the Warhol Conspirators by the use of telephone and meetings to avoid written records;

      c.    Creating and maintaining separate files concerning the Warhol Conspirators;

      d.    Concealing these separate files from government officials, plaintiff and the other Class members;

      e.    Adopting a policy of never explaining the reasons for their rejection of competing Warhols, falsely claiming that to do so would aid art forgers;

      f.    Adopting a policy of requiring that anyone submitting artwork to The Authentication Board sign a non-negotiable Submission Agreement with a sweeping In Terrorem Clause designed to prevent anyone from exercising their legal rights to challenge The Board's rulings and authentication policies;

      g.    Falsely and repeatedly representing that The Foundation would consider any evidence that plaintiff submitted in support of the authenticity of *Double Denied*;

      h.    Falsely and repeatedly representing to plaintiff and the press that *Double Denied* was not an authentic Warhol;

      i.    Falsely and repeatedly representing that The Authentication Board is a not-for-profit corporation that is completely independent of The Foundation that controls it; and

      j.    Falsely and repeatedly representing that The Foundation is not motivated by profit.

46

220.    By virtue of the fraudulent concealment by defendants and their co-conspirators, the commencement of the running of any statute of limitations had been tolled and suspended until at least July 14, 2007 with respect to any claim that plaintiff and other Class members have as a result of the combination and conspiracy alleged in this Amended Complaint.

**Injury to Plaintiff and Class Members**

221.    As a direct and foreseeable result of the above-mentioned violations of the antitrust laws, defendants have excluded *Double Denied* and countless other legitimate Warhols owned by Class members from the marketplace, completely destroying their investment value. Also, as a direct and foreseeable result of the above-mentioned violations of the antitrust laws, defendants have precluded plaintiff and Class members from seeking redress for their exclusion by forcing them to sign a sweeping legal waiver that deters even meritorious claims.

**Irreparable Injury and Injunctive Relief**

222.    If the Court finds that plaintiff has not established the market value of *Double Denied* due to lack of access to the market for Warhol works, plaintiff alternatively alleges irreparable injury by reason of defendants' activities and seeks preliminary and permanent injunctions prohibiting defendants and those acting in concert with them from:

a.      Using The Authentication Board as a purportedly independent, unbiased, truth-seeking group that endeavors to provide an honest expert opinion concerning the authenticity of Warhol works submitted to The Board for authentication.

b.      Funding The Authentication Board, whether directly or indirectly.

c.      Failing to provide a written opinion for all submissions of works for authentication, setting forth the reasons in reasonable detail why a particular Warhol work is deemed authentic or inauthentic, or why The Authentication Board declines to make such a determination.

47

d.  Enforcing any of the terms of the Submission Agreement against any member of the Class, and imposing the Submission Agreement or any of its terms on any future individuals who submit Warhol works for authentication.

## COUNT TWO

### Violation of § 2 of the Sherman Act Against All Defendants
### (Joe Simon-Whelan, Individually and on Behalf of All Others Similarly Situated)

223.    Plaintiff repeats and re-alleges allegations set forth in paragraphs 36 through 190, as if fully set forth herein.

224.    The relevant market is defined above in paragraphs 201 through 210, relating to the offering and sale of Warhol works in New York, the United States generally, and anywhere else in the world that Warhol works are bought and sold.

225.    Defendants possess the power to arbitrarily exclude the offering and sale of Warhol works from said market. All of the Warhol works offered for sale anywhere in the world, whether privately or by auction, must either be listed in the Warhol Catalogue Raisonné or have a letter or opinion of authenticity from The Authentication Board before any sale, by auction or otherwise, can take place. Thus, as for any specific Warhol work, defendants have total domination of the market to prohibit such painting from being offered and sold either at auction or privately in New York specifically, the United States generally, and anywhere else in the world that art is bought or sold.

226.    The reason for defendants' overt activities as alleged was to restrain competition unreasonably, to maintain their unlawful market domination, and, alternatively, to monopolize the market for buying and selling Warhol works. Indeed, even if defendants have not yet attained monopoly power, their success in doing so is probable. This is because defendants are able to leverage their existing total control over the authentication process into monopoly power in the market for buying and selling Warhol works.

48

227.    Defendants' activities affect many tens or hundreds of millions of dollars in interstate transactions and commerce.

228.    This power to exclude persons from the relevant market has been, and continues to be, exercised by defendants through their combination and conspiracy.

