# EXHIBIT A

SEP-24-2007  16:43

Swain, J

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— X

JOE SIMON-WHELAN, Individually And On
Behalf Of All Others Similarly Situated,

                          Plaintiff,

          - against -

THE ANDY WARHOL FOUNDATION FOR
THE VISUAL ARTS, INC., THE ESTATE OF
ANDY WARHOL, VINCENT FREMONT,
Individually and Successor Executor for the
Estate of Andy Warhol, VINCENT FREMONT
ENTERPRISES, THE ANDY WARHOL ART
AUTHENTICATION BOARD, INC., JOHN
DOES 1-20, JANE DOES 1-10, and RICHARD
DOES 1-10,

                        Defendants.

—————————————————————— X

Case No. 07 CV 6423

Justice Assigned:
Hon. Laura T. Swain

STIPULATION AND ORDER

WHEREAS, on September 14, 2007, Defendants The Andy Warhol Foundation for the

Visual Arts, Inc., Vincent Fremont, Vincent Fremont Enterprises, and The Andy Warhol Art

Authentication Board, Inc. ("Defendants") filed a Motion to Dismiss the Complaint pursuant to

Fed. R. Civ. P. 12(b)(6); and

WHEREAS counsel for Plaintiff Joe Simon-Whelan, individually and putatively on

behalf of all others similarly situated ("Plaintiff"), has advised counsel for Defendants that

Plaintiff intends to file an amended complaint as of right pursuant to Fed. R. Civ. P. 15(a);

WHEREAS, by endorsed letters dated September 11, 2007, this Court has permitted the

parties to file briefs of up to 45 pages in connection with Defendants' motion to dismiss the

Complaint;

AZ399M.1

SEP-24-2007  16:44

WHEREAS, by Initial Conference Order dated July 20, 2007, this Court scheduled a pre-trial conference for October 12, 2007 and directed the parties to preliminarily confer about various issues at least 21 days prior to the pre-trial conference;

WHEREAS, the parties agree that the pre-trial conference should be adjourned until after Defendants respond to the amended complaint, so that the parties can meaningfully confer in advance of the conference;

IT IS HEREBY STIPULATED AND AGREED by the undersigned counsel as follows:

1.    Plaintiff shall file an amended complaint on or before October 19, 2007;

2.    Defendants' pending Motion to Dismiss is withdrawn without prejudice;

3.    Defendants shall respond to the Amended Class Action Complaint by November 30, 2007; if Defendants file a motion to dismiss the Amended Class Action Complaint, the accompanying memorandum of law shall not exceed 45 pages;

4.    If Defendants file a motion to dismiss the Amended Class Action Complaint, Plaintiff shall file an opposition brief to Defendants' motion to dismiss, which shall not exceed 45 pages, by January 10, 2008;

5.    If Defendants file a motion to dismiss the Amended Class Action Complaint, Defendants shall file their reply brief to Plaintiff's opposition, which shall not exceed 30 pages, by February 7, 2008.

-2-

6.     The pre-trial conference currently scheduled for October 12, 2007, shall be

adjourned until after January 7, 2008, on a date that is convenient for the Court.

Dated: New York, New York
       September 21, 2007

DRIER LLP                              CARTER LEDYARD & MILBURN LLP

By:                                    By:
    Lee A. Weiss                           Gary D. Sesser
    499 Park Avenue                        Ronald D. Spencer
    New York, New York 10022               2 Wall Street
    (212) 328-6100                         New York, New York 10005
                                           (212) 732-3200
    --and--                                *Attorneys for Defendants The Andy
                                           Warhol Foundation for the Visual Arts,*
    Seth Redniss                           *Inc., Vincent Fremont, Vincent Fremont*
    Redniss & Associates LLC               *Enterprises, and The Andy Warhol Art*
    185 Franklin Street, 5th Floor         *Authentication Board, Inc.*
    New York, New York 10013
    (212) 334-9200
    *Attorneys for Plaintiff*

*The pretrial conference is adjourned to January 18, 2008
at 10:00AM.*

SO ORDERED:

_____  9/24/2007
        U.S.D.J.

# EXHIBIT B

# Andy Warhol Art Authentication Board, Inc.

May 18, 2004

Joe Simon
14 Langton Street
London SW 10 OJH
ENGLAND

Dear Mr. Simon,

It is the opinion of the Andy Warhol Art Authentication Board that the work you submitted "Self Portrait," marked by the Board "B101.021" and "B138.032" on the verso, is not a work by Andy Warhol for the following reasons:

- The series of self-portraits that Andy Warhol made in early 1964 consists of a group of works of the same size, produced from the same photographic source. Eleven works of this type have been documented by the editors of the Andy Warhol Catalogue Raisonné thus far. Each work in this series is different from all the others as noted below. This is not the case with respect to the work you submitted to the Andy Warhol Art Authentication Board.

  To date, ten paintings have been examined by the Andy Warhol Art Authentication Board that are identical to each other and to the work you submitted. The existence of ten identical works is without precedent in the corpus of Warhol's paintings.

- The background of the self-portraits that Andy Warhol made in early 1964 is painted by hand; and each background has been painted a different color. The background of the painting you submitted and the backgrounds of the nine identical examples are printed, not hand-painted.

- The eyes, skin tones, and the silver hair in the self-portraits that Andy Warhol made in early 1964 are hand-painted; the color of the eyes varies from work to work. The eyes, skin tones, and hair in the work you submitted and in the nine identical examples are printed, not hand-painted.

- The only aspect of the self-portraits that Warhol made in early 1964 that is printed is the black silkscreen impression, printed over the areas of hand-painted color. Each impression varies among the works made by Warhol, as does the registration of the black screen over the areas of hand-painted color. This is not the case with respect to the work you submitted and the nine identical examples.

- Warhol's self-portraits of early 1964 were all made on linen. The work you submitted and the nine identical examples were made on cotton.

525 West 20 Street, 7th floor    David Whitney, President
New York NY 10011    Robert Rosenblum, Treasurer
Telephone: 212.727.1735    Neil Printz, Secretary
Facsimile: 212.242.2836    Sally King-Nero

- Warhol's self-portraits were produced from a photograph that he submitted to the silkscreen fabricator with his instructions on a paste-up mechanical. The photograph in the mechanical was reproduced by the silkscreen fabricator onto a photo-sensitive silkscreen. The silkscreen was used by Warhol to depict the outlines of the head and the features of the face. The tones from the photograph seen on the canvas as a pattern of black dots are known as halftone. The density of the halftone in the work you submitted to our review and in the nine identical examples is reduced, as compared to the density of the halftones on Warhol's early 1964 canvases, indicating the work you submitted and the other nine identical works examined by the Board were not made from the same silkscreen that Warhol used to make this series of work in early 1964.

- Finally, as part of its research, the Board learned that the work you submitted and the nine identical examples were printed by a commercial printer in 1965. This printer claimed that he received materials and specifications from another party, and had never had any contact with Warhol himself.

This contradicts the way Warhol worked. To be as precise as possible, during the 1960s Warhol's paintings were made in his studio. Only the screens that he used to make his paintings were fabricated outside the studio. However, these silkscreens were reproduced from a paste-up mechanical that was made by Warhol; the silkscreens were fabricated by printers whom Warhol had worked with on a regular basis; and were then printed in Warhol's studio. Moreover, silkscreen printing was part of a more complex process of making a painting that characteristically included areas of hand-painting. These paintings were made by Warhol himself or by Warhol with the help of a studio assistant, who worked directly under his supervision. The Board knows of no independently verifiable documentation from the period in question, 1964 through 1965, to indicate or to suggest that Warhol sanctioned or authorized anyone to make the work that you submitted to our review or the nine identical examples. This letter is provided to you subject to the terms and conditions of the Letter of Consent dated December 21, 2001 and January 31, 2003.

The Board trusts that this will explain the criteria of its opinion.

Sincerely,

ANDY WARHOL ART AUTHENTICATION BOARD, INC.

By: _____
Authorized Representative

2

# EXHIBIT C

## APPROVAL OF SUPREME COURT JUSTICE

I, __EDITH MILLER__, a Justice of the Supreme Court of the State of New York, First Judicial District, do hereby approve the annexed Certificate of Amendment of the Certificate of Incorporation of Andy Warhol's Foundation For the Visual Arts, Inc. and consent to its filing.

Dated: FEB. ~~January~~ 5, 1988.

NEW YORK COUNTY

_____
Justice of the Supreme Court of the
State of New York, First Judicial
District

THE UNDERSIGNED HAS NO OBJECTION
TO THE GRANTING OF JUDICIAL
APPROVAL HEREIN AND WAIVES
STATUTORY NOTICE.

Feb 3, 1988

ROBERT ABRAMS, ATTORNEY GEN.
STATE OF NEW YORK

CERTIFICATE OF AMENDMENT OF

THE CERTIFICATE OF INCORPORATION

OF

ANDY WARHOL'S FOUNDATION FOR THE VISUAL ARTS, INC.

Under Section 803 of the Not-for-Profit Corporation Law

**P H**

**BILLED**

TREANOR, HARVEY & HORGAN
ATTORNEYS AT LAW
515 MADISON AVENUE, NEW YORK, NEW YORK 10022
(212) 832-3000

STATE OF NEW YORK
DEPARTMENT OF STATE

FILED FEB 12 1988

AMT. OF CHECK $ 50
FILING FEE $ 30
TAX $
COUNTY FEE $
COPY $ 10
CERT $
REFUND $
SPEC HANDLE $ 10

BY:

11422.1

13-3410749

 

# CERTIFICATE OF INCORPORATION

## OF

## ANDY WARHOL'S FOUNDATION FOR THE VISUAL ARTS, INC.

Under Section 402 of the Not-for-Profit Corporation Law.

The undersigned, a natural person of the age of eighteen or over, desiring to form a corporation pursuant to the provisions of the Not-for-Profit Corporation Law of New York, does hereby certify:

1.   The name of the corporation (the "Foundation") is Andy Warhol's Foundation for the Visual Arts, Inc.

2.   The Foundation is a corporation as defined in subparagraph (a)(5) of Section 102 of the New York Not-for-Profit Corporation law, and shall be a Type B corporation under Section 201 of the Not-for-Profit Corporation Law.

3.   The purposes for which the Foundation is formed are to advance the visual arts, including without limitation the study, creation, preservation, exhibition and public understanding and appreciation thereof, and to conduct any and all lawful activities which may be necessary, useful or desirable for the furtherance or accomplishment of the foregoing purposes.

13-34074

Nothing herein shall be construed as authorizing the Foundation to operate a school, institution of higher learning, library, museum, historical society or educational television station. Nor shall the Foundation engage in any of the professions designated in Title VIII of the Education Law.

4. In furtherance of the foregoing purposes, the Foundation shall have all of the general powers enumerated in Section 202 of the Not-for-Profit Corporation Law, together with the power to solicit grants and contributions for any corporate purpose and the power to maintain a fund or funds of real or personal property (or both) for any corporate purposes. The Foundation shall have the right to exercise such other powers as now are, or hereafter may be, conferred by law upon a corporation organized for the purposes hereinabove set forth or necessary or incidental to the powers so conferred or conducive to the furtherance thereof.

5. Notwithstanding any other provision of this certificate, the Foundation is organized exclusively for charitable, educational and artistic purposes, as specified in Section 501(c)(3) of the Internal Revenue Code of 1954, as amended, and the regulations thereunder, or the corresponding provision of any future United States internal revenue law ("the Code"), and shall not carry on any activities not permitted to be carried on by a corporation exempt from Federal income tax under the said Code section.

-2-

13-34/0749

6. The Foundation is not formed for pecuniary profit or for financial gain, and no part of its assets, income or profit shall be distributed to or inure to the benefit of any private individual. Reasonable compensation, however, may be paid for services rendered to or for the Foundation in furtherance of one or more of its purposes. No private individual shall be entitled to share in the distribution of any of the corporate assets on dissolution of the Foundation.

7. Nothing herein shall authorize the Foundation; directly or indirectly, to engage in or include among its purposes any of the activities listed in Sections 404(b) through (u) of the Not-for-Profit Corporation Law.

8. In every taxable year in which the Foundation is a private foundation as defined in Section 509 of the Code:

(a) The Foundation shall distribute its income for each taxable year at such time and in such manner as not to become subject to the tax on undistributed income under Section 4942 of the Code.

(b) The Foundation shall not engage in any act of self-dealing which is subject to tax under Section 4941 of the Code.

(c) The Foundation shall not retain any excess business holdings which are subject to tax under Section 4943 of the Code.

- 5 -

13-340749

(d)  The Foundation shall not make any investments in such manner as to subject it to tax under Section 4944 of the Code.

(e)  The Foundation shall not make any taxable expenditures which are subject to tax under Section 4945 of the Code.

9.  No substantial part of the activities of the Foundation shall be devoted to carrying on propaganda, or otherwise attempting to influence legislation (except to the extent authorized by Section 501(h) of the Code, during any fiscal year or years in which the Foundation has chosen to utilize the benefits authorized by such statutory provision), and the Foundation shall not participate or intervene in (including the publishing or distributing of statements) any political campaign on behalf of any candidate for public office.

10.  The office of the Foundation shall be located in the County of New York, State of New York.

11.  The names and addresses of the initial directors of the Foundation until the first annual meeting are as follows:

| Names | Addresses |
|---|---|
| Frederick Hughes | 1342 Lexington Avenue<br>New York, New York  10128 |
| Vincent Freemont | 51 Fifth Avenue<br>New York, New York  10003 |
| John Warhola | 1230 Ingham Street<br>Pittsburgh, Pennsylvania 15212 |

-6-

13-3410749

12.  The Secretary of State is hereby designated as agent of the Foundation upon whom process against it may be served.  The post office address to which the Secretary shall mail a copy of any process against the Foundation served upon him is:  c/o Edward W. Hayes, Esq., Goldberg & Dubin, Suite 306, 401 Broadway, New York, New York 10013.

13.  (a) Every person made a party to any action, suit, or proceeding by or in the right of the Foundation to procure a judgment in its favor by reason of the fact that he, his testator or intestate, is or was a director or officer of the Foundation or of any corporation which he served as such at the request of the Foundation, may be indemnified by the Foundation to the full extent permitted by law, against any and all reasonable expenses, including attorneys' fees, actually and necessarily incurred by him in connection with the defense of such action or in connection with any appeal therein, except in relation to matters as to which it shall be adjudged in such action, suit or proceeding that such officer or director has breached his duty to the Foundation.

(b) Every person made a party to any action, suit or proceeding other than one by or in the right of the Foundation to procure a judgment in its favor, whether civil or criminal, including an action by or in the right of any other corporation of any type or kind, domestic or foreign, which any director or officer of the Foundation served in any capacity at the request

-7-

13-340749

of the Foundation, by reason of the fact that he, his testator or
intestate, was a director or officer of the Foundation, or served
such other corporation in any capacity, may be indemnified by the
Foundation, to the full extent permitted by law, against
judgment, fines, amounts paid in settlement, and reasonable
expenses, including attorneys fees, actually and necessarily
incurred as a result of such action, suit or proceeding, or any
appeal therein, if such person acted in good faith for a purpose
which he reasonably believed to be in the best interests of the
Foundation, and, in criminal actions or proceedings, in addition,
had no reasonable cause to believe that his conduct was unlawful.

14.  In the event of dissolution, the assets and
property of the Foundation remaining after payment of expenses
and satisfaction of all liabilities shall be distributed to one
or more charitable organizations as shall then qualify under
Section 501(c)(3) of the Code.  The selection of such
organization(s) shall be made as follows:

(a) If Frederick Hughes is then a director of the
Foundation, he shall select the recipient(s) of such assets and
property.  If Frederick Hughes is not then a director of the
Foundation, such selection shall be made by Vincent Freemont, if
he is then a director of the Foundation.  Any selection made
under this paragraph (a) shall be made within six (6) months of
the date of dissolution of the Foundation and shall be subject to

-8-

13-34/0749

the approval of a Justice of the Supreme Court of the State of New York (the "Supreme Court") or other court of competent jurisdiction.

(b)  In the event that no selection has been made pursuant to paragraph (a) within the aforesaid six-month period, such selection shall be made by the Board of Directors of the Foundation, subject to the approval of the Supreme Court or other court of competent jurisdiction.  Such selection by the Board of Directors shall be made within six (6) months of the date of dissolution of the Foundation.

(c)  Any corporate assets not disposed of pursuant to paragraph (a) or (b) shall be disposed of in accordance with an order of the Supreme Court or other court of competent jurisdiction.

IN WITNESS WHEREOF, the undersigned has signed this certificate and affirmed as true the statements made herein under penalties of perjury this  *1ST*  day of May, 1987.

