Gary D. Sesser
Ronald D. Spencer
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, New York 10005
(212) 732-3200
*Attorneys for The Andy Warhol Foundation for the Visual Arts, Inc.,*
*Vincent Fremont, Vincent Fremont Enterprises, and The Andy Warhol*
*Art Authentication Board, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X

|  |  |
|---|---|
| JOE SIMON-WHELAN, Individually and on Behalf of All Others Similarly Situated, : : : | Index No. 07 CV 6423 (LTS) (AJP) <u>ECF CASE</u> |

JOE SIMON-WHELAN, Individually and on
Behalf of All Others Similarly Situated,      :

                    Plaintiff,      :

        - against -      :

THE ANDY WARHOL FOUNDATION FOR      :
THE VISUAL ARTS, INC., THE ESTATE OF
ANDY WARHOL, VINCENT FREMONT,      :
Individually and Successor Executor for the
Estate of Andy Warhol, VINCENT FREMONT      :
ENTERPRISES, THE ANDY WARHOL ART
AUTHENTICATION BOARD, INC., JOHN      :
DOES 1-20, JANE DOES 1-10, and RICHARD
ROES 1-10,      :

               Defendants.      :

----------------------------------------------------------X

**DEFENDANTS' MEMORANDUM OF LAW**
<u>**IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**</u>

6247641.6

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

FACTS ...............................................................................................................2

    The Andy Warhol Foundation .........................................................................3

    The Andy Warhol Art Authentication Board....................................................5

    Simon and His Work......................................................................................6

    The Amended Complaint................................................................................9

LEGAL STANDARD........................................................................................10

ARGUMENT....................................................................................................12

    POINT ONE

    SIMON'S ANTITRUST CONSPIRACY CLAIMS ARE IMPLAUSIBLE AND
    MUST BE DISMISSED UNDER THE SUPREME COURT'S DECISION IN
    *BELL ATLANTIC V. TWOMBLY*................................................................12

        1.   The Amended Complaint Fails to Show that the Alleged Conspiracy Created
            An Artificial Scarcity of Warhol Works or Inflated Prices ......................13

        2.   The Allegations in the Amended Complaint and in Published Materials Cited
            in the Amended Complaint Are Inconsistent with a Conspiracy to Inflate the
            Prices of Warhol Works Sold by the Estate or Foundation ......................17

        3.   The Amended Complaint Offers No Plausible Motive for the Supposed
            Conspirators to Engage in the Alleged Conspiracy .................................19

        4.   The Amended Complaint Fails to Demonstrate that the Requirements for
            Claims Under Sections 1 and 2 of the Sherman Act Can Be Met ............21

        5.   The Amended Complaint Fails to Show That the Activities of the Supposed
            Conspirators Are Inconsistent with Lawful Conduct................................25

    POINT TWO

    SIMON LACKS STANDING TO ASSERT THE ANTITRUST CLAIMS IN
    COUNTS ONE AND TWO.............................................................................28

POINT THREE

    THE ANTITRUST CLAIMS ARE TIME-BARRED ........................................................31

POINT FOUR

    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UNDER THE

    LANHAM ACT ........................................................................................................34

POINT FIVE

    THE FRAUD AND ANTITRUST CLAIMS ARE NOT PLED WITH

    PARTICULARITY AS REQUIRED BY FED. R. CIV. P. 9(B) ......................................37

POINT SIX

    THE COMPLAINT MUST BE DISMISSED BECAUSE SIMON TWICE

    AGREED IN WRITING NOT TO SUE BASED UPON THE AUTHENTICATION

    BOARD'S OPINION ................................................................................................40

POINT SEVEN

    THE CLAIMS AGAINST FREMONT AS "SUCCESSOR EXECUTOR" OF THE

    WARHOL ESTATE MUST BE DISMISSED ..............................................................43

POINT EIGHT

    THE UNJUST ENRICHMENT CLAIM MUST BE DISMISSED ...................................44

CONCLUSION ..............................................................................................................45

# TABLE OF AUTHORITIES

## FEDERAL CASES

*AD/SAT, A Division of Skylight, Inc., v. Associated Press*, 181 F.3d 216 (2d Cir. 1999) ..................................................................................................22, 23, 25

*Amron v. Morgan Stanley Investment Advisors Inc.*, 464 F.3d 338 (2d Cir. 2006)...........10

*Armstrong v. McAlpin*, 699 F.2d 79 (2d Cir. 1983)..............................................................34

*Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir. 1994)...................................................................21

*Barnum v. Millbrook Care Ltd. P'ship*, 850 F. Supp. 1227 (S.D.N.Y. 1994) ...................11

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ....................................... 1, passim

*Berkey Photo v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) ...................................29

*Boule v. Hutton*, 328 F.3d 84 (2d Cir. 2003) ......................................................................36

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)...........13

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ......................................................14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ....................14, 28, 30

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 691 F.2d 1335 (9th Cir. 1982) .........................................................................................30

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) ................................11

*In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL. 1946553 (S.D.N.Y. June 28, 2007)............................................................................................10, 37

*Daniel v. Am. Bd. of Emergency Med.*, 269 F. Supp. 2d 159 (W.D.N.Y. 2003) ...............31

*DeWeerth v. Baldinger*, 836 F.2d 103 (2d Cir. 1987), *on remand*, 804 F.Supp. 539 (S.D.N.Y. 1992), *rev'd on other grounds*, 38 F.3d 1266 (2d Cir. 1994) ...............4

*Delta Kappa Epsilon (DKE) Alumni Corp. v. Colgate Univ.*, 492 F. Supp. 2d 106 (N.D.N.Y. 2007)...................................................................................................23, 24

*Donahue v. Pendleton Woolen Mills, Inc.*, 633 F. Supp. 1423 (S.D.N.Y. 1986) ........32, 33

*In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007)..............................................2, 21

*Fed. Trade Comm'n v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25 (D.D.C. 1999)...................30

*First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)..............................21

*Galerie Gmurzynska v. Hutton*, 355 F.3d 206 (2d Cir. 2004) ............................................36

*Groden v. Random House, Inc.*, 61 F.3d 1045 (2d Cir. 1995) ...........................................35

*Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242 (S.D.N.Y. 1997)................30

*Hamilton County Bd. of Comm'rs v. Nat'l Football League*, 491 F.3d 310 (6th
 Cir. 2007) ............................................................................................................34

*Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219 (2d Cir. 2006) ...........................21

*Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007).....................................39

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ......................................................29, 31

*Inn Chu Trading Co., Ltd. v. Sara Lee Corp.*, 810 F. Supp. 501 (S.D.N.Y. 1992) ...........37

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ................................................................39

*Kirby v. Wildenstein*, 784 F. Supp. 1112 (S.D.N.Y. 1992)................................................4

*Klickads Inc. v. Real Estate Bd. of New York Inc.*, No. 04 Civ. 8042, 2007 WL
 2254721 (S.D.N.Y. Aug. 6, 2007) ......................................................................25

*Klos v. Polskie Linie Lotnicze*, 133 F.3d 164 (2d Cir. 1997)............................................41

*Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250 (S.D.N.Y. 1995) ....................22, 26

*Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523 (S.D.N.Y. 2007)...........................11

*Lomaglio Assocs. Inc. v. LBK Marketing Corp.*, 876 F. Supp. 41 (S.D.N.Y. 1995) .........38

*Mallon Res. Corp. v. Midland Bank plc*, 96 Civ. 7458, 1997 U.S. Dist. LEXIS
 10346 (S.D.N.Y. July 17, 1997) .........................................................................11

*Maryland Casualty Co. v. W.R. Grace*, 218 F.3d 204 (2d Cir. 2000) ..............................44

*Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465 (S.D.N.Y. 2001) ....................14, 21, 28

*Matsushita Electric Indus. Co. v. Zenith Radio Corp.*,
 475 U.S. 574 (1986)............................................................................... 16, passim

*Medinol, Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575 (S.D.N.Y. 2004)..............41

*In re Merrill Lynch & Co., Inc. Res. Reports Sec. Litig.*, 289 F. Supp. 2d 429
    (S.D.N.Y. 2003) ........................................................................................................34

*Mid-West Paper Prods. Co. v. Continental Group, Inc.*, 596 F.2d 573 (3d Cir.
    1979) ........................................................................................................................30

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993)........................................38

*Monsanto v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984) .......................................25

*Moviecolor Ltd. v. Eastman Kodak Co.*, 288 F.2d 80 (2d Cir. 1961) ...........................34

*Naso v. Park*, 850 F. Supp. 264 (S.D.N.Y. 1994)................................................ 14, passim

*New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065 (2d Cir. 1988) ...........................28

*Papason v. Allain*, 478 U.S. 265 (1986) ......................................................................10

*Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283
    (2d Cir. 2006)....................................................................................28, 29, 30

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002)..................................23, 25

*Reading Indus. Inc. v. Kennecott Copper Corp.*, 631 F.2d 10 (2d Cir. 1980) ..................29

*Register.com, Inc. v. Domain Registry of Am., Inc.*, No. 02 Civ. 6915 (NRB),
    2002 WL 31894625 (S.D.N.Y. Dec. 27, 2002) .........................................................36

*Rozsa v. May Davis Group, Inc.*, 187 F. Supp. 2d 123 (S.D.N.Y. 2002) ..........................10

*Santana Prods., Inc. v. Sylvester & Assocs., Ltd.*, 121 F. Supp. 2d 729 (E.D.N.Y.
    1999) ........................................................................................................................14

*Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974)..........................28

*Segan v. Dreyfus Corp.*, 513 F.2d 695 (2d Cir. 1975) ..................................................39

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) ...............................37, 38

*Soc'y for the Advancement of Educ., Inc. v. Gannett Co., Inc.*, 98 Civ. 2135, 1999
    U.S. Dist. LEXIS 700 (S.D.N.Y. Jan. 21, 1999)........................................................40

*Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231 (S.D.N.Y. 2006)..................45

*Solow v. Stone*, 994 F. Supp. 173 (S.D.N.Y. 1998) ................................................33

*Stolow v. Greg Manning Auctions, Inc.*, 258 F. Supp. 2d 236 (S.D.N.Y. 2003) ...............31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) ................................39

*The Andy Warhol Found. for Visual Arts, Inc. v. Hayes*, 183 F.3d 162 (2d Cir. 1999) ................................................................................................................27

*Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383 (2d Cir. 2002) ................................................................................................35

*Todd v. Exxon Corp*, 275 F.3d 191 (2d Cir. 2001) ................................................24

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) ...........................22

*Volvo N. America Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55 (2d Cir. 1988) ...............................................................................................................28, 30

*Wellnx Life Scis., Inc. v. Iovate Health Scis. Research, Inc.*, No. 06 Civ. 7785(PKC), 2007 WL 2789469 (S.D.N.Y. Sept. 6, 2007) ................................................35

*Wexner v. First Manhattan Co.*, 902 F.2d 169 (2d Cir. 1990) ................................................39

*Wolf v. Wagner Spray Tech. Corp.*, 715 F. Supp. 504 (S.D.N.Y. 1989) ............. 31, passim

*Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co.*, No. 00 CIV. 5663, 2001 WL 1468168 (S.D.N.Y. Nov. 19, 2001) ................................................. 14, passim

## STATE CASES

*Chimart Assocs. v. Paul*, 66 N.Y.2d 570 (1986) ................................................42

*In re Determination of Legal Fees Payable by the Estate of Andy Warhol*, 1994 N.Y. Misc. LEXIS 687 (Surr. Ct. N.Y. County 1994) ................................3, 5, 12

*In re Estate of Einstoss*, 26 N.Y.2d 181 (1970) ................................................44

*Lariviere v. Thaw*, Index. No. 100627/99, 2000 WL 33965732 (Sup. Ct. N.Y. County June 26, 2000) ................................................................................5, 41

*Newsday, Inc. v. Fantastic Mind, Inc.*, 237 A.D.2d 497 (2d Dep't 1997) ........................22

*New York v. Daicel Chem. Indus., Ltd.*, 42 A.D.3d 301 (1st Dep't 2007) ........................31

*Rocanova v. Equitable Life Assurance Society of the United States*, 83 N.Y.2d 603 (1994)............................................................................................40

*Seltzer v. Morton*, 154 P.3d 561 (Mont. 2007) ..............................................42

*Skluth v. United Merchandise & Mfrs., Inc.*, 163 A.D.2d 104 (1st Dep't 1990)...............41

*Topal v. BFG Corp.*, 108 A.D.2d 849 (2d Dept. 1985) ...................................44

*Watts v. Clark Assoc. Funeral Home, Inc.*, 234 A.D.2d 538 (2d Dep't 1996)...................22

## FEDERAL STATUTES

15 U.S.C. § 15(b) ...........................................................................31, 34

15 U.S.C. § 1125(a)(1)...........................................................................35

26 U.S.C. § 6104(d) ...............................................................................12

Fed. R. Civ. P. 9(b) ...................................................................... 11, passim