229.    The activities of defendants constitute a violation of § 2 of the Sherman Act, 15 U.S.C. § 2 and the New York Donnelly Act, § 340 of the New York General Business Law.

230.    By reason of these activities by defendants, plaintiff has been unable to sell _Double Denied_ in the relevant market and has suffered damages of $2 million or more, an amount plaintiff will prove at trial.

## COUNT THREE

### Unjust Enrichment Against All Defendants
### (Joe Simon-Whelan, Individually and on Behalf of All Others Similarly Situated)

231.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 36 through 190 as if fully set forth herein.

232.    Defendants have knowingly benefited from their illegal contract, combination or conspiracy, which caused plaintiff and the Class to pay artificially high and non-competitive prices for their Warhol works.

233.    Equity and good conscience dictate that defendants should retain no part of the sums unjustly seized as a result of their illegal contract, combination or conspiracy.

234.    As a result of this conduct, plaintiff and the Class have suffered damages in an amount that will be proved at trial.

49

## COUNT FOUR

### Lanham Act
### (Joe Simon-Whelan Individually Against All Defendants)

235.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 36 through 190 with the same force and effect as though more fully set forth herein again at length.

236.    Defendants have falsely advertised and publicized that *Double Denied* is not a Warhol work by twice stamping it "DENIED," disclosing to anyone who inspects *Double Denied* that The Board has judged it inauthentic.

237.    Defendants have also falsely advertised and publicized that *Double Denied* is not a Warhol work by excluding *Double Denied* from the most recent publication of the Warhol Catalogue Raisonné in 2002.

238.    Defendants have also falsely advertised and publicized that *Double Denied* is not a Warhol work by failing to withdraw and counteract the adverse information that defendants themselves disseminated to the marketplace.

239.    Defendants' activities constitute a violation of the Lanham Act, 15 U.S.C. § 1125(a).

240.    Plaintiff has suffered damages in the amount of $2 million or more as to *Double Denied*, an amount plaintiff will prove at trial.

## COUNT FIVE

### Fraud
### (Joe Simon-Whelan Individually Against Fremont and The Authentication Board)

241.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 36 through 190 as if fully set forth herein.

242.    In July 2001, Fremont, then the exclusive sales agent for The Foundation's paintings, personally intervened and interfered with plaintiff's sale of *Double Denied*.

50

243.    Fremont sought to cause plaintiff to submit *Double Denied* to The Authentication Board, despite knowing full well the history of *Double Denied* and that *Double Denied* was from the same series as the Ekstract-related painting that Fremont had personally rejected on behalf of The Estate in October 1990.

244.    In conversations with plaintiff during the period from August through October 2001, Fremont insisted that *Double Denied* had to be submitted to The Authentication Board.

245.    Fremont did so knowing and intending that plaintiff would rely upon his statements, which plaintiff did.

246.    During this same period, Fremont had conversations with other persons in an effort to have plaintiff submit *Double Denied* to The Authentication Board.

247.    Fremont knew full well that The Authentication Board would reject *Double Denied*, despite his and Hughes' previous authentications.

248.    Fremont knew and intended that plaintiff, as part of the submission process, would be required to sign the Submission Agreement, which purported to insulate Fremont and his fellow co-conspirators from liability for any wrongdoing.

249.    Following the First Rejection in February 2002, Fremont urged plaintiff to conduct further research into the authenticity of *Double Denied*, and to resubmit the painting to The Authentication Board, despite knowing that any re-submission would automatically be denied.

250.    Fremont did so knowing and intending that plaintiff would rely upon his statements, which plaintiff did, at great personal and professional cost.

251.    Fremont knew and intended that plaintiff, as part of the submission process, would be required to sign another Submission Agreement, further insulating Fremont and his fellow co-conspirators from liability for any wrongdoing.

252.    Fremont and Defendi (who acted on behalf of The Authentication Board) intentionally failed to disclose that denial was a foregone conclusion in the case of plaintiff's submission.

253.    Plaintiff relied upon the integrity of the submission process in submitting _Double Denied_ to The Board for authentication.

254.    Following the First Rejection in February 2002, The Board's assistant secretary Claudia Defendi represented to plaintiff that The Board would consider any further evidence that plaintiff submitted in support of the authenticity of _Double Denied_.

255.    Defendi, who acted on behalf of The Authentication Board, did so knowing and intending that plaintiff would rely upon her statements, which plaintiff did, at great personal and professional cost.