Gerald Dickler
Incorporator
460 Park Avenue
New York, New York 10022

CERTIFICATE OF AMENDMENT OF

THE CERTIFICATE OF INCORPORATION

OF

ANDY WARHOL'S FOUNDATION FOR THE VISUAL ARTS, INC.

Under Section 803 of the Not-for-Profit Corporation Law


It is herby certified that

FIRST:   The name of the Corporation is ANDY WARHOL'S FOUNDATION FOR THE VISUAL ARTS, INC.

SECOND:  The Certificate of Incorporation of the Corporation was filed by the Department of State on May 26, 1987.

THIRD:  The Corporation was formed under the Not-for-Profit Corporation Law.

FOURTH:  The Corporation is a Corporation as defined in subparagraph (a) (5) of Section 102 of the Not-the-Profit Corporation Law.

FIFTH:  The Corporation is a Type B Corporation under Section 201 of the Not-for-Profit Corporation Law.  The type of Corporation which the Corporation shall hereafter be under Section 201 of the Not-for-Profit Corporation Law is Type B.

SIXTH:   The amendment of the Certificate of Incorporation of the Corporation effected by this certificate is to change the name of the Corporation.

SEVENTH:   To accomplish the foregoing amendment, Article 1 of the Certificate of Incorporation is hereby amended to read as follows:

1. The name of the Corporation (the "Foundation") is The Andy Warhol Foundation for the Visual Arts, Inc.

EIGHTH:  The foregoing amendment of the Certificate of Incorporation of the Corporation was authorized on January 5, 1988 by the vote of at least a majority of the entire Board of Directors, the Corporation having no members.

NINTH: The Secretary of State is designated as the agent of the Corporation upon whom process against the Corporation may be served. The post office address within the State of New York to which the Secretary of State shall mail a copy of any process against the Corporation served upon him is:

The Andy Warhol Foundation for the Visual Arts, Inc.
19 East 32nd Street
New York, New York 10016

IN WITNESS WHEREOF, we have subscribed this document on January 5, 1988 and do hereby affirm under the penalties of perjury that the statements contained therein have been examined by us and are true and correct.

_____
Frederick Hughes, President

_____
Vincent Fremont, Secretary

STATE OF NEW YORK    )
                     )    SS.:
COUNYT OF NEW YORK   )


        EDWARD W. HAYES, being duly sworn, deposes and says
that he is an attorney and counsellor at law and the attorney
for the corporation submitting the annexed Certificate of
Amendment of the Certificate of Incorporation of Andy Warhol's
Foundation For the Visual Arts, Inc., and that no previous
application for the approval of said Certificate of Amendment
by any Justice of the Supreme Court has ever been made.


Sworn to before me this
5 day of January, 1988.

Notary Public

STATE OF NEW YORK    )
                     )    SS.:
COUNTY OF NEW YORK   )


FREDERICK HUGHES, being duly sworn, deposes and says that he is one of the persons who signed the foregoing certificate of amendment; that he signed said certificate in his capacity as President; that he has read the said certificate and knows the contents thereof; and that the statements contained therein are true to his own knowledge.

Sworn to before me this
5 day of January, 1988

Notary Public

FRANCIS J. HARVEY JR.
Notary Public, State of New York
No. 31-5756375
Qualified in New York County
Commission Expires August 31, 1988


STATE OF NEW YORK    )
                     )    SS.:
COUNTY OF NEW YORK   )


VINCENT FREMONT, being duly sworn, deposes and says that he is one of the persons who signed the foregoing certificate of amendment; that he signed said certificate in his capacity as Secretary, that he has read the said certificate and knows the contents thereof; and that the statements contained therein are true to his own knowledge.

Sworn to before me this
5 day of January, 1988.

Notary Public

FRANCIS J. HARVEY JR.
Notary Public, State of New York
No. 31-5756375
Qualified in New York County
Commission Expires August 31, 1988

# EXHIBIT D

# Surrogate's Court
## 428815 of the County of New York

CERTIFICATE OF LETTERS TESTAMENTARY
The People of the State of New York

Index# 1987-0824

To all to whom these presents shall come or may concern,

Know Ye, that we, having inspected the records of our Surrogate's
Court in and for the County of New York, do find that on April 1,
1987 by said court, LETTERS TESTAMENTARY on the estate of Andy
Warhol   deceased,   late of the County of New York  were granted
unto    Frederick Hughes, the executor(s) named in the last Will
and Testament of said deceased, and that it does not appear by said
records that letters have been revoked.

In Testimony Whereof, we have caused the Seal of the Surrogate's
Court of the County of New York to be hereunto affixed.

WITNESS, Honorable Renee R. Roth, a Surrogate of the County of New
York, this 15TH Day of November, 2007.

_Jane Passenant_
———————————————
Jane Passenant

Clerk of the Surrogate's Court

Liber 446   Page 193

**\* THIS CERTIFICATE IS NOT VALID WITHOUT A RAISED SEAL OF THE COURT \***

# EXHIBIT E



**THE 2003 MUSIC ISSUE! 410 PAGES OUR BIGGEST EVER!**

# AMERICAN MUSIC

## ANNIE LEIBOVITZ'S NEW BOOK!

**STARTING 11**
QUEEN LATIFAH, NORAH JONES,
WILLIE NELSON, DR. DRE, JAMES TAYLOR,
MARY J. BLIGE, LUCINDA WILLIAMS, LIZ PHAIR,
ANTHONY KIEDIS, ANTWAN "BIG BOI" PATTON,
AND "ANDRE 3000" BENJAMIN.

NOVEMBER 2003/$4.50 U.S.
$5.50 CANADA + FOREIGN

0 75335 4     11>

## DAVID BOWIE'S
TOP 25 CD WISH LIST

## LIZA MINNELLI
ON
AND FRED EBB     JOHN KANDER



**FLOWER POWER**
Andy Warhol in his Factory at 231 East 47th Street, with some of his Flower paintings, mid-1960s.

# JUDGING ANDY

Signed by the artist, certified by his estate—it's got to be an original Andy Warhol, right? Not unless the Warhol authentication board says so. But dealers and collectors are crying foul over the four-member board's perplexing verdicts, which have turned high-priced art into wall decoration

## BY MICHAEL SHNAYERSON

They tend to look nervous as they come, bearing their packages, to the red-brick warehouse on far-west 20th Street in Manhattan's Chelsea district. Up on the seventh floor of the Andy Warhol estate building, they add prints and paintings to the pile that gathers there three times a year. Soon enough, they get a tell-tale letter from the Andy Warhol Art Authentication Board. Some return to pick up their works with obvious relief, but many, many others storm back in grief or rage. "It's a depressing job," admitted a young elevator man on duty to a stunned collector on the way down not long ago. "People have so much hope, and they come out just crushed."

In the netherworld of great artists' estates, some panel of experts is usually on tap to determine the authenticity of once humble paintings that now sell for millions of dollars. They may debate, they may equivocate. None, though, has seemed so capricious as the Andy Warhol board. None has stirred such indignation, such loathing, and such fear.

Much of the fault lies with the artist himself. Sixteen years after his untimely death at 58 from complications following gall-bladder surgery, Warhol is the hottest name, by far, in modern art. His silkscreened prints, with their globally recognized images, have doubled in value in the last three to five years. Prices for his important paintings have risen as much as tenfold in that period.

But as demand has increased, so has the number of forgeries. "Warhol is the most famous artist in America," says Manhattan

art dealer John Woodward, "and the most faked." Forgers have a field day because Warhol was also among the world's most prolific artists—hundreds of paintings, thousands of prints—thanks to his pioneering production of "mechanized" art, for which he employed helpers both inside and outside his "Factory" sites. Forgers can start with the same photographic images Warhol did, and sometimes knock off silkscreens only an expert can distinguish from the originals. Often, as a result, the Warhol board is simply blamed as the messenger of bad news to hoodwinked buyers.

For some time, though, disturbing stories have wafted out from that red-brick building into the art world. Gallery owners and dealers have submitted works signed by Warhol or authenticated by the executors of the artist's estate, only to have the board declare them, in its words, "not the work of Andy Warhol." Works that Warhol discussed or produced in the company of Factory assistants have been denied despite multiple affidavits from those assistants. The board has even reversed its own judgments, creating huge confusion.

Unlike some such boards—sculptor Alexander Calder's, for example—the Warhol board never officially explains why it's denied authenticity to a work. That would help the forgers. So an owner is left to come up with his own theory for why the painting he bought in good faith for perhaps several hundred thousand dollars or more is now worthless.

Nor do the owners have any recourse: to have their works reviewed, they have to sign a contract by which they forgo any right to a legal appeal. The contract says the board will issue "merely an opinion," but the board's opinion is, like a king's, the only one that counts, and so over this huge domain of the global art market the board's power is absolute.

To a wide range of disgruntled gallery owners, dealers, and collectors contacted by *Vanity Fair*, those opinions are suspect. Few such boards, they observe, are linked to a foundation that has had troves of the late artist's work to sell—a potential conflict of interest. Critics say the board plays favorites: the same painting may be authenticated when submitted by one dealer, they suggest, but denied if submitted by a less established one.

Underlying many of the stories is an issue more philosophical than financial. When the board declares works "not the work of Andy Warhol," does it just mean actual fakes? Or does it, as many of the stories suggest, often mean works that were by Warhol, but not in the board's opinion intended by the artist to be shown or sold as art?

And if so, how do the board's members have the gall to judge that?

Joe Simon, 39, a U.S.-born filmmaker and British art-world habitué, has spent most of the last two years pondering that very question. His harrowing odyssey with the Warhol authentication board began soon after July 2001, when he found a buyer, through a London gallery, for a Warhol painting he'd bought in 1989. Simon had paid $195,000 for the work, a red silkscreened self-portrait done in 1965. His buyer had agreed to pay $2 mil-



**Warhol was always experimenting,** Gerard Malanga asks, **"How can the board say Joe's painting is not real?"**

lion. The only condition was that Simon submit the work to the Warhol authentication board.

Simon did so without hesitation, signing the legal waiver that explained, among other matters, the board's rating system: "A" for "work of Andy Warhol," "B" for "not the work of Andy Warhol," and "C" for "not able at this time to form an opinion." Shortly after, Simon was faxed a let-

ter with the verdict: a B. He was floored.

As far as Simon could see, the painting had an impeccable provenance. Before his purchase of it from the Lang & O'Hara gallery in New York, the 24-by-20-inch work (synthetic polymer and silkscreen ink on canvas) had been handled by Christie's auction house and by Ronald Feldman, a well-known Manhattan dealer long associated with the artist. It had also been examined by Fred Hughes, Warhol's executor and the late chairman of the Andy Warhol Foundation for the Visual Arts, who wrote and signed an authentication on the back of the painting. "And before I bought it, having known Fred forever, I rang him at home and discussed it with him," Simon recalls. "The irony is that he owned one of the portraits himself."

Simon had moved in Warhol circles since coming to New York as a teenager and landing a job as an assistant for *Vogue* editor Diana Vreeland. Handsome and charming, he slid easily into the Factory crowd and knew Warhol personally. Over the years, as he became a movie producer (*Richard III*), various artists, including David Hockney, painted portraits of him. When the board denied his Warhol self-portrait in early 2002, Simon was trying to produce a sequel to the 1994 drag-queen camp classic *The Adventures of Priscilla, Queen of the Desert*. Appalled at what he felt to be a gross injustice, he put his work aside and embarked on a full-time campaign to prove his painting was real. It was a campaign that would immerse him in the creative chaos of Warhol's early Factory years, even as it deepened his suspicions of the authentication board.

By the late summer of 1965, as Simon already knew, Warhol at 37 had made the leap from commercial designer to Pop-art pioneer, and all but burned out as he did. His first canvases—comic-book characters, Campbell's-soup cans—had been painstakingly hand-painted, but he soon moved on to silkscreening, which hardly any other artist had tried. Not only was it faster and more profitable, but the assembly-line process of silkscreening seemed perfect for the iconic images he was producing.

By now Warhol's passion had also shifted from painting to moviemaking. It was easier—and more fun. The Factory had become

PHOTOGRAPH BY CHRISTOPHER SIMON SYKES

THE ART WORLD

a Pop version of a Hollywood studio, with Warhol-named "stars"—Baby Jane Holzer, Viva, Ultra Violet—making mind-numbingly long films of people sleeping or kissing. Warhol was also using a new handheld tape recorder to "write" a novel called *A: A Novel*. On the fringe of this scene, as Simon learned, was a young magazine publisher named Richard Ekstract, who'd just struck a deal with the artist. In exchange for having Warhol sit for a cover interview for his trade magazine *Tape Recording*, Ekstract called an executive he knew over at Norelco and persuaded him to lend Warhol one of the world's first video recorders and cameras—a $15,000 novelty.

Warhol was thrilled: how much easier to make movies with it than with a 16-mm. camera! When the short tryout period ended, Ekstract says, Warhol asked to keep the camera and recorder, with plenty of videotape, for six more months. In return, he would give silkscreened self-portraits to Ekstract and half a dozen others who'd made possible the extended loan and a related party to celebrate Warhol as an underground filmmaker. Such were the origins, Ekstract explained to Joe Simon, of Simon's own painting.

Because Warhol was so busy, Ekstract added, and because the self-portraits were for barter, not cash, Warhol delegated more of the creative work than usual. Typically, Warhol sent the image he'd chosen to a downtown studio to have a silkscreen made. When the silkscreen came back to the Factory, Warhol and an assistant produced the painting from it. This time, however, Warhol told Ekstract to have a silkscreen printer do that final step with Andy's guidance. The point, Ekstract said with a laugh, was to save money. "He was too cheap to do it himself!"

Up at the Factory, Ekstract recalled, Warhol approved the paintings. Ekstract, who paid for the silkscreening, kept one for himself. One of the others went to an advertising man. That one, Simon determined after more sleuthing, was the one he'd bought in 1989.

Ekstract, 72, has come a long way since the early days of *Tape Recording*. He's published some 20 trade and consumer magazines, including the new *Hamptons Cottages & Gardens*. He's an art collector, keeps an apartment on Gracie Square in New York, and has a radically contemporary home on seven and a half acres in Sagaponack, Long Island, that looks like a lunar-landing module. As Simon recounted his frustrations with the board, Ekstract began to seethe. The authentication board had denied his own self-portrait some years before, but he'd shrugged off the slight: Warhol had given him the painting, and he wanted to keep it. Since then, however, more than one of his old cronies had tried to sell their paintings and, like Simon, had had them denied by the board. Ekstract encouraged Simon to keep on with his research. If he prevailed, all seven owners would benefit. If the board turned him



"We used to throw those Polaroids in the garbage," says Sam Bolton. Yet now dealers are hawking them for thousands of dollars each.

down again, Ekstract might be willing to foot a lawsuit.

Simon kept digging. He spoke to Paul Morrissey, Warhol's Factory film director in the 1960s, who remembered the Ekstract deal and wrote a letter of support. Billy Name, the Factory's photographer at that time, corroborated Morrissey's version. Perhaps the most authoritative of the early Factory affidavits came from Warhol's

Factory assistant Gerard Malanga, who helped the artist produce nearly all his early silkscreened paintings.

"The Ekstract situation was an anomaly," Malanga admits. "We never farmed out another job at that point." But, he says, "it's still valid." After all, he notes, Warhol was always experimenting with different methods. Just because this method was different at the time, he says, "how can the board say Joe's painting is not real?"

Along with Factory workers, Simon sought out three of Warhol's early dealers and champions: Sam Green, Irving Blum, and Ivan Karp. All of these art-world figures agreed that Simon's self-portrait was real. Karp was especially supportive: he, too, had had a Warhol painting denied by the board.

I was his first art dealer, in 1961, and I was dedicated to his good cause!" the twinkly-eyed Karp, 77, declares of Warhol from the office of his venerable West Broadway gallery, called OK Harris. So Karp was stunned when a buyer to whom he'd sold a two-panel self-portrait by Warhol informed him that the then newly formed authentication board had declared it "not the work of Andy Warhol."

Karp had bought the painting in the 1960s, knowing full well that its creation had been atypical. A Michigan art professor had contacted Warhol to say that his class wished to produce a Warhol silkscreen, and could the artist advise them? Warhol blithely obliged. When the students were done, CONTINUED ON PAGE 211

CONTINUED FROM PAGE 204 Warhol went to visit the class, pronounced himself delighted by the two square panels, one on top of the other, each of which bore his silkscreened image—one in silver, one in blue—and signed the upper one of them. When the professor offered to sell Karp the work, the dealer snapped it up, convinced it was merely another of the artist's experiments in method, no less legitimate than any of his other works.

To Karp, the proof was in the penmanship. "The signature was the confirming act on the part of the artist!" he declares. "That meant this is what he meant it to be!" As Karp knew, the lack of a signature on a Warhol work meant nothing: the artist produced works in such volume that he often waited until they were sold before signing them. But when Warhol did sign a work, and the signature could be confirmed, how could the board ignore it? "To be uninterested in the signature is extraordinary," Karp fumes. "That's the whole thing for authenticators of classical paintings, after all. In my 46 years in the business, I've never come across anything like this."