Fed. R. Civ. P. 12(b)(6)...........................................................................10

Fed. R. Evid. 201(b) ...............................................................................11

## STATE STATUTES

N.Y. CPLR § 1015(a) .............................................................................44

N.Y. Gen. Bus. Law § 340.................................................................22, 31, 32

N.Y. Est. Powers & Trusts Laws § 11-3.1 ......................................................43

## MISCELLANEOUS

*Andy Warhol Prints: A Catalogue Raisonné 1962–1987* (Frayda Feldman & Jorg Schellman eds., 4th ed. 2003) (revised and expanded by Frayda Feldman and Claudia Defendi) ..................................................................................5

1 *Andy Warhol Catalogue Raisonné: Paintings and Sculpture 1961–1963* (Georg Frei & Neil Printz eds., 2001) ...............................................................5

2A–2B *Andy Warhol Catalogue Raisonné: Paintings and Sculpture 1964–1969* (Georg Frei & Neil Printz eds., Sally King-Nero exec. ed., 2004) ...............................5

Calder Foundation, http://www.calder.org ............................................................5

Foundation Center, http://foundationcenter.org/findfunders/990finder/ ...........................40

Jason Edward Kaufman, *Challenge to the Andy Warhol Art Authentication Board*, The Art Newspaper, Oct. 2003, at 1 ..............................................33

Randy Kennedy, *Scientist Presents Case Against Possible Pollocks*, N.Y. Times, Nov. 29, 2007, at B3 ........................................................................42

Tyler Maroney, *Much More than Fifteen Minutes*, ARTnews, Jan. 2002.....................6, 13

James Morrison, *One in Six Original Warhols is a Copy*, Independent, Oct. 26, 2003, at 9.............................................................................33

*Jackson Pollock Catalogue Raisonné of Paintings, Drawings, and Other Works: Supplement No. 1* (Francis V. O'Connor, ed., 1995)....................................15

Kelly Devine Thomas, *Authenticating Andy*, ARTnews, Sept. 2004 ................... 4, passim

Richard Polsky, *I Bought Andy Warhol* (2003) ...........................................18, 19, 20

Roy Lichtenstein Foundation, http://www.lichtensteinfoundation.org/frames.htm ...........5

Michael Schnayerson, *Judging Andy*, Vanity Fair, Nov. 2003.............................. 6, passim

The Noguchi Museum, http://www.noguchi.org/catalogue_raisonne.html.......................15

Carol Vogel, *A Warhol and Others Break Records in a Vigorous Sale that Itself Makes Auction History*, N.Y. Times, May 17, 2007, at B5 ...........................15

Carol Vogel, *Big Prices for Bacon Paintings Lead Sales of $315.9 Million, A Record Total for Sotheby's*, N.Y. Times, Nov. 15, 2007, at B4 ...................15

C. Wright & A. Miller, *Federal Practice and Procedure* § 1216 ......................10

Defendants The Andy Warhol Foundation for the Visual Arts, Inc., Vincent Fremont, Vincent Fremont Enterprises, and The Andy Warhol Art Authentication Board, Inc. (collectively "Defendants")[1] submit this memorandum in support of their motion to dismiss the Amended Complaint, pursuant to Fed. R. Civ. P. 12(b)(6).

## INTRODUCTION

On September 14, 2007, Defendants filed a motion to dismiss the original Complaint on the ground, *inter alia*, that the speculative and implausible conspiracy theory offered up by Plaintiff Joe Simon-Whelan ("Simon") — a vast 20-year conspiracy to "artificially inflate" the prices of artwork by Andy Warhol — did not justify imposing the burden and expense of antitrust discovery on the Defendants under the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007) ("*Twombly*"). Rather than respond to Defendants' motion, Simon's counsel threw in the towel four days after the motion was filed and announced their intention to amend the Complaint. Although the 72 references to "information and belief" have been deleted and additional snippets from various newspaper and magazine articles and books have been added in the new Amended Complaint, the fundamentally implausible theory remains and, in addition to other material deficiencies, Simon now purports to assert "overcharge" claims on behalf of a class that he lacks standing to represent.

Simon has brought this class action antitrust suit in order to bludgeon a *charitable* organization into coercing a panel of independent art experts to change their opinion concerning the authenticity of his purported Warhol self-portrait. His theory is that the art experts comprising the Andy Warhol Art Authentication Board, Inc. ("the Board") conspired to refuse to

---

[1] Fremont is named in the caption as "Successor Executor For the Estate of Andy Warhol," even though the Amended Complaint does not allege that Fremont ever qualified as successor executor of the Warhol Estate after the death of the original executor, Fred Hughes. Because Fremont was never appointed as successor executor by the Surrogate's Court and has never acted in that capacity, Fremont must be dismissed from this action in the capacity as successor executor. *See* Point Seven, *infra*.

authenticate legitimate Warhol works in order to create an "artificial scarcity" of Warhol art. The purpose of this alleged conspiracy, according to the Amended Complaint, was to inflate the value of Warhol works held by The Andy Warhol Foundation for the Visual Arts, Inc. (the "Foundation"), a non-profit institution which exists to support artistic causes through cash grants and gifts of artwork. Simon seeks to pursue this conspiracy theory even though the Board has declined to authenticate *fewer than one percent* of the works in the relevant market defined in the Amended Complaint. In short, this is a classic case for the rigorous pre-discovery scrutiny of pleadings mandated by the Supreme Court in *Twombly*.

Concerned about the high cost of discovery in antitrust cases, the Supreme Court in *Twombly* held that pleadings must cross a threshold of plausibility before a district court may allow a potentially massive factual controversy to proceed. 127 S.Ct. at 1966–67. Thus, a complaint seeking recovery based upon an alleged antitrust conspiracy must contain "allegations plausibly suggesting (not merely consistent with) agreement." *Id.* at 1959, 1966. It must contain enough factual support to show that the asserted claims are not just "possible" or "conceivable" but actually plausible. *See id.* at 1965–66, 1974; *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007) (granting motion to dismiss and holding that *Twombly* applies to conspiracy claims asserted under both Sections 1 and 2 of the Sherman Act). In this case, the Amended Complaint fails to show that Simon's central premise of a vast conspiracy to create an "artificial scarcity" of artwork by Andy Warhol is even *possible,* much less plausible.

## FACTS

The Amended Complaint alleges that the late Andy Warhol was "one of the *most prolific and innovative* artists of the 20th century." Am. Compl. ¶1 (emphasis supplied). At his death, Warhol's estate contained nearly 100,000 works of art. ¶38. In the estate valuation litigation referenced in the Amended Complaint, ¶¶39–43, Surrogate Preminger confirmed that the estate

contained nearly 100,000 works. *In re Determination of Legal Fees Payable by the Estate of Andy Warhol*, 1994 N.Y. Misc. LEXIS 687 at *4 (Surr. Ct. N.Y. County 1994). This number does not include all the works sold or given away by Warhol in the 30 years prior to his death in 1987. Warhol works were actively sold by dealers and at auction, including "hundreds of worldwide auction sales of Warhol's art over a twenty year period." *Id.* at *10. At the time of Surrogate Preminger's decision in 1994, for example, the Estate and Foundation had sold 2,500 works for an aggregate price of $32 million. However, during that *same* period, 1987-1993, another *$100 million* of Warhol art not owned by the Estate was sold by others. *Id.* at *20. All of these sales occurred in a "competitive market." *Id.*

### The Andy Warhol Foundation

The Foundation was formed in 1987 as a not-for-profit corporation shortly after Warhol's death, pursuant to his will, and in 1991 received hundreds of millions of dollars of Warhol's artwork from his estate. Am. Compl. ¶5, *In re Determination of Legal Fees Payable by the Estate of Andy Warhol*, 1994 N.Y. Misc. LEXIS 687 at *2. The purpose of the Foundation was "to advance the visual arts, including . . . the study, creation, preservation, exhibition and public understanding and appreciation thereof."[2] The Foundation funds its charitable activities by selling artwork, investing the proceeds, and earning income on its financial investments, as well as through licensing activities.[3] According to the Amended Complaint, the Foundation has sold well over $150 million in Warhol artwork since its formation. Am. Compl. ¶¶18, 53.

---

[2] Foundation Certificate of Incorporation, attached to the Declaration of Gary Sesser in Support of the Motion to Dismiss the Amended Complaint (hereafter, "Sesser Decl."), Exh. C. As discussed more fully in the section entitled *Legal Standard*, pp. 10-12, all documents attached to the Sesser Declaration are materials either publicly available or already referenced in the Amended Complaint, and therefore are properly considered upon a Rule 12(b)(6) motion to dismiss.

[3] Sesser Decl., Exh. N. (Foundation's publicly available tax filing, on IRS Form 990-PF, for the fiscal year ending April 30, 2006).

In the early 1990s, the Foundation established the Andy Warhol Museum in Pittsburgh in collaboration with the Carnegie Institute and New York's Dia Center for the Arts. During fiscal year 1999, the Foundation donated over 3,000 works of art valued at more than $62 million to the Andy Warhol Museum.[4]  As of 2004, the Foundation had donated more than 6,000 works to the Andy Warhol Museum.[5]  In addition, the Foundation has sold works to 24 other museums at "deeply discounted prices."[6]  The Amended Complaint quotes attorney Ed Hayes, early counsel to the Estate and Foundation, acknowledging that the Foundation "sold paintings at a substantial discount" to museums. ¶42. According to another source cited and relied upon in the Amended Complaint, "the estate [sic] kept their prices *artificially low*" in selling to dealers and collectors as well.[7]  *See also* ¶112 ("elite galleries and dealers enjoy the privilege of buying Warhol works directly from The Foundation at a substantial discount").

One of the more costly activities of the Foundation is to fund the publication of the Andy Warhol Catalogues Raisonné ("Catalogues Raisonné"), to which the Amended Complaint makes various references.  ¶¶12, 17, 65, 87, 145, 150.[8]  A catalogue raisonné of Warhol's prints has been completed (now in its fourth edition), and the catalogue raisonné of Warhol's paintings and

---

[4] Sesser Decl., Exh. P (excerpts from Foundation's publicly available tax filings disclosing gifts of artwork).

[5] *See* Kelly Devine Thomas, *Authenticating Andy*, ARTnews, Sept. 2004 [hereafter *Authenticating Andy*, ARTnews, Sept. 2004"], annexed as Sesser Decl., Exh. F, at 133  (cited in the Amended Complaint at ¶¶82, 85). Where articles are cited in the Amended Complaint, the Court is entitled to take notice of the full contents of such articles in connection with a motion to dismiss.  In *Twombly*, for example, the Supreme Court held that where "[t]he complaint quoted a reported statement" of defendant Qwest's CEO to suggest that the defendants declined to compete with each other "the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn." *Twombly*, 127 S.Ct. at 1773 n.13.

[6] Sesser Decl., Exh. F (*Authenticating Andy*, ARTnews, Sept. 2004), at 133.

[7] Richard Polsky, *I Bought Andy Warhol* 229 (2003) (hereafter "Polsky, *I Bought Andy Warhol*") (emphasis supplied) (cited in Am. Compl. at ¶¶114, 132, annexed as Sesser Decl., Exh. G).

[8] A catalogue raisonné is a comprehensive listing of all of an artist's known works. *DeWeerth v. Baldinger*, 836 F.2d 103, 112 (2d Cir. 1987), *on remand*, 804 F.Supp. 539 (S.D.N.Y. 1992), *rev'd on other grounds*, 38 F.3d 1266 (2d Cir. 1994) ("A catalogue raisonné is a definitive listing of the works of an artist."); *Kirby v. Wildenstein*, 784 F. Supp. 1112, 1113 (S.D.N.Y. 1992) ("A catalogue raisonné is regarded as a definitive catalogue of the works of a particular artist; inclusion of a painting in a catalogue raisonné serves to authenticate the work.").

sculpture is in progress, with the second volume, covering the period from 1964 through 1969, having been published in 2004.[9] Listing in the Catalogues Raisonné "informally authenticates Warhol works" according to the Amended Complaint. ¶65. As of September 2004, the Foundation had spent more than $2.3 million on the Catalogues Raisonné alone.[10]

### The Andy Warhol Art Authentication Board

The Board was formed as a not-for-profit entity in 1995.[11]  Am. Compl. ¶¶7, 30. Authentication boards are not unusual in the art world; the Amended Complaint acknowledges the existence of "other art authentication boards" of prestigious artists. ¶¶8, 102. Authentication boards have been established for famous artists such as Alexander Calder, Jackson Pollock, Roy Lichtenstein, and Isamu Noguchi which have been set up to protect the artist's legacy and assure correct attribution of the artist's work.[12]  Authentication boards serve the salutary purpose of preventing fakes and forgeries from being passed off as authentic works of the artist, thereby protecting the artistic legacy of the artist, the investment of owners of genuine works, and the

---

[9] *Andy Warhol Prints:  A Catalogue Raisonné 1962–1987* (Frayda Feldman & Jorg Schellman eds., 4th ed. 2003) (revised and expanded by Frayda Feldman and Claudia Defendi); 1 *Andy Warhol Catalogue Raisonné:  Paintings and Sculpture 1961–1963* (Georg Frei & Neil Printz eds., 2001); 2A–2B *Andy Warhol Catalogue Raisonné: Paintings and Sculpture 1964–1969* (Georg Frei & Neil Printz eds., Sally King-Nero exec. ed., 2004). *See* Sesser Decl., ¶¶ 11–12, Exhs. K–L.