256.    As a result of Fremont and The Board's fraudulent conduct, plaintiff has been damaged in an amount to be determined at trial, but in an amount no less than $2 million and is further entitled to exemplary damages in an amount in excess of Twenty Million Dollars ($20,000,000) as defendants' actions demonstrate such reprehensible motives as to imply a criminal indifference to civil obligations.

### COUNT SIX

### Declaratory Judgment Against The Authentication Board
### (Joe Simon-Whelan, Individually and on Behalf of All Others Similarly Situated)

257.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 36 through 190 as if fully set forth herein.

258.    The Submission Agreement is a contract of adhesion, the enforcement of which would be unconscionable.

259.    The Submission Agreement is a mechanism used to perpetuate the fraudulent conduct of the Warhol Conspirators, the enforcement of which would contravene public policy.

260.    The Submission Agreement is unenforceable for failure of consideration because The Authentication Board's promise to "endeavor to form an opinion as to the authenticity" of submissions following "completion of its examination" was fraudulent. In fact, The Authentication Board conducted no examination prior to the First Rejection because The Board's judgment as to plaintiff's painting was a foregone conclusion. The Board's examination prior to the Second Rejection was similarly a sham designed to cover for its prior failure to examine because The Board's judgment as to plaintiff's painting was, as before, a foregone conclusion.

261.    The Submission Agreement is unenforceable for failure of consideration because The Authentication Board's promise to "endeavor to form an opinion as to the authenticity" of submissions is illusory. As the remainder of the Submission Agreement makes clear, the agreement lacks mutuality because The Board reserves absolute and unfettered discretion not only to "form no opinion" regarding a work's authenticity, but also to reverse its grant or denial of authenticity at any point in the future.

262.    For all of the foregoing reasons, the Submission Agreement should be declared to be unenforceable against plaintiff and the Class.

## RELIEF REQUESTED

WHEREFORE, plaintiff, individually and on behalf of the Class, requests for relief and judgment as follows:

a.    Declaring that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that plaintiff be certified as class representative, and that his attorneys be appointed class counsel;

b.    Decreeing that:

53

(i)    each of the defendants violated Section 1 of the Sherman Act and the New York Donnelly Act by unlawfully attempting and conspiring to restrain trade;

(ii)   each of the defendants violated Section 2 of the Sherman Act and the New York Donnelly Act by unlawfully attempting and conspiring to monopolize, and actually monopolizing, the relevant markets;

(iii)  each of the defendants violated the Lanham Act;

(iv)   each of the defendants is liable to plaintiff for fraud; and

(v)    the Submission Agreement is unenforceable.

c.    Awarding actual damages to plaintiff and the Class in an amount to be trebled pursuant to 15 U.S.C. § 15(a);

d.    Granting restitution to plaintiff and the Class in an amount equivalent to defendants' unjust enrichment as a result of their conspiracy;

e.    Awarding appropriate punitive damages in an amount sufficient to punish defendants for their conduct and to set an example to deter others from similar conduct;

f.    Awarding attorneys' fees for plaintiff and the Class;

g.    Awarding pre- and post-judgment interest to plaintiff and the class;

h.    Awarding plaintiff's costs incurred litigating this suit;

i.    Enjoining defendants, individually and collectively, and all persons working with them from:

(i)    participating in the actual or purported authentication, or the offering or sale by auction or otherwise of Warhol works while any defendants who participate in the authentication process, whether formally or informally, has any financial interesting any Warhol works.

(ii)   refusing to permit the market for Warhol works to have access to or consider opinions on authenticity (together with the reasons offered in support of them) rendered by any art experts not approved by defendants to authenticate Warhol works; and

(iii)  further antitrust violations of the kind alleged in this complaint.

54

j.    Awarding plaintiff and the Class such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial of all claims for relief that may be tried before a jury.

Dated: New York, New York
       October 19, 2007

Respectfully submitted,

**DREIER LLP**

_____

Lee A. Weiss (LW-1130)
Brian C. Kerr (BK-6074)
Andrew Wilmar
499 Park Avenue
New York, New York 10022
212.328.6100

**REDNISS & ASSOCIATES LLC**
Seth Redniss (SR-7988)
185 Franklin Street, 5th Floor
New York, New York 10013
212.334.9200

*Counsel for Plaintiff and the Proposed Class*