Karp had no choice but to take the painting back and refund the buyer his $40,000. After stewing for a while, he decided to submit the painting himself. "I figured when I submitted it under my name, from my loyalty to Warhol's career ... that they would honor that," Karp says. It came back with a DENIED stamp on the back of the canvas. Furious, Karp discarded that one and hung the unspoiled panel in his office.

"There it is," Karp says, gesturing to the wall behind him. As a salable work, Karp

figures, the small panel would be worth about $90,000. Now it's just a decorative wall hanging. "And you know what?" Karp says, fuming again at the memory. "I found a paper in my files, from Vincent Fremont, confirming the picture."

**B**ehind a big wooden desk in his loft-like Manhattan office at One Union Square, framed by rows of art books behind him, Vincent Fremont at 53 has the rumpled, shambling look of a college art professor, and a casual, self-deprecating charm to match. Yet he holds a post of high power in the art world, one that makes a lot of art dealers nervous. As exclusive agent for the Warhol foundation, which was formed in 1987, Fremont decides which galleries and museums will get Warhol shows,

"To be uninterested in the signature is extraordinary. That's the whole thing for authenticators of classical paintings."

and which dealers will get works to sell. From all paintings, drawings, and sculpture that the foundation sells, he gets a commission: originally 10 percent, now 6 percent. Since its inception, the foundation has sold about $150 million worth of Warhol's art. Fremont, who showed up as a worshipful teenager at the Factory in 1969 to sweep the floors, is now a multimillionaire.

Fremont readily admits that in the tumultuous period after Warhol's death he

authenticated Karp's double-panel self-portrait. In the absence of any authentication board at that time, he and Fred Hughes took on the thankless job, as he puts it, of judging works that came in for review. "You wouldn't believe the stories that some people brought, huge packages of stories that were totally fabricated," Fremont recalls. "It's much more complicated than you'd think." In the case of the Karp self-portrait, he remembers the circumstances: the Michigan art class, Warhol's visit. How then could the board later reverse his judgment? "The present board is its own body," Fremont says evenly. Did the board decide that work done off-site was invalid, despite Warhol's approval of it? That impression, he says without elaboration, is "understandable but not correct."

**H**ughes did most of the authenticating until his eyesight began to fail from multiple sclerosis. As Hughes's condition worsened, Fremont became the estate's chief authenticator. (After a protracted and painful decline, Hughes died in 2001.) Dealers began muttering that this created, at the least, an apparent conflict of interest—one that might lead Fremont to reject works presented by outsiders in order to promote sales of the foundation's own stock, for which he would get his sales commission. Fremont denies that. "It was never about commerce," he says of the authenticating. "It was about the integrity of the artist's work."

Eight years after Warhol's death, the authentication board was formed. It would be an expert panel wholly separate from, but underwritten by, the Warhol foundation, which would continue to sell Warhol's art.

One member was David Whitney, a Warhol acquaintance who had once hung a show of Warhol drawings at New York's Whitney Museum of American Art. (No relation to the museum's founding family, he was, and is, architect Philip Johnson's companion.) Another, Neil Printz, was a well-regarded academic, while Georg Frei worked at the Thomas Ammann Fine Art gallery in Switzerland. Interior designer Jed Johnson, a close friend of Warhol's for many years, was a fourth member, though he would serve for little more than a year—a victim of the crash of TWA Flight 800. There was briefly one other member of the board: Vincent Fremont.

Early on, Fremont says, he realized he was once again in a tricky position: both on the authentication board and selling art

BOB ADELMAN

as the foundation's exclusive agent. "That's when it dawned on me that I should step off," he says. "I didn't want the perception of conflict to arise, so ... I removed myself."

With Johnson's tragic death, Fremont's resignation, and Frei's decision to work instead on the catalogue raisonné, the board assumed its current roster: Whitney, Printz, New York University professor Robert Rosenblum, and former foundation curator Sally King-Nero. These were the judges who began to gather three times a year, reviewing upwards of 100 submissions each time. These were the ones whose judgments began to roil the art world.

When paintings and prints from Warhol's well-known series were denied—the Flower series, for example—one could assume the board thought them fakes. But dealers began to believe that if they submitted several from the same series at once—seemingly from the same source—a certain percentage appeared to get turned down as a matter of course.

"I bought 14 Warhols from a major wholesaler," recounts one dealer. "These were 70s silkscreens. I bought and paid for them without written agreement because the works were not only purchased from the Andy Warhol estate but stamped with the Andy Warhol stamp—a circle—and with serial numbers from the estate. I submitted five to the authentication board. Four of the five got an A. But the fifth got a B. Now what do I do about the other nine?"

Some dealers felt the board was cutting down on outside stock on general principles: the less stock out there, the higher the value of what the foundation still owned. Others worried that the board was making decisions based on quality. "Let's say you have two Marilyns, and one is in better condition," hypothesizes one dealer. "So they'll say, 'We'll authenticate this one, but not that one.' But that's not their position to take."

Dealers became accustomed to having the board deny paintings from well-known series that Fremont, or Hughes, or both, had authenticated on behalf of the estate in the late 1980s or early 1990s. The Karp double-panel self-portrait was a perfect example. In cases like this, dealers wondered if the board had new information, or was quietly correcting misjudgments made by Fremont and Hughes. But how to explain when the board reversed its own rul-

ings, going from A to B—within months?

One dealer submitted two silkscreened paintings to the board and had both approved. "Three months later I sold the first painting for about $300,000. After a few months I consigned the second to Christie's." To the dealer's mystification, Christie's kept the painting awhile, then returned it without explanation. "Then I consigned it to Sotheby's. After 15 days, they said they didn't want to deal with it. It turned out that the authentication board had faxed both Christie's and Sotheby's to say the painting was a fake ... less

INNER CIRCLE
Top, Warhol executor Fred Hughes, 1979; right, Warhol Foundation agent Vincent Fremont, 1996.

"I made a purchase based on the green light Fred gave me. Sixteen years later, to be told that it's a fake—it's just not acceptable."

than a year after they gave it an A rating.

One dealer passed on to *Vanity Fair* a letter written by the board's lawyer, Ronald Spencer, to a New York gallery owner. In the letter, Spencer called attention to a work being exhibited in a show of Warhol paintings and drawings. Spencer acknowledged that the board had given that work an A, but then informed the gallery owner, "A little more than thirteen months thereafter ...

the authentication board wrote the [painting's] owner to advise that the authentication board's opinion had changed by reason of circumstances coming to its attention." Now the work was "not by Andy Warhol," Spencer advised, and its A should be immediately changed to a B.

One well-known New York dealer recounts getting an unsolicited letter recently from the authentication board about a Warhol painting the dealer had bought in the 1980s and kept in her personal collection. The letter advised that the painting had been overlooked in the first volume of the catalogue raisonné. "However, if I wanted to resubmit, I was welcome to do that," the dealer recounts. "The next thing I knew, the painting was stamped DENIED on top of Fred Hughes's authentication!

"The value isn't the point," says the outraged dealer. "The point is that I made a purchase based on the green light that Fred gave me. Fred was the only person at that point who could authenticate it. Sixteen years later, to be told that it's a fake—it's just not acceptable. I want them to be deposed, but more than that, I can't say. I'll leave it to my lawyer."

In the gossipy world of art dealers, no one heard of such rude surprises happening to the long-established inner circle of major Warhol dealers—Larry Gagosian (with galleries in New York, Los Angeles and London), Zurich's Bruno Bischofberger, et al. (In Gagosian's case, that's because, as a gallery spokesperson says, Gagosian didn't feel the need to submit paintings with a clear provenance for review. Bischofberger could not be reached for comment.) And so charges of favoritism arose, charges which one dealer outside the circle decided to put to the test. He bought a Flower painting in Italy, he says, and paid $120,000 for it—"today it would be worth $500,000"—on the condition that the board approve it. He brought it back to New York and submitted it; it was returned with a B rating. So the dealer showed the painting to a more powerful dealer in New York, one who has frequent dealings with the estate. The second dealer agreed it was real, and offered to become a half-owner of it for $60,000. The painting was then sub-

TOP, BY MARCIA RESNICK; BOTTOM, BY ROSE HARTMAN

mitted under the second dealer's name. It came back an A.

Irving Blum, the dealer whose erstwhile Ferus gallery staged a seminal Warhol show in 1963, believes that who submits a painting definitely affects what the board will say. "My sense is that if it's a charmed member of the inner circle they're inclined to accept it. And if it comes from another source they're inclined not to. It's arbitrary, I believe."

One well-known collector with longtime ties to Warhol says, "I think the thing is deeply sinister. It's not that they're uninformed. It has to do with manipulating an art market: by denying any and every Warhol they can, they only increase the value of what they've got."

Fremont, for one, rolls his eyes at this theory. The authentication board does not have any art to sell," he says. "It is a separate animal from the foundation. And the foundation's running out of work. So that's not a factor."

By intent or not, says one aggrieved dealer, the board's penchant for changing its mind about works submitted by outsiders has another, subtler effect on the market. "A major museum will probably choose not to buy from an outside dealer because the authentication board may change its rating on an artwork from A to B," the dealer observes. "Whereas if it buys from the estate, that's a guarantee." The same guarantee, he suspects, comes with paintings sold by the inner circle of dealers.

As he kept up his lonely campaign, Joe Simon heard stories like these. They only made him more determined. The board's assistant secretary, Claudia Defendi, had offered him one of the well-lawyered lines she says to all owners when they've been denied: "You're welcome to resubmit your work with more documentation." Later, she would draw a blank when asked to come up with the name of just one owner—one owner in the board's eight-year history—who had, in fact, submitted more documentation and had his B rating changed to an A. (Actually, *V.F.* came up with one: Billy Name, the Factory photographer.) But Simon took her words to heart.

Fremont had been encouraging, too. "He invited me to lunch," Simon recalls. "He advised me to try to trace the history of the piece. I never realized that he knew everything about the painting." In fact, Fremont had participated in the estate's authentication of the Ekstract self-portrait,

back in the late 1980s. "It didn't even come to my mind," Fremont says now with exasperation. "Anyway, I authenticated it with a qualifier. At that point in time, since we didn't have a lot of information when Ekstract brought it to the estate ... a letter was attached to the effect that there might be a need to revisit the situation."

Simon collected dozens of affidavits from anyone remotely relevant. He got transcripts of Warhol himself discussing the making of the painting. The transcript was provided by Matt Wrbican, an archivist at the Andy Warhol Museum in Pittsburgh. Both Wrbican and Tom Sokolowski, the museum's director, were sympathetic to his plight, even though the museum has received grants from the foundation that also funds the board.

All this, along with the painting itself, was tendered to the board for its next re-

view meeting. One day in late February 2003, Simon's mobile phone rang. It was Paul Morrissey, one of the many affidavit writers. Morrissey had just spoken to Fremont, who remains a consultant to the board, though not a voting member.

The painting had been denied again.

Once more, the board refused to explain its decision. And when approached by *Vanity Fair*, none of the board members chose to speak for himself. After some hesitation, however, Claudia Defendi consented to an interview at the red-brick building on West 20th Street; Ronald Spencer, the board's lawyer, would also be in attendance.

Wherever the tens of millions of dollars earned by the estate on the sale of Warhol art over the last 16 years has gone, it certainly hasn't produced any luxuries visible on the ground floor of 525 West 20th Street. When Spencer and Defendi usher a guest into a tiny office with three tiny chairs around a tiny white table, the effect is rather like pulling open the Wizard of Oz's curtain.

Usually, one would prefer that a lawyer not be present at an interview. Defendi,

however, seems almost incapable of saying anything other than her standard lines. "The board is more than happy to re-review a work if the owner is unhappy and feels the judgment is unfair," she says. Asked on what basis the board authenticates work, she says, "The board authenticates work if it's authentic."

Spencer, a dapper veteran of art-world law, is at least more voluble. "All works that are 'not by Warhol' are not all fakes," he clarifies. "That is to say, a fake is a work created with an intent to deceive. Historically, you have all kinds of work that were not created by the artist but were not created to deceive. They might have been copies; they might have been misattributions." Just as likely, the board might see works Warhol did create—but not as art. "It has to do with the intent of the artist," Spencer explains. "If the artist intends to create art, that's one thing. If the artist intended to sign a baseball cap to give someone his signature, that's not art."

Intention is the key, Spencer confirms, no matter how the art is made. "If Warhol conceived the idea, and he then directed someone else to prepare a silkscreen, and he then supervised the process of production and in effect signed off on it, whether or not he signed his name to it, as long as he said, 'That's good, that's what I wanted,' Warhol created that work," Spencer says, "no matter whether there were three, four, or five assistants working under his direction."

The Ekstract and Simon self-portraits would seem to fall squarely within that definition. But Spencer says no. "Ekstract's story, if I understand you correctly, is that in return for giving him the acetates, Ekstract was going to have produced a certain number of silkscreened paintings—six or seven," Spencer says. "Why not 156 or 157? Did you ask him that? I suggest you do. Who said six or seven? Did Warhol say that to Ekstract? Is that Ekstract's story?"

Ekstract has heard this from the board before. "I said, 'These are the people you can trace; these are the people who were connected with this event, who I felt should have them because of their contribution,'" he recalls telling the board. None of them got rich making counterfeit Warhols, he adds, including himself. "I'm a real person, I publish magazines! I have my own money! Whatever success I've had has been by being creative and doing good work, not scamming anybody."

The double-panel Karp self-portrait

would also seem to meet Spencer's definition of what constitutes a Warhol work. But again the lawyer disagrees. "Did you ever see the film?" he asks, in reference to a film apparently made of Warhol's visit to the Michigan art class where the silkscreen was made. "Ask Karp about that. I think you'll find that he can't come up with this famous film. And that nobody will be able to."

"I never heard of such a film before," Karp replies in astonishment. "I don't know what he's talking about. In any event, why would one have to come up with a film to justify the work of art anyway? Remember, the work was signed—and they don't deny the signature." ("The board would not say whether the signature was authentic or not," Spencer replies.)

Spencer is unflappable even when shown the letter he wrote relating the board's reversal of judgment over a period of 13 months. "New information came to the board's attention," he says with a shrug. "The legal waiver specifically allows for that kind of change. Art-historical research is an ongoing river of information. Pieces fall into that river and get taken up by the art-historical community even if it's only 13 months."

As for the story of the dealer who resubmitted a DENIED work under a more powerful dealer's name, Spencer says, "The idea that the board would change its opinion because the owner was an important dealer is so foreign to the way the board operates."

Spencer, like Fremont, debunks the idea that the board denies outsiders' works to enhance the value of the estate's own Warhols. "If one day there are suddenly 100 more Rembrandts on the market, do you think it affects the value of the other Rembrandts? Any art-world expert will tell you it doesn't."

Nor, says Defendi, is the board acting in an arbitrary fashion when it authenticates certain paintings of a series and denies other seemingly identical ones. "It seems arbitrary," she says, "but you have to realize that the board examines every work of art individually." And the dealers who feel the board is denying genuine War-

hols because it questions their quality are simply wrong, she asserts. "The board is not concerned with quality," she says, "only that a work is authentic."

How much simpler, by comparison, the Alexander Calder foundation's authentication board seems! Sandy Rower, director and, as it happens, Calder's grandson,



FOOD FOR THOUGHT Warhol buys groceries in New York City in 1965; some of the packaging looks a lot like his art.

says his own lawyer advised drawing up a stern contract for applicants. "For many months we labored over language and wording. Then I realized: this is stupid. So we do not ask anyone to sign any contract of any kind. . . . I prefer to have an open process where no one is intimidated."

Rower takes a broad view of what constitutes Calder's art. "My grandfather made a lot of unusual things in unusual ways," he says. "He'd make things for people af-

ter dinner. We don't think of those works as any less authentic than mobiles." When he does have to deny a work, Rower says, "we always explain why a work isn't a Calder. A letter from me describes in relatively broad terms why a work isn't genuine, including research into our archives and records. If necessary, I'll even go into great detail."

"Sandy is entitled to conduct his foundation as he wishes," Spencer replies. "But the first time he gets a claim, he's going to rethink how he operates."

A signed baseball cap, as Spencer suggests, is not art. Or is it?

Warhol, after all, was an artist whose work always posed the question: What is art? Or conversely: What is not art? Toward the end of his life, Warhol even began putting seemingly random objects into boxes and calling them time capsules; those capsules are now on display as art at the Warhol museum. If he signed a baseball cap, who's to say he wasn't making a work of art with a typically wry, Warholian comment on art and celebrity?