[10] Sesser Decl., Exh. F (*Authenticating Andy,* ARTnews, Sept. 2004), at 132.

[11] Although not material to this motion, the allegation in the Amended Complaint that the Warhol Board was populated by "obscure figures in the art world" who did not possess "expertise in the authentication of Warhol Works," ¶¶8, 74, is patently false, as easily demonstrated by any number of public sources.  For example, Robert Rosenblum, described in the Amended Complaint as having "no expertise" in the authentication of Warhol Works, ¶74, was described by Surrogate Preminger as a "prominent art historian" who wrote essays for the book prepared as an adjunct to the famous Warhol retrospective held at the Museum of Modern Art in 1989.  *In re Determination of Legal Fees Payable by the Estate of Andy Warhol*, 1994 N.Y. Misc. LEXIS 687 at *6–7.

[12] Similar foundations have established authentication procedures.  *See Lariviere v. Thaw*, Index. No. 100627/99, 2000 WL 33965732, *3 (Sup. Ct. N.Y. County June 26, 2000) (discussing Pollock-Krasner Authentication Board); Calder Foundation, http://www.calder.org (noting that Calder Foundation's authentication service has examined 3600 works since 1993); Roy Lichtenstein Foundation, http://www.lichtensteinfoundation.org/frames.htm (stating that Lichtenstein Foundation "hopes to assist the public in the confirmation of correct attribution and provenance of the artist's extensive oeuvre" through the operation of the Lichtenstein Authentication Committee); The Noguchi Museum, http://www.noguchi.org/catalogue_raisonne.html (discussing authentication process for Isamu Noguchi works).

integrity of the marketplace. *See* ¶¶206–09. The Board provides its authentication services for free. *See* Am. Compl., Exh. B.

A principal source cited and relied upon in the Amended Complaint, a 2003 article in *Vanity Fair*, notes that while Warhol is the most famous artist in America he is also "the most faked."[13] "[A]s demand has increased, so has the number of forgeries."[14] "Forgers have a field day because Warhol was also among the world's most prolific artists."[15]    As the *Vanity Fair* article explains:

> Forgers can start with the same photographic images Warhol did, and sometimes knock off silkscreens only an expert can distinguish from the originals. Often, as a result, the Warhol board is simply blamed as the messenger of bad news to hoodwinked buyers.

As of 2004, the Board had examined just over 3,000 works and allegedly had rejected about 10–20% as inauthentic.[16] In other words, the Board rejected only about 300 to 600 works from its inception in 1995 to 2004.

### Simon and His Work

Simon is a film writer and producer who purchased an alleged Warhol self-portrait for $195,000 in 1989. ¶¶19, 25, 133. Significantly, he did not purchase his work directly from either the Warhol estate or the Foundation. In fact, ownership of the work passed though a number of hands between 1987 and 1989, when Simon acquired the work from a private dealer.

---

[13] Michael Schnayerson, *Judging Andy*, Vanity Fair, Nov. 2003, pp. 196, 201 [hereinafter "*Judging Andy*, Vanity Fair, Nov. 2003"], annexed as Sesser Decl., Exh. E. This article is cited and relied upon in ¶¶22, 80, 82, 86, and 167 of the Amended Complaint. As noted, the Court is entitled to take notice of the full contents of the article. *See Twombly*, 127 S.Ct. at 1773 n.13.

[14] Sesser Decl., Exh. E (*Judging Andy*, Vanity Fair, Nov. 2003), at 196.

[15] *Id.* at 201.

[16] Sesser Decl., Exh. F (*Authenticating Andy*, ARTnews, Sept. 2004), at 130. *See also*, Tyler Maroney, *Much More than Fifteen Minutes*, ARTnews, Jan. 2002 (hereafter, *Much More than Fifteen Minutes*, ARTnews, Jan. 2002), at 110 ("10 to 20 percent of the works submitted to the board's rigorous monthlong test are considered 'questionable.'") This article, cited in ¶215 of the Amended Complaint, is annexed as Sesser Decl., Exh. H. *See also* ¶182 of the Amended Complaint, citing articles that put the figure at 15% for previously authenticated works.

¶¶124–33. Simon's work was "one of a series of 12 identical paintings" created in or about 1965. ¶¶120–21.[17] According to the Amended Complaint, Paul Morrissey provided Richard Ekstract an acetate with Warhol's self-portrait and "Warhol and Morrissey personally authorized Ekstract to create these 12 paintings." ¶121. Ekstract "arranged for this series of self-portrait paintings to be created from the acetate" allegedly "under the express authorization and instruction of Warhol." ¶122. The *Vanity Fair* article relied upon in the Amended Complaint quotes one of Simon's supporters, former Factory assistant Gerard Malanga: "The Ekstract situation was an anomaly [Malanga admits]. We never farmed out another job at that point."[18]

Prior to formation of the Board in 1995, Fred Hughes, the executor of Warhol's estate, authenticated certain works of art including, apparently, the work ultimately purchased by Simon in 1989. ¶120. Hughes wrote: "I certify that this is an original painting by Andy Warhol *completed by him in 1964.*" *Id.* (emphasis supplied). The Amended Complaint concedes that Simon's painting was made in 1965, not 1964. ¶¶19, 120. Warhol's 1964 self-portraits are well-known and are listed in the Painting and Sculpture Catalogue Raisonné.[19]

As early as 1989, the Estate expressed doubts about the authenticity of one of the Ekstract paintings, one presented by gallery owner Michael Kohn. ¶¶134–37. In 1990, the Estate allegedly declined to authenticate another work from this same series submitted by Ekstract himself. ¶¶138–40. That same year, a third painting from the Ekstract series was likewise not authenticated by the Estate, and later others were apparently not authenticated as well. ¶¶142–44.

---

[17] Simon's story has changed even since the original Complaint was filed in July 2007. The original Complaint stated that Simon's work was "one of several created in or about 1964." Complaint, ¶¶13, 36, 94.

[18] Sesser Decl., Exh. E (*Judging Andy,* Vanity Fair, Nov. 2003), *supra,* at 204.

[19] The 1964 self-portraits were the subject of the U.S. postage stamp, not the 1965 Ekstract works. *See* Am. Compl. ¶¶147, 162(d). The 1964 self-portraits are numbered 1244 to 1253 in volume 2A of the *Andy Warhol Catalogue Raisonné: Paintings and Sculpture 1964–1969.*

In the course of attempting to sell his work for $2 million in 2001, Simon submitted his work to the Board for authentication. ¶¶148, 153. At that time, he signed a letter agreement dated December 21, 2001. ¶153 & Exh. B. The agreement provides that the Board "will endeavor to form an opinion as to the authenticity of the Work as a work created by Andy Warhol." Am. Compl., Exh. B, p.2. It states that upon the conclusion of its analysis, the Board would affix a stamped or written legend to the Work indicating the Board's opinion of the authenticity of the Work or that the Board could form no opinion as to authenticity. Am. Compl., Exh. B, p. 2. In signing the agreement, Simon specifically acknowledged that "forming an opinion as to the authenticity of a work purporting to be by Andy Warhol is often very difficult and will in most cases depend upon subjective criteria which are not capable of proof or certainty, and that the conclusion, if any, reached by the Authentication Board respecting the Work is an opinion only." *Id.* at 2–3. Having made that acknowledgment, Simon agreed not to sue the Board, its members, or the Foundation based, *inter alia*, on any claim that the opinion expressed by the Board "is not correct." *Id.* at 3.

On February 7, 2002, the Board sent a letter to Simon expressing its opinion that his work was not the work of Andy Warhol. ¶155 & Exh. D. In response, Simon contacted the assistant secretary to the Board, who informed him that he could re-submit his work if he had additional documentation to support his position. ¶158. Simon resubmitted his work with additional documentation in February 2003. ¶162. Once again, Simon signed an agreement specifically acknowledging the difficulty of opining on the authenticity of works attributed to Warhol and promising not to sue based on his dissatisfaction with the Board's opinion, whatever that opinion might be. ¶21. On July 14, 2003, the Board sent Simon a letter in which it adhered to its initial

opinion that his work is not an authentic work by Warhol. ¶165. Some time thereafter the Board provided Simon with a written explanation for its opinion. ¶168 & Exh. E.[20]

Unmentioned in the Amended Complaint is the fact that Simon submitted to the Board *another* work, allegedly by Warhol, at about the same time. This incident is discussed in detail in the 2003 *Vanity Fair* article cited in the Amended Complaint.[21]  The "Dollar Bills" work submitted by Simon had dollars bills bearing the signature of Treasury Secretary Nicholas F. Brady, who took office in September 1988, *a year after* Warhol died and two years after the date inscribed on Simon's work.  In a written letter of explanation, the Board advised Simon that it was "certain that the work submitted by you is not by Andy Warhol."[22]

### The Amended Complaint

Simon's Amended Complaint purports to state six causes of action:  two claims under federal and state antitrust laws (¶¶200–30); a claim for unjust enrichment (¶¶231–34); a Lanham Act claim (¶¶235–40); a fraud claim (¶¶241–56); and a claim for a declaratory judgment that the agreement he twice signed with respect to this piece (and additional times with respect to the fake Dollar Bills work) is unenforceable (¶¶257–62).  The antitrust claims are predicated on an alleged 20-year conspiracy to create an "artificial scarcity" of works by Andy Warhol in order to "inflate the value" of works held by the Foundation. *See, e.g.,* ¶¶14, 16, 18, 23, 35, 87, 150, 196, 215–16.

The Amended Complaint is denominated as a class action and Simon purports to represent a class consisting of "all persons who purchased Warhol works at artificially inflated prices (the *Class*) during the period February 22, 1987 through such time in the future as the

---

[20] A more legible copy is annexed as Sesser Decl., Exh. B.

[21] *See* Sesser Decl., Exh. E (*Judging Andy*, Vanity Fair, Nov. 2003), *supra*, at 218-219.

[22] *Id.* at 218-219. *See* Sesser Decl., Exh. Q  (full text of the letter of explanation).

9

effects of defendants' illegal conduct, as alleged, have ceased (the *Class Period*)." ¶196. Persons who sold Warhol works during the Class period are excluded. ¶197.

## LEGAL STANDARD

While the well-pleaded allegations of a complaint are generally accepted as true on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 127 S.Ct. at 1965 (citing *Papason v. Allain*, 478 U.S. 265, 286 (1986)). "[B]ald assertions and conclusions of law will not suffice" in resisting a motion to dismiss. *Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 344 (2d Cir. 2006). The factual allegations in a complaint must be enough to raise the right to relief above the speculative level. *Twombly*, 127 S.Ct. at 1965, citing 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216, pp. 235–236 (3d ed. 2004). The complaint must contain something more than a statement of facts that creates a suspicion of a legally cognizable right of action. *Twombly*, 127 S.Ct. at 1965. When the allegations in a complaint, however true, cannot raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court. *Id.* at 1966.

Allegations of fraud in a complaint must be stated with particularity. Fed. R. Civ. P. 9(b). This applies not only to fraud claims but also to any claims alleging a "manipulative scheme." *See In re Crude Oil Commodity Litig.*; No. 06 Civ. 6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007) ("manipulative scheme" sounding in fraud must be pled with the particularity called for in Rule 9(b)). The Amended Complaint in this action alleges "a 20 year scheme of fraud, collusion and manipulation . . . to control the market in works of art by the late Andy Warhol." Am. Comp. ¶ 1; *see also* ¶¶13, 17, 19, 31–34, 60, 170, 217–20 (allegations of fraud).