"If you bring a napkin that Andy signed for you, it's a souvenir," Vincent Fremont says. "There may be value in it, but the board will not authenticate souvenirs." And yet, he admits, "if it's a drawing—for instance, Halston and others had drawings that Andy drew on menus and stuff—that would be different." That would be art? Fremont hesitates. "Yeah. In my opinion. But I don't speak for the board."

It's in trying to draw this line, between art and non-art, that the Warhol authentication board seems to get hopelessly-absurdly—bollixed up.

Take the issue of printers' proofs, made by the printer to determine color, etc., before an actual print run. Sometimes Warhol would give extra proofs of a silkscreened work to the printer as payment, or partial payment, for producing a set of prints for sale or exhibition. Art or non-art? Fremont observes that all printers' proofs must be signed and numbered and marked "P/P." Then, he says, they're le-

BOB ADELMAN

gitimate art. One Warhol printer recently submitted about 10 to the board. "They were all printers' proofs," he declares, but none were signed. "I wish I'd had the balls at the time I got them, and asked Andy to sign them." The board's response was ambivalent. "Half of them the board said 'yes' to," the printer recounts. "On one they had no opinion [a C]. And the others are B."

The same printer also has "overage." "If I need 300 good pieces, I will print 400," he explains, "because you always have a problem. The majority of them are destroyed because they obviously have flaws. Some would go to Andy. The boy du jour at the Factory might get one." Art or non-art? One would guess the latter. But, the printer charges, "the foundation is selling this overage! To dealers. You have to buy a block of $100,000."

Fremont says flatly that the foundation is selling no such overage—unnumbered prints from a limited edition. What it has sold are portfolios of unique trial proofs. "Andy would have 15 versions, say, made of one image, to see which colors he wanted to use. The 14 he didn't choose aren't any less good; so [dealer] Ronald Feldman made portfolios of those."

Another former printer, Horst Weber von Beeren, ran off scores of these unique trial proofs in helping Warhol decide which final version of a portrait to go with on private commissions. "Andy should have destroyed the extra prints," he says. "He couldn't and wouldn't. He was a hoarder." Weber von Beeren has no quarrel with the foundation selling its own trove of thousands of such prints. He just wishes the authentication board would authenticate his own. In the fall of 2000, he submitted five of his eight Liza Minnelli proofs. "And they were authenticated! So I sold them to an Italian art dealer. Then we submitted the last three; they were not authenticated." At the same time, the board reversed itself on the first five Minnellis.

Then there's the case of the "Rauschenberg blouse."

Occasionally in the 1960s, Warhol designed one-of-a-kind clothes with images from his paintings. The "Brillo dress" was made of paper. In February 2002, it sold at Christie's for $56,400, after getting an A from the authentication board. From the same dealer who put the "Brillo dress" up for auction, Los Angeles collector Andrew Dodge bought the "Rauschenberg blouse," a one-of-a-kind garment silkscreened with Warhol's image of artist Robert Rauschenberg and his family. The blouse had been on exhibit at the Warhol museum for about three months as part of a show called "The Warhol Look: Glamour Style Fashion." It was identified in that show by the museum's curators as made by Warhol. Still, when Dodge decided to put the blouse up for auction, Christie's took the precaution of submitting it to the authentication board.

The board denied it.

Stunned, Dodge started researching the blouse, as Joe Simon had done with his self-portrait. He discovered that Warhol had made the Rauschenberg blouse in 1962 for Sarah Dalton, a British ingenue who helped Warhol edit the movie *Sleep*. Dalton wrote Dodge a letter recounting that she was 16 years old on the one night she wore the blouse, to a John Cage concert, and that she remembered meeting Rauschenberg there. She wore the blouse only once, she said, because it was intended to be a work of art.

"I challenged the board," Dodge recalls, "and they said, 'The object you submitted is "associated" with the artist, but it is not "made by him."' I said, 'What do you mean "not made by him"?' He didn't [silk]screen his own work!" ("If the board used that word ['associated'], says Spencer, "it's not the [same] meaning that Dodge put on it.") Now, as Dodge observes, the blouse is "a dead duck," with no value either to another collector or to a museum.

Just as confusing was the board's treatment of the so-called dollar-bill painting. On the night of April 21, 1986, as Warhol recounted in his published diary, a birthday dinner was to be held at Manhattan's Odeon restaurant for Sam Bolton, a handsome young man from a wealthy family who'd drifted into the Factory and become the artist's latest crush. "I had to be creative to think of birthday presents for Sam," Warhol recounts. "I stuck money in that grandmother-type birthday card, and I did a canvas that had dollars pasted onto it."

Paige Powell, Warhol's closest female friend at the time, accompanied him that evening. "I was there when Andy made it," she says of the artwork. "He pasted dollar

"You wouldn't believe the stories that some people brought totally fabricated. It's more complicated than you'd think."

ON THE MONEY
Top, the back of Joe Simon's dollar-bill painting with a DATED stamp; above, Warhol at the Factory, 1965.

EDITION, BY BOB ADELMAN

## THE ART WORLD

bills to a blank canvas and signed it. That was it. It was the kind of thing Andy would do. He made a lot of presents for people."

Some years after Warhol's death, Bolton decided to sell the work. Bizarrely enough, he sold it to … Joe Simon. Simon submitted the dollar-bill painting to the authentication board.

The board denied it.

Again, in the absence of any explanation, Simon gathered affidavits and other evidence to prove the painting real. Again, the board denied it. Finally, in response to Simon's pleas, the board broke its own policy and issued a reason: the dollar bills bore the signature of Secretary of the Treasury Nicholas F. Brady, who took office in September 1988, well after the painting was made. In this instance, the board members had *not* denied the painting because they deemed it ephemera. The artwork raised more questions. Its creation was beyond dispute. Had someone doctored it, then, after it was made? "I know I didn't do anything to it," Bolton declares, "and I know Joe didn't." The board's letter also raises a uniquely Warholian question. If someone removed the original dollar bills from the painting, spent them, and later replaced them with others, would Warhol have deemed it any less a work by Andy Warhol?

With the dollar-bill painting, at least, the board has made a decision based on the work's seeming inauthenticity, not on its status as ephemera. But how to explain the Polaroids?

In recent years, hundreds of Polaroid pictures have been finding their way from the Warhol foundation to Bischofberger and other dealers. These are Polaroids Warhol took of the rich and famous whose portraits he did on commission, to great profit, beginning in the early 1970s. The Polaroids were used the same way they are in fashion shoots, as rough, preliminary takes. Warhol would use the images on them to produce his silkscreens, but the Polaroids themselves were just a means to an end.

"We used to throw those Polaroids in the garbage," Bolton recalls. Yet now dealers are hawking them for thousands of dollars each. The subject of one Polaroid, Bolton relates, is a well-known artist. "They are now selling Polaroids that I took of Andy with the artist, and a European dealer is selling them—to the artist! It's insane!"

Timothy Hunt, the Warhol foundation's exclusive agent for Warhol photos and prints, sees no problem with that. "If Andy hands his camera off to someone else and instructs them to take a photograph, then

we still consider that a Warhol photograph," he says. "It's Warhol as director." Hunt says the fact that Warhol kept so many of them suggests he valued them. "I suspect if Andy had caught Sam throwing Polaroids into the garbage can, he would have gone berserk." That Christie's in the early 1990s appraised the Polaroids at 50 cents to a dollar each is immaterial. "The market clearly doesn't agree with their appraisal," Hunt says. "They *are* selling"—for prices ranging up to $20,000 per Polaroid.

The Polaroids are sold directly by the estate and foundation, which stamps them. So they aren't actually considered by the authentication board—unless a buyer wants to resell them. Can a buyer assume the board *would* authenticate them? Hunt panses. "If the Polaroid is by Andy Warhol, then yes, you could expect the board to authenticate it."

Last winter, Joe Simon and Richard Ekstract submitted their self-portraits for a final time to the Warhol authentication board. The board was due to meet again on June 9. Ever dogged, Simon had even more documentation to show, collected now in a three-ring binder with multicolored, numbered tabs: affidavits, sales receipts, dealer letters, and the like.

With their works still on the pile at West 20th Street waiting to be reviewed, both Ekstract and Simon received curt letters from the board. Once again, their works had been denied.

As a sort of thank-you to the Warhol museum for its support during his odyssey, Simon recently agreed to let designer Philip Treacy—a good friend—create a handbag imprinted with the Warhol self-portrait the board had just denied. Simon wanted a royalty from sales to go to the museum. The Warhol foundation, however, informed Treacy that it owns the copyright to the iconic image. So it, not the museum, will get the handbag royalties.

"Someone has to be wrong here," Ekstract says one radiant June morning in the semicircular living room of his art-filled Sagaponack home. "It's either me or them. You can't be in the middle someplace."

As far as he and his lawyer can see, Ekstract adds, the board's rejection amounts to a charge of forgery, which is defamation of character. And so he and Simon are seriously contemplating legal action. "These people don't know who to pick a fight with," he says. "We will sue."

"At the very least," says Simon, "we want to stop this madness from happening to all the other owners of Warhol art. Someone has to say to this board: Enough." □



VANITY FAIR **AGENDA**
ADVERTISING AND PROMOTION
EVENTS AND OPPORTUNITIES

**GET IN. GET OUT.
GET EVEN.
GET THE DVD TODAY.**

Press "play" and then fasten your seatbelt for *The Italian Job*, starring Mark Wahlberg, Charlize Theron, and Edward Norton. After a master thief loses his heist in a double-cross, he and his team set out to reclaim the loot—by creating the largest traffic jam in Los Angeles history. From Paramount Home Entertainment, this fast-paced, action-adventure thriller is available today on DVD and VHS. The special collector's edition DVD is packed with extras, including deleted scenes, production featurettes, a theatrical trailer, and more. For more information on *The Italian Job*, visit www.paramount.com/homeentertainment.

Copyright © 2003 by Paramount Pictures. All Rights Reserved.



# EXHIBIT F

By Kelly Devine Thomas

## AUTHENTICATING

# ANDY

Seventeen years after Andy Warhol's death, controversies

surrounding the Warhol Art Authentication Board

and the catalogue raisonné of his work reflect confusion

about his intent, his working methods, and his legacy

# Andy Warhol

was the most successful and famous American artist of the 20th century. His signature images—the Jackies, Elvises, and Marilyns—are as familiar to us as the Mona Lisa. His pictures sell for millions, and he is represented in virtually every public and private collection of contemporary art in the world. Everybody knows what an "Andy Warhol" looks like.

Or do they? The coeditors of the second volume of *The Andy Warhol Catalogue Raisonné*, published by Phaidon last month, would dispute that statement. Warhol himself, write Neil Printz and Georg Frei, didn't make it easy. Not only did he "deflect those who would attempt to know his work or to discern his hand in it, he disputed the role of the artist as the author of a work of art." He made hundreds of virtually identical paintings. He overturned traditional notions of rarity and uniqueness. He even suggested that he didn't care if people couldn't see "whether my picture was mine or somebody else's."



Warhol accumulated more than 600 "time capsules." This one dates from the period 1850–73.

"There are so many Andy Warhols," says Printz. "Everyone has their own Andy. We wanted to look at the Warhol we can see."

The catalogue raisonné is an ongoing project of the Andy Warhol Foundation for the Visual Arts, a controversial entity since its beginnings in 1987, when Warhol died, leaving artwork and assets worth more than half a billion dollars and a will directing that most of his assets be used to establish a foundation dedicated to the "advancement of the visual arts." The foundation inherited an astounding trove that people fought over—how much was it worth, who would get what, who was in control—throughout much of the 1990s. In the past decade, the foundation has reaped more than $175 million from sales of works left in Warhol's estate, enabling it to become a powerhouse in the contemporary-art world as a grant giver, a facilitator of scholarship, and an arbiter of authenticity as well as a source of Warhol's work. It is the foundation's role as an authenticator that has caused the most contention in recent years and is threatening to pull it into another court battle.

While the dispute concerns money, it also involves confusion about Warhol's working methods, his intent, and his legacy. The handling of Warhol's estate, the complex nature of his work,

*Kelly Devine Thomas is senior writer of ARTnews.*



and the volume and value of what he left behind make it very difficult to clarify his oeuvre. "There have been some disgruntled people," says foundation president Joel Wachs, "But it's not the job of the authentication board to think about whether people will be upset. It's the job of the authentication board to protect



Warhol's legacy and owners of his legitimate works."

The Andy Warhol Art Authentication Board, which was established by the foundation in 1995, has examined more than 3,000 works submitted to it and has rejected about 10 to 15 percent of them as inauthentic. Decisions by the board—whose members are David Whitney, an independent curator, who was a friend of Warhol's and worked with him; Robert Rosenblum, professor of fine arts, New York University, and curator of 20th-century art at the Guggenheim Museum in New York; Sally King-Nero, the foundation's curator for drawings and photography; and Printz—are unanimous and are protected by a waiver indemnifying the board, the foundation, and the estate, a practice that is not uncommon among authentication committees.

Because the board does not explain its decisions—it says explanations are subject to misunderstanding, misinterpretation, or misuse—there is growing frustration in the market over how it arrives at its conclusions. Adding to the confusion is the fact that the board has rejected works previously authenticated by representatives of the foundation and has reversed its own opinions about works it had previously determined to be authentic. "I don't understand the science of it," says one New York dealer. "That's what is unclear."

The authentication board acts as an arm of the six-volume catalogue raisonné project. Printz, King-Nero, and Frei, who is the director of Thomas Ammann Fine Art in Zurich, have traveled the world to document and compare as many of Warhol's works as possible. Not all works must be submitted to the board to be included in the catalogue, sources say. A work must be submitted if one of the three-member team considers its authenticity uncertain and wants the whole board to see it.

New York dealer and collector Timothy Baum says he was told a year ago that four *Flowers* paintings—two of which he owned and two that he had sold—needed to be submitted to the board for inclusion in the catalogue. The paintings, which Baum says were given by the late Henry Geldzahler, Warhol's friend and the Metropolitan Museum of Art's first curator of contemporary art, as a wedding gift to a family friend of the curator's in the 1960s, were rejected. "The works were not signed, but Warhol didn't sign all of his works," says Baum. Since the board does not explain its decisions, Baum doesn't know why the works were not accepted. "They don't have to give any reason, and they don't," says Baum. "It's shocking."

Rainer Crone, author of a catalogue raisonné of Warhol's paintings published in 1970, estimated that Warhol made more than 900 *Flowers* paintings in the 1960s. The foundation's catalogue records a little more than half that number. The authentication board contends that Warhol was "acutely aware of how many works he was making," but Crone took the opposite view, stating, "Warhol was neither interested in the exact number of paintings produced nor in limiting the edition."

"There is this perception that Warhol painted more than he did," says Brett Gorvy, Christie's codirector of contemporary art. "The catalogue raisonné has shown how few there actually are in some cases. It has had quite a big impact on the market. People had been looking at his works as serial; now they are seeing them as more unique."

Catalogues raisonnés are scholarly endeavors that list every known work in an artist's oeuvre. They also have an enormous influence on the market. If a work is not published in a catalogue raisonné, it has little or no market value.

Joe Simon, a London-based film producer and collector, has been trying for years to obtain the current board's acceptance of a Warhol self-portrait he bought in 1989, which was twice approved by previous foundation representatives. Simon and other dealers and collectors have told *Vanity Fair* and other publications that they intend to take legal action against the board and the foundation for decisions they say have cost them millions. They contend that the board is refusing to authenticate certain artworks in order to increase the value of the foundation's own collection. As *ARTnews* went to press, no lawsuit had been filed.

Wachs scoffs at the notion that the board's decisions are linked with the relative value of the foundation's assets. He also dismisses criticism that it is a conflict of interest for the foundation to be selling works by Warhol and, at the same time, judging the authenticity of works owned by others. "The authentication board operates completely independently," Wachs says. "The foundation is totally uninvolved in its decisions."

Dealers and auction specialists say that outright fakes of Warhol's works are relatively easy to spot. It's much more difficult, they say, to distinguish between works that were made under Warhol's direction and those that weren't, in part because Warhol employed assistants and used reproducible silk screens.

Warhol described the silk-screening process like this: "With silkscreening, you pick a photograph, blow it up, trans-

*Flowers*, 1964, silk-screen ink and acrylic paint on canvas. One scholar believes that Warhol made more than 900 *Flowers* paintings in the 1960s.

PENDING COLLECTION, © ANDY WARHOL FOUNDATION/ ARS, NEW YORK. © ANDY WARHOL MUSEUM, PITTSBURGH/ THE VISUAL ARTS

fer it in glue onto silk, and then roll ink across it so the ink goes through the silk but not through the glue. That way you get the same image, slightly different each time."

The board has set out to decide which works made with his silk screens were authorized by Warhol. "There are clear distinctions between what Warhol made and what he did not," the board has stated. "The goal of the Andy Warhol Art Authentication Board is to clarify these distinctions."