In evaluating a motion to dismiss, the Court may consider the complaint and any documents that have been attached to or incorporated by reference in the complaint. *Rozsa v.*

*May Davis Group, Inc.*, 187 F. Supp. 2d 123, 128 (S.D.N.Y. 2002); *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 528 (S.D.N.Y. 2007). A court is not required to accept as true "conclusory allegations that are clearly contradicted by documentary evidence incorporated into the pleadings by reference." *Labajo*, 478 F. Supp. 2d at 528; *Barnum v. Millbrook Care Ltd. P'ship*, 850 F. Supp. 1227, 1232–33 (S.D.N.Y. 1994); *Mallon Res. Corp. v. Midland Bank plc*, 96 Civ. 7458, 1997 U.S. Dist. LEXIS 10346, at *9–10 (S.D.N.Y. July 17, 1997). It is well settled that where the allegations of the complaint are contradicted by documents attached to or referenced in the complaint, "the document controls and the court need not accept as true the allegations of the complaint." *Barnum*, 850 F. Supp. at 1232–33; *Mallon Res.*, 1997 U.S. LEXIS 10346 at *9–10. In addition, the Court is entitled to take notice of the full contents of any published materials referenced in the Complaint. *Twombly*, 127 S.Ct. at 1773 n.13. Thus, this Court may consider the full contents of the numerous magazine articles and the Foundation's public tax filings which Simon relies upon for his allegations in the Amended Complaint. *See* Am. Compl. ¶¶80, 82, 119, 167 (citing magazine articles); ¶¶55, 58 (citing Foundation's tax filings).[23] The public availability of published books, certificates of incorporation, and tax filings of a nonprofit organization is generally known, and the existence of specific published books, certificates of incorporation and tax filings is readily verifiable. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (court "may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC," especially "where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint"). Like filings with the SEC, the Foundation's

---

[23] This Court can also take judicial notice of the referenced tax filings pursuant to Rule 201(b) of the Federal Rules of Evidence, because they are facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

federal tax returns are publicly disclosed. *See* 26 U.S.C. § 6104(d) (requiring public disclosure of nonprofit organization tax filings).

**ARGUMENT**

**POINT ONE**

**SIMON'S ANTITRUST CONSPIRACY CLAIMS ARE IMPLAUSIBLE AND MUST BE DISMISSED UNDER THE SUPREME COURT'S DECISION IN *BELL ATLANTIC V. TWOMBLY***

Because the Board owns no Warhol artwork and the Foundation makes no authentication decisions, the premise of the antitrust claims in the Amended Complaint is that the Board and Foundation conspired to restrict the supply of authentic Warhol art, by refusing to authenticate legitimate Warhol art, in order to artificially inflate the price of such art. *See* ¶¶14, 16, 18, 23, 35, 87, 150, 196, 215–16. Although the Complaint alleges a "20-year scheme" of collusion, ¶1, it fails to plausibly demonstrate that there *is* a "scarcity" of Warhol art as a result of authentication opinions of the Board which has affected or could affect the prices for such art.

Assuming for the sake of argument that there is a relevant market limited to the sale of Warhol art as alleged in the Amended Complaint (¶¶ 1, 6, 199, 201), that market would include far in excess of the 100,000 works in Warhol's estate at the time of his death. ¶38; *see also In re Determination of Legal Fees Payable by the Estate of Andy Warhol*, 1994 N.Y. Misc. LEXIS 687 at *4 (nearly 100,000 works in Warhol's estate). At the time of Warhol's death in 1987, a vast amount of his art was owned by others, as Warhol works had been actively sold by Warhol himself, by dealers and at auction, including "hundreds of worldwide auction sales of Warhol's art over a twenty year period." *Id.* at *10. During the period 1987–1993, for example, *$100 million* of Warhol art not owned by the Estate or the Foundation was sold by others, while only $32 million was sold by the Estate or the Foundation. *Id.* at *20.

1.    **The Amended Complaint Fails to Show that the Alleged Conspiracy Created An Artificial Scarcity of Warhol Works or Inflated Prices**

The Amended Complaint does not state how many legitimate Warhol works the Board has refused to authenticate, so as to establish that an "artificial scarcity" has been created. It does not even give an approximate number.[24] Nonetheless, a principal source relied upon in the Amended Complaint indicates that as of 2004, the Board had rejected only 10–15% of the 3,000 or so works presented for its authentication opinion.[25] Even if the rejection rate were as high as 50% — which it surely is not — that would represent *fewer than one percent* of the works in the relevant market.[26] Moreover, Simon can hardly claim that all of the rejected works were "legitimate" Warhols, as the existence of numerous fake Warhols is well-documented in the very articles cited in the Amended Complaint. In fact, Simon himself presented an indisputably fake Warhol to the Board, the "Dollars Bills" collage with pasted dollar bills bearing the signature of a Treasury Secretary who took office a year after Warhol died.

However disappointed Simon may be about the Board's opinion of his work, elimination of his work, or a few others from the Ekstract series, from an alleged relevant market of far in excess of 100,000 Warhol works does not create "an artificial scarcity" or affect prices or competition. The purpose of the antitrust laws is for "the protection of *competition*, not *competitors.*" *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224

---

[24] The best Simon could do is allege that "*countless* other legitimate Warhols" (in addition to his own) have been excluded from the market. Am. Compl. ¶221 (emphasis supplied).

[25] Sesser Decl., Exh. F (*Authenticating Andy,* ARTnews, Sept. 2004), at 130. *See also* Sesser Decl., Exh. H (*Much More than Fifteen Minutes,* ARTnews, Jan. 2002), at 110 ("10 to 20 percent of the works submitted to the board's rigorous monthlong test are considered 'questionable'").

[26] The Amended Complaint cites unnamed "former employees of the Board" as suggesting that "closer to 50%" of "previously authenticated Warhols that were re-submitted to the Board have had their judgment of authenticity reversed," although the articles cited in ¶182 allegedly put the figure at 15% for previously authenticated works. In any event, "previously authenticated Warhols" represent a tiny fraction of the works submitted to the Board for its authentication opinion. The Amended Complaint contains no estimate of the overall rejection rate or the absolute number of works which received a negative opinion from the Board.

(1993) (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320 (1962)) (emphasis in original); *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488 (1977) (same). To show antitrust injury, Simon must demonstrate "more than individual loss or exclusion" from the market. *Mathias v. Daily News, L.P.,* 152 F. Supp. 2d 465, 480 (S.D.N.Y. 2001); *see Yellow Page Solutions, Inc. v. Bell Atl. Yellow Pages Co.,* No. 00 CIV. 5663, 2001 WL 1468168, at *11 (S.D.N.Y. Nov. 19, 2001) ("[A]n antitrust plaintiff must prove more than harm to its own business or the loss of a competitor"). Rather, the plaintiff must show that the alleged harm resulted in "a demonstrable impact on the market." *Mathias,* 152 F. Supp. 2d at 480; *see Yellow Page Solutions,* 2001 WL 1468168, at *11; *Naso v. Park,* 850 F. Supp. 264, 271 (S.D.N.Y. 1994). The Amended Complaint utterly fails to show that a *sufficient number* of authentic Warhol works were eliminated by action of the Board to have a demonstrable impact on the alleged relevant market.

To be clear, the issue for purposes of the antitrust conspiracy claims is not whether Simon and his work were disfavored or otherwise treated unfairly (which is denied), but rather whether he was the victim of a 20-year conspiracy to create an *artificial scarcity* of Warhol works for the purpose of *artificially inflating* prices of such works. In *Santana Products, Inc. v. Sylvester & Assocs., Ltd.,* for example, the plaintiff claimed that the defendants' conduct harmed other competitors besides himself, and resulted in an injury to the competitive structure of the market. 121 F. Supp. 2d 729, 736 (E.D.N.Y. 1999). However, because the plaintiff failed to identify the other allegedly harmed competitors, "or even specify how many there [were]," the court held that the plaintiff's claim amounted to "the exclusion of a single person from competition" and dismissed the complaint. *Id.* at n.3. Here, the Amended Complaint is devoid of the factual

showing required under *Twombly* to establish that it is plausible that a conspiracy to "manufacture scarcity" existed, particularly given the sheer numbers of Warhol works.

Not only does the Amended Complaint not allege, or even estimate, the number of works of art the Board has declined to authenticate, it fails to allege that the percentage of works rejected by the Board is particularly high, unusual, or differs materially from the percentage of works rejected by the authentication boards of other artists.[27] Similarly, while the Amended Complaint makes conclusory allegations about "inflated prices" of Warhol works, it does not allege that those prices are any different from the prices of works of art by other "deceased famous artists" whose works have not been affected by an alleged 20-year conspiracy to create an artificial scarcity. In fact, the Amended Complaint states that "[t]he value of modern and contemporary art generally, and Warhols specifically, regularly ranges into the millions of dollars (or more) because the supply of artwork from a given deceased artist is fixed." ¶204. The Amended Complaint makes no showing that prices of Warhol art are in any way different from the prices of art by comparable "deceased famous artists."[28]

In *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, the Supreme Court found it implausible that Japanese television manufacturers had engaged in a longstanding conspiracy to drive competitors from the U.S. market through predatory pricing, given the unlikelihood that

---

[27] The 1995 supplement to the 1978 Jackson Pollock Catalogue Raisonne authenticated 28 works after reviewing more than 260 submissions, for a rejection rate of *nearly 90%* of works submitted for review. *Jackson Pollock Catalogue Raisonné of Paintings, Drawings, and Other Works: Supplement No. 1*, at xiv (Francis V. O'Connor, ed., 1995).

[28] During the same week in May 2007 that a Warhol painting entitled *Green Car Crash* sold for $71 million and another Warhol painting entitled *Lemon Marilyn* sold for $28 million, as noted in the Amended Complaint, ¶2, a work by contemporary artist Mark Rothko sold for $72.84 million, and works by Jasper Johns, Willem de Kooning and others greatly exceeded auction estimates. Carol Vogel, *A Warhol and Others Break Records in a Vigorous Sale that Itself Makes Auction History*, N.Y. Times, May 17, 2007, at B5. In November 2007, the New York Times reported that purchasers spent over $600 million in two evening sales at Sotheby's and Christie's, including $45 million for the painting "Second Version of Study for Bullfight No. 1" by Francis Bacon and $23.5 million for the Jeff Koons sculpture "Hanging Heart (Magenta/Gold)." Carol Vogel, *Big Prices for Bacon Paintings Lead Sales of $315.9 Million, A Record Total for Sotheby's*, N.Y. Times, Nov. 15, 2007, at B4.

they would be able to recoup their losses from below-cost pricing in the future. 475 U.S. 574, 587 (1986). Significantly, the Court found that "[t]he alleged conspiracy's failure to achieve its ends in the two decades of its asserted operation is strong evidence that the conspiracy does not in fact exist." *Id.* at 592. Here, the Amended Complaint alleges a relevant market of far in excess of 100,000 works and fails to make any factual showing whatsoever (supported by numbers) that an "artificial scarcity" of Warhol works has been created as a result of authentication decisions in the two decades of the alleged conspiracy's operation.

Because this glaring deficiency in Simon's conspiracy theory was highlighted in Defendants' motion to dismiss the original Complaint, the new Amended Complaint came up with a quotation from a Sotheby's Vice-President, lifted from a 2002 magazine article, that Warhols "are hard to find these days." ¶215. Neither the Amended Complaint nor the article suggests what kind of "Warhols" Leslie Prouty is speaking about, but another quotation in that same paragraph refers to "quality work." The relevant market defined by Simon includes *all* works of art by Warhol, not just "quality work" (whatever that means). It is also important to note that the Foundation has donated 6,000 Warhol works to the Andy Warhol Museum and sold numerous other Warhol works to other museums at a substantial discount. Museums tend not to re-sell artwork acquired for their collections. If these gifts and charitable donations by the Foundation contributed to a "scarcity" of Warhol art for sale, that is hardly legally actionable conduct. Gifts by a charitable foundation, mandated by law and consistent with the purpose expressed in Andy Warhol's Will to promote the visual arts, cannot form the basis for a cause of action. The numbers of Warhol works involved in these charitable donations dwarfs the small number of works which have received negative authentication opinions from the Board. Hence,

a non-specific statement that "Warhols are hard to find these days" is not suggestive of the conspiracy alleged.

Where the factual context renders a claim implausible, as in this case, a plaintiff must present more persuasive proof to support a conspiracy claim than would otherwise be necessary. *Matsushita*, 475 U.S. at 587. The Amended Complaint does not indicate that any such proof is available. Nor can Simon insist that he needs discovery to substantiate his allegation of a vast 20-year conspiracy to create an "artificial scarcity" of Warhol works. *Twombly* made it absolutely clear that the plausibility standard enunciated by the Supreme Court in *Matsushita* must be met at the pleading stage. *See Twombly*, 1955 S.Ct. at 1964–68. The dissent in *Twombly* acknowledged as much. *Id.* at 1982–83. A complaint needs more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action" in order to make it to the discovery stage. *Id.* at 1964–65. The mere possibility of recovery is not enough to prevent a case from being dismissed for failure to state a claim. Rather, a complaint must set forth factual allegations "plausibly suggesting" an entitlement to relief. *Twombly*, 127 S.Ct. at 1966. Here, there are no factual allegations in the Amended Complaint plausibly suggesting that there is an "artificial scarcity" of Warhol art resulting from improper authentication opinions or that prices of Warhol art are "inflated" as a result of a conspiracy.