Among the works the board has rejected is a 1967 two-panel self-portrait produced by a Michigan art class and signed by Warhol, which New York dealer Ivan Karp, one of Warhol's earliest supporters, bought in the 1960s and later sold. The work had been authenticated by the foundation in 1989 as a "collaboration." "It was authorized by Warhol, with his signature," says Karp, who is now out the $40,000 purchase price he refunded to the buyer when the work was rejected. "The authentication board does not dispute the signature. They say they do not take the signature into account. How can they say that! The signature is the confirming act!"

Asked by *ARTnews* if the board views Warhol's signature as an authenticating act, the board responded, via fax: "The signature is taken into consideration as one factor among many during the authentication review." The bottom line, surmises Karp, is that "if the board doesn't like the conditions under which an object was made, it's not going to authenticate it."

In general a work doesn't have to be reviewed by the board for Christie's or Sotheby's to handle it if its provenance is solid, although the board has had suspect works pulled from auction, sources say. "With some artists' estates, you have to secure the authentication board's approval because clients are looking for it," says Gorvy. But in the case of Warhol, "this is not currently deemed by buyers to be essential for a work to be sold at auction."

"The vast majority of what we sell never needs an authentication," says Ronald Feldman, who commissioned works from Warhol, copublished with the foundation the catalogue raisonné of prints, and frequently buys works from the foundation. But another dealer insists, "You need their 'Good Housekeeping stamp of approval.' Without it a work is

dead in the water." Jean-Paul Russell, who worked for Warhol's printer in the 1980s, says he would never submit one of his works to the board. "What would they tell me? That it's real?" asks Russell. "I know more about his work than they do." Russell says he is the owner of a green *Hamburger* painting that Warhol





made on the same roll of canvas as a *Camouflage* painting. "Nobody would know that story," says Russell. "The authentication board wouldn't know why it was green."

Some critics charge that the independence of the authentication board is compromised by the fact that two of its four members are also employees of the foundation: Printz is coeditor of the first and second volumes of the foundation's catalogue raisonné of Warhol paintings, sculpture, and drawings. King-Nero, the foundation's curator of drawings and photography, works with Printz on the catalogue.

Foundation employees often play dual roles or are involved in both the foundation's business and its scholarly ventures. Vincent Fremont, who worked for Warhol from 1969 until the artist's death, is the foundation's exclusive sales agent for paintings, sculpture, and drawings and is also a consultant to the authentication board. Fremont was named in

Warhol's will as one of the foundation's three founding trustees (with the late Frederick Hughes, Warhol's longtime manager, and his older brother, John Warhol, who lives in Pittsburgh). He was the foundation's primary authenticator and exclusive agent for all works sold between 1990 and 1995.



Authentication board member Sally King-Nero with foundation trustee John Warhol; foundation president Joel Wachs; the late Frederick Hughes, a Warhol associate, being bussed by Barbara Allen.

Claudia Defendi, chief curator of the foundation's collection and coeditor of its catalogue raisonné of Warhol prints, is also the authentication board's spokesperson. Timothy Hunt, the first curator hired by the estate, in 1987, to catalogue the collection and the foundation's former chief curator, is now the foundation's exclusive agent for sales of photography and prints.

## Work

on the catalogue raisonné began in 1977, when the late Zurich dealer Thomas Ammann started the project with Warhol's cooperation. Warhol didn't keep detailed records of how many works he made. Instead, he dumped receipts, junk mail, and exhibition flyers into more than 600 boxes, sealed them, and called them "time capsules." About one-quarter of the capsules, which are housed in the Andy Warhol Museum in Pittsburgh, have been catalogued, says

John Smith, assistant director for collections and research.

The Warhol Foundation became involved with the project in 1993, when it hired Printz as coeditor. "I wanted to catalogue Warhol like they catalogued Picasso," says Printz.

In order to do that, the authors examined the voluminous amount of material Warhol had left behind, from his thousands of works—they estimate that he made about 10,000 paintings, sculptures, and drawings—to the roughly 1,500 boxes



that hold a "vast and staggeringly complicated account of his activities as an artist." The authors admit that "aspects of the archive, including many of the time capsules, have not been inventoried, nor has it been possible to exhaustively review the entire archive."

What did Warhol make? When did he make it? How did he do it? When did he put the screen on? How did he know where to put the yellow in Marilyn's hair? How did he change, and when did he change? These are some of the questions Printz says he and his colleagues set out to answer.

The first volume of the catalogue, published in 2002, covers the years from 1961 through 1963. Volume two deals with the period from 1964 through 1969, when Warhol created more than 1,500

works, many of which are virtually identical. The problem, then, the editors note, "becomes one of differentiation, no longer a question of Warhol versus not-Warhol, but of one Warhol versus another; or put another way, which Warhol is it?—which *Campbell's Tomato Soup Painting?* Which *Brillo Box Sculpture?* And how many of each are there?"

The foundation will publish the next four volumes of the paintings, sculpture, and drawings catalogue raisonné, on which it has spent more than $2.3 million

**Get it while it's hot: limited-edition Campbell's tomato-soup cans with Warhol-inspired labels went on sale this spring.**

so far. There were discussions about transferring the project to the Warhol Museum, but the foundation's directors decided to keep the volumes under the foundation's control. Printz, who took a leave of absence last year to work on the Isamu Noguchi catalogue raisonné, will edit the volumes. "It's staying with us," says Wacha. "We want to make sure that we continue the high quality of scholarship we had in the first two volumes. It's not going to be cheap, but it has to be done."

# Warhol was born Andrew

Warhola in 1928, the youngest son of Czechoslovakian immigrants Julia and Ondrej Warhola. His older brother, John, remembers Warhol as a kid who had "all

the makings of a priest" and who often abandoned ball games to draw on the front stoop of their home. "He was a blue-eyed, blond-haired quiet kid who never argued," Warhola told *ARTnews*. "He was more of a listener. He let you do the talking."

Warhol moved to New York when he was 21, dropped the *a* from his last name, and became a successful commercial illustrator. He became an art star in 1962, when the Ferus Gallery in Los Angeles exhibited his *32 Campbell's Soup Cans* in his first one-man show. He founded the Factory during the 1960s, a playground for the rich, the famous, and the drug-ridden that also functioned as his work space.

Warhol created his art across mediums, pushing the limitations of painting, printmaking, and film. He shrewdly identified iconic images of American identity, celebrity, and death: Campbell's soup cans, Marilyn Monroe, Elvis, Jacqueline Kennedy (before and after John F. Kennedy's assassination), the electric chair. He was also a successful publisher. He founded *Interview* magazine and wrote several books in which he set forth his views on life, art, and pop culture.

Today Warhol's work is a cornerstone of the contemporary-art market. His paintings routinely sell for millions of dollars. His auction record is the $17 million paid for *Orange Marilyn* (1964) in 1998. New York dealer Larry Gagosian recently sold *Superman* (1961) for around $25 million—the highest price known to have been paid for a work by Warhol. While most evening auctions will feature no more than three works by the same artist, up to five of Warhol's works may be included, so strong is his market. "He is the Picasso of the late 20th century," says Gorvy.

Warhol died unexpectedly in 1987, following routine gall bladder surgery. Most of his personal belongings—primarily antique furnishings, jewelry, and odd collections of cookie jars and other objects—were sold in 1988 at Sotheby's, raising $25.3 million and providing the foundation with its seed money.

Warhol's estate also included a vast collection of his own work: more than 100,000 paintings, drawings, prints, and photographs; more than 100 films; 4,000 hours of experimental video and segments produced for television; and hundreds of boxes of archival material. The value of the artworks became the subject

PHOTO: SEEN CAMPBELL SOUP CO./WARHOL ART ON LABEL LICENSED BY THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS/TM LICENSED BY CAMPBELL SOUP CO./ALL RIGHTS RESERVED

of a prolonged court battle in the 1990s between the foundation, which was the principal beneficiary of the estate and took responsibility for its assets in 1990, and Edward Hayes, the attorney for the estate who was hired immediately after Warhol's death by Hughes, the executor, who died in 2001.

The foundation argued for a lower valuation, because Hughes and Hayes were each due to receive compensation equal to 2 percent of the estate's value, and because the IRS requires private foundations to give away 5 percent of their assets annually. When it appraised the estate, Christie's, acting on the foundation's instructions, applied a blockage discount—a practice that allows an appraiser to reduce the value of an artist's estate for tax purposes—and arrived at the sum of $95 million for Warhol's art, bringing the estate's total value to around $220 million.

Hayes rejected that figure. He sued the foundation, arguing that the artworks alone were worth at least $700 million. A judge settled the matter in 1994, declaring the estate worth $510 million, with Warhol's art valued at nearly $400 million. A separate investigation by the New York state attorney general's office into the foundation's business affairs ended in 1998, with a settlement in which the foundation agreed to strengthen its internal financial controls and to provide, at regular intervals, more extensive financial information to the attorney general's office and the public.

The foundation has donated almost 6,000 works to the Warhol Museum, which it opened in 1994 in collaboration with the Carnegie Institute in Pittsburgh and New York's Dia Center for the Arts. Other works in Warhol's estate went to more than 24 museums, including the Art Institute of Chicago and the San Francisco Museum of Modern Art, which purchased works from the foundation in 1992 at deeply discounted prices.

Some of the works inherited by the foundation were on rolls of canvas. "Many of his paintings were stored unstretched," says Fremont. "There wouldn't have been enough room to store them all otherwise."

Several rolls of Elvis canvases were in Warhol's studio after his death. These Elvis paintings are distinct from, and are considered precursors to, the Elvis canvases that were shown by Irving Blum at the Ferus Gallery in 1963,

according to the catalogue raisonné. "During Warhol's lifetime, the studio series remained largely unknown," the authors note. Crone did not include them in his catalogue. The studio types were never exhibited during Warhol's lifetime because they were damaged, according to Gerard Malanga, Warhol's assistant in the 1960s. Warhol wrote about the incident in *POPism*: "One night that summer there was a terrible thunderstorm and when I came in the next morning, the Elvises were sopping wet—I had to do them all over again." Malanga says Warhol asked him to destroy the rolls.

He says he destroyed some of them but became distracted and forgot to destroy all of them. "When these paintings started popping up in 1993, I wondered where they were coming from," Malanga recalls. "They differed from the Ferus ones in the cropping of the head and the cowboy boots." According to the catalogue raisonné, Elvis is about six inches shorter in the studio types than in those shown at Ferus. Says Fremont, "If Warhol had wanted to destroy them, he would have. He had 20-plus years to do that."

One of the studio rolls, *Elvis 11 Times*, was kept intact and donated by the foundation to the Warhol Museum. The catalogue raisonné notes that another studio roll, *Elvis 6 Times*, was divided by the foundation in 2001 into three distinct works, featuring, respectively, one Elvis impression, three impressions, and two impressions. "That was a determination that was made with a lot of thought," says Fremont of the works, which were later sold. If the roll had been exhibited intact during Warhol's lifetime, Fremont says, "it wouldn't have been cut." He adds that there was a precedent for the foundation's action: Warhol himself had cut a studio-type double Elvis from a roll and sold it to a collection in Japan in February 1987, shortly before his death that same month.

An advantage of buying works from the foundation, aside from the fact that they are sold to dealers at a discount, is

that works with a foundation provenance are marked with inventory numbers, beginning with *PA* for painting, *PO* for portrait, and *SC* for sculpture. The authentication board says it has never rejected a work originating from the estate. Many of them are never submitted. "The message is that if you buy from the foundation, it will be OK forever," says a New York dealer who has had works rejected by the board. "But if it doesn't come from the foundation, it can be fake tomorrow."



*Superman, 1961, recently sold for around $25 million, the highest price known to have been paid for a work by Warhol.*

Fremont and Hunt do not submit the works they sell on behalf of the foundation to the authentication board, nor do most people who buy works from the foundation. Fremont says that people who buy from him are welcome to submit the works to the board, but "it's not necessary."

Some sources argue that the authentication board and catalogue raisonné authors are not applying the same standards of authenticity to the works that are being sold by the foundation. In particular, they point to the studio-type Elvis paintings that Warhol never exhibited and allegedly directed Malanga to destroy. Others say the foundation

PHOTO: ©2004 CAMPBELL SOUP CO./ANDY WARHOL AND LICHTENSTEIN FOUNDATIONS/LICENSED BY CORBIS © ARS, NEW YORK / ROBERT MCKEEVER/COURTESY GAGOSIAN GALLERY, NEW YORK/©ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS/ARS, NEW YORK






has sold works completed after Warhol's death. Says Fremont, "Anything Andy did not see directly before his death was stopped. Works that had been approved by him were completed." The foundation has also acquired works over the years from Warhol's associates that, sources say, the board might otherwise question. "Would the board authenticate some of these works if they didn't come from or weren't owned by the foundation?" asks one dealer. "I don't think so."

In May 1993, Hughes tried to sell ten Warhol works at Sotheby's. Eight of them failed to sell. The works, many of which dated from the early 1960s and were major examples of the artist's oeuvre, had a scant exhibition history. None of them had been exhibited during Warhol's life-

Among Warhol's Polaroid subjects in the 1970s were Marisa Berenson (with Andy), John Lennon and Yoko Ono, Mick Jagger, and Paloma Picasso.

time; most had been shown for the first time at Galerie Bruno Bischofberger in Zurich six months before the Sotheby's sale.

Two months after the failed Sotheby's sale, Hughes reached an agreement with the foundation, which was in the middle of its court battle with Hayes. Hughes agreed to accept Christie's lower valuation of the estate; in return the foundation agreed to pay him his 2 percent executor's fee, based on that valuation, and to hand over dozens of works worth tens of millions of dollars that Hughes claimed were his. Among these were the works that Hughes had tried to sell at Sotheby's, according to an affidavit by Hughes that has been obtained by *ARTnews*. Today they appear in the catalogue raisonné.

In his affidavit, Hughes also claimed

five Elvis paintings, which he said had been given to him by Warhol in the 1960s. All of them were the studio type that Malanga says Warhol asked him to destroy.

Fremont says Hughes initially stamped Warhol's signature on estate works but stopped this practice within a matter of months, because, he says, "it wasn't practical." Hughes authenticated works until 1989, when he became ill with multiple sclerosis. Fremont, who took over the authentication duties in 1990, says, "There was a lot of learning, real-time learning, involved." The foundation began assigning authentication numbers in 1990 to works that were reviewed, a practice the board continues today. Works accepted as authentic are stamped and assigned numbers beginning with the letter *A*; works not considered authentic are assigned the letter *B* and are stamped *denied*; and works whose authenticity the board can't determine are assigned the letter *C*. The authentication board says it has also assigned numbers beginning with the letter *D* when it believes a work is collaborative. To date it has issued nine *D* numbers—none to works dating before 1969.

Photos play a large part in Warhol's oeuvre—his images came from photos he found in periodicals or took himself, most famously in a photo booth or with a Polaroid, but he had only one show of his photos during his lifetime. According to the board, it authenticates only black-and-white photographs that match negatives in the foundation's possession and may decline to approve such a work if it has doubts about ownership, provenance, or authorization. Today, four-panel stitched photographs have sold for upward of $50,000, and a single Polaroid can sell for $20,000.

As reported in a 1995 *ARTnews* article, the estate exhibited Warhol's photo-booth images at New York's Robert Miller Gallery in 1989, where each strip was priced at $12,500. Among them were photos of the late dealer Holly Solomon, who sued the estate, claiming that she, not Warhol, had taken the pictures. The article reported that she later agreed to split the photographs with the estate to settle the suit.

The estate and the foundation acquired a number of works by reaching similar settlement agreements with former associates of Warhol's, such as Rupert Jasen Smith, Warhol's printer from 1977 to

©2004 ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS/COURTESY PACE/MACGILL GALLERY, NEW YORK

1987. Generally, works in the possession of an artist's printer are returned to the estate when he or she dies. But some of Warhol's printers and assistants say that Warhol often gave them works as payment, in lieu of cash. Ultra Violet, one of Warhol's superstars during the 1960s, says that Warhol was very clever about money. Whenever anyone asked him for some, "he never had any."

Horst Weber von Beeren worked with Smith from 1978 to 1985, producing thousands of Warhol screen prints on paper and canvas. Around 1996, von Beeren says, Archibald Gillies, president of the foundation at the time, offered to buy the 300 works he had in his possession for $100,000—works, von Beeren says, that were then worth closer to $2.4 million. Some were unpublished prints, that is, they were unique, and others were excess prints relating to limited editions commissioned by dealers during Warhol's lifetime. Gillies declined to comment for this article, saying that he didn't think it was appropriate to comment on foundation matters after his retirement, in 2001. He referred all questions to the foundation's attorney, Peter Gates, who also declined to comment.