**2. The Allegations in the Amended Complaint and in Published Materials Cited in the Amended Complaint Are Inconsistent with a Conspiracy to Inflate the Prices of Warhol Works Sold by the Estate or Foundation**

The gist of Simon's conspiracy theory is that the Foundation had to sell art at "inflated prices" in order to meet its "substantial overhead" because it has "disproportionately high administrative costs relative to most charities." ¶15. Among other problems with this theory, specific allegations in the Amended Complaint and in published materials cited in the Amended Complaint flatly contradict the conclusory allegation that the Foundation or the Estate charged

"inflated prices" for Warhol art. The Amended Complaint states that "elite galleries and dealers enjoy the privilege of buying Warhol works directly from The Foundation at a substantial discount." ¶112. It quotes Ed Hayes acknowledging that the Foundation "sold paintings at a substantial discount" to museums. ¶42. And an article cited in the Amended Complaint reports that the Foundation has sold works to 24 other museums at "deeply discounted prices."[29]

Most significantly, the Amended Complaint cites a book by Richard Polsky (*I Bought Andy Warhol*) for the proposition that "favored dealers and galleries blackball those who break [an alleged] non-competition agreement by selling within two years of purchase." ¶114. The Polsky book actually says no such thing, but instead recounts that Fremont agreed to sell Polsky a new Warhol at a "sizable discount" shortly after Polsky had re-sold two paintings of sea turtles acquired the previous year from the Estate.[30] According to Polsky, the sizable discount offered by Fremont was intentional: "The idea was to encourage legitimate collectors and museums to buy paintings by *keeping their prices artificially low*."[31] Polsky later describes his negotiation with Fremont to purchase a Warhol Self-Portrait: "Knowing that the estate kept their prices artificially low, I knew the quote would be favorable."[32] Polsky estimated that the painting he wanted was worth between $75,000 and $100,000 on the open market. Fremont offered to sell it to him for $50,000. After further negotiation Fremont sold the Self-Portrait to Polsky for $47,500.[33] Thus, the Polsky book cited in the Amended Complaint demonstrates the very opposite of what Simon alleges.

---

[29] *See* "Sesser Decl., Exh. F (*Authenticating Andy,* ARTnews, Sept. 2004), at 133.

[30] Sesser Decl., Exh. G (Polsky, *I Bought Andy Warhol*), at 18-23.

[31] *Id.* at 18 (emphasis supplied).

[32] *Id.* at 229.

[33] *Id.* at 229-31.

Apart from conclusory allegations, which are entitled to no weight on a motion to dismiss, the Amended Complaint cites no examples of Warhol art sold by the Foundation or the Estate at "inflated prices." Both *Green Car Crash* ($71.7 million) and *Lemon Marilyn* ($28 million), cited in the Amended Complaint, ¶2, were sold at auction in May 2007. The Foundation had nothing to do with these sales. Nor did the Estate. Moreover, neither work was authenticated by the Board,[34] which decisively undermines the allegation in the Amended Complaint that authentication by the Board is necessary in order to sell a Warhol work. *See* ¶¶116–18. In short, specific allegations in the Amended Complaint and in published materials cited in that pleading are fundamentally at odds with Simon's central premise that the Foundation charged "inflated prices" for Warhol art.

### 3. The Amended Complaint Offers No Plausible Motive for the Supposed Conspirators to Engage in the Alleged Conspiracy

A significant obstacle facing Simon's antitrust conspiracy claims is the issue of motive. The absence of a plausible motive to enter into the alleged conspiracy is a telling factor. *See Matsushita*, 475 U.S. at 587, 593, 595–97. "Lack of motive bears on the range of permissible conclusions that can be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Id.* at 596–97.

It speaks volumes about the *bona fides* of the Amended Complaint that it nowhere mentions that the Foundation has gifted thousands of works of Warhol art, worth tens of millions of dollars, to the Andy Warhol Museum in Pittsburgh. Simon thus avoids explaining how these enormous gifts are at all consistent with the Foundation's supposed need to charge "inflated

---

[34] *See* Sesser Decl. ¶13, Exh. M, at 64, 80 (excerpts from auction catalog for Christie's Post-War and Contemporary Art Evening Sale on May 16, 2007).

prices" for Warhol art in order to cover the Foundation's expenses. It is a matter of public record that the Foundation has donated over $67 million dollars worth of Warhol art to the Andy Warhol Museum in Pittsburgh, in addition to millions of dollars in donations to other museums.[35] According to the Polsky book cited in the Amended Complaint, roughly a third of the Estate's paintings were donated to the Andy Warhol Museum, including "many of the most important and valuable remaining canvases."[36] Three thousand works were donated to the Museum in fiscal 1999 alone, two years before the Board's initial opinion on Simon's work.

Simon's effort to come up with a rational economic motive for his facially nonsensical conspiracy theory also founders on the reality of publicly available data. In 2001, when the Board gave its initial opinion on the authenticity of Simon's work, the Foundation had nearly $100 million in assets other than artwork. In 2003, when the Board reaffirmed its opinion, the Foundation had over $135 million in assets other than artwork.[37] The suggestion in the Amended Complaint that the Board's opinions were somehow motivated by the Foundation's need for cash is therefore objectively baseless.

Equally baseless is Simon's insinuation that a mid-1990s investigation by the New York Attorney General (in which no charges were filed) has anything at all to do with the Board's opinion of his work, the alleged conspiracy, or this case. ¶¶51, 56. Suffice it to say that this non-antitrust investigation took place six years *after* Simon purchased his work in 1989, and was concluded four years *before* the Board's opinion on the authenticity of his work in 2001. By way of contrast, the Second Circuit recently held that *pending antitrust investigations* in Europe were

---

[35] Sesser Decl., Exh. P (excerpts from Foundation's publicly available tax filings disclosing gifts of artwork).

[36] Sesser Decl., Exh. G (Polsky, *I Bought Andy Warhol*), at 17. *See also*, Sesser Decl., Exh. H (*Much More than Fifteen Minutes*, ARTnews, Jan. 2002), at 110 ("[A]fter Warhol died museums were given the first pick at around 50 percent of book value . . . ").

[37] *See* Sesser Decl. ¶15, Exh. O (excerpts from publicly available Foundation tax filings).

insufficient to raise a plausible inference of an antitrust conspiracy in the United States, as required to survive a motion to dismiss under *Twombly*. *See In re Elevator Antitrust Litig.*, 502 F.3d at 51–52. Viewed in light of that precedent, the suggestion that the mid-1990s New York Attorney General investigation cited in the Amended Complaint is in any way relevant to the existence of Simon's alleged conspiracy is ludicrous.

The plausibility of an alleged conspiracy to monopolize a market or otherwise restrain trade "turns on the suggestions raised by [defendant's] conduct when viewed in light of common economic experience." *Twombly* at 1971; *see Matsushita*, 475 U.S. at 587 (assessing whether defendants had rational economic motive to engage in alleged conspiracy); *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 278–79 (1968) (same). With due deference to Robin Hood, common sense alone suggests that it is implausible for a non-profit to enter into an illegal conspiracy with the objective of inflating the price of works of art it is either *giving away* or the sale proceeds of which it is *donating to charity*. At least in *Twombly* the defendant telecommunications providers had the usual economic motive to maximize profits. Thus, even if the factual allegations in the Amended Complaint demonstrated that it were *possible* to create an "artificial scarcity" in an alleged relevant market of well in excess of 100,000 Warhol works — which (as shown above) they do not — the Amended Complaint does not suggest a plausible economic motive for the Board and the Foundation to conspire to do so.

**4.    The Amended Complaint Fails to Demonstrate that the Requirements for Claims Under Sections 1 and 2 of the Sherman Act Can Be Met**

A plaintiff asserting a claim under section 1 of the Sherman Act is required to define the relevant market in which competition has been harmed. *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227–29 (2d Cir. 2006); *Mathias*, 152 F. Supp. 2d at 481 (S.D.N.Y.

2001).[38]  Similarly, a claim for monopolization under section 2 of the Sherman Act cannot survive a motion to dismiss unless it sufficiently alleges a relevant market and control of that market by the defendants. *See Naso*, 850 F. Supp. at 272 n.6; *see also Yellow Page Solutions*, 2001 WL 1468168, at *12 (if plaintiff has failed to sufficiently allege a relevant market, "it is impossible for the court to determine if the defendants possess monopoly power in the relevant market" (internal quotation marks omitted)).

A relevant market for the purpose of antitrust analysis "is the area of effective competition," and "is composed of products that have reasonable interchangeability for the purposes for which they are produced — price, use and qualities considered." *AD/SAT, A Division of Skylight, Inc., v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956)).  Under the "reasonably interchangeable" standard, products "need not be identical to be part of the same market." *AD/SAT*, 181 F.3d at 227.  Rather, products are "reasonably interchangeable where there is sufficient cross-elasticity of demand" such that "consumers would respond to a slight increase in the price of one product by switching to another product." *Id.*; *see Yellow Page Solutions*, 2001 WL 1468168, at *12.

Here, Simon makes the outlandish allegation that the works of Warhol and the works of *each* of approximately 500 other artists (including Picasso, Rothko, and Miro) constitutes a "distinct submarket within the general global market for modern and contemporary art." ¶202. The "facts" that Simon lists do not support his contention that works of art by Warhol are not

---

[38] Count One of the Amended Complaint also alleges a violation of the Donnelly Act. N.Y. Gen. Bus. Law § 340. The pleading requirements for a claim of conspiracy to monopolize under the Donnelly Act are the same as those under section 1 of the Sherman Act. *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 254 (S.D.N.Y. 1995). For example, a plaintiff must sufficiently allege a relevant market under the Donnelly Act. *See, e.g., Newsday, Inc. v. Fantastic Mind, Inc.*, 237 A.D.2d 497 (2d Dep't 1997); *Watts v. Clark Assoc. Funeral Home, Inc.*, 234 A.D.2d 538 (2d Dep't 1996). As discussed herein, the Amended Complaint fails to meet this requirement.

reasonably interchangeable with works of art by "Pollock, Picasso, Miro and Rothko" or other "modern and contemporary artists." *See* ¶203(a). For example, the fact that "Warhols are typically included in the category of "modern and contemporary artists in auctions, museum showings, dealer and gallery advertising and sales literature, and newspaper and magazine articles," ¶203(a), if anything, suggests that works of art by Warhol inhabit the same "area of effective competition" as works by other modern and contemporary artists. *See AD/SAT*, 181 F.3d at 227.

Nor is it significant that "Warhols are advertised for sale, whether privately or at auction, by specific reference to the name Andy Warhol, rather than by generic reference to 'modern and contemporary art.'" ¶203(b). Brand advertising does not indicate a separate market. It is merely an attempt to distinguish a product from other reasonably interchangeable products in the same market—as is done with Pepsi and Coke, various "luxury automobiles," and institutions of higher education, to name just a few. *See, e.g., PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002); *Delta Kappa Epsilon (DKE) Alumni Corp. v. Colgate Univ.*, 492 F. Supp. 2d 106 (N.D.N.Y. 2007). In *DKE Alumni*, the court found that the plaintiff's alleged relevant market for housing at Colgate University was insufficient in that it did not include housing at reasonably interchangeable colleges. 492 F. Supp. 2d at 114. Students may have strong family ties or personal reasons for preferring one college over another, just as art collectors may have subjective reasons for preferring one artist to another. But this does not mean that an increase in the price of college housing, or an increase in the price of works by a particular artist, would not lead some individuals who preferred that college or artist to switch to their second-ranked, less expensive preference.

In addition, Simon's alleged relevant market ignores museums and galleries as consumers, even though the Amended Complaint cites them as purchasers from the Foundation. ¶16.  Museums typically include works by many artists.  Owners of galleries may have an area of expertise, but they, even more than individuals, likely take into consideration the relative price of works by particular artists as much as any subjective aesthetic preferences of their own.  Some individuals choose to invest in contemporary art (or art of any other specific period, style, or subject matter) based on subjective preferences, but their collections may include works by many different artists based on price and availability, and may be motivated as much by investment goals as by aesthetic preferences.  Simon includes "investors" in his class, and to the extent that investment growth is a motive, there should be cross-elasticity among works by similar artists. *See* ¶216(e).

The failure to properly allege a relevant market is a fatal deficiency which alone requires dismissal of the antitrust claims in the Complaint.  *See Todd v. Exxon Corp*, 275 F.3d 191, 200 (2d Cir. 2001) ("To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." (citations and internal quotations omitted)); *DKE Alumni*, 492 F. Supp. 2d at 114 ("Where the plaintiff . . . alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.").

Moreover, even if there were a relevant market limited to Warhol works, Simon cannot plausibly show that there is a dangerous probability that the Defendants will successfully monopolize that market.  The Foundation has been selling and donating the works comprising its

bequest for nearly 20 years, thereby permanently *reducing* its market share and *increasing* the number of potential competitors who might sell these works. The Amended Complaint alleges that the Foundation started with approximately 100,000 works and the Estate and Foundation have since sold $150 million of those works. ¶¶18, 38, 53. The issue of market power is especially important because "a defendant's market share is the primary indicator of the existence of a dangerous probability of success," without which a claim of attempted monopolization must fail. *AD/SAT*, 181 F.3d at 226; *see also PepsiCo*, 315 F.3d at 105; *Naso*, 850 F. Supp. at 272 n.6. Publicly available data shows that as the Foundation has sold or gifted Warhol artwork over the years, and consequently has a declining inventory of art to sell, an increasing share of the Foundation's income is attributable to earnings on its financial investments and licensing activities, and a decreasing share of its income is attributable to sales of Warhol artwork.[39] A decreasing market share is obviously inconsistent with a dangerous probability of success in monopolizing the relevant market, which further demonstrates that Simon's antitrust claims are utterly implausible.