When he didn't accept the offer, von Beeren says, the foundation made another proposal: von Beeren would give the foundation all of the prints relating to limited editions, and he and the foundation would split the unpublished prints. But von Beeren says he was told he would still need to submit his share to the authentication board. "I was told we would submit them separately," says von Beeren. He rejected the foundation's terms and later submitted the works in batches, sometimes under other people's names, to the authentication board. The works included a number of identical 1978 Liza Minnelli images on paper (prints) and on canvas (paintings).

According to letters from the board that were provided to *ARTnews*, between June 1999 and early 2000, the board approved five of the paintings. Eight months later, it rejected three additional canvases. At the same time, the board approved seven prints and re-



The real Liza? This image of Minnelli, 1978, owned by printer Horst Weber von Beeren, was first accepted and later rejected by the Warhol authentication board.

versed its opinion about the five paintings it had previously approved. When one of the paintings it had reversed its opinion about was exhibited at New York's Tony Shafrazi Gallery in 2001, the authentication board's attorney, Ronald Spencer, sent a letter to Shafrazi alerting him to the fact that the work had been deemed inauthentic. Shafrazi did not return phone calls seeking comment.

It is not uncommon for owners to submit works to the authentication board under another person's name. Sam Bolton, who was Hughes's assistant from 1984 until 1988, says he submitted Polaroids to the board under someone else's name last summer. "I didn't want any trouble," says Bolton. "Why would I want to go up against a foundation that has turned down so many things?"

## In early 1988, Los Angeles

dealer Michael Kohn advised a client to buy a Warhol self-portrait (ca. 1964) for $22,000. Kohn knew of two similar paintings that had been authenticated by the estate and sold at Sotheby's and Christie's a few months earlier, in No-

vember 1987. But when Kohn tried to get his client's work approved in 1988, the estate wouldn't authenticate it. Instead, Hayes, the attorney for the estate at the time, offered to reimburse Kohn's client in 1989.

Hayes says he believed that the estate should reimburse clients if works it had authenticated later proved to be problematic. The estate's offer included a clause that granted Kohn's client the option to buy back the work within two years if it were authenticated. "I thought they should be able to extend the option for a much longer time," says Kohn, who turned down the offer.

The estate's policy toward authentication began to change in the summer of 1989, when seven signed Superman collages, which were included in the Museum of Modern Art's 1989 Warhol retrospective, were reported to be fakes. Miller was the owner of six of the collages; Hughes reportedly owned the seventh. According to Hayes and to Paul Alexander's 1994 book *Death and Disaster: The Rise of the Warhol Empire and the Race for Andy's Millions*, Hughes received the collage in exchange for authenticating 15 collages that Miller had bought from an Italian dealer for $175,000. When Miller asked the estate to reimburse him for his loss, Hughes refused.

Hayes says he insisted that Hughes refund Miller's money, but instead Hughes asked him to draw up an agreement that would prohibit owners from making authentication claims against the estate. When Hayes refused, the foundation turned to Gates, Gillies's personal attorney at the time, who in 1990 drew up the waiver that owners now sign before submitting their works to the authentication board. "I realized they weren't using any document," says Gates, "so I drew up one that could be used going forward for all cases."

The self-portrait Christie's sold in November 1987, which was identical to the one Kohn's client bought in 1988,

WARHOL WARHOL FOUNDATION FOR THE VISUAL ARTS/COURTESY FROM HORST WEBER VON BEEREN



fetched $28,600 from Paris dealer Daniel Templon. By the time London collector Joe Simon bought the work from New York's Lang & O'Hara Gallery, in August 1989, for $195,000, it had twice been authenticated by Hughes: once prior to the Christie's sale and again when it was being handled by Ronald Feldman, in March 1988. In 2001, Simon says, a London dealer had a buyer willing to pay him $2 million for the self-portrait on condition that it be submitted first to the authentication board. Simon submitted it to the board and was informed that it wasn't authentic.

Stunned by the board's decision, Simon set out to learn more about the painting. He located magazine pub-



LEFT: COURTESY MICHAEL KOHN GALLERY, LOS ANGELES

lisher Richard Ekstract, who in 1965 had arranged to lend Warhol a high-quality Norelco video camera if Warhol would agree to be interviewed for his trade magazine, *Tape Recording*. According to Ekstract and Paul Morrissey, Warhol's manager at the time, who has written a letter to the board in support of Simon's case, Warhol loaned Ekstract a set of acetate transparencies so that he could have some silk-screened self-portraits made for use in the magazine and for a party Ekstract gave for Warhol. (By loaning Ekstract the acetates, Warhol obligated Ekstract to pay for the expensive silk screens, Morrissey says.) Ekstract and Morrissey say Warhol then gave the self-portraits to Ekstract and to half a

dozen others who had made the deal and the event possible.

Whitney Museum adjunct curator Callie Angell, who is compiling the foundation's catalogue raisonné of Warhol films, says Warhol used the Norelco camera to shoot at least eleven half-hour tapes of people at the Factory.

When Simon submitted his self-portrait a second time, last year, along with a dozen affidavits from Warhol's former printers and associates, it was rejected again, with no explanation. "It's like getting in a car accident with someone who doesn't have car insurance," says Simon. "There's nothing you can do."

After the *Vanity Fair* piece and other articles appeared about Simon's case, the



OPPOSITE Warhol's 1964 self-portrait sold at Christie's last November for $1.4 million. ABOVE The unauthenticated self-portrait Michael Kohn advised his client to buy; Richard Ekstract with his controversial Warhol self-portrait.

board sent him a letter last May, explaining the reasons why it would not authenticate the work. According to the letter, which was provided to *ARTnews*, the reasons relate to eleven self-portraits on linen that the catalogue raisonné states Warhol created in early 1964. One of the works, on linen with a green background, was used as the image for the U.S. Postal Service stamp commemorating the artist in 2002. Another painting of this type fetched $1.4 million at Christie's last November.

The same photo image was used to make both sets of works, but whereas the self-portraits on linen are hand painted and differ slightly from one another in terms of screen intensity and detail coloring, those on cotton have no hand painting and are

identical to one another, making them more like prints. The letter also contends that Simon's self-portrait, as well as nine others identical to it that the board has reviewed, was made without Warhol's authorization by a commercial printer who received no instructions from Warhol, which contradicts the way the board says Warhol worked during the 1960s.

"The board says Warhol never did this and Warhol never did that," says Ekstract. "But that's a load of crap. He did do this. There's no other way for them to come into my possession."

## To establish the mechanisms we've created," says Wachs, "is no small undertaking." In the 17 years since Warhol's death, the foundation, which does not accept donations, has self-generated all of its revenue from investment proceeds, the sale of its art collection, and the licensing of Warhol products.

It has more than $135 million in cash and investments, and its collection of Warhol art is worth more than $20 million, according to the foundation's 2003 annual report. But Wachs says this figure is based on Christie's discounted appraisal, conducted more than a decade ago. "It's difficult to know the value of what we have," he says. Fremont put it this way: "It's getting down there. Warhol was prolific but not that prolific." While the second volume of the catalogue raisonné lists the foundation as the owner of dozens of box sculptures and *Jackie*, *Flowers*, and *Electric Chair* paintings, along with a number of society portraits, Fremont says many of the works have been sold. When asked how many prints and photographs are left, Hunt replies, "Less than there was two weeks ago, and less than there was two weeks before that."

The foundation supports museums and arts organizations around the country and is also concerned with broader political and social issues facing artists—such as freedom of artistic expression and, in recent years, health insurance. Wachs says the aim of the foundation is to "create and nurture an environment from which future Andy Warhols will emerge."

As for what Warhol would have thought about the handling of his legacy, Ronnie Cutrone, his assistant in the 1970s, observes, "He would say, 'Oh my God. What a soap opera.'" ∎

# EXHIBIT G



I BOUGHT ANDY WARHOL

Richard Polsky

PO40.010

Fo

EDITOR: Deborah Aaronson

DESIGN AND TYPESETTING: Arlene Lee

JACKET DESIGN AND TYPE GRAPHICS: Beth Middleworth

PRODUCTION MANAGER: Stanley Redfern


Library of Congress Cataloging-in-Publication Data

Polsky, Richard.
    I bought Andy Warhol / Richard Polsky.
        p. cm.
Includes bibliographical references and index.
    ISBN 0-8109-4271-2
    1. Polsky, Richard. 2. Art dealers—United States—Biography.
    3. Art—Collectors and collecting—-United States. 4. Warhol, Andy, 1928–
    I. Title.

N8660.P65 A3 2003
709'.2—dc21

                    2002151482

Text copyright ©2003 Richard Polsky

Published in 2003 by Harry N. Abrams, Incorporated, New York
All rights reserved. No part of the contents of this book may be
produced without the written permission of the publisher

Printed and bound in the U.S.A.
10 9 8 7 6 5 4 3 2 1



Harry N. Abrams, Inc.
100 Fifth Avenue
New York, N.Y. 10011
www.abramsbooks.com

Abrams is a subsidiary of
LA MARTINIÈRE
GROUPE

1

# VINCENT FREMONT

HAVE YOU EVER WALKED INTO AN AUTO showroom and been assaulted by their sales force hell-bent on selling you a new car? If you have, you probably recall how these desperate individuals couldn't do enough for you. Want the car yesterday? No problem. Would you like some floor mats thrown in at no charge? They're yours. Care for tinted glass? You've got it. Whether you are a repeat customer or a first-time buyer, the salesman does whatever it takes to close a deal. Perhaps that's why it irked me one day that the Andy Warhol estate's exclusive sales agent, Vincent Fremont, couldn't be bothered to return my calls—despite my having purchased hundreds of thousands of dollars of Warhols from him over the years.

It was April 2002 and, fortunately, I was no longer preoccupied with my twelve-year-long quest to buy a Warhol for my own collection. All I was trying to do was buy a painting of a lobster for inventory. As an art dealer, I had dedicated the last fifteen years of my life to learning the intricacies of the Warhol market. Not long before, that hard-won knowledge had allowed me to buy the Warhol of my dreams. But life goes on and now I was preoccupied with the necessity of making a living. If I could convince Fremont to sell me the lobster, I had a ready buyer waiting in the wings.

At this point, Warhol had been dead for fifteen years. When he died in 1987, he left behind approximately 4,100 paintings and sculptures.

Fremont was given the lucrative task of selling them in order to fund the newly formed Andy Warhol Foundation for the Visual Arts. The board of directors had agreed to pay him a 10 percent commission on everything that he sold (reduced to 6 percent many years later), which made him a millionaire. As Warhol's work appreciated dramatically in value, Fremont became increasingly selective as to whom he chose to sell paintings to. If I wasn't willing to bow down to him in order to buy the lobster, there were a couple of dozen people in line behind me who would be only too happy to do so.

Vincent Fremont was a character in his own right. Back in 1969, at the age of nineteen, he had left his native San Diego and showed up on the doorstep of the Factory. Warhol's silver foil–covered studio in New York City. Somehow, he charmed Warhol into hiring him to sweep the floors, paint the walls, and perform various other basic functions. Fremont impressed his boss with his seriousness and reliability. His maturity stood out in stark contrast to the studio's menagerie of flakes. As time went on, he won Warhol's trust and was given the responsibility of opening and locking up the Factory each day.

Eventually, his position evolved into developing television projects, including MTV's Andy Warhol's Fifteen Minutes. Upon Warhol's death, Fremont was appointed to sit on the Foundation's board of directors. Once it became apparent that they needed someone with integrity to disperse the art work, he became the logical choice. To avoid a conflict of interest, he was asked to resign his seat on the board, but was rewarded with a contract to handle all sales.

Fremont summed up his mandate by saying, "My job was to raise money so the Foundation could give it away." As he plunged into his new position, he must have been overwhelmed by the enormity of the task. The first order of business was to determine which paintings should be designated for placement in the new Andy Warhol Museum in Pittsburgh, Andy's hometown. Roughly a third of the estate's paintings were donated to the institution. Included in this group were many of the most important and valuable remaining canvases.

Once the museum was squared away, Fremont opened up an eighteen-month window to other American museums, allowing them to buy Warhol paintings at 50 percent of "book" value. Many of the

nation's institutions eagerly took advantage of this extraordinary offer. To Fremont's credit, he tried to do the right thing by distributing the work in a way that benefited Warhol's reputation most. For instance, both the San Francisco Museum of Modern Art and the Museum of Modern Art in New York had put dibs on National Velvet. This oversized silver masterpiece featured a young Elizabeth Taylor on horseback, repeated forty-two times. It was the only painting that Warhol had done of this particular image. Its appraised value was approximately $700,000, which meant the winning candidate would pay only $350,000 for it. Fremont and the board elected to sell the painting to San Francisco's museum. Their thinking was that there were already many more important Warhols in New York than in San Francisco.

After the museums had made their selections, Fremont moved on to lining up shows with Warhol's longtime dealers. He based his decisions on loyalty—Warhol patrons who were early supporters were given first crack at the remaining paintings. Those dealers wanting to exhibit an entire series of work had to commit to buying the majority of them. What's more, they were also expected to promote the work by producing a scholarly catalogue along with an extensive advertising campaign for the show.

In this way, bodies of work that were largely unknown to the public received exposure. New York's Gagosian Gallery bought and exhibited the Shadows, Rorschachs, Camouflages, Diamond Dust Shoes, and Ladies and Gentlemen (a series of paintings of transvestites). Thanks to Fremont's adroit handling, Warhol's memory was further honored and the awareness of his oeuvre was expanded. As fresh bodies of work were exhibited, especially from the underexposed 1980s, the art world began to grasp the depth of his achievement.

Fremont was also open to selling works out of the warehouse, which explains why I was waiting by the phone just as April was coming to an end. I fought off pangs of exasperation and summoned the courage to call him one last time. Right before placing the call, I looked at the image of the lobster that one of his assistants had e-mailed me. Just getting that JPEG had been an ordeal that had taken almost two weeks of back-and-forth phone calls. Toward the end of his career, Warhol had

done perhaps a dozen paintings of lobsters. Each one measured 20 by 16 inches. Typical of Warhol, he had painted them in different color combinations. The one I was vying for featured a black lobster, claws outstretched, on a kelly green background, with silkscreened overlays of pink and white lines that defined the lobster. While this wasn't a significant painting, it was quite decorative.

The last Warhol lobster to sell at auction came up at Sotheby's in 1998. It carried an estimate of $35,000–$45,000 and sold for an impressive $57,500. But that was four years ago and now the market for Warhol was even stronger. The good news was that Fremont would sell me the painting for only $26,000. This sizable discount was intentional. The idea was to encourage legitimate collectors and museums to buy paintings by keeping their prices artificially low. These buyers effectively removed work from the market, which increased the scarcity and value of Warhols.

Even though I was primarily a private dealer and so couldn't be counted on to hold onto the painting personally for very long, Fremont dealt with me because I had previously written a number of articles that said very positive things about the Warhol market. Our relationship had progressed nicely over the years. I can vividly remember a wild martini-filled evening when we bonded. But recently our friendship had taken a hit.

Here's what happened. The previous year, I had acquired two Warhol paintings of sea turtles from the estate. Each was relatively large (42 by 50 inches) and very colorful. When asked what I intended to do with the paintings, I hinted around that I would try to keep at least one of them. Nodding his approval, Fremont sold the canvases to me for $55,000 each. Not long after buying them, I came under intense financial pressure and was forced to sell them. Not that it was Fremont's concern, but I was a dealer who had to play things close to the edge. Unlike most dealers, I had no family backing or spousal money behind me. Nor did I make my fortune in another field—which is typical of many businessmen-turned-art dealers. My margin for error was almost nonexistent. My selling the paintings would have been fine with the estate, as long as I placed them with a collector. But when I found no takers, I was forced to approach a fellow dealer. He bought the paintings and I made a

substantial profit. But then he turned around and consigned the sea turtles to Christie's. It was a purely speculative play—exactly what the estate sought to discourage.

I knew that Fremont would consider this to be a grave violation of our unspoken agreement that the paintings would not end up at auction. In his mind, this was the equivalent of the United States testing a nuclear device after signing a treaty with Russia not to. Once I saw the day and evening auction catalogues that contained the aquatic reptiles, I immediately got on the phone to alert him.

"Hi. I know this isn't going to thrill you, but those turtles that you just sold me are coming up next month at Christie's."

"Both of them?" said Fremont, with a hint of anger in his voice.

"I apologize. I sold them to a dealer and didn't expect him to flip them at auction," I said, none too convincingly.

"Both of them?" repeated Fremont.

Swallowing before speaking, I said, "Yeah, both of them. One's coming up in the evening sale, the other one's in the day sale."

"What are the estimates?"

"They have both turtles at $150,000–$200,000."

"So, what did you sell them for?"

"A lot less than that," I said, trying to play it cool.