## 5.    The Amended Complaint Fails to Show That the Activities of the Supposed Conspirators Are Inconsistent with Lawful Conduct

The range of permissible inferences that can be drawn from ambiguous evidence is limited in an antitrust case. *Matsushita*, 475 U.S. at 588; *Klickads Inc. v. Real Estate Bd. of New York Inc.*, No. 04 Civ. 8042, 2007 WL 2254721, at *3 (S.D.N.Y. Aug. 6, 2007). Conduct which is as consistent with independent action as with illegal conspiracy does not support an inference of conspiracy. *Matsushita*, 475 U.S. at 588 (citing *Monsanto v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984)). A plaintiff needs evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. *Matsushita*, 475 U.S. at 588. Conspiracy claims under

---

[39] *See* Sesser Decl. Exhs. M-O.

the Sherman Act will fail where "the defendants' allegedly conspiratorial actions could equally have been prompted by lawful, independent goals which do not constitute a conspiracy." *Twombly*, 127 S.Ct. at 1971 (quoting *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 256 (S.D.N.Y. 1995)).

Defendants' activities cited in the Amended Complaint are in no way inconsistent with legitimate, independent conduct. Certainly the fact that the Board issued a negative opinion on Simon's work is in no way inconsistent with independent conduct. Authentication boards, authentication committees and art experts do reject works of art. The publications cited in the Amended Complaint recognize a particular problem with fake Warhols. Simon himself submitted a fake Dollar Bills collage. The fact that Simon's self-portrait previously had been authenticated by the Estate, as alleged in the Amended Complaint, does not mean that the Board could not legitimately have a different opinion. The Amended Complaint acknowledges that doubts had been expressed about works from the same series as Simon's as far back as 1989 and 1990 (¶¶134–44), and also reflects that executor Hughes was under the misimpression that Simon's work had been created in 1964, not 1965 (¶¶19, 120). It also notes that Hughes erroneously authenticated other works. ¶¶93–94. Simon's own supporter describes the circumstances behind the creation of this work as an "anomaly" given the way Warhol usually worked. Moreover, the Board's stated reasons for its opinion about the authenticity of Simon's work are reflective of thoughtful and informed critical analysis, and entirely consistent with independent, non-conspiratorial conduct by the Board and its members. *See* Am. Compl., Exh. E. Simon concedes that the Board's comments on the physical characteristics of his work are "literally true." ¶170. Whether others agree with the Board's opinion or not, the issue of authenticity is at least debatable.

Similarly, the fact that a work of art may be difficult to sell after receiving a negative authentication opinion from the Board is not indicative of conspiracy. It is indicative of the respect the art market has for the opinions of the Warhol experts on the Board. Any work of art would be difficult to sell as authentic if it were known that respected art experts believe it is not authentic. Likewise, with numerous fake Warhols on the market (as confirmed in publications cited in the Amended Complaint), it is not surprising that buyers may want an opinion of the Board before paying large sums of money for a Warhol. That also is not indicative of a conspiracy. It is fully consistent with legitimate, non-conspiratorial conduct.

There is no direct evidence of the conspiracy identified in the Amended Complaint.[40] The question for the Court, therefore, is whether the *facts* alleged in the Amended Complaint — not the conclusory allegations about "artificial scarcity" and "inflated prices" — are sufficient to plausibly support the conspiracy claims and justify the enormous expense of antitrust discovery.[41] Carefully selected snippets from magazine articles reporting second-hand tales of alleged discriminatory treatment gathered from "the gossipy world of art dealers"[42] is not the sort

---

[40] The Amended Complaint states that a "former lawyer for the Estate and the Foundation (Ed Hayes) has suggested that Fremont and Hughes rejected Ekstract's submission because the Foundation and The Estate had adopted a policy of rejecting as many works as possible in order to induce artificial scarcity in the Warhol market . . ." ¶141. It does not state where or when this "former lawyer for the Estate and the Foundation" "suggested" this information about his former clients. It also neglects to mention that Attorney Hayes was found to have overbilled the Estate by $1.35 million as a result of an unethical fee agreement. *See The Andy Warhol Foundation for Visual Arts, Inc. v. Hayes*, 183 F.3d 162 (2d Cir. 1999). Indeed, Mr. Hayes' attempt to avoid his obligation to repay the $1.35 million through a bankruptcy filing was rejected by the Second Circuit, which found that Mr. Hayes' debt was not dischargeable in bankruptcy because he had committed a defalcation while acting in a fiduciary capacity. *Id.* To say that Hayes has an ax to grind is to put it mildly. In any event, the Amended Complaint's quotation from Mr. Hayes' recent book (*Mouthpiece: A Life in — and Sometimes Just Outside — the Law*) to the effect that the Foundation sold paintings to museums "at a substantial discount" (¶42) is inconsistent with Simon's "inflated prices" conspiracy theory.

[41] Even the dissent in *Twombly* recognized that "[p]rivate antitrust litigation can be enormously expensive" and requires special measures to prevent abuse. 127 S.Ct. at 1975. Justice Stevens, in his dissenting opinion, made it clear that if he had been the trial judge in *Twombly* he also "would not have permitted the plaintiffs to engage in massive discovery based solely on the allegations in [the] complaint." 127 S.Ct. at 1986. The factual support for the conspiracy claim in *Twombly* was far beyond anything contained in Simon's Amended Complaint in this action.

[42] Sesser Decl., Exh. E (*Judging Andy*, Vanity Fair, Nov. 2003), *supra*, at 212.

of "factual enhancement" that the Supreme Court had in mind in *Twombly*. Because the conspiracy to manufacture an "artificial scarcity" of Warhol works is clearly implausible and Defendants' conduct described in the Amended Complaint is fully consistent with lawful, non-conspiratorial conduct, the antitrust claims set forth in the Amended Complaint must be dismissed in accordance with the Supreme Court's decision in *Twombly*.

## POINT TWO

### SIMON LACKS STANDING TO ASSERT THE<br>ANTITRUST CLAIMS IN COUNTS ONE AND TWO

Simon purports to assert antitrust claims on behalf of a class of "all persons who purchased Warhol works at artificially inflated prices" since February 22, 1987, the date of Andy Warhol's death. ¶196. Presumably, Simon is alleging that he paid an "artificially inflated price" for his work in 1989 because a class representative "must possess the same interest and suffer the same injury shared by all members of the class he represents." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974) (citations omitted).

To have standing to allege a claim under Section 1 or 2 of the Sherman Act, a private plaintiff must have suffered an "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp.*, 429 U.S. at 489 (emphasis supplied); *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006); *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 66 (2d Cir. 1988); *Yellow Page Solutions*, 2001 WL 1468168, at *11; *Naso*, 850 F. Supp. at 271. The "prototypical example of antitrust injury" from monopolistic conduct is a higher price for consumers. *Mathias*, 152 F. Supp. 2d at 478. The measure of damages that a direct purchaser can recover for price fixing or monopolistic conduct is the amount of the overcharge caused by the wrongdoing. *New York v. Hendrickson Bros.,*

*Inc.*, 840 F.2d 1065, 1077 (2d Cir. 1988); *Berkey Photo v. Eastman Kodak Co.*, 603 F.2d 263, 294 (2d Cir. 1979).

In this case, however, Simon lacks standing to bring such claims because he did not purchase his painting directly from any of the Defendants. In *Illinois Brick Co. v. Illinois*, the Supreme Court held that plaintiffs who did not purchase the allegedly overpriced item directly from the one of the defendants do not have standing, as this would frequently create a serious risk of duplicative liability and involve complex apportionment of damages that courts are not equipped to perform. 431 U.S. 720, 730–31 & n.11 (1977). As the Second Circuit explained in *Hendrickson Brothers*, "the person who has purchased directly from those who have fixed prices at an artificially high level in violation of the antitrust laws is deemed to have suffered the antitrust injury" because "antitrust treble-damage action should not be complicated by a need to trace the effects of the overcharge with respect to such matters as prices, costs, and the potentially different behaviors of all the pertinent variables in the absence of the overcharges." 840 F.2d at 1079; *see also Paycom Billing Servs.*, 467 F.3d at 291–92 (granting motion to dismiss suit by indirect purchaser); *Reading Indus. Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13–14 (2d Cir. 1980) (under *Illinois Brick*, the antitrust laws "exclude claims based on conjectural theories of injury and attenuated economic causality that would mire the courts in intricate efforts to recreate the possible permutations in the causes and effects of a price change").

The Amended Complaint identifies nine individuals, galleries, dealers, and auction houses that bought and sold the work in question before Simon purchased it from a private dealer. ¶¶122–33. The painting allegedly traces its lineage to a barter transaction in the mid-1960s in which Ekstract loaned a video camera to Andy Warhol. ¶¶121–22. There is no

allegation that the private dealer from whom Simon purchased the work in 1989 (or anyone else in the chain of title) was a co-conspirator. The Board had not yet been formed, and the Foundation did not yet own or sell any art, at the time Simon purchased this work.

Not having purchased the work from any of the Defendants or any alleged conspirator, Simon has no standing to assert overcharge claims on the theory that the alleged conspiracy raised overall prices in the marketplace, and therefore Simon paid an "artificially high" price. *Mid-West Paper Prods. Co. v. Continental Group, Inc.*, 596 F.2d 573 (3d Cir. 1979); *see also Fed. Trade Comm'n v. Mylan Labs., Inc.*, 62 F. Supp.2d 25, 39 (D.D.C. 1999) (*citing Mid-West Paper*) (rejecting umbrella liability); *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 691 F.2d 1335 (9th Cir. 1982) (same); *Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 245–47 (S.D.N.Y. 1997) (same, *citing Mid-West Paper*).

Nor does Simon have standing to recover damages on the theory that he has not been able to profit from the "artificially high" prices resulting from the alleged conspiracy. Although the Amended Complaint repeatedly condemns "artificially high" prices for Warhol art, Simon oddly contends that the work he purchased is "*rightly* worth millions of dollars." ¶24, emphasis supplied. He claims to have "suffered damages of $2 million or more," presumably based on the "artificially high" price for which he hoped to sell his work. ¶230; *see also* ¶¶20, 148. However, a claim that Simon should benefit from "artificially high" prices caused by the alleged illegal conspiracy condemned in the Amended Complaint is not "*antitrust* injury," *i.e.* "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp.*, 429 U.S. at 489 (emphasis supplied); *Paycom Billing Servs.*, 467 F.3d at 290; *Volvo N. Am. Corp.*, 857 F.2d at 66. The antitrust laws were designed to *prevent* artificially high prices, not allow competitors to benefit from them. *Cf.*

*Matsushita*, 475 U.S. at 582–83 (respondents could not recover on claim that petitioners conspired to raise market prices because "as petitioners' competitors, respondents stand to gain from any conspiracy to raise the market price").

The only antitrust injury Simon and his putative class could have suffered was the anticompetitive overcharge based on the "artificially high" prices they allegedly paid for Warhol art. However, because Simon is not a direct purchaser from any of the alleged conspirators, he lacks standing to assert such claims. *See Illinois Brick Co.*, 431 U.S. at 730–31 & n.11; Am. Compl. ¶¶122–33.[43]

## **POINT THREE**

## **THE ANTITRUST CLAIMS ARE TIME-BARRED**

The statute of limitations for Sherman Act claims is four years. *See* 15 U.S.C. § 15(b) ("Any action to enforce any cause of action under sections 15 or 15a of this title shall be forever barred unless commenced within four years after the cause of action accrued."). A cause of action accrues under the Sherman Act "when a defendant commits an act that injures a plaintiff's business." *Wolf v. Wagner Spray Tech Corp.*, 715 F.Supp. 504, 508 (S.D.N.Y. 1989).[44] The antitrust claims in the Amended Complaint are alleged on behalf of a class of "all persons who purchased Warhol works at artificially inflated prices." ¶196. Therefore, Simon's overcharge

---

[43] A plaintiff must allege an antitrust injury when proceeding under the Donnelly Act as well. *See, e.g., Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir. 1994); *Daniel v. Am. Bd. of Emergency Med.*, 269 F. Supp. 2d 159 (W.D.N.Y. 2003). Simon lacks standing to assert claims under the Donnelly Act because of the bar on suits by indirect purchasers at the time Simon purchased his work—and is not interpreted retroactively. NY Gen. Bus. Law § 340(6); *New York v. Daicel Chem. Indus., Ltd.*, 42 A.D.3d 301, 302 (1st Dep't 2007) (affirming dismissal of claims brought by indirect purchasers on grounds that § 340(6) of Donnelly Act "may not be given retroactive application").