There was a pregnant pause.

"Not good," was all Fremont could muster.

As I hung up, my first thoughts were that he might cut me off from buying paintings in the future. I wasn't too worried though, because I knew there was little work of quality left in the estate. Still, I felt badly because I had let Fremont down. I felt doubly guilty because of the role he had played in my quest to find the right Warhol for myself—a role I never would have anticipated.

Given what had happened, it felt like a minor miracle that Fremont was now even considering selling me another painting. Apparently, enough time had passed and he had mellowed out. But that still didn't mean he would make it easy for me to buy the lobster.

Even though I had seen an image of the painting and had been quoted a price, I still needed to see it in person. The Foundation had a policy that nothing could be sent on approval. What this meant was that I had

to schedule a trip to Manhattan (I lived in San Francisco). Sometimes a dealer will commit to buy a painting solely on seeing a transparency, but I always believed that rule number one of art collecting is to see the work in the flesh. There is no substitute.

Going to New York to inspect the painting was not a problem. Getting Fremont to return my calls was. I needed him to give me a firm date for our meeting so that I could book my plane ticket, secure a hotel reservation, and take care of all the other small details that go into planning a trip. Whenever I managed to reach Fremont by circumventing his wife, who dutifully screened his calls, he would insist that he was busy and would get back to me. Naturally, he never did. I tried sending him a fax. I tried sending him e-mails. I even got up at 6:00 A.M. West Coast time to try and catch him at 9:00 A.M. in New York—just as he came in to work. Once, I sent a FedEx letter to his tiny poodle, Matilda, asking her master to get in touch with me. None of these increasingly desperate tactics did the trick.

I decided to go for broke. Late one morning, I drove down to the city's world famous Fisherman's Wharf. I hadn't been there in years and had forgotten how tacky it was. Among the bustling tourists, fishmongers cried out, "Walk-a-way shrimp cocktails!" "Fresh Dungeness Crab—just off the boat—we crack and clean!" "San Francisco's finest sourdough bread!" While all of those descriptions conjured up visions of a tasty meal, the reality was far different. The meager shrimp cocktails with their blobs of tired cocktail sauce weren't so fresh. The sourdough bread had little flavor compared to the heavenly loaves from the Bay Area's Acme Bakery. The crabs were decent, but had the tourists known to shop in one of the city's many neighborhood markets, they could have bought two for the price of one.

I hadn't planned to eat at the Wharf. Unfortunately, it was lunchtime and the tantalizing smell of boiled crabs completely destroyed my willpower. I walked over to the stand that looked the most appetizing and said, "I'd like a crabmeat cocktail."

The tough looking Italian fisherman behind the counter slid a champagne glass over to me that was filled mostly with shredded lettuce and a smattering of crabmeat. I handed him six dollars and said, "How about a little more crab?"

"How about another six dollars?"

Feeling semifortified, I began to comb the wharf's souvenir shops for the object that would allow me to complete my master plan for getting Fremont's attention—a rubber lobster. After striking out at half-a-dozen shops—plenty of crabs, but no lobsters—I hit pay dirt. In a shop crammed with kitsch T-shirts ("I Got Crabs at Fisherman's Wharf") I spotted a pile of red lobsters. Each fake crustacean was only $4.95—perhaps the only bargain at the entire wharf. I immediately bought one and went back to my car.

At the local Mail Boxes Etc. on Fillmore Street, I scribbled a note that read: "Hi, Vincent! I'm Larry the Lobster and I want to remind you to call Richard!" I taped the message to one of the creature's extended claws, shoved it in a mid-size FedEx box, and sent it off to Fremont Enterprises.

The next day, I anxiously waited for Fremont to respond. I envisioned a call in which he praised my humor and cordially arranged an appointment to view the painting. Instead, I heard nothing. Another day came and went and still no call from Fremont. The following day, I swallowed my pride and phoned him. His wife, Shelly, answered and sympathetically put me through to her husband.

"Hi, Vincent. Did you get the lobster?"

"Yeah, so?"

Taken aback by his lack of emotion, I said, "Did you think it was funny?"

"Sort of. Listen, I'm busy. I've got someone on the other line and I'm trying to get out of here. What do you want?"

"I just want to make an appointment to come to New York and view the painting."

Without responding to my request, he said, "Oh, by the way, I also have a painting of a crab—same size, same year, and it's a thousand dollars less than the lobster."

"Really? I might be interested in buying it, too. But we still need to set up a time to get together."

"Tell you what, I'm completely booked this week and I have only Tuesday of next week at 11:30 available," said Fremont. Without hesitation, I said, "Great—I'll take it!"

Case 1:07-cv-06423-LTS    Document 22-2    Filed 11/30/2007    Page 53 of 62

"See you then."

That was it. I hung up and quickly got on the phone to United Airlines, cashing in mileage because I didn't want to buy a ticket that forced you to stay over Saturday night.

The day after I arrived in New York, I made my way down to Chelsea to meet Fremont at Crozier's warehouse. The Warhol estate stored their paintings there and also used it for viewings. At the assigned hour, I took the freight elevator up to the seventh floor and was greeted by Fremont.

With his horn-rimmed glasses, slicked back hair, and three-piece suit, Fremont reminded me of a detached MBA type. Yet, when I once overheard him speak to his wife, I detected a greater warmth. As the father of two teenage daughters, he was also a family man who purposely didn't work weekends in order to spend more time at home. Beyond that, Fremont remained something of a mystery to me. I never had any idea whether he genuinely loved art or even liked it. Although he did let it slip that he cherished the small *Mao* painting that Andy once gave him as a gift.

After a preliminary handshake, I looked up at the viewing wall and my eyes connected with the Warhol lobster for the first time. The painting itself was striking. Then I looked at the crab, which was equally attractive. But there was a problem. Pointing at the pumpkin-colored crab, I said to Fremont, "Nice painting. Too bad it's upside down."

"No it's not," said Fremont, as his eyebrows furrowed. "It's hung exactly as it should be—with the claws below the body."

"What are you talking about? I'm familiar with the series and they've always been displayed with the claws above the body. That was Andy's intention."

Fremont started to turn red and glare at me. It was obvious that he wasn't used to having someone challenge him. As the omnipotent distributor of the Warhol estate, he expected total obedience from interested parties. Even Larry Gagosian—the estate's biggest customer—was rumored to acquiesce to Fremont's wishes. Yet, I knew I was right.

The airless atmosphere at Crozier's began to close in on me. Another glance at Fremont's face seemed to say, "Contradict me one more time and you can kiss both pictures goodbye." But I wasn't ready to back

down. Maybe it was my pent-up anger over all the unreturned phone calls or the frustration over the lack of response from the Fisherman's Wharf lobster. Whatever it was, I refused to give in. I had just opened my mouth to speak when Fremont unwittingly rescued me from myself.

"Look, if you buy it, you can hang it anyway you want."

I felt like a spooked cat whose puffed-up body began to slowly deflate. Extracting a prewritten check from my wallet, I handed it to him and said, "O.K. We have a deal."

At that point, Fremont pulled out a rubber stamp and affixed the seal of the Andy Warhol Estate to the back of both paintings. They were also assigned numbers which were recorded in the estate's archives.

About a week later the paintings arrived at my apartment. When I went to hang the crab, I looked at its back to examine the estate's seal. What I saw somehow didn't surprise me. It was stamped upside down.

possible. Based on Christie's low-ball evaluation of the remaining Warhol paintings, Hayes felt he was on the verge of being cheated out of his fees. The problem with the Foundation's line of thinking was that the Foundation was trying to devalue the work of the very artist whose financial legacy supported the organization. Their thinking was based on pretzel logic.

Christie's was forced to defend its questionable evaluation of the Warhols and hired its share of expert witnesses, including the venerable art dealer, Andre Emmerich. In court, Emmerich explained how the value of Warhol's work could easily go down, based on its "ephemeral" subject matter. He claimed that Marilyn Monroe and Elvis Presley, indisputable icons of popular culture, wouldn't endure and could easily be forgotten in years to come. All of this seemed highly unlikely, but as an expert being paid by Christie's, it wasn't too hard to figure out why he said what he did.

Hayes had hired Jeffrey Hoffeld, a well respected private dealer, to make his own appraisal of Warhol's work. Hoffeld's financial analysis was much more realistic. It didn't use the ludicrous "blockage" discount and was based more on what similar examples of Warhol's work had brought both at auction and in private sales. After much acrimonious testimony, the judge decided on a figure far closer to Hoffeld's evaluation than Christie's. The value of Warhol's work in 1994, not including his real estate, stocks, etc., was determined to be a little over $390 million. In spite of the Foundation's unprofessional behavior, the ruling ultimately worked in their favor—they were sitting on a goldmine.

I was aware that Vincent Fremont, who was appointed to handle the sales of all paintings, prints, photographs, drawings, and sculpture, had been selling off work on behalf of the Foundation over the years, but I correctly assumed that much of the best work had already been sold to long-time supporters and insiders. It wasn't until 1998, when I realized that paintings might be available on a case-by-case basis to people not as well known to the Foundation, that I began to consider the possibilities.

My hope was that I would have some credibility with the Foundation because of my favorable evaluations of Warhol's work in my Art Market Guides. When I called Fremont Enterprises, I was pleased to hear that Fremont was familiar with my guidebooks.

I then explained my request. "I would like you to consider selling me a painting for my own collection. I'm not planning to resell it. I intend to hang on to it—at least until my retirement."

Sounding cranky, Fremont said, "Well, what painting did you have in mind?"

"What's available?"

"I don't work that way. You need to decide which image or series you are interested in and I'll get back to you on availability."

Fremont had his reasons. He was astute enough to realize that the key to getting top dollar for his paintings was to create an aura of rarity. By never letting anyone know what remained in the estate, he kept people in the dark about how much or how little was left—or which images, for that matter.

Trying to interject some levity, I asked, "Are there any early gold Marilyns?

"I'm not even going to answer that ridiculous question."

Feeling like a contestant on a game show, I said, "Alright, are there any Lizes?

"Look, I'm not going to play twenty questions with you. Why don't you carefully think about what you really would like to own and what you can realistically spend and get back to me."

Not wanting to anger Fremont and blow my chances of getting a great painting, I agreed to do just that.

# 22

# GREEN

"WE'RE GOING TO ROLL THE BONES!"

So said John Berggruen, the emperor of Bay Area art dealers.

It was 1997 and I was sitting with Berggruen and Jim Corcoran in Le Central, a French brasserie in the heart of downtown San Francisco. Earlier that morning, Jim had awakened me with a call from his hotel. "Listen, why don't you meet me at Berggruen's gallery at twelve—he's taking us to lunch." I hung up thinking, "This should be good."

When we first sat down at Le Central, the talk had immediately turned to women. Not business, not politics, and certainly not art. In fact, the topics of discussion that followed were so juvenile and the insults so nasty that I thought I was back at my fraternity house. Lunch was served and I tried to interject some serious art-dealing talk. But I was rebuffed with looks that said, "Let's not worry about doing deals, let's just continue to talk nonsense—it's more productive."

At one point, I casually mentioned to Berggruen that I was in the market for a Warhol. He responded that I was talking to the wrong guy because he wasn't a fan. His comment proved ironic because five years later, his gallery put on a show of Warhol's *Cowboys and Indians* series (created in 1986), which was possibly one of the least successful group of paintings he ever produced.

As the meal came to an end, our waiter sauntered over with the bill. My first thought was, "Boy, am I glad I'm not getting stuck with paying." Le Central wasn't Le Cirque, but it wasn't cheap either—particularly

222

I BOUGHT ANDY WARHOL

with the wine Berggruen ordered. When the waiter placed a tray with a check in the middle of the table, I waited for Berggruen to reach for it, but five minutes passed before he casually scooped up the check. A wave of relief shot through my body. I relaxed and reflected on how entertaining that lunch had been. Even though Jim and Berggruen were both ten years my senior and in a different league financially, I felt comfortable with them during those brief moments when the conversation turned to art. I started projecting that maybe now I'd be invited to hang out with them on a regular basis. I figured, why not? I had already done a number of successful deals with Jim. Perhaps my moment had arrived.

Berggruen held up the check and glanced at it. A fiendish grin crossed his face as he announced, "All right boys, we're going to roll the bones!"

Our waiter, who was hovering nearby, picked up his cue and appeared at our table with a well-worn leather cup containing a pair of dice.

Jim started laughing. I had a sneaking suspicion that the old adage was about to come true: there really was no such thing as a free lunch. I became slightly agitated and, trying to head Berggruen off, I said, "Now wait a minute. Jim said you were taking *me* to lunch!"

"Look, Richard, if you want to play with the big boys, this is how it's done."

Jim started laughing even harder. "Come on, Richard," he said. "You only have a one in three chance of getting stuck with the check!"

I was trapped. It wasn't the money, it was the...actually, it was the money. Here I was, sitting with two of the wealthiest dealers on the West Coast, and I was in danger of having to buy them an expensive lunch— *after they had invited me*. Somehow, it just didn't seem right.

My shoulders began to droop. All I could say was, "I have a bad feeling about this."

Berggruen went first. He rolled with great concentration, as if he were bidding on a Blue Period Picasso. Rather than watch the dice, I watched his face. As I stared at him, I saw his tightly pursed lips break into a broad smile. Berggruen had rolled a perfect twelve.

"Well, I know one person who's not going to be paying for lunch!" he crowed.

It was Jim's turn next. Unlike Berggruen, Jim was not the most demonstrative person in the world. Here was a man who was so unemotional

*Green*

223

that when he was offered a slice of the highly desirable Joseph Cornell estate, he shrugged and told me it was no big deal. But now that something *really* important was at stake, he became highly animated.

Jim grabbed the brown leather cup, gave it a few good shakes, and tossed the dull white cubes onto the table. The dice kissed, landing with a soft click. Jim had rolled an eight—pretty good, but I still had a chance. Now it was my turn. My two competitors were mesmerized as I picked up the leather cup. They stared at me as if I was coming to bat in the bottom of the ninth with the seventh game of the World Series on the line.

I blew on the dice for luck and let them fly. I couldn't bear to look. While I never saw the contest as some sort of confirmation of my personal karma, I thought to myself, "There's no way I should get stuck paying for these two assholes." When I peeked, one of the dice had landed with two dots face up and the other was a snake eye. I had lost. It wasn't even close. With a worried look on my face, I grabbed the check to inspect the damage. All it said was $105, which seemed reasonable.

"That's just for the bottle of wine. Turn it over!" roared Berggruen.

I flipped the check over and, sure enough, the actual bill was closer to $305. All I could do was stare in disbelief. When the two of them saw the sour look on my face, they started carrying on as if something wonderful had happened. Lunch was over and I was three hundred dollars poorer.

Fortunately, I had more potentially lucrative opportunities to focus on. For one thing, I was still in the middle of negotiations with Vincent Fremont. I was having a difficult time deciding which Warhol painting I should ask him for. Given his prickly personality, I sensed that I would not have too many chances to voice my requests. I spent a lot of time poring through old Andy Warhol exhibition catalogues, looking at images that might trigger an idea. I was reluctant to ask for a work from a mainstream series since I knew it was already late in the game.

I began to take my search in a different direction. I tried to think in terms of work that might not be as well known to the collecting public. Maybe there were variants of important images that people weren't aware of. For instance, when I owned the gold *Self-Portrait*, I remembered that it was the only small-scale example from the series that I had ever seen. The more I pondered that painting, the more I realized how

224

much I missed owning it. There was something about the intense look on Warhol's face that I couldn't erase from my mind. Now if only the estate had one left....

I called Fremont. As usual I was put on hold. I could never tell if he was really that harried or if it was done just for effect. Finally, he took my call.

"Richard, I'm really busy. What do you want?"

Even though I shouldn't have been, I was thrown by his harsh greeting and it took me a moment to recover my composure. "I, uh, was thinking, or I should say wondering, if you have any small *Self-Portraits* available?"

"Which *Self-Portraits* are you talking about? I think they're all gone."

With nothing to lose, I said, "I'd love to own a small 'Fright Wig.' I know for a fact that he did some that were 12 by 12 inches."

There was silence. I had finally caught Fremont off guard. "What makes you think that I have one?"

"Years ago, I owned a gold example that was inscribed to one of Warhol's friends. My take is that he did a handful of them to give as presents."

"Let me do this. I'll be at the warehouse later in the week and I'll take a look around."

I got a kick out of that. How could he not know *exactly* what was available? There had to be a master computer printout of every single painting remaining in the estate. But I played along and said, "I appreciate it. By the way, I'm going to be in New York later in the week. Is it worth making an appointment to come see you?"

"Only if I have something specific to show you. I'll let you know. Listen, I have someone on the other line. I've got to go."

Feeling rushed, I said, "When will you let me know?"

"I've got to run."