[44] Claims under the Donnelly Act must also be brought within four years after the cause of action has accrued. N.Y. Gen. Bus. L. § 340(5). A cause of action accrues under the Donnelly Act "when a defendant commits an act that injures plaintiff's business in violation of the antitrust statute[]." *Stolow v. Greg Manning Auctions, Inc.*, 258 F. Supp. 2d 236, 251 (S.D.N.Y. 2003).

claim accrued 18 years ago, when he purchased his painting on August 25, 1989. ¶133. The statute of limitations for his overcharge claim thus expired in 1993.

In addition, any antitrust claims predicated on the Board's negative opinion on the authenticity of his work are likewise time-barred. The opinion was rendered on February 7, 2002. ¶155 & Exh. D. According to Simon, the Board's initial opinion "was designed to remove [Simon's] competing Warhol from the marketplace by declaring it to be inauthentic." ¶21. This occurred more than five years before the filing of the Complaint in July 2007.

Simon seeks to circumvent the statute of limitations by invoking the "fraudulent concealment" doctrine. *See* ¶217–20. However, Simon has twice failed to plead fraudulent concealment with the particularity required by Federal Rule of Civil Procedure 9(b). *See Donahue v. Pendleton Woolen Mills, Inc.*, 633 F.Supp. 1423, 1443 (S.D.N.Y. 1986) (rejecting fraudulent concealment claim where plaintiff failed to provide "specific allegations of acts by defendant to conceal the antitrust violation that forms the basis of plaintiffs' antitrust claim"). A plaintiff seeking to toll the statute of limitations based on fraudulent concealment must establish "(1) wrongful concealment of their actions by defendants, (2) failure of the plaintiff to discover the operative acts that are the basis of his cause of action within the limitations period and (3) plaintiff's due diligence until discovery of the facts." *Wolf*, 715 F.Supp. at 508. The burden of establishing these elements rests upon the party seeking to toll the statute of limitations. *Id.*; *Donahue*, 633 F.Supp. at 1443.

The November 2003 *Vanity Fair* article cited in the Amended Complaint reported that Ekstract and Simon "are seriously contemplating legal action" against the Board and Foundation and stated: "[s]ome dealers felt the board was cutting down on outside stock on general principles: the less stock out there, the higher the value of what the foundation still owned" or

"manipulating an art market: by denying any and every Warhol they can, they only increase the value of what they've got."[45]  Obviously, Simon spoke to the author of the article well before the November 2003 publication date.  In October 2003, the *Independent* reported that "Mr. Simon questioned the board's actions as 'a perfect mechanism for removing as many Warhols from the market as possible, to preserve the scarcity and value of the multimillion dollar stock of Warhols which was controlled by the small, tightly knit group around the foundation.'"[46]  *ARTnews* reported in September 2004 that "Simon and other dealers and collectors have told *Vanity Fair* and other publications that they intend to take legal action . . . They contend that the board is refusing to authenticate certain artworks in order to increase the value of the foundation's own collection."[47]  The Amended Complaint cites a January 2002 article allegedly discussing a scarcity of Warhol art.  ¶215.

Given that his antitrust claims are facially barred by the statute of limitations, Simon was required to allege in the Amended Complaint what he knew and when he knew it.  No claim of fraudulent concealment can survive where the plaintiff was aware of the facts on which his cause of action rests.  *Wolf*, 715 F. Supp. at 508.  Simon fails to identify which of the Defendants' alleged acts underlying his cause of action he failed to discover until recently.  Nor does he state when such allegedly fraudulently concealed information came to light.  He simply alleges that the Defendants "fraudulently concealed their continuing unlawful combination and conspiracy from Plaintiff and the other Class members."  Am. Compl. ¶218.  Such a "naked assertion" of fraudulent concealment is not sufficient to satisfy Rule 9(b).  *Solow v. Stone*, 994 F. Supp. 173,

---

[45] *See* Sesser Decl., Exh. E (*Judging Andy*, Vanity Fair, Nov. 2003), *supra*, at 212, 214, 219.

[46] James Morrison, *One in Six Original Warhols is a Copy*, Independent, Oct. 26, 2003, at 9 (citing Jason Edward Kaufman, *Challenge to the Andy Warhol Art Authentication Board*, The Art Newspaper, Oct. 2003, at 4), cited in ¶192 of the Amended Complaint and annexed as Sesser Decl., Exh. I-J.

[47] Sesser Decl., Exh. F (*Authenticating Andy*, ARTnews, Sept. 2004), at 130.

182 (S.D.N.Y. 1998). Rather, the plaintiff "must make 'distinct averments as to the time when the fraud, mistake, concealment, or misrepresentation was discovered, and what the discovery is, so that the court may clearly see, whether, by the exercise of ordinary diligence, the discovery might not have been before made.'" *Armstrong v. McAlpin*, 699 F.2d 79, 89 (2d Cir. 1983) (quoting *Moviecolor Ltd. v. Eastman Kodak Co.*, 288 F.2d 80, 88 (2d Cir. 1961)). A court will not toll the statute of limitations simply because a defendant failed to reveal purportedly illegal conduct to the plaintiff. *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 433 (S.D.N.Y. 2003); *see also Hamilton County Bd. of Comm'rs v. Nat'l Football League*, 491 F.3d 310, 315–18 (6th Cir. 2007) (declining to toll statute of limitations because plaintiffs knew that the information it sought was concealed, and because that information was not essential to its antitrust claim).

The very publications cited in the Amended Complaint indicate that Simon has long been aware of his alleged "claims" and elected to sit on his rights for years. Simon bears the burden of demonstrating fraudulent concealment. Due to his failure to allege fraudulent concealment with particularity, or demonstrate that he acted with due diligence, Simon's antitrust claims are barred by the four-year statute of limitations and must be dismissed. 15 U.S.C. § 15(b).

## POINT FOUR

### THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UNDER THE LANHAM ACT

In Count Four, Simon alleges that Defendants have "falsely advertised and publicized that *Double Denied* is not a Warhol work" in violation of the Lanham Act, by (1) stamping "Denied" on the back of the work; (2) excluding his work from the Catalogue Raisonné; and (3) "failing to withdraw and counteract the adverse information that defendants themselves

disseminated to the marketplace." ¶¶236–38. These allegations do not support a Lanham Act claim.

First, Simon explicitly acquiesced to the very statements he now complains were issued. When Simon submitted his painting to the Board in December 2001, he signed an agreement acknowledging that the Board would affix a stamp or written legend to the Work indicating the Board's opinion of the authenticity of the Work. Am. Compl., Exh. B, p. 2. Simon signed a second such agreement in February 2003 when he re-submitted his piece. ¶162. Simon is therefore barred by the doctrine of "estoppel by acquiescence" from bringing any claim here, since he explicitly agreed to the very act to which he now complains, without justification for his delay. *See Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 395 (2d Cir. 2002) (estoppel by acquiescence for Lanham Act claims requires an active representation not to assert a right or a claim, delay between the active representation and assertion of the right or claim that was not excusable, and prejudice to the defendant). *See also* Point Six, *supra*.

Moreover, Simon fails to establish the basic elements of a Lanham Act claim.[48] The Lanham Act "does not impose liability on statements of opinion," which is what Simon complains of here. *Wellnx Life Scis., Inc. v. Iovate Health Scis. Research, Inc.*, No. 06 Civ. 7785(PKC), 2007 WL 2789469, at *7 (S.D.N.Y. Sept. 6, 2007); *see also* 15 U.S.C. § 1125(a)(1); *Groden v. Random House, Inc.*, 61 F.3d 1045, 1051 (2d Cir. 1995). Indeed, Simon readily admits that all of the facts listed in the Board's rejection letter to him describing the physical characteristics of his work are "literally true." ¶170. Instead, Simon takes issue with the

---

[48] Under 15 U.S.C. § 1125(a)(1) of the Lanham Act, a person is liable for using "in commerce any word, term, name symbol or device, or any combination thereof, or any false designation of origin, false or misleading description *of fact*, or false or misleading representation *of fact*" in connection with any goods or services, and which either (A) "is likely to cause confusion, . . . mistake, or to deceive as to the affiliation, origin, sponsorship, or approval of [the] goods," or (B) "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of [the] goods" (emphasis supplied).

Defendants' ultimate opinions, manifested both in the stamping of the word "Denied" on the back of his painting, and in the omission of the piece from the catalogue raisonné. But a mere opinion is not actionable under the Lanham Act.

Furthermore, Simon has no basis to bring a Lanham Act claim for the alleged omission from listing his painting in the catalogue raisonné, or based on the Defendants' alleged "fail[ure] to withdraw and counteract" information in the marketplace. An omission does not violate the Lanham Act unless relevant to an affirmative statement that is made false or misleading by its omission, which is not the case here. *See Register.com, Inc. v. Domain Registry of Am., Inc.*, No. 02 Civ. 6915 (NRB), 2002 WL 31894625, *14 (S.D.N.Y. Dec. 27, 2002).

Finally, Simon has no basis to claim a violation under the "commercial advertising" prong of the Lanham Act. Under that section, a statement is considered "commercial advertising or promotion" only if the statement is (1) commercial speech; (2) made for the purpose of influencing consumers to buy the defendant's goods or services; and (3) is sufficiently disseminated to the relevant purchasing public. *See Boule v. Hutton*, 328 F.3d 84 (2d Cir. 2003). The statements at issue here, solicited by Simon himself and issued only to Simon, were not made for the purpose of influencing consumers. Two Second Circuit cases have denied Lanham Act claims for art expert opinions under these grounds. *See Galerie Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004) ("The art experts' opinions and assertions, solicited by either the art collector or by the museum, are not commercial advertising or commercial promotion for [the defendant]."); *Boule v. Hutton*, 328 F.3d 84 (2d Cir. 2003) (rejecting a Lanham Act claim under the commercial advertising prong where defendants, the son and daughter in law of the deceased artist, sent a letter to 25 art dealers repudiating a specific art collection).

Accordingly, Simon's Lanham Act claims must be dismissed.

## POINT FIVE

## THE FRAUD AND ANTITRUST CLAIMS ARE NOT PLED WITH PARTICULARITY AS REQUIRED BY FED. R. CIV. P. 9(B)

Simon's fraud claims as an individual (Count Five), ¶¶241–56,[49] must be dismissed for failure to plead fraud with particularity. Similarly, because Simon's antitrust claims on behalf of the alleged class and on his own behalf in Counts One and Two are alleged to be based on "a 20-year scheme of fraud, collusion and manipulation," ¶1, the antitrust claims must also be pled with particularity. *See In re Crude Oil Commodity Litig.*; 2007 WL 1946553 ("manipulative scheme" sounding in fraud must be pled with the particularity called for in Rule 9(b)); *see also* ¶¶13, 17, 19, 31–34, 60, 170, 217–20 (mentioning fraud). Since they are not, these claims must be dismissed.

The purposes of the particularity requirement are to provide defendants with notice, to safeguard a defendant's reputation from unfounded fraud allegations, and to protect defendants from strike suits. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994). Thus, "[o]n certain subjects understood to raise a high risk of abusive litigation, a plaintiff must state factual allegations with greater particularity than Rule 8 requires." *Twombly*, 127 S.Ct. at 1973 n.14. These rationales fully apply to the Amended Complaint, which alleges — with no plausible support — that the Defendants conspired for two decades to defraud the worldwide art market and engaged in "criminal" conduct. ¶256.

A fraud cause of action must allege (1) misrepresentation of an existing material fact, (2) known to be untrue by the offending party, and (3) made with intent to deceive and for the purpose of inducing the other party to act upon it. *Inn Chu Trading Co., Ltd. v. Sara Lee Corp.*,

---

[49] Simon apparently discontinued the fraud claim on behalf of the class alleged in the original Complaint at ¶¶168–74.

810 F. Supp. 501, 506 (S.D.N.Y. 1992). These elements must be pled with particularity. Fed. R. Civ. Pro. 9(b). A complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields*, 25 F.3d at 1128–29 (2d Cir. 1994).

Simon alleges conversations between "a prospective buyer" and himself, art dealer Georg Frei, and the Foundation; that Fremont "personally intervened and interfered with Plaintiff's sale"; that Fremont "sought to cause" Simon to submit his work; and that "Fremont had conversations with other persons in an effort to have plaintiff submit" his work. ¶¶ 151, 242, 243, 246; *see also* ¶¶12, 77–78, 81, 90, 152, 161 (non-specific allegations). These allegations are insufficiently specific for several reasons.[50]

Simon fails to make allegations against specific defendants. If a claim involves multiple defending parties, a claimant must make specific and separate allegations against each defendant. *Lomaglio Assocs. Inc. v. LBK Mktg. Corp.*, 876 F.Supp. 41, 44 (S.D.N.Y. 1995) (*citing Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). Simon refers collectively to defendants and conspirators. *See* ¶¶18, 110–11, 113, 115, 117–18.