With that, Fremont hung up. Although the conversation wasn't very satisfying, I sensed that I was on to something. Based on past conversations, I knew that if there wasn't a distinct possibility that he had a "Fright Wig," he would have immediately vetoed the idea. Feeling encouraged, I spent the rest of the day trying to line up appointments for New York.

*Green*

225

When I arrived the next week, I became preoccupied with calling Fremont. Although we didn't have a formal appointment, I figured it was worth a spontaneous call to see if he'd show me something. I tried reaching him by phone, to no avail.

At that point, not knowing whether he would come through or not, I pursued a lead at the Gagosian Gallery. Knowing that they were handling a lot of Warhols for the estate, I thought it was worth a shot to see what they had available, although, even if I found something worthwhile, chances were that it would be priced too high for a dealer to buy. But you never knew.

I walked down Madison Avenue to the former home of Sotheby's, now the location of Gagosian. My hunch about Warhol availability paid off when I noticed two small "Fright Wig" *Self-Portraits* propped up on a shelf. One was red and the other was green. Only these weren't your basic "Fright Wigs"—they were negative rather than positive images. Andy looked demonic in both paintings. I didn't like either one enough to own, but recognized their resale potential—if the price was right.

Sensing my interest, the salesperson perked up and said, "So what do you think?"

"I'm interested. How much do you want for each one?"

Without missing a beat, he said, "$7,500."

I looked him in the eye but betrayed no emotion. Clearly, he had made a mistake—a big one.

"$7,500 each?"

"That's right."

My first reaction was to reach for my wallet and extract a check. This was crazy—they were worth ten times that. How anyone could leave off a zero was beyond me. Maybe each painting wasn't worth exactly $75,000, but they were in that vicinity.

But before I said, "I'll take them," I began thinking about the ramifications. Not only would the salesperson lose his job, but I'm sure that if I paid for the two Warhols and left the premises with them, Larry Gagosian himself would be after me. Although he was well connected, legally there wouldn't have been a darn thing he could have done about it. On the other hand, who knows what sort of grief the purchase would have led to. It wasn't that I was such a moralist—far from it. But somehow, I knew

this deal warranted taking the advice of those television commercials that preached to America's youth to avoid drugs: "Just say no."

Reluctantly, I said, "I hate to tell you this, but I think you just made a serious error. Why don't you check your records and call me later. If you still want to sell me the two paintings for $35,000, let me know."

The young dealer looked at me quizzically but said he'd look into it. Sure enough, within thirty minutes, I had received a message at my hotel. There had indeed been a mistake. His message also gratefully acknowledged that he owed me one—hopefully a big one that I could call in sometime in the future.

Emboldened by this close brush with a large profit, I called Fremont. Miraculously, I got through to him.

"Hey, Vincent. I'm in town and was wondering if you've given any further thought to my request?"

Fremont sounded nonplussed. "What request?"

"Don't start with me. All I'm asking is whether there is a small 'Fright Wig' available."

Fremont paused. I didn't know what he would say next, but I sensed that it would be definitive. "You're in luck. I saw one at the warehouse."

My heart started to race. Trying to remain calm without stifling my enthusiasm, I said, "That's great news. What color is it?"

"You want to know that too?"

"Oh, come on. Just tell me. Enough already."

"It's green." As Fremont pronounced the color, he drew the word out slowly for effect.

"Green sounds good to me. I'm afraid to ask, but how much do you want for it?"

For the first time, Fremont sounded serious. "I don't know. I need to check with the board. I'll have to get back to you."

"It would be great to know during the next twenty-four hours, since I'm already here in New York. If we can agree to a price, then I could stop by and hopefully buy it."

"Sorry. I won't be meeting with the board for another week. Your search for a painting will just have to wait."

## 25

# DON'T DO ME ANY FAVORS

DURING THE WEEK THAT I ANXIOUSLY waited in San Francisco to hear from Fremont, I tried to occupy myself with other matters. I had recently bought a copy of the catalogue from the Andy Warhol Museum and decided that I should take a quick trip to Pittsburgh to check it out. I figured I owed it to myself to learn all I could before making a decision on the Warhol painting I was going to be offered. But the more I thought about it, I knew I was rationalizing. The truth of the matter was that I just wanted to see a museum that housed seven floors of Warhols.

The new museum was founded in 1994 by three institutions: the Carnegie Institute, Dia Center for the Arts, and the Warhol Foundation. Despite all of the hoopla over the museum's formation, the decision to locate it in the artist's hometown of Pittsburgh provoked instant controversy. The majority of the art world felt the collection should be based in New York. Supporters of this plan pointed out that attendance would be far higher in New York than Pittsburgh. Since the art world was centered in Manhattan, how could Andy Warhol, a New York artist, not have his life's work displayed there? After all, this was to be the first museum in the United States devoted to the work of an individual artist.

But the New York advocates were leaving out one crucial detail in their desire to see a museum built in their city: real estate. The Warhol Museum would need a substantial space in a decent neighborhood, and even if the money for it existed, the building might not. Because the New York logistics had proved too daunting, the committee decided to

buy a renovated industrial warehouse in Pittsburgh's downtown business district.

Although it was an unpopular decision, it proved to be a wise one. There was something about making a pilgrimage to Warhol's place of birth that felt right. The fact that you had to make an effort to get to Pittsburgh in order to see his paintings made the experience all the more worthwhile. Once you got there, you found yourself spending as much time as possible with the work—you wanted to savor it. Had the collection been in New York, given the city's vast wealth of art destinations, it would have been just another museum.

As soon as I arrived in the "Iron City," I caught a cab to the museum and found myself crossing into Warhol territory. Upon entering, I was confronted by a wall covered with matching pairs of 40-by-40-inch commissioned portraits. As I scanned the glamorous faces, I realized that the display was a reconstruction of the Whitney Museum's "Portraits of the 70s" show. It was as if Warhol's entire social universe was staring down on me. There were portraits of everyone from Halston to Paul Anka. Having missed the original Whitney show, I was delighted by the opportunity to experience a facsimile of it.

The portraits turned out to be just an appetizer. As I took the elevator up to each floor, the quality of the paintings got better and better. There were *Maos, Electric Chairs, Elvises, Marilyns*—you name it. There was also a room full of helium-filled balloons that Warhol referred to as *Silver Clouds*. Each balloon resembled a large metallic silver pillow, almost three feet long. The balloons were allowed to float around the room and visitors were encouraged to bat them around and interact with them. Here was Warhol at his most playful. The installation was designed to capture the lighthearted approach of the original exhibition at the Castelli Gallery in 1966.

Then I came to the floor that displayed Warhol memorabilia and source material for his silkscreens. The most fascinating thing I stumbled upon was a display of Warhol's time capsules. Periodically, he would fill cardboard boxes with the daily minutiae of his life. Warhol saved everything: postage stamps torn off envelopes, airline silverware that he swiped, gifts of clothing with his portrait painted on it, fan letters, autograph requests, and other correspondence (some of a highly personal nature). Once he had filled a one-and-a-half-cubic-foot box,

he would seal it for posterity—then start another box. The Warhol Museum owned more than six hundred of these monuments to obsession.

Another intriguing aspect of the museum was the display of photographs, taken by Warhol and by others who chose to portray him. Whether Warhol was a great photographer was debatable. Whether his photographs captured the cross-current of society and cultural figures of his times was indisputable. His black-and-white images were an uplifting nostalgia trip. From the height of the 1960s underground to the heyday of Studio 54, Warhol was able to document the zenith of each period because he was an active participant. Looking at these photos and a comprehensive selection of his paintings, I was hit hard by the enormity of Warhol's achievement. If there was ever any doubt that I was doing the right thing by spending what was left of my savings on one of his paintings, it was permanently dispelled.

I took the stairs down to the gift shop. As you would expect, the space was crammed with refrigerator magnets, towels, glasses, purses, and necklaces, each bearing a Warhol icon, such as a Campbell's Soup can. Business appeared to be brisk—Andy would have loved it. Once I left the store, I found myself back on the first floor, confronted by a canary-yellow *Self-Portrait*, a gigantic "Fright Wig." The painting was overwhelming in scale and physicality—I was stunned. Warhol's persona seemed to envelop the room. If the "Fright Wig" that Fremont was about to offer me contained just a fraction of this picture's sense of wonder, I would be fortunate.

I left the museum and flew home heavy with anticipation. It was finally time to get back in touch with Fremont. I had been thinking continuously about how much he would want for the *Self-Portrait*. Knowing that the estate intentionally kept their prices artificially low, I knew the quote would be favorable. Calculating the value of the painting was difficult because a 12-inch example had never come up to auction. An educated guess was that the painting was worth between $75,000 and $100,000 on the open market. If Fremont quoted me $55,000 or less, it was a done deal. Anything higher and I'd have to think about it more carefully.

After the usual litany of missed phone calls, we finally connected.

"Hi, Vinny. How are you doing?" I said.

"Vinny?"

"Just kidding."

"You better be. No one—not even my wife—calls me Vinny."

"Sorry. Anyway, can we once and for all get squared away on our Warhol deal?"

"What Warhol deal?"

Ignoring him, I said, "You were supposed to get back to me on the price of the *Self-Portrait*."

"I was? Oh, that's right. It's $50,000."

Not bad. Fremont had come through. Trying not to sound too thrilled, I decided to see if I could wrangle a small discount. "We're close. Pending seeing it in person, I'll commit to buy it for $45,000."

"Don't do me any favors. Do you know how many people are begging me for small paintings?"

Unfortunately, I did know. When it came to negotiating with Fremont, I had little leverage. My only strategic advantage came from knowing the value of silence. I patiently waited for him to speak again.

"Tell you what. You're in luck—the board is meeting this afternoon. I'll present your offer and see what I can do. Let me call you back around five o'clock."

As soon as I put down the phone, I began to fear that I had blown it. Maybe I was being greedy. After all, I knew that I was getting a bargain at $50,000. Yet, after all these years of negotiating on paintings, the process had become permanently ingrained in me. Then my panic attack escalated. What if the board said, "The hell with him—we'll sell it to someone more appreciative." Or what if they simply rejected my offer and didn't give me a second chance to accept their price? I tried to tell myself that everything was fine. Still, when it came to the art world, I knew how unpredictable things could be.

Later that day, I got the call from Fremont. I was so relieved to hear from him that I almost said I'd take it for $50,000 even before I listened to what he had to say. Disguising my fear, I said, "Hi Vincent. How'd we do?"

"We? Where do you get this 'we' from?"

At that point, I was completely unnerved. I opened my mouth to say that I'd gladly pay his price. But before I could speak, Fremont beat me

to the punch. "I'll split the difference with you. You can have it for $47,500."

"Done."

"You're buying it sight unseen?"

Recovering my bravado, I said, "Well, no. Why don't I come to New York next week to view the painting and assuming it looks good in person, we have a deal?"

"Fine. My week is already filling up. Let's put something on the calendar."

We picked a date and time. As soon as I hung up, I booked my plane ticket. Then inspiration struck. I thought I'd invite my father to join me. I wanted to impress him by dropping approximately "fifty" on a painting that I was buying just for myself. My father, Bernie, readily agreed to fly in from Cleveland for the big occasion.

The week went by slowly. I couldn't stop thinking about what the painting would look like. Each day, I went through the mental gymnastics of preparing my response if the painting turned out to be only "good" rather than "great." Or worse, if the painting was somewhere in between. It was hard to believe, but my search for the right Warhol was entering its twelfth year. With prices rising and the estate running out of paintings, I sensed it was now or never.

Finally, I was back in New York on my way to Union Square and Fremont Enterprises. As my father and I opened the door to Fremont's office, we were greeted by the wild gyrations of Matilda, Fremont's dog. In contrast to Fremont's distant phone persona, on his home court he couldn't have been more forthcoming. While it was obvious that he had picked up some of Warhol's eccentricities, he had also absorbed many of Fred Hughes's gracious manners.

As we watched Matilda skid across the room's highly polished wood floors, Fremont turned his attention to my father. He put him at ease by offering him coffee and making sure he was comfortable. After a few moments of conversation, we went for a short walk to Crozier's warehouse for the grand viewing.

Fremont continued to flatter my father by asking him what he had done for a living (camera sales), where he had graduated from school (New York University), and how he was spending his retirement (mostly

aggravating my mother). Once we arrived at the cavernous art warehouse, located in the heart of Chelsea, we climbed the concrete steps and checked in with security. Although Fremont was a regular, they still made him go through the motions of signing in.

As we rode the massive freight elevator up to the viewing floor, I said to Fremont, wistfully, "It must be nice having everyone in the art world pursuing you."

He half smiled and said, "We'll see who my friends are when I don't have any paintings left."

The elevator came to a loud halt. With much effort, the elevator's operator pried open its horizontal wooden gate with tooth-like vertical slats. As it yawned, it resembled a giant mouth, ready to gobble up all unwary buyers.

Even before I stepped out, I started obsessing. I knew that I was predisposed to buy the painting. It was as if my entire validity as a dealer hinged on acquiring the Self-Portrait. By doing so, I felt like I could cleanse myself of every bad deal and missed opportunity. This was no longer just about buying a Warhol.

Fremont led us into a nondescript medium-size room. The only furniture in the space was a long black table and a pair of generic office chairs. The ceiling was ringed with track lights. Even though the space was set up to feel like a makeshift gallery, it felt more like a police interrogation room. There was no natural light and precious little art-viewing ambience. Then I reminded myself that I was in a warehouse and perhaps the austere surroundings were part of the psychology. You were there to conduct your business and not waste anyone's time, least of all Fremont's.

Finally, the moment of truth. In the center of the back wall, hung at eye-level, was a small bright green painting illuminated by a pinpoint spotlight. Warhol's face glowed like he was spewing radioactive isotopes. I expected to see a warning sign asking us to don protective suits. As I approached the painting, my heart sank. Yes, it was a genuine "Fright Wig." However, it was one of those paintings where Warhol had pushed a minimum of black ink through the photo-silkscreen—in common parlance it was a dry screen.

This was exactly what I was afraid of. Sure, the painting was salable—it wasn't as if it was awful. However, the image felt impermanent. A great

painting affects you like a tattoo—it penetrates every pore of your skin and is with you forever. This was not a great painting.

Noticing the disappointed look on my face, Fremont said, "What's the matter? Not good enough for you?"

Then he pointed at one of the black desk chairs on wheels and said, "Why don't you relax? Have a seat."

Reluctantly, I sat down and then Fremont started wheeling me around the room like I was a sputtering go-cart. I looked at my father and he looked back at me. You could tell he was unsure of whether this was some sort of game or if this was really how I conducted my business. Actually, it was both.

Feeling thoroughly pissed off, I started to get up. Then Fremont commanded, "Sit back down!"

I don't know why, but I obeyed him. As I did, my dad said, "Things have sure changed since I used to sell cameras."

Fremont spun my chair around so that I was no longer facing the wall. The Warhol painting was now behind me. Then he ordered, "Don't turn around until I tell you."

I listened to him remove the painting and then walk away. The next sound I heard was a key turning in a locked door. Fremont had descended into the bowels of the Warhol painting storage room. The identity of the room's paintings was unknown to everyone but Fremont and the board. Though a few dealers had tried to sneak in or coerce employees into revealing its contents, I didn't know of a single one who had succeeded. I figured Fremont had gone into his stash to offer me an alternative, perhaps a Dollar Sign or something else to ease my disappointment. Then the metal door clicked open and I heard Fremont walk over to the viewing wall and hang something.

"Alright, you can turn around."

Still seated, I spun around 180 degrees. At a distance, I saw another bright green Self-Portrait. I thought, "What kind of nonsense is this? It's the exact same painting." But as I wheeled myself closer, the features of Andy's face came into focus. Clearly, this was not the same painting. Digging in my heels to pick up speed, I kicked myself within six feet of the wall. Suddenly, the details of Warhol's face were razor sharp.

There, directly in front of me, was one of the greatest small "Fright Wigs" I had ever seen. Playing devil's advocate, I mentally compared it

to the gold one, the one I once owned, the one that got away. I said to myself, "It's wonderful, but it's not gold." But then I noticed something special about the green picture. Just as in the gold one, Warhol's likeness was crisply screened. But unlike the gold painting, where his face was surrounded by an unbroken sea of black, the right-hand side of this picture revealed a hint of green canvas. Apparently, the squeegee was eased across it with just a bit less ink. The gold version was created with mechanical precision, but in the green painting, because of the intentional imperfections, there was no getting away from Warhol's humanity. It may not have been more valuable, but it had more soul and was a superior work of art.

Fremont looked at me and said, "I hope you're satisfied. You know, if I never showed you this painting, you would probably have bought the other one."

He may have been right.

Pointing to the hanging painting, Fremont said, "I could have sold this one to anyone I wanted to. Just remember that."

I would never forget it.