Simon omits specific times. A "vague reference to a period of several months does not sufficiently apprise Defendant of when the allegedly fraudulent speech was made, and in turn fails to satisfy Rule 9(b)." *Lomaglio Assocs.*, 876 F.Supp. at 44. Simon alleges time frames of up to seven months, or no time frame at all. *See* ¶¶85, 150, 161, 244, 246.

Simon alleges that the Defendants are motivated by salaries and prestige, ¶13, but a desire to maintain such benefits is "common" and "too generalized" to support a fraud allegation.

---

[50] Simon also alleges that he "was forced to use third-parties to sell his Warhols at a fraction of their fair market value" without specifying the works, sale dates, prices, or names of intermediaries or purchasers. ¶166. This allegation, besides lacking particulars, contradicts Simon's theory that Board approval is a prerequisite to any sale.

*Kalnit v. Eichler,* 264 F.3d 131, 135–39 (2d Cir. 2001). A plaintiff must "assert a concrete and personal benefit to the individual defendants *resulting from the fraud.*" *Id.* (emphasis supplied). Simon does not.[51]

Simon cites unattributed sources. Am. Compl. ¶¶80, 86, 119; 150, 246. A "suit charging fraud may not be based on facts so secret that the defendants cannot be told what they are." *Segan v. Dreyfus Corp.*, 513 F.2d 695 (2d Cir. 1975). Nor can a court assess plausible opposing inferences, because "[p]erhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504–05 (2007)).

Simon alleges that because the Defendants failed to "disclose" an alleged conspiracy, numerous otherwise unremarkable statements constitute material omissions, and are therefore fraudulent. In *Wexner v. First Manhattan Co.*, the Second Circuit rejected just such a bootstrapping argument when it evaluated a customer's allegations that a securities firm had sold a large block of the customer's securities at too low a price and that various representations were part of a "cover-up."

> Wexner claims that the defendants made the misrepresentations in an attempt to cover-up their fraudulent conduct. There is no question that Wexner has adequately identified the statements alleged to be misrepresentations . . . . The amended complaint nonetheless fails to allege circumstances that give rise to a strong inference that the defendants knew the statements to be false . . . . Clearly, an inference that the defendants knew their statements to be false cannot be based on allegations which are themselves speculative.

---

[51] Nor does Simon allege specifics, even though the Foundation discloses compensation of its officers and highest paid employees. *See* Sesser Decl., Exh. N (publicly available tax filing of Foundation).

902 F.2d 169, 174 (2d Cir. 1990). (internal citations omitted).  Here, Simon argues that the covenant not to sue is part of a cover-up, but alleges no facts in support of the underlying misconduct.

Finally Simon alleges a conflict of interest in the relationship between the Board and the Foundation, the Foundation's ownership of Warhol works, and Fremont's role as sales agent. The Board is described on the Foundation's web site, making the association between the two entities clear (although the Board's decision-making is wholly independent).  The Foundation's sales of artwork and fees to sales agents are disclosed on tax returns that are made public.[52] As such, none of the allegations about these fully disclosed business relationships can serve as a factual basis for an inference of fraud.

## POINT SIX

### THE COMPLAINT MUST BE DISMISSED BECAUSE SIMON TWICE AGREED IN WRITING NOT TO SUE BASED UPON THE AUTHENTICATION BOARD'S OPINION

It is undisputed that Simon twice agreed in writing not to sue based upon the Board's opinion of the authenticity of his work.  ¶¶97, 153, 162 & Exh. B, p. 3 ("releases, waives, and covenants not to sue").[53]  Under New York law, a release or covenant not to sue in an agreement, validly entered into by the parties, is enforceable according to its terms.  *Soc'y for the Advancement of Educ., Inc. v. Gannett Co., Inc.*, 98 Civ. 2135, 1999 U.S. Dist. LEXIS 700, at *15 (S.D.N.Y. Jan. 21, 1999); *see Rocanova v. Equitable Life Assurance Soc'y of the United*

---

[52] *See* Foundation Center, http://foundationcenter.org/findfunders/990finder/ (tax returns for private foundations). *See also* Sesser Decl., Exh. N. (Foundation tax filing, cited in paragraphs 55 and 58 of the Amended Complaint).

[53] Simon's quotation from the letter agreement in paragraph 99 of the Amended Complaint omits the language "releases, waives, and covenants not to sue" contained in Simon's letter agreement.

*States*, 83 N.Y.2d 603, 616 (1994); *Skluth v. United Merch. & Mfrs., Inc.*, 163 A.D.2d 104, 106 (1st Dep't 1990).

In *Lariviere v. Thaw*, the owner of a painting allegedly created by Jackson Pollock sued the Pollock-Krasner Authentication Board for failing to authenticate the painting. No. 100627/99, 2000 WL 33965732, at *1 (Sup. Ct. N.Y. County June 26, 2000). The court dismissed the complaint on the grounds that the letter agreement signed by plaintiff prior to submitting the painting to the Pollock-Krasner Authentication Board contained a provision in which plaintiff agreed "to hold the Authentication Board and its directors and officers in their representative and individual capacities harmless from any liability towards me or others because of rendition of an opinion (or its refusal to render any opinion)." *Id.* at *2. The indemnity language in *Lariviere* is quite similar to the indemnity quoted in paragraph 99 of the Amended Complaint. In addition to the indemnity language similar to *Lariviere*, the agreement in this case also contains a *release* and a *covenant not to sue.* Am. Compl., Exh. B, p. 3.

Although Simon complains that the letter agreement is a "contract of adhesion" and should not be enforced, there is no allegation that Simon actually tried to negotiate its terms. Contracts of adhesion, unlike the letter agreement, are typically "standard-form contracts offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis, with no opportunity to change the contract's terms." *Medinol, Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575, 623 (S.D.N.Y. 2004); *see also Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997). Simon was not compelled to agree to the terms of the letter agreement. He admits that he has been able to sell "Warhols" without Board authentication, albeit for less favorable prices than he would have liked. ¶166. It is not surprising that Warhol works with favorable authentication opinions may command higher

prices, particularly given the incidence of fake "Warhols" discussed in publications cited in the Amended Complaint. Nevertheless, as previously noted, neither *Green Car Crash* nor *Lemon Marilyn* — which achieved spectacular prices at auction, ¶2 — received authentication opinions from the Board.[54]

Here, after acknowledging the difficulty of authenticating Warhol works, Simon *induced* the Board to render an opinion, without charge, by his *express* agreement not to sue based upon any disagreement with the opinion the Board might render. The letter agreement contained no promise that the Board would authenticate Simon's work — quite the contrary. It did not promise to set forth reasons for the Board's opinion. In fact, it attached samples of the form of letter that might be sent, depending on the conclusion reached by the Board. Simon's non-specific allegations of fraud are insufficient to invalidate the letter agreement. *See Chimart v. Paul*, 66 N.Y.2d 570, 574–75 (1986) (on claim to reform written agreement in response to allegations of fraud, court notes that a "high order of evidence" is needed to rebut the "heavy presumption" that the agreement represented the intention of the parties).

It is obvious that qualified art experts will not serve on authentication boards if they are subjected to lawsuits from disappointed art collectors who often have considerable financial resources as well as an incentive to second-guess the experts' opinions. *See Seltzer v. Morton*, 154 P.3d 561 (Mont. 2007) (lawsuit to coerce art expert to change authentication opinion amounted to "legal thuggery").[55] Moreover, every dollar the Foundation spends defending such

---

[54] The September 2004 *ARTnews* article cited by Simon contains a quote from Brett Gorvy, Christie's co-director of contemporary art, stating: "With some artists' estates, you have to secure the authentication board's approval because clients are looking for it" but that for Warhol works "this is not currently deemed by buyers to be essential for a work to be sold at auction." Sesser Decl. Exh. F (*Authenticating Andy*, ARTnews, Sept. 2004), at 131.

[55] *See* Randy Kennedy, *Scientist Presents Case Against Possible Pollocks*, N.Y. Times, Nov. 29, 2007, at B3 (reporting an owner threatening litigation against an expert whose findings suggested artwork was not authentic).

lawsuits means less money for the artistic causes Andy Warhol sought to support in his will. Simon has not demonstrated that the covenant not to sue, which he signed without objection or protest, is contrary to public policy or in any way unreasonable under the circumstances.

Even after the Board's first authentication opinion, Simon, a sophisticated businessman, *again* agreed in writing not to sue. The Amended Complaint contains no allegation that he objected to this provision for his second submission. Clearly he understood the risk that he could receive a negative opinion again. Having been warned that rendering an opinion can be difficult and subjective, and having induced the Board to render an opinion for free by promising not to sue, Simon should not be permitted to pursue this lawsuit in violation of his promise.

## POINT SEVEN

## THE CLAIMS AGAINST FREMONT AS "SUCCESSOR EXECUTOR" OF THE WARHOL ESTATE MUST BE DISMISSED

Simon purports to sue defendant Vincent Fremont as "successor executor" of the Estate of Andy Warhol. *See* ¶28 ("Defendant Vincent Fremont, who is named in his individual capacity and also as successor executor for the Estate . . . ."). However, the Amended Complaint makes clear that no court has ever actually *named* Fremont as the executor of the Warhol Estate.[56] It states: "The executor of the Warhol Estate was originally Frederick Hughes. Warhol's will named Vincent Fremont as *alternate executor*." ¶27 (emphasis supplied).

The naming of Fremont as "alternate executor" in Warhol's will, standing alone, provides no basis to sue him as an official representative of the Warhol Estate. Only the court-appointed executor of an estate can be held as the personal representative and sue or be sued. Estates, Powers & Trusts Laws § 11-3.1 provides that "[a]ny action, other than an action for injury to

---

[56] The Surrogate's Court recently confirmed that no one succeeded Hughes as executor of the Warhol estate. *See* Sesser Decl. Exh. D (Certificate of Letters Testamentary), Index No. 1987-0824.

person or property, may be maintained by and against a *personal representative* in all cases and in such manner as such action might have been maintained by or against his decedent." (emphasis supplied). The "personal representative" can only be appointed by a court. *See* CPLR §1015(a) ("If a party dies and the claim for or against him is not thereby extinguished *the court shall order* substitution of the proper parties.") (emphasis supplied).

Here, after Warhol's death, Fred Hughes was named as Executor of the Warhol Estate. ¶27. After Hughes's death in 2001, no successor was ever appointed. *See id.* Simon cannot unilaterally designate Fremont as the new "personal representative" of the Estate for purposes of his lawsuit, as he apparently attempts to do here. *See Topal v. BFG Corp.*, 108 A.D.2d 849, 851 (2d Dept. 1985) (personal representative must be named by court and only after the representative is "accorded all the procedural safeguards required by due process of law . . . .'") (internal citations omitted) (quoting *In re Estate of Einstoss*, 26 N.Y.2d 181, 190 (1970)). Accordingly, the claims against Fremont in his capacity as alleged "successor executor" of the Warhol Estate must be dismissed.

## POINT EIGHT

### THE UNJUST ENRICHMENT
### CLAIM MUST BE DISMISSED

Simon's claim to recover alleged overcharges on the equitable theory of unjust enrichment (Am. Compl., Count Three) must be dismissed because no Defendant was unjustly enriched at Simon's expense. None of the Defendants received any portion of the alleged anticompetitive overcharge. The Board did not even exist and the Foundation did not yet own or sell any art at the time Simon purchased his work in 1989. *See Maryland Cas. Co. v. W.R. Grace*, 218 F. 3d 204, 212 (2d Cir. 2000) ("[T]he controlling inquiry under an equitable analysis is whether one party is unjustly enriched *at the expense of another* . . . .") (emphasis supplied).

Nor can Simon recover on an unjust enrichment theory based on the Board's negative opinion on the authenticity of his work. "It is a general rule under New York law that no claim for unjust enrichment lies where the subject matter of the claim is covered by a written contract." *Soft Classic S.A. de C.V. v. Hurowitz*, 444 F.Supp.2d 231, 249 (S.D.N.Y. 2006). Here a valid contract governs the Board's review of Simon's work. *See* Point Six, *supra*. Thus, Simon's remedy, if any, would be a breach of contract claim. He may not pursue an unjust enrichment to circumvent the terms and conditions in the letter agreement.

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that the Amended Complaint must be dismissed, with costs, including reasonable attorneys' fees, awarded to Defendants.

Dated:  New York, New York
        November 30, 2007

CARTER LEDYARD & MILBURN LLP

By: _____
        Gary D. Sesser
        Ronald D. Spencer
        2 Wall Street
        New York, New York  10005
        (212) 732-3200

*Attorneys for Defendants The Andy Warhol Foundation For The Visual Arts, Inc., Vincent Fremont, Vincent Fremont Enterprises, and The Andy Warhol Art Authentication Board, Inc.*

On the brief:
Kenneth S. Levine
Laura A. Reeds
Pamela J. Shelinsky
Judith Wallace

6247641.6

45