**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JOE SIMON-WHELAN, Individually And On Behalf Of All Others Similarly Situated,

                   Plaintiff,

      -against-

THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC., THE ESTATE OF ANDY WARHOL, VINCENT FREMONT, Individually and Successor Executor For the Estate of Andy Warhol, VINCENT FREMONT ENTERPRISES, THE ANDY WARHOL ART AUTHENTICATION BOARD, INC., JOHN DOES 1-20, JANE DOES 1-10, and RICHARD ROES 1-10,

                 Defendants.

Case No.  07 Civ  6423 (LTS)

---

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**DREIER LLP**
Lee A. Weiss (LW-1130)
Brian C. Kerr (BK-6074)
499 Park Avenue
New York, New York 10022
212.328.6100

**REDNISS & ASSOCIATES LLC**
Seth Redniss (SR-7988)
185 Franklin Street, 5th Floor
New York, New York 10013
212.334.9200

*Counsel for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

I.      Introduction .................................................................................................................. 1

II.     Summary of Plaintiff's Factual Allegations ................................................................. 4

III.    Argument .................................................................................................................... 12

        A.      The Relevant Legal Standards ........................................................................ 12

        B.      The Complaint Adequately Alleges Antitrust Claims ..................................... 14

                1.      Plaintiff Alleges a Plausible Antitrust Conspiracy Consistent With *Bell Atlantic v. Twombly* ............................................................................. 14

                        a.      Defendants Mischaracterize the Conspiracy Alleged ................... 14

                        b.      The Complaint Contains "Plus Factors" Supporting an Inference of Conspiracy ..................................................................................... 17

                        c.      The Complaint Pleads a Legally Recognized Product Market ..... 24

                        d.      Plaintiff is Entitled to Explore Defendants' Conspiracy in Discovery ....................................................................................... 26

                2.      Plaintiff Has Standing To Pursue The Antitrust Claims Alleged ............ 30

                3.      Plaintiff's Antitrust Claims Are Timely .................................................. 35

        C.      The Complaint States A Valid Claim For Declaratory Relief ............................. 39

        D.      The Complaint Pleads Fraud With Requisite Particularity .................................. 40

        E.      The Complaint States Valid Lanham Act Claims ................................................. 43

        F.      The Complaint Successfully States Class Claims For Unjust Enrichment ........... 44

IV.     Conclusion .................................................................................................................. 45

TABLE OF AUTHORITIES

**Federal Cases**

*In re Abbott Labs. Norvir,,*
   *No*s. C 04-1511, C 04-4203, 2007 WL 1689899 (N.D. Cal. June 11, 2007)....................45

*Alevizopoulos & Assocs., Inc. v. Comcast Int'l Holdings, Inc.,*
   100 F. Supp. 2d 178 (S.D.N.Y. 2000)...............................................................................38

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
    486 U.S. 492 (1988)................................................................................... *passim*

*Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.,*
   456 U.S. 556 (1982)...........................................................................................16, 17

*Apex Oil Co. v. DiMauro,*
   822 F.2d 246 (2d Cir. 1987)...............................................................................21

*Associated Press v. United States,*
   326 U.S. 1 (1945)................................................................................................23

*Bangkok Crafts Corp. v. Capitolo Di San Pietro in Vaticano,*
   No. 03 Civ. 0015, 2006 WL 1997628 (S.D.N.Y. July 18, 2006) ...............................42, 43

*Bell Atlantic Corp. v. Twombly,*
   127 S. Ct. 1955 (2007).................................................................................. *passim*

*Blue Shield of Va. v. McCready,*
   457 U.S. 465 (1982)........................................................................................31, 34

*Broadcom Corp. v. Qualcomm Inc.,*
   501 F.3d 297 (3d Cir. 2007)..............................................................................16

*Chicago Bd. of Trade of the city of Chicago v. United States,*
   246 U.S. at 238....................................................................................................23

*In re Ciprofloxacin Hydrochloride Antitrust Litig.,*
   261 F. Supp. 2d 188 (E.D.N.Y. 2003) ...............................................35, 36, 38

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.,*
   691 F. 2d 1335 (9th Cir. 1982) ......................................................................33

*In re Copper Antitrust Litig.,*
   98 F. Supp. 2d 1039 (W.D. Wis. 2000) ...........................................................34

*In re Crude Oil Commodity Litig.,*
   No. 06 Civ. 6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007)......................14

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
    822 F.2d 1242 (2d Cir. 1987) ......................................................13

*Doe v. Abbott Labs.*,
    No. C 04-1511, 2004 WL 3639688 (N.D. Cal. Oct. 21, 2004) ....................................44, 45

*Erickson v. Pardus*,
    127 S. Ct. 2197 (2007) ......................................................13

*F.T.C. v. Mylan Labs.*,
    62 F. Supp. 2d 25 (D.D.C. 1999) ......................................................33

*Galerie Gmurzynska v. Hutton*,
    355 F.3d 206 (2d Cir. 2004) ......................................................44

*Gelles v. TDA Industries, Inc.*,
    No. 90 Civ. 5133, 1991 WL 39673 (S.D.N.Y. Mar. 18, 1991) ......................................42

*Goldin Assocs., L.L.C. v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    No. 00 Civ. 8688, 2003 WL 22218643 (S.D.N.Y. Sep 25, 2003) ........................13, 40, 42

*Groden v. Random House, Inc.*,
    61 F.3d 1045 (2d Cir. 1995) ......................................................43, 44

*Gross v. New Balance Athletic Shoe, Inc.*,
    955 F. Supp. 242 (S.D.N.Y. 1997) ......................................................33

*Hennegan v. Pacifico Creative Serv., Inc.*,
    787 F.2d 1299 (9th Cir.) ......................................................35

*Illinois Brick v. Illinois*,
    431 U.S. 720 ......................................................17, 30, 31, 32

*Indian Head, Inc. v. Allied Tube & Conduit Corp.*,
    817 F.2d 938 (2d Cir. 1987) ......................................................16, 18

*Int'l Motor Sports Group, Inc. v. Gordon*,
    No. 98 Civ. 5611, 1999 WL 619633 (S.D.N.Y. Aug 19, 1999) ......................................14, 42

*Jordan (Bermuda) Investment Co., Ltd. v. Hunter Green Investments, Ltd.*,
    No. 00 Civ. 9214, 2003 WL 1751780 (S.D.N.Y. April 1, 2003) ......................................39

*Kramer v. Pollock-Krasner Foundation*,
    890 F. Supp. 250 (S.D.N.Y. 1995) ......................................................24, 25, 26

*Lane v. Random House, Inc.*,
    985 F. Supp. 141 (D.D.C. 1995) ......................................................43

*Loeb Indus., Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) ......................................................31, 32

*Lomaglio Associates Inc. v. LBK Marketing Corp.*,
　　876 F. Supp. 41 (S.D.N.Y. 1995) ...................................................................42

*Mathias v. Daily News, L.P.*,
　　152 F. Supp. 2d 465 (S.D.N.Y. 2001).............................................................26

*Matsushita Electric Indus. Co. v. Zenith Radio Corp.*,
　　475 U.S. 574 (1986)........................................................................................18

*Mid-West Paper Prods. Co. v. Continental Group, Inc.*,
　　596 F.2d 573 (3d Cir. 1979)...........................................................................33

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla.*
　　468 U.S. 85 (1984)...............................................................................2, 16, 23

*O'Brien v. National Prop. Analysts Partners*,
　　719 F. Supp. 222 (S.D.N.Y. 1989) .................................................................13

*Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
　　No. 00 Civ. 8688, 2002 WL 362794 (S.D.N.Y. Mar. 6, 2002) .........................14

*Omni Food Sales v. Boan*,
　　No. 06 Civ. 119, 2007 WL 2435163 (S.D.N.Y. Aug. 24, 2007) ................38, 39

*Pace Industries, Inc. v. Three Phoenix Co.*,
　　813 F.2d 234 (9th Cir.1987) ...........................................................................36

*Packer v. TDI Systems, Inc.*,
　　959 F. Supp. 192 (S.D.N.Y. 1997) .................................................................39

*Roth v. Jennings*,
　　489 F.3d 499 (2d Cir. 2007)......................................................................12, 13

*Sanner v. Board of Trade of City of Chicago*,
　　62 F.3d 918 (7th Cir. 1995) .......................................................19, 31, 32, 34

*Santana Prods., Inc. v. Sylvester & Associates, Ltd.*,
　　121 F. Supp. 2d 729 (E.D.N.Y. 1999) ......................................................37, 38

*Standard Sanitary Manufacturing Co. v. United States*,
　　226 U.S. 20 (1912)..........................................................................................23

*Twombly v. Bell Atlantic Corp.*,
　　425 F.3d 99 (2005)..........................................................................................20

*Twombly v. Bell Atlantic Corp.*,
　　313 F. Supp. 2d 174 (S.D.N.Y. 2003)..................................................... *passim*

*United States for Use & Benefit of Walton Tech., Inc. v. Weststar Eng'g. Inc.*,
　　290 F.3d 1199 (9th Cir. 2002) ........................................................................45

*United States v. Griffith,*
    334 U.S. 100 (1948) ...................................................................................................23

*United States v. Trans-Missouri Freight Assn.,*
    166 U.S. 290 (1897) ...................................................................................................23

*Vess v. Ciba-Geigy Corp. USA,*
    317 F.3d 1097 (9th Cir. 2003) ...........................................................................14, 41

Vitale v. Marlborough Gallery,
    No. 93 Civ. 6276, 1994 WL 654494 (S.D.N.Y. July 5, 1994) ................................. *passim*

*Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.,*
    516 F. Supp. 2d 270 (S.D.N.Y. 2007)......................................................................43

*Wurtsbaugh v. Banc of America Sec. LLC,*
    No. 05 CIV. 6220, 2006 WL 1683416 (S.D.N.Y. June 20, 2006)...................................39

### State Cases

*Kalisch-Jarcho, Inc. v. City of New York,*
    448 N.E.2d 413 (N.Y. 1983) ..............................................................................39, 40

### Federal Statutes

15 U.S.C. § 1 or § 2 ....................................................................................................30

15 U.S.C. § 15(b) .......................................................................................................35

Fed R. Civ. P. 8(a) .....................................................................................................14

Fed R. Civ. P. 9(b) ...................................................................................4, 13, 14, 46

Fed. R. Civ. P. 12(b)(6)..............................................................................................12

Plaintiff Joe Simon-Whelan respectfully submits this memorandum in opposition to the motion to dismiss filed by defendants The Andy Warhol Foundation for the Visual Arts, Inc. (the *Foundation*), Vincent Fremont (individually and as successor executor for The Estate of Andy Warhol), Vincent Fremont Enterprises, and The Andy Warhol Art Authentication Board, Inc. (the *Authentication Board* or the *Board*) (collectively, *defendants*).

## I.    Introduction

Having orchestrated a 20-year scheme to manipulate the market in works by Andy Warhol, defendants now ask this Court to dismiss the case against them.  As set forth below, plaintiff has clearly demonstrated that he is entitled to conduct discovery on these serious allegations since his Amended Class Action Complaint (the *Complaint*) satisfies the relevant pleading standards for each claim.[1]

With respect to plaintiff's antitrust claims (*see* Section III.B below), defendants repeatedly cite *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) for the proposition that plaintiff has provided insufficient factual support for the claim that defendants conspired to induce artificial scarcity in the market for Warhol works.  Yet *Twombly* "does not impose a probability requirement at the pleading stage." *Id.* at 1965.  Plaintiff has done far more than make "an allegation of parallel conduct and a bare assertion of conspiracy." *Id.*  The Complaint thus pleads ample facts "to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.*

Moreover, defendants' motion to dismiss disregards obvious legal analogies from the antitrust context and ignores important facts pleaded in the Complaint.  Defendants' most glaring error is their effort to pound the square peg of plaintiff's antitrust claims into the round hole of a traditional cartel case, in which an antitrust violator's overcharge gets passed down a chain of

---

[1] References to "¶__" are to paragraphs in the Complaint.

distribution to plaintiffs. That is not the type of antitrust conspiracy plaintiff alleges. Instead, this case resembles those involving antitrust abuse of private standard-setting power. *E.g., Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988); *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85 (1984). Defendants and their co-conspirators abuse the Authentication Board and the Warhol Catalogue Raisonné (the purportedly authoritative listing of all authentic artwork by Warhol, published by the Foundation and edited by the Board), which are the only two bodies that set authentication standards for all Warhol artwork, to systematically exclude and otherwise remove competing artwork from the market.

The direct and intended effect of these exclusions and removals is to make Warhol artwork more scarce, thereby raising the value of the works in defendants' possession. Defendants, including the Foundation and Fremont, then reap the benefits of their conspiracy by selling their artwork at a premium under the resulting marketwide umbrella of price inflation. The Foundation alone has earned over $240 million on sales of its art at prices inflated by this umbrella created by defendants.[2]

In addition to mischaracterizing plaintiff's antitrust claims, defendants seek to persuade the Court that the alleged conspiracy is illogical because plaintiff alleges that the Foundation sells works to various galleries and dealers at significant discounts. Some of these same galleries and dealers, however, are named as defendants (Richard Roes 1-10), as they are part of the conspiracy. The named defendants provide the discounts to the galleries and dealers in exchange for their agreements to enforce the rigged authentication process and to not sell the discounted

---

[2] The Complaint alleges that the "Foundation has sold well over $150 million in Warhol's artwork at artificially inflated prices." ¶18. Since the Complaint was filed, however, the Foundation has published a 20th Anniversary Report stating that sales of works of art has actually earned the Foundation closer to ***$240 million***. Jason Edward Kaufman, *Warhol Foundation Looks Back on 20 Years*, The Art Newspaper (December 20, 2007) (available at: http://www.theartnewspaper.com/article.asp?id=7004). Foundation President Joel Wachs reportedly refused to say how many Warhols the Foundation still owns, stating that such holdings are "proprietary information because ***we are in the business of selling them***." *Id.* (emphasis added).

works for several years.  This permits defendants to retain total control over the authentication process without having to increase the market's supply of Warhol's work.

Finally, defendants seek to shift this Court's focus away from the merits of plaintiff's claims and wrap themselves in the mantle of charity by arguing that the Foundation's substantial gifts and donations of artwork cannot give rise to legal liability.  However, defendants' motives in having the Foundation make gifts and donations are far from pure.  As detailed below, plaintiff alleges that a primary purpose of these donations and gifts, apart from the need for the Foundation to retain its favored tax status, is to shield the Foundation from government scrutiny and to improve its weak grants to expenses ratio.  Also, directing charity towards institutions that defendants know will not resell the works simultaneously accomplishes another primary goal of the conspiracy by removing work from the market, "which increase[s] the scarcity and value of Warhols."  Richard Polsky, *I Bought Andy Warhol* 18 (Harry N. Abrams 2003).  All of the defendants benefit from the general price inflation generated by these donations as it decreases the supply of available works.

Defendants also fail to show why plaintiff's other claims (which are not subject to the standards set forth in *Twombly*) should be dismissed at the pleading stage.  First, plaintiff has adequately alleged a claim for declaratory relief from the sweeping covenant not to sue in the Authentication Board's non-negotiable submission agreement (*see* Section III.C below).  Although defendants argue that this agreement not to sue is enforceable according to its terms, it is well-established that a party cannot invoke such an agreement to insulate itself from intentional misconduct, such as in this case.

Second, the Complaint adequately alleges a fraud claim against Fremont and the Authentication Board for fraudulently inducing plaintiff to submit his painting for "re-authentication" (*see* Section III.D below).  Defendants contend that plaintiff's fraud allegations

3

do not satisfy Fed. R. Civ. P. 9(b) because, in some instances, they refer to time periods of several months.  However, as set forth below, plaintiff has adequately alleged a number of specific instances when defendants urged plaintiff to resubmit his painting for authentication – even though they knew that rejection by the Authentication Board was a foregone conclusion.

Third, plaintiff has asserted a valid Lanham Act claim based upon, among other things, defendants' false representations concerning inclusion of plaintiff's painting in the Catalogue Raisonné and the Authentication Board's May 18, 2004 letter (in which the Board stated that plaintiff's painting was being denied authentication for the second time).  As set forth below, defendants' contention that they cannot be held liable because their statements are opinion and non-commercial speech is absurd (*see* Section III.E below).

Finally, defendants erroneously contend that plaintiff's unjust enrichment claim should be dismissed because he was never a direct purchaser of artwork from defendants.  However, a number of courts have certified classes that are not limited to direct purchasers where (as in this case) the defendant knowingly benefited from a boosted market price, and it would be unfair to allow defendant to retain that benefit (*see* Section III.F below).

Flail as they might, defendants cannot avoid liability for their long-running monopolistic and fraudulent conduct, and their motion to dismiss should be denied.

## II.     Summary of Plaintiff's Factual Allegations

Plaintiff's Complaint details a decades-long conspiracy hatched by defendants in the aftermath of artist Andy Warhol's death in 1987 in order to reap substantial financial and reputational benefit.

Between the Foundation, which informally authenticates Warhol artwork via the Catalogue Raisonné, and the Authentication Board, which presides over the formal authentication process, defendants have total control over authentication of Warhol artwork.

¶¶17, 65, 225.   Defendants' co-conspirators (*i.e.*, certain galleries and dealers who enjoy a special "insider" relationship) help enforce this control over authentication standards by pressuring owners of targeted works to submit them to the Authentication Board for review. ¶¶111, 116-17, 119.

Defendants use their complete control over formal and informal authentication standards to systematically exclude competing Warhol artwork from the marketplace.   ¶17.   This reduces the amount of Warhol artwork in circulation, artificially inflating the market value of Warhol artwork generally and the Foundation's own substantial holdings specifically.   ¶¶14-17, 23, 184. For example, when reviewing several works from the same series, the Authentication Board will arbitrarily reject a portion of the submitted works as a matter of course.   ¶86.

Similarly, when deciding which works to include in the Catalogue Raisonné, the Foundation will also arbitrarily reject a portion of works from the same series.   ¶86.   For example, Warhol himself states in the original Catalogue Raisonné, which was published in 1970, that some 900 "Flower" paintings were created.   ¶87.   The Foundation's edition, by contrast, inexplicably lists only half that number.   *Id.*

Perhaps most insidiously, defendants use their power over the authentication process to exclude works that would otherwise compete directly with paintings owned by defendants and their co-conspirators.   ¶¶14, 17, 21.   For example, as described in more detail below, plaintiff's painting is a Warhol self-portrait that is printed on cotton.   Both the Foundation and Georg Frei of Thomas Ammann Fine Art (Frei is a major dealer of Warhol works; he and Fremont were the original two members of the  Authentication Board) own virtually identical Warhol self-portraits on linen.   ¶171.   When the Authentication Board denied plaintiff's submission, the letter of rejection expressly mentioned that his print was "made of cotton."   ¶169-71.   In so doing, the

Board enhanced the desirability of Warhol self-portraits on linen like those owned by the Foundation and Frei's gallery.  ¶¶170-71.

Defendants' efforts to induce scarcity have been remarkably successful.  According to Leslie Prouty, now a Senior Vice President of Contemporary Art at Sotheby's, Warhols "are selling so well because they are hard to find these days."  ¶215.  This characterization is echoed by Robert Mnuchin, now the owner of L&M Gallery in New York, who has put on Warhol shows: "There is a small percentage of what we consider quality work.  When supply gets taken out of the market, prices go up."  *Id.*

Defendants profit from their manipulation of the market in a number of ways.  First and foremost, to paraphrase Mr. Mnuchin, decreasing supply increases prices.  As a result, the Foundation can sell its Warhol artwork at premium prices – with Fremont earning a tidy six percent commission on each and every sale.  ¶151.  Second and just as importantly, the Foundation gains business because those who buy directly from the Foundation need not worry about the "provenance" of their purchases being questioned by the Authentication Board.  ¶¶16, 23.  Third and finally, now that demand for Warhol artwork is high and the supply scarce, defendants are able to reap even greater profits by strategically reversing the Authentication Board's policies when it is in their interest to do so.  ¶23.

In 2007, for example, the Board reversed its prior policy of categorically rejecting all unsigned and unnumbered trial prints.  ¶89.  The Board implemented this change because of the Foundation's desire (as well as certain favored galleries and dealers) to sell such unsigned and unnumbered trial prints from their own collections.  *Id.*  To prevent this influx of Warhol works from disrupting the market, however, the Board has adopted a policy of limiting submissions to 100 prints at a time.  *Id.*  The Board has further adopted a policy that submissions must be made pursuant to reservations, with the Foundation's favored galleries and dealers receiving first

priority.  ¶90.  In this way, defendants and their co-conspirators ensure that their own unsigned and unnumbered trial prints are the only ones that can be sold.  *Id.*

The submission agreement is a principal tool that defendants use to perpetuate their illegal conspiracy.  The agreement, which was drafted by defense counsel in this litigation, Carter Ledyard & Milburn LLP, contains a sweeping in terrorem clause that purportedly waives any legal claims arising out of the Authentication Board's opinions or conduct.  ¶100.  The agreement further obligates signatories to reimburse the Board for any legal costs incurred in connection with such legal claims.  ¶99.

Because the Authentication Board has a policy of not explaining the reasons for its rejections, the only way for individuals to learn the truth about why their submissions were denied is to sue the Board.  ¶101.  But the sweeping liability waiver and onerous obligation to reimburse the Board's legal costs deter even legitimately aggrieved parties from bringing suit. As a result, the agreement enables defendants to reject Warhol artwork for any reason, including naked self interest, without fear of liability.  ¶¶18, 107. Defendants have abused this power to exclude competing Warhol artwork (like plaintiff's) from the marketplace.

All of the major players in the conspiracy have clearly identifiable motives for participating.  As exclusive sales agent for the Foundation's paintings, Fremont earns a six percent sale on all sales of the Foundation's Warhol paintings.  ¶¶51-52.  Over the years of Fremont's exclusive sales agency, the Foundation has paid him commissions in excess of $10 million.  ¶54.   The Foundation itself has made over $240 million by selling Warhol artwork at artificially inflated prices.  *See supra* at n.2.  It desperately requires this money to fund its substantial administrative costs (including salaries) and to provide grants (as called for in Warhol's will and required by law).  ¶15.

Indeed, the Foundation has been dogged by charges of waste and financial mismanagement since its creation.  *Id.*  These charges attracted a high-profile investigation in the mid-1990s by the New York State Attorney General into the Foundation's financial practices, with the Foundation's former accountant as the star witness.  ¶¶51, 56.  The Foundation avoided prosecution only after agreeing to a series of reforms, including much stricter financial controls and a reduction of Fremont's commission from ten percent to its present six percent.  ¶51.

Even now, the Foundation struggles to control its administrative costs and to fulfill its charitable mandate.  ¶57.  In 1998, the Foundation reportedly paid out only $2.9 million in grants but had administrative costs of $5.3 million.  ¶58.  In 2006, the Foundation paid out $8 million in grants and reported administrative expenses of $6 million.  *Id.*  By contrast, the ratio of grants to overhead for most comparable charitable non-profits is closer to ten to one.  *Id.*

The Authentication Board is funded by the Foundation and completely dominated and controlled by Fremont and the Foundation.  ¶66.  Among the indicia of this domination and control:

- The Authentication Board is (for all practical purposes) funded by the Foundation. ¶67.

- The Authentication Board's offices are located in the same building where the Foundation stores a substantial portion of its collection of Warhol artwork.  ¶68.

- The Foundation and the Authentication Board share the same email address (*i.e.*, "__@warholfoundation.org").  ¶69.

- Many of the same people work simultaneously for both the Foundation and the Authentication Board.  ¶70.

- Authentication Board members receive discounts or other such favorable treatment from the Foundation.  ¶75.

As for defendants' co-conspirators, most of these galleries and dealers are motivated to participate in the conspiracy by the promise of favorable treatment – and fear of unfavorable treatment by the Authentication Board.  ¶¶111-12.  There is, however, an inner circle of select

8

galleries and dealers who enjoy a special "insider" relationship with the Foundation and Authentication Board (*i.e.*, Richard Roes 1-10 – collectively, the *Richard Roe defendants*). ¶¶33, 111, 115. These insider galleries and dealers have the privilege of buying Warhol works directly from the Foundation at a substantial discount, with Fremont acting as the sales agent. Buyers agree, in return, not to sell the artwork for a period of years. After this non-competition agreement expires, the works may be resold at a large profit without any fear that the Board will challenge their authenticity. ¶112. In this way, defendants secure the participation of certain influential galleries and dealers in the conspiracy, while minimizing the impact of these discounted sales on the market for Warhol artwork. ¶113.

Plaintiff's painting is one of many Warhol works that have been wrongfully denied authentication by defendants. "Double Denied" is a Warhol self-portrait created in or about 1965 that was "DENIED" twice by the Authentication Board, despite its indisputable authenticity. ¶120. Double Denied is silkscreen ink on synthetic polymer paint on canvas measuring 24" by 20". *Id.* As a result of Fremont's authentication of Double Denied, it bears the stamped signature of Andy Warhol twice on the upper right edge, and once on the lower left edge. ¶126. The left edge also bears the following certification of authenticity, which was written and signed by Fred Hughes (the original executor of Warhol's Estate): "I certify that this is an original painting by Andy Warhol completed by him in 1964." ¶130.

Double Denied is one of a series of 12 identical paintings. ¶121. Warhol, who often traded his art when he was short of cash early in his career, and Paul Morrissey (the film director and full-time manager of Warhol's "Factory" production facility in the 1960s), provided Richard Ekstract an acetate with Warhol's self-portrait. *Id.* Warhol and Paul Morrissey personally authorized Ekstract to create these 12 paintings (the *Ekstract Paintings*) in exchange for very rare and expensive video cameras, video recorders, and related equipment that Ekstract had obtained.

*Id.* Warhol subsequently used this video equipment to make several films, including the well-regarded Outer and Inner Space (1965). *Id.* Ekstract, under the authorization and instruction of Warhol and his employees, arranged for these series of self-portrait paintings to be created from the acetate that Warhol provided. This method of production was typical of Warhol.[3] ¶122.

Plaintiff purchased Double Denied in 1989 for $195,000 based, in part, by the authentications of Hughes and Fremont. ¶133. That same year, unbeknownst to plaintiff at the time, the Estate reviewed another print from the same series of Ekstract Paintings, this one owned by clients of dealer Michael Kohn. ¶¶134-37. The Estate rejected the work for insufficient evidence of its authenticity. ¶137. In 1990, the Estate reviewed two other paintings from the series of Ekstract Paintings. ¶¶138, 142. In both cases, the Estate refused to authenticate the works for insufficient evidence of their authenticity. ¶¶139, 142.

In 2001, plaintiff tried to sell his painting for approximately $2 million. ¶148. Defendants, however, intervened in the sale and waged a campaign to force plaintiff to submit Double Denied for "re-authentication". ¶¶149-52. In December 2001, plaintiff acceded to defendants' campaign and submitted Double Denied to the Authentication Board with ample evidence of the painting's provenance. ¶¶153-54.

In February 2002, however, the Board rejected plaintiff's painting without even bothering to inspect it. ¶¶155-56. Even more insidiously, following that first rejection, Fremont (among others) encouraged plaintiff to resubmit his painting after conducting more research into its authenticity. ¶159. Defendants never disclosed that the Estate had already rejected several other

---

[3] It is widely accepted among art historians that the period from 1961-65 was one of transition for Warhol, as he moved away from a personal approach to art-making, in favor of the more mechanized, mass-production model that featured minimal supervision and extensive outsourcing. ¶177. In fact, by 1965, most of Warhol's works were being made off-site, without his personal supervision. *Id.* Double Denied specifically, and the series of Ekstract paintings generally, are so significant and rare precisely because they are among the earliest examples of the aforementioned "factory" mass-production technique for which Warhol would eventually become famous. ¶178.

works from the same series. Plaintiff spent the next year researching the provenance of Double

Denied – at great personal and professional cost. ¶160.

From February 2002 through July 2003, plaintiff communicated repeatedly with Fremont

and various employees of the Board, including Sally King Nero, Claudia Defendi and Bibi Khan.

¶161. In telephone conversations and emails, Fremont and these Board employees deliberately

prolonged plaintiff's wild goose chase, including by sending him questionnaires that sought

information about Double Denied that the Board already knew. *Id.*

In February 2003, plaintiff resubmitted his painting to the Authentication Board with

even more evidence of its authenticity, including letters from Warhol's own staff at the Factory,

and transcrips of audiotapes supplied by the Warhol museum where Warhol authorizes his

manager Paul Morrissey to make a deal with Ekstract regarding the video equipment. ¶162. On

or about February 12, 2003, plaintiff received a telephone call from Paul Morrissey. According

to Morrissey, Fremont had informed him over dinner the night before that plaintiff's painting had

been denied a second time. ¶163. The Authentication Board had not yet met to consider

plaintiff's second submission at the time of Fremont's conversation with Morrissey since one

Board member was in London and another in Colorado. ¶164.

By letter dated July 14, 2003, the Authentication Board notified plaintiff that it had

rejected Double Denied a second time, refusing once again to explain its decision. ¶165.

The purpose of this second rejection was to insulate defendants from liability for their

complete failure to conduct any examination whatsoever of Double Denied prior to the First

Rejection. ¶165. The Authentication Board made sure that all of its members physically

examined Double Denied prior to the second rejection, even though denial was a fait accompli.

¶165. This second rejection effectively blackballed plaintiff within the community of Warhol

collectors. ¶166. He found himself unable to sell any of the Warhols he owned without first

submitting them to the Authentication Board, which he knew would reject them. Ultimately, plaintiff was forced to use third-parties to sell his Warhols at a fraction of their fair market value.[4]  *Id.*

Defendants have systematically targeted other owners of paintings to further their conspiracy. For example, Susan Mearns owns a painting from the Ekstract series that was rated a C (*i.e.*, "not able at this time to form an opinion") by the Estate in 1990. ¶185. In 2004, Ms. Mearns received a letter out of the blue from the Board ambiguously stating that "additional information has come to the attention of the Board since the date of the Estate's opinion letter. Therefore you may wish to submit this painting to the Board for its opinion." ¶¶186-87.

Fearing that rejection was a foregone conclusion, Ms. Mearns declined to resubmit her painting. ¶189. Her experience demonstrates that the anti-competitive effects of defendants' conspiracy are not simply confined to those works it explicitly rejects. When owners like Ms. Mearns refuse to submit a targeted painting for authentication, the result is the same – the artwork becomes unsaleable and is effectively excluded from competition. ¶189.

## III.  Argument

### A.    The Relevant Legal Standards

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007) (quotation omitted). For most claims, including

---

[4] Following the second rejection (in a letter dated May 18, 2004) the Authentication Board finally purported to explain the reasons for its rejections but was filled with half-truths and outright lies. ¶168. For example, the May 18, 2004 letter specifically mentioned that Double Denied was made of "cotton" because the Foundation and Georg Frei's gallery, Thomas Ammann Fine Art, each owned a similar competing Warhol self-portrait on linen from the same time period as Double Denied. ¶171. The conclusion of the May 18, 2004 letter was also false and misleading because, as defendants were equally well aware, many early Warhols were screened on cotton. ¶175. Each of the Campbell's Soup Cans series, for example, was painted or screened on various materials such as cotton canvas, linen, and even shopping bags. The conclusion of the May 18, 2004 letter was further false and misleading because, as defendants were also well aware, Warhol worked in precisely the manner that the letter denies – both at the time that Double Denied was created and with increasing frequency until his death in 1987. ¶176.

antitrust, this entails satisfying the "liberal pleading standards set forth by Rule 8(a)," which "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007); *see also id.* ("Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'") (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, (2007)).

To be sure, allegations of antitrust conspiracy must be "plausible," but plausibility "does not impose a probability requirement at the pleading stage." *Twombly*, 127 S. Ct. at 1965. All that is required is "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* Indeed, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* (quotation omitted). Thus, "the bottom-line principle is that 'once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.'" *Roth*, 489 F.3d at 510 (quoting *Twombly*, 127 S. Ct. at 1969)).

Claims for fraud must meet the heightened pleading standards of Fed. R. Civ. P. 9(b), which requires that allegations "specify the time, place, speaker and content of an alleged misrepresentation." *E.g., Goldin Assocs., L.L.C. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 00 Civ. 8688, 2003 WL 22218643, at *6 (S.D.N.Y. Sep 25, 2003) (citing *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987); *O'Brien v. National Prop. Analysts Partners*, 719 F. Supp. 222, 225 (S.D.N.Y. 1989)). Nevertheless, "Rule 9(b) must be read together with Rule 8(a), which calls for a 'short and plain statement' of a claim for relief." *Id.* Plaintiffs thus "need not plead dates, times and places with absolute precision, so long as the complaint 'gives fair and reasonable notice to defendants of the claim and the grounds upon

which it is based.'") (quoting *Int'l Motor Sports Group, Inc. v. Gordon*, No. 98 Civ. 5611, 1999 WL 619633, at *4 (S.D.N.Y. Aug 19, 1999)).

To be clear, where a complaint alleges fraud in conjunction with other claims, only the conduct actually alleged to be fraudulent needs to be pleaded with particularity. *See, e.g., Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003) ("[I]n a case where fraud is not an essential element of a claim, only allegations ('averments') of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b).") (discussing cases). While plaintiff alleges certain fraudulent acts by defendants in furtherance of their scheme, fraud is not a "necessary element" for antitrust claims. *Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 00 Civ. 8688, 2002 WL 362794, at *6 (S.D.N.Y. Mar. 6, 2002). ("Allegations of conspiracy are not measured under Rule 9(b) standards, but under the more liberal notice pleading standards set out in Rule 8(a).").[5] Because plaintiff "allege[s] some fraudulent and some non-fraudulent conduct . . . only the allegations of fraud are subject to Rule 9(b)'s heightened pleading requirements."[6] *Vess*, 317 F.3d at 1104.

**B.    The Complaint Adequately Alleges Antitrust Claims**

**1.    Plaintiff Alleges a Plausible Antitrust Conspiracy Consistent With *Bell Atlantic v. Twombly***

**a.    Defendants Mischaracterize the Conspiracy Alleged**

As demonstrated herein, the Complaint details a plausible antitrust conspiracy by defendants that is entirely consistent with the pleading requirements set forth in *Bell Atlantic v. Twombly*. 127 S. Ct. 1955. The conspiracy arises directly as a result of defendants' exclusive control over the Authentication Board and the Catalogue Raisonné, the only two recognized

---

[5] *See also Twombly*, 127 S. Ct. at 1973 n.14 (In rejecting plaintiffs' claim of conspiracy, "we do not apply any 'heightened' pleading standard, nor do we seek to broaden the scope of Federal Rule of Civil Procedure 9.").

[6] Defendants' reliance upon *In re Crude Oil Commodity Litig*., No. 06 Civ. 6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007) is misplaced. There, "the crux of plaintiffs' allegations [was] that defendants misled the market with regard to supply and demand" through a litany of affirmative misstatements catalogued by the court. *Id.* at *5. In this case, by contrast, the alleged misrepresentations, while significant and independently actionable, comprise a comparatively minor part of defendants' antitrust scheme.

14

sources of authentication for Warhol artwork.    ¶17.    As a result of this control over both standard-setting bodies, defendants have absolute and final power to set formal and informal authentication standards for all Warhol artwork worldwide, irrespective of ownership.[7] Defendants have long abused this standard-setting power to exclude competing Warhol artwork from the marketplace by falsely declaring that authentic works of art are not the work of Andy Warhol.  These false declarations have the purpose and effect of increasing the value of Warhol artwork generally by making it artificially scarce.[8]

The Foundation and Fremont (together with the Richard Roe defendants) then reap the benefits of this general price inflation, among other ways, by selling their own Warhol works at prices substantially higher than they could if the authentic Warhol works that they rejected were on the market.  As exclusive sales agent, Fremont also earns a hefty six percent commission on every sale of Foundation artwork and has earned well in excess of $10 million over the years.[9] ¶54.  The Foundation further benefits by entering into lucrative licensing deals for images it owns and by making charitable donations of expensive artwork, all of which favorably affects the Foundation's ratio of charitable contributions to operating costs, enabling the conspiracy to flourish while the Foundation appears outwardly similar to any other charitable organization.

The allegations in the Complaint fall well within established antitrust precedents involving abuse of private industry standard-setting authority to harm competition.[10]  *E.g., Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492 (1988) (steel conduit tube

---

[7] Defendants disingenuously claim that the recent sales of Warhols like *Lemon Marilyn* and *Green Car Crash* show that review by the Authentication Board is not a prerequisite for sale.  This conveniently ignores that both paintings are listed in the Catalogue Raisonné, which authenticates the works listed in that publication.  Plaintiff's allegation, moreover, is not that the Authentication Board must affirmatively approve all sales.  The Complaint alleges that control of the Authentication Board and Catalogue Raisonné gives defendants "effective veto power" over sales if they choose to intervene like in the case of Double Denied.

[8] Just as a central bank raises the value of currency by decreasing the money supply, defendants inflate the value of Warhol artwork by reducing the number of works in circulation.  The difference, of course, is that defendants use improper, anti-competitive methods to effect this scarcity.

[9] In 2006 alone, Fremont earned $950,000 from the Foundation.  ¶55.

[10] Since the Catalogue Raisonné and Authentication Board are both private standard-setting bodies with no influence over public policy, *Noerr Pennington* immunity is not an issue.  *E.g., Allied Tube,* 486 U.S. at 505.

manufacturer abused private standard-setting association to exclude rival plastic conduit tube manufacturer from the marketplace); *Nat'l Collegiate Athletic Ass'n*, 468 U.S. at 85 (National Collegiate Athletic Association abused private standard-setting authority by preventing university from entering into contracts to televise football games).  In *Allied Tube*, for example, the Supreme Court affirmed a Second Circuit ruling that antitrust liability was appropriate where defendant had "subverted," "undermined," and "violated the integrity" of a private standard-setting association with the purpose "of achieving an anticompetitive result."  *Indian Head, Inc. v. Allied Tube & Conduit Corp.*, 817 F.2d 938, 947 (2d Cir. 1987), *aff'd*, 486 U.S. 492 (1988). As the Supreme Court explained: "There is no doubt that the members of such associations often have economic incentives to restrain competition and that the product standards set by such associations have a serious potential for anticompetitive harm. . . .  Accordingly, private standard-setting associations have traditionally been objects of antitrust scrutiny."  *Allied Tube,* 486 U.S. at 500 (citations omitted); *see also Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 571 (1982) ("[A] standard-setting organization . . . can be rife with opportunities for anticompetitive activity."); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 310 (3d Cir. 2007) ("Private standards-determining organizations, in contrast to legislative or quasi-legislative bodies, have historically been subject to antitrust scrutiny.").

Defendants have similarly subverted, undermined, and violated the integrity of the Authentication Board and Catalogue Raisonné.  Just as the defendant in *Allied Tube* packed the meeting of a standard-setting association with its representatives to ensure the outcome of a vote to exclude a competitor, *Allied Tube,* 486 U.S. at 496-97, so too have defendants here packed the Authentication Board with their agents to ensure the exclusion of competing Warhol works,[11] ¶70.  Moreover, defendants' extreme secrecy, lack of Warhol experts, and policy of refusing to

---

[11] Authentication Board members lack specific expertise in Warhol's artwork and are compensated in various ways for their acquiescence to the scheme.  ¶¶74-75.

explain the reasons for the Authentication Board's rejections, ¶¶74, 101, 107, suggest an absence of "meaningful safeguards" that "prevent the standard-setting process from being biased by members with economic interests in stifling product competition." *Allied Tube,* 486 U.S. at 501 (quoting *Hydrolevel*, 456 U.S. at 572). Indeed, it is precisely this lack of safeguards and transparency – in marked contrast to the practices of other authentication boards, *e.g.*, Alexander Calder's[12] – that has permitted defendants to abuse their standard-setting power to induce artificial scarcity in the market for Warhol artwork. ¶107.

Despite the obvious parallels to the foregoing standard-setting precedents, defendants mischaracterize this as an ordinary cartel case, in which antitrust violators fix prices by overcharging direct purchasers of their products. D. Mem. at 29 (citing *Illinois Brick v. Illinois*, 431 U.S. 720, 730-31 & n.11). Defendants' misreading of the relevant conspiracy infects all of their arguments, most notably those concerning standing. *See* Section III.B.2, *infra*. As stated previously, however, defendants' conspiracy operates differently from an ordinary cartel. Because defendants control the Authentication Board and Catalogue Raisonné, they can directly inflate the price of all Warhol artwork, irrespective of ownership, by manipulating general supply, then reap the benefits in the aforementioned ways.[13] This is precisely the kind of anti-competitive harm from abuse of standard-setting power that the antitrust laws forbid.

### b. The Complaint Contains "Plus Factors" Supporting an Inference of Conspiracy

When read in context with the above-cited authorities from the private standard-setting context, the Complaint articulates an antitrust conspiracy that readily meets the requirements of *Bell Atlantic v. Twombly*, 127 S. Ct. 1955 (2007). Defendants object that the alleged conspiracy – to manufacture artificial scarcity in the market thereby inflating the value of all Warhol

---

[12] ¶102.

[13] Defendants manipulate the market for Warhol works in other ways including by reversing their own previous authentication rulings and refusing to disclose the scope of their own holdings that are sold strategically over time to maximize value of individual works.

17

artwork, including defendants' – is "clearly implausible."    D. Mem. at 28.   They argue that

certain of the anti-competitive acts alleged – *e.g.*, the Foundation offering sizable discounts to

certain select galleries and dealers – "flatly contradict" claims of a conspiracy to inflate prices.

D. Mem. at 17-18 (quoting ¶112).  Defendants insist that such contradictions show they have "no

rational economic motive" to conspire.  D. Mem. at 19 (quoting *Matsushita Electric Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 596-97 (1986)).   In fact, as detailed in the Complaint and

summarized below, the aforementioned discounts are crucial to defendants' scheme to abuse

their private standard-setting authority and inflate the price of Warhol works generally.  And the

absence of any "rational economic motive" for these and other overtly anti-competitive acts is

actually a "plus factor" that signals plaintiff's satisfaction of *Twombly*.

        The discounts at issue function as bribes designed to exploit and advance defendants'

anticompetitive scheme in several ways.[14]   As described in the Complaint, defendants "enforce

their control over the market for Warhol works through a select group of powerful galleries and

dealers who enjoy a special relationship with Fremont, The Foundation and The Authentication

Board."   ¶111.  Defendants purchase the acquiescence of these elite galleries and dealers by

affording them "the privilege of buying Warhol works directly from The Foundation at a

substantial discount" on the inflated market prices.  ¶112.  In return, buyers agree not to resell the

discounted artwork for a period of years, keeping it off the market and further inflating the price

all other works that remain in circulation, including those the Foundation, Fremont, and the

Richard Roe defendants sell to unwitting non-participants in the scheme.  ¶¶112-13.  Defendants

counter by selectively quoting Warhol expert Richard Polsky to imply these discounts were

meant to keep the price of Warhol artwork "artificially low."   D. Mem. at 18 ("According to

Polsky, the sizable discount offered by Fremont was intentional: 'The idea was to encourage

---

[14] Defendants use these bribes to reward Authentication Board members, too.  For example, the Complaint describes
how member Robert Rosenblum "received a substantial discount on a Warhol self-portrait from 1986 valued at
several million dollars – a purchase that would otherwise have been well-beyond his financial means."   ¶75.

legitimate collectors and museums to buy paintings by *keeping their prices artificially low*.'") (quoting Polsky, *I Bought Andy Warhol*, at 18 and adding emphasis). Defendants omit the next sentence, which explains, consistent with plaintiff's antitrust allegations, that the decision to offer these particular purchasers discounts was ***blatantly anti-competitive***: "These buyers effectively removed the work from the market, which ***increased the scarcity and value of Warhols***." Polsky, *I Bought Andy Warhol*, at 18 (emphasis added).[15]

These museums and legitimate collectors, moreover, are only one type of purchaser who receives discounts from the Foundation. As the Complaint also alleges, after the "non-competition agreement expires, the works may be resold at a large profit without any fear that The Board will challenge their authenticity." ¶112. This arrangement is so lucrative that certain galleries and dealers– *i.e.*, the Richard Roe defendants – have opted to join the conspiracy. They "patrol the art world on behalf of the Warhol Conspirators" and help "defendants further enforce their power to compel formal and informal authentication of Warhol works." ¶115. The aforementioned discounts (and attendant possibility of further huge profits through eventual resale at prices inflated by defendants manipulation) are one reward for this complicity. Far from contradicting the conspiracy alleged, therefore, these discounts are actually a principal means by which defendants control the standard-setting process and exclude competing Warhol artwork from the marketplace.

Plaintiff admits that, absent the conspiracy alleged, there is no "rational economic motive" for the Foundation to offer discounts to buyers, especially galleries and dealers like the

---

[15] Polsky undoubtedly means that the Foundation offered "artificially low" prices (*i.e.*, discounts) to certain customers it knew would keep the artwork off the market, thereby "increasing the scarcity and value" of those still in circulation. Of course, even if the Foundation's goal were to artificially deflate the price of Warhol artwork generally, their anti-competitive behavior would still give rise to antitrust liability. *See, e.g., Sanner v. Board of Trade of City of Chicago*, 62 F.3d 918, 929 (7th Cir. 1995) (antitrust conspiracy to artificially deflate the cash price for soybeans through manipulation of the futures market for the same).

Richard Roe defendants, who would otherwise be the Foundation's competitors.[16]  That such conduct is, in a vacuum, against the Foundation's general economic self interest constitutes a "plus factor" that, pursuant to precedents like *Twombly*, strongly supports an inference of conspiracy.  In *Twombly*, the plaintiffs sued local telephone and internet providers, alleging the defendants had agreed not to compete and conspired to prevent competitors from entering their respective territories.  *Twombly*, 127 S. Ct. at 1962-63.  The District Court dismissed the complaint, finding that plaintiffs had failed to establish "at least one 'plus factor' that tends to exclude independent self-interested conduct as an explanation for defendants' parallel behavior." *Twombly v. Bell Atlantic Corp.*, 313 F. Supp. 2d 174, 179 (S.D.N.Y. 2003).  The Second Circuit reversed, holding that plaintiffs need not plead plus factors to state an antitrust claim based on parallel conduct to survive dismissal.  *Twombly*, 127 S. Ct. at 1963 (quoting *Twombly v. Bell Atlantic Corp.*, 425 F.3d 99, 114 (2005)).  The Supreme Court reversed the Court of Appeals, essentially agreeing with the District Court that plaintiffs must plead something more than just parallel conduct to state a claim for relief.  *See Twombly*, 127 S. Ct. at 1966 ("Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.").

The "plus factor" required by the District Court in *Twombly* provides precisely the sort of "context" mandated by the Supreme Court.  This context helps differentiate illegal conspiracy from mere self interested parallelism:

> This requirement is necessary to ensure that plaintiffs actually state
> a claim on which relief can be granted, by separating complaints
> that allege simple parallel action that does not suggest a conspiracy

---

[16] Even for a non-profit like the Foundation, it makes economic sense to charge buyers like the Richard Roe defendants fair market value.  These defendants, who represent some of the most powerful galleries and dealers in the market, are not cash-strapped museums that cannot afford to pay full price – they and can and would do so, absent the conspiracy alleged.  This is especially true since, as President Joel Wachs admits, the Foundation is in the "business of selling" its artwork.  *See* n.2, *supra*.

> and is therefore not actionable under § 1, from complaints that
> allege parallel action that could be the result of a conspiracy, and
> that plaintiffs are therefore entitled to explore in discovery.

*Twombly*, 313 F. Supp. 2d at 180; *see also Twombly*, 127 S. Ct. at 1965 ("[W]e hold that stating

such a claim requires a complaint with enough factual matter (taken as true) to suggest that an

agreement was made" and "to raise a reasonable expectation that discovery will reveal evidence

of illegal agreement.").   Plus factors that courts have recognized "include evidence that the

parallel behavior would have been against individual defendants' economic interests absent an

agreement, or that defendants possessed a strong common motive to conspire." *Twombly*, 313 F.

Supp. 2d at 179 (citing *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253-54 (2d Cir. 1987)).   In this

case, the aforementioned discounts offered to certain galleries and dealers, ***particularly the***

***Richard Roe defendants***, "would have been against . . . defendants' economic interests absent an

agreement." *Twombly*, 313 F. Supp. 2d at 179.   The money lost by the Foundation on such sales

could be used to fund grants and charitable contributions.   Defendants' conduct thus constitutes a

"plus factor" pointing to the existence of an illegal agreement.

Another such "plus factor" in this case is defendants' "strong common motive to

conspire." *Twombly*, 313 F. Supp. 2d at 179.   Defendants point to the Foundation's sizable

donations of artwork to museums, arguing that such gifts are inconsistent with any reasonable

motive to conspire.   D. Mem. at 19-20.   Obviously, charitable donations do not, indeed should

not, trigger antitrust scrutiny all by themselves.   In this case, however, these donations are

accompanied by other facts giving rise to an inference that they were made for an

anticompetitive purpose with anti-competitive effect, distorting their charitable character.   The

Richard Roe defendants and the Foundation benefit directly from the general scarcity and price

inflation in the market induced by such gifts and donations to entities that will not resell,

effectively removing artwork from the market.   Moreover, the Foundation has earned in excess

of $240 million through the sale of Estate works at the inflated market price, and Fremont has earned approximately $10 million in the course of his exclusive sales agency.  ¶54; s*ee supra* at n.2.  Plaintiff is confident that discovery will similarly demonstrate that the Richard Roe defendants have benefited directly from sales at artificially inflated prices.  In this specific case, therefore, the charitable character of such gifts and donations cannot, and should not, insulate them from antitrust scrutiny.  At a minimum, plaintiff should be able to explore whether these donations were meant (even if only partly) to have an anti-competitive effect, and to what degree they accomplished this goal. *See Twombly*, 127 S. Ct. at 1965 (plaintiff need only plead "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.").

The Foundation, moreover, has an added financial motive to abuse these gifts and donations, above and beyond the foregoing motive common to the other defendants.  As also detailed in the Complaint, "The Foundation has long-suffered from financial mismanagement." ¶56.  One important indicator of this mismanagement is the Foundation's poor ratio of grants to administrative costs.  Former Estate attorney Ed Hayes explains:

> Though it once had $25 million in its accounts, the foundation [in 1991] now has just $6 million in cash and securities. And though the foundation, under Gillies's leadership, will spend $7.2 million in administrative costs (including $170,000 worth of furniture for the foundation's offices) in the fiscal year ending in April 1994, it will give away just $1.1 million, an embarrassingly substandard amount; *similar groups routinely spend just eleven cents for every dollar they donate*.[17]

This exceptionally poor ratio of grants to administrative costs was one of many charges that, during the mid-1990s, prompted an investigation by the New York State Attorney General into

---

[17] ¶57 (quoting Edward Hayes, *Mouthpiece* at 200 (Broadway Books 2006) and adding emphasis).  Nor has the ratio of grants to administrative costs improved substantially since 1991.  "In fiscal 1998, The Foundation reportedly paid out only $2.9 million in grants but had administrative costs of $5.3 million.  According to its IRS Form 990-PF for 2006, The Foundation paid out $8 million in grants and reported administrative expenses of $6 million" – far short of the 10:1 ratio of most comparable charities.  ¶58.

the Foundation's financial administration and practices.[18]  ¶¶51, 56-58.  Formal charges were averted after defendants agreed to certain reforms,[19] but the Foundation remains a target. Because a common measuring stick for charities is the aforementioned ratio of grants to administrative costs, that number serves as an informal bottom line for defendants in their efforts to stave off further inquiry into their financial practices.  One way to affect this bottom line favorably is, as noted above, to sell the Foundation's paintings at the artificially inflated market prices, generating cash that can be used for grants.  ¶60.  Another method – suggested by defendants' own argument – is to donate these paintings to museums and charities, valuing the donations at the artificially inflated market prices on the Foundation's financial reports.

Defendants argue that such gifts and contributions "cannot form the basis for a cause of action."  D. Mem. at 16.  But defendants cannot evade liability by wrapping themselves in charity.  It is "well settled that good motives will not validate an otherwise anticompetitive practice." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 101 n.23 (1984)  (citing *United States v. Griffith*, 334 U.S. 100, 105-106 (1948); *Associated Press v. United States*, 326 U.S. 1, 16, n.15 (1945); *Chicago Bd. of Trade of the City of Chicago v. United States*, 246 U.S. at 238; *Standard Sanitary Manufacturing Co. v. United States*, 226 U.S. 20, 49 (1912); *United States v. Trans-Missouri Freight Assn.,* 166 U.S. 290, 342 (1897)).  If defendants donated the works with the purpose and effect of increasing scarcity and value, they have committed antitrust violations.  The same is true of defendants' authentication decisions. Even if defendants truly believed that some of the competing paintings they have rejected over the years were not authentic, their total subversion of the standard-setting process would still

---

[18] As further elaborated in the Complaint, "the NYS Attorney General investigated allegations of waste and financial mismanagement, including excessive salaries paid to The Foundation's employees, and the exorbitant 10% commission paid to Fremont for sales of Estate Works by The Foundation."  ¶51.

[19] These reforms included a reduction of Fremont's sales commission from ten percent to six percent and "the implementation of new financial controls, including the creation of an audit committee; the hiring of a new chief financial officer; and the introduction of stricter accounting and bookkeeping procedures"  ¶¶ 51, 56.

give rise to antitrust liability. *Allied Tube,* 486 U.S. at 498 (imposing antitrust liability for abuse of a standard-setting organization despite the defendant's "genuine belief" that the technology of its competitor was "unsafe").

The Supreme Court was motivated in *Twombly*, by the concern that "antitrust discovery can be expensive." 127 S. Ct. at 1959. *Twombly*, however, involved millions of subscribers and massive telecommunications companies, and therefore costly discovery. *Id.* In this case, by contrast, that risk is minimized. The Foundation and the Authentication Board are small private organizations with ready access to discoverable material, and, importantly, defendants' counsel has represented the defendants continuously for close to 20 years, and themselves authored and maintained many of the documents and agreements at the heart of this case.

### c.    The Complaint Pleads a Legally Recognized Product Market

The Complaint defines the relevant product market as "the offering and sale, at auction or otherwise, of Warhol artwork worldwide." ¶201. As the Complaint explains, this market for Warhol artwork "is actually a subset of the broader global market for modern and contemporary art, which includes approximately 500 artists,"[20] each of whom "comprises his or her own distinct submarket within the general global market for modern and contemporary art." ¶202. Defendants mock this alleged product market definition as "outlandish," D. Mem. at 22, but their dismissive objection flies in the face of decisions by at least two different judges in this District recognizing an almost identical definition as plausible. *Vitale v. Marlborough Gallery*, No. 93 Civ. 6276, 1994 WL 654494 (S.D.N.Y. July 5, 1994) (recognizing "Jackson Pollock paintings" as a relevant product submarket); *Kramer v. Pollock-Krasner Foundation*, 890 F. Supp. 250 (S.D.N.Y. 1995) (dismissing suit for failing to allege the same relevant submarket as *Vitale*).

---

[20] *E.g.*, Warhol, Pollock, Picasso, Miro, Rothko, etc . . .

In *Vitale,* the plaintiff sued the Pollock-Krasner Foundation and the Pollock-Krasner Authentication Board (among others) as a result of plaintiff's "inability to sell a painting as a Jackson Pollock original because of defendants' alleged monopolization of the market for Pollock paintings, in violation of the Sherman Antitrust Act." *Vitale*, 1994 WL 654494 at *1. Though the complaint was ultimately dismissed on statute of limitations grounds, Judge Leisure took pains to stress that plaintiff had successfully alleged a relevant product market – one almost identical to the market alleged in this case:

> Plaintiff alleges that the relevant market is contemporary and modern paintings and that Jackson Pollock paintings constitute a distinct and independent submarket. Examining plaintiff's assertion of a submarket in light of the above criteria, the Court finds, for the purposes of this motion to dismiss, that Jackson Pollock paintings may constitute a submarket, the monopolization of which may be unlawful under 15 U.S.C. § 1 or § 2. According to plaintiff's allegations, both exhibitions and sales of Pollock paintings are advertised as Pollock sales and not under the general rubric of modern art sales, thus signalling public recognition of a distinct submarket for Pollock paintings. Also, as any major art purchase may be motivated by highly subjective tastes, one cannot assume that a Rothko or a Franz Kline is interchangeable with a Pollock, as a salted peanut may be interchangeable with a salted corn chip. In the esoteric world of art collecting, a Rothko painting would by no means satisfy the same artistic taste as would a Pollock painting. . . . Accordingly, this Court finds, for the purposes of the instant motion, that plaintiff has adequately alleged a submarket, sufficient to state a claim under 15 U.S.C. § 1 or § 2.[21]

Similarly, in *Kramer*, another plaintiff brought suit against the Pollock-Krasner Foundation and Authentication Board, alleging a conspiracy with Sotheby's and Christie's "to exclude certain authentic Pollock pieces from the accepted canon of his work, and thereby from the market, in an attempt to increase the value of Pollock paintings owned by the Foundation and auctioned by Christie's and Sotheby's." *Kramer*, 890 F. Supp. at 253. Unlike his counterpart in *Vitale,* however, the plaintiff in *Kramer* alleged that the relevant product market was "'the

---

[21] *Vitale*, 1994 WL 654494 at *4.

offering and sale *at auction* of paintings by modern and contemporary artists', with a submarket for Pollock paintings." *Id.* at 254 (quotation omitted) (emphasis in original). Judge Baer acknowledged that "Pollock paintings may constitute a submarket,"[22] but rejected plaintiff's further limitation of the relevant market to "Pollocks sold *at auction*" as narrower than, and thus inconsistent with, the *Vitale* decision. *Id.* at 255 (emphasis in original).

Like in *Vitale*, plaintiff in this case alleges a product submarket based on the works of a single deceased artist. As in *Vitale*, moreover, plaintiff alleges that "Warhols are advertised for sale, whether privately or at auction, by specific reference to the name Andy Warhol, rather than by generic reference to 'modern and contemporary art.' ¶203. Plaintiff further specifically alleges that "Warhols are not interchangeable with works by other modern and contemporary artists because major art purchases are motivated by highly subjective tastes, indicating a lack of cross-elasticity of demand" – just like in *Vitale*. ¶201. Finally, **unlike** in *Kramer*, plaintiff specifically refers to the offering and sale of Warhols "at auction **or otherwise**" to avoid defining the relevant submarket too narrowly. *Id.* (emphasis added). Accordingly, "for the purposes of the instant motion, [plaintiffs have] adequately alleged a submarket, sufficient to state a claim under 15 U.S.C. § 1 or § 2." *Vitale*, 1994 WL 654494 at *4.

### d.    Plaintiff is Entitled to Explore Defendants' Conspiracy in Discovery

Many of the factual assertions that defendants make to support their legal contentions are demonstrably false. Defendants repeatedly insist that the Complaint fails "to establish that an 'artificial scarcity' has been created" in the market for Warhol artwork. D. Mem. at 13-14. Similarly, defendants assert that plaintiff has failed to "demonstrate 'more than individual loss or exclusion' from the market." D. Mem. at 14 (quoting *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 480 (S.D.N.Y. 2001) (citations omitted)). Defendants demand certitude but *Twombly*

---

[22] *Kramer,* 890 F. Supp. at 255 (quoting *Vitale*, 1994 WL 654494 at *4).

"does not impose a probability requirement at the pleading stage." *Twombly*, 127 S. Ct. at 1965. That decision requires simply "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* The Complaint pleads sufficient facts supporting the conclusion that defendants' conspiracy resulted in an artificial scarcity of Warhol artwork and inflation of price. Among these facts are several examples, summarized below, of defendants' conspiracy directly affecting numerous *other* owners of Warhol artwork *besides* plaintiff. Accordingly, plaintiff's allegations readily satisfy *Twombly*.

Plaintiff pleads both general and specific indicators of scarcity and price inflation of Warhol artwork. For example, the Complaint quotes an executive at Sotheby's, Leslie Prouty, who comments on the general scarcity of Warhols, stating that Warhols "are selling so well because they are hard to find these days." ¶215 (quoting Tyler Maroney, *Much More Than Fifteen Minutes*, 101 Art News (January 2002)). Prouty's general characterization of Warhols as "hard to find" (*i.e.*, scarce) is confirmed by gallery owner Robert Mnuchin, who also comments on how scarcity inflates price of all Warhols: "*When supply gets taken out of the market, prices go up*."[23] *Id.* (emphasis added). The Complaint also cites a book by Richard Polsky,[24] whose Warhol expertise defendants acknowledge.[25] As noted previously, Polsky describes how defendants' conduct "effectively removed the work [sold at discounts] from the market, which increased the scarcity and value of Warhols." Polsky, *I Bought Andy Warhol* at 18.

Plaintiff corroborates these general allegations of scarcity and price inflation with specific claims of the same. The Complaint relates the case of Warhol's famous "Flower"

---

[23] Defendants dismiss these comments concerning scarcity and price inflation as ambiguous, seizing upon Mnuchin's passing reference to the scarcity of "quality" Warhol artwork available. D. Mem. at 16. Yet defendants themselves are at a complete loss to explain what "quality" artwork means, or how it alters Mnuchin's basic conclusion that scarcity inflates price. On that last point, plaintiff notes that defendants' arguments defy not just the facts alleged but basic microeconomic principles concerning supply and demand. Defendants' failure to present a plausible competing inference for these allegations rooted in fact and common sense undercuts their motion to dismiss.

[24] ¶¶114, 132.

[25] D. Mem. at 18 (quoting Polsky with approval).

paintings. "Warhol himself states in the original Catalogue Raisonné, which was published in 1970, that some 900 'Flower' paintings were created. By contrast, The Board and The Foundation's version of the Catalogue Raisonné inexplicably recognizes only **_half_** that number." ¶87 (original emphasis). This otherwise inexplicable halving of the number of Flower paintings recognized by the Catalogue Raisonné is typical and reflects a general agreement, between the Foundation and Authentication Board, to reject a certain percentage of paintings as a matter of course (*i.e.*, irrespective of their actual authenticity) thus increasing scarcity and value. *Id.*

Defendants misleadingly suggest that the Authentication Board reviews only a small percentage of the Warhols in existence in any given year, minimizing any impact on the market. D. Mem. at 13. This objection ignores plaintiff's allegations that the scarcity and inflation at issue result from the **_combined_** impact of the Foundation (through the Catalogue Raisonné) **_and_** Authentication Board pursuing a coordinated policy of rejection together over **_many years_** – not to mention the Foundation's policy of selling its Warhols at a loss to buyers who agree to keep the art off the market and to enforce the conspiracy. Defendants' objection also ignores plaintiff's allegations that many Warhols are never submitted to the Board for fear that rejection is a foregone conclusion, and never offered for sale because the Board will intervene. Because the art market is complex and shrouded in secrecy, it is difficult, absent discovery and expert analysis, to quantify the effects of these anti-competitive policies. Plaintiff nonetheless submits that facts like the foregoing strongly support the conclusion that defendants have induced scarcity and inflated value by manipulating the amount of Warhol artwork in circulation.

Further bolstering this conclusion are plaintiff's allegations that defendants' exclusionary abuse of the authentication process was systematic. Plaintiff's experience clearly was not an isolated case. The Complaint cites numerous examples **_besides_** Double Denied where Warhol artwork was targeted by defendants for exclusion from the market, including:

- Horst Weber von Beeren, who turned down a deal from the Foundation for a number of prints in his possession. When he submitted them for authentication, the Board rejected some of the very same prints the Foundation had offered to buy. When one of the rejected prints was exhibited, the Board contacted the gallery to advise them of the print's rejection. ¶¶82-85.

- The dealer who bought 14 paintings that had previously been owned by the Estate and each bore stamps and serial numbers attesting to their authenticity. The Authentication Board accepted four of these paintings but rejected a fifth when the dealer submitted them for review. The rejection deterred the dealer from submitting the remaining nine for fear that rejection was a foregone conclusion. ¶86.

- The dealer who received an unsolicited letter stating that her Warhol painting had been overlooked in the first volume of the Catalogue Raisonné. When she submitted the work for authentication, it was denied. ¶119.

- Richard Ekstract, who submitted a painting from the same series as Double Denied to the Estate for authentication. The Estate was unable to form an opinion despite acknowledging that the painting "was made from an acetate transparency created by Andy Warhol," and that there was "no basis on which to doubt that the silkscreening of the work onto canvas was authorized by Andy Warhol as stated in your letter." ¶¶138-39.

- Susan Mearns, who owns another painting from the same series as Double Denied. Much like Ekstract, Mearns submitted her painting to the Estate, which was unable to form an opinion. Years later, she received an unsolicited letter from the Authentication Board suggesting that "new information" had come to light concerning her painting and inviting her to resubmit. Mearns soon realized, however, that the letter was a ruse and declined to resubmit for fear that rejection was a foregone conclusion. ¶¶142-43, 185-88.

Once again, *Twombly* "does not impose a probability requirement at the pleading stage." *Twombly*, 127 S. Ct. at 1965. All that is required is "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* In contrast to the draconian pleading standard advocated by defendants, the Supreme Court emphasized, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* (quotation omitted). The factual allegations of the Complaint readily surmount this pleading requirement, and plaintiff has articulated a legal theory that is firmly rooted in precedent. Defendants' efforts to manufacture factual disputes simply underscore the need for discovery in this case.

### 2.    Plaintiff Has Standing To Pursue The Antitrust Claims Alleged

Plaintiff has standing to pursue all antitrust claims alleged in the Complaint, including those for price inflation.  Defendants object that plaintiff's standing is foreclosed by the Supreme Court's decision in *Illinois Brick,* 431 U.S. 720, which held that only direct purchasers of a defendant's product may sue for price fixing.  Defendants assert that the *Illinois Bric*k rule applies because plaintiff "did not purchase his painting directly from any of the Defendants."  D. Mem. at 29.  But because there is no direct purchaser whatsoever in the case of Double Denied, *Illinois Brick* is irrelevant.[26]

Here again, defendants' misreading of the Complaint fatally infects their legal analysis.  Defendants analogize the alleged conspiracy to one in which an antitrust violator's overcharge gets passed along a supply chain, which was the circumstance in *Illinois Bric*k.  This analogy is flawed, however, because defendants' conspiracy operates differently.   As explained previously,[27] defendants do ***not*** inflate prices by overcharging certain specific direct purchasers, who then pass on the charges to indirect purchasers, creating general price inflation as a side effect.  Rather, defendant' first priority is to inflate the price of ***all*** Warhol works, including their own, by abusing the standard-setting (*i.e.*, authentication) process to affect ***all*** market participants.  Only then do defendants reap the benefits of this manipulation by charging the inflated market price.

Since defendants never owned Double Denied, there is no third-party direct purchaser, and *Illinois Bric*k does not apply.  Stated another way, the "reason the plaintiffs' suit in *Illinois Brick* failed was not because the defendants did ***not*** sell to them. Rather, it was because the defendants ***did*** sell to a third party who (after *Hanover Shoe* ) could recover for any injury they

---

[26] Needless to say, the aforementioned museums and galleries who purchase Warhols directly from the Foundation at substantial discounts were not injured by defendants' scheme and thus have no incentive to pursue price-inflation claims.  *C.f. Illinois Brick*, 431 U.S. at 725-26 (noting that indirect purchaser rule exists because indirect purchasers have less incentive to sue).

[27] *See* Section III.B.1.a, *supra*.

claimed." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 482 (7th Cir. 2002) (emphasis in original). Indeed, "*Illinois Bric*k does not stand for the proposition, as the defendants would seem to have it, that a defendant cannot be sued under the antitrust laws by any plaintiff to whom it does not sell."[28] *Id*. at 481. As plaintiff is not an indirect purchaser, his injury "is in no sense 'derivative'" and he is "not attempting to stand in the shoes of a third party or to complain of the secondary consequences arising from an injury to a third party." *Sanner v. Board of Trade of City of Chicago*, 62 F.3d 918, 929 (7th Cir. 1995).

This case better resembles the Supreme Court's decision in *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982), and the above-cited Seventh Circuit precedents of *Sanner*, 62 F.3d 918, and *Loeb Indus.,* 306 F.3d 469. In *McCready*, the plaintiff sued her health insurer for refusing to reimburse fees she paid to her psychologist. The plaintiff alleged that her insurer had conspired with psychiatrists to raise the cost of visits to psychologists. *McCready*, 457 U.S. at 468-70. The Supreme Court rejected defendant's contention that, under *Illinois Brick*, only plaintiff's employer, who had directly purchased the insurance plan, could bring suit. *McCready*, 457 U.S. at 474-75; *Sanner* 62 F.3d at 929 (discussing *McCready*); *Loeb Indus.,* 306 F.3d at 481 (same). The Court noted that plaintiff's harm (*i.e.*, unreimbursed fees) was distinct from any injury to her employer. *McCready*, 457 U.S. at 475; *Sanner* 62 F.3d at 929 (discussing *McCready*); *Loeb Indus.,* 306 F.3d at 481 (same). The Court also rejected the argument that plaintiff's injury was too remote, noting that it was "inextricably intertwined with the injury the conspirators sought to inflict" on the market generally. *McCready*, 457 U.S. at 483-84; *Sanner* 62 F.3d at 929 (discussing *McCready*); *Loeb Indus.,* 306 F.3d at 481 (same).

*Sanner* and *Loeb Industries,* offer further persuasive parallel. Both cases involved antitrust conspiracies to affect prices in the entire physical commodities market through

---

[28] As explained by the Seventh Circuit, "[s]uch a rule would eliminate in one fell swoop all competitor suits based on exclusionary practices," *Loeb Indus.,* 306 F.3d at 481, which is precisely what plaintiff alleges in this case.

manipulation of the futures market.   And, in both cases, the Seventh Circuit flatly rejected arguments that plaintiffs from the commodities market lacked antitrust standing because those from the futures market were more directly harmed.   *Sanner* 62 F.3d at 929 (distinguishing *Illinois Bric*k because plaintiff "farmers are not attempting to stand in the shoes of a third party or to complain of the secondary consequences arising from an injury to a third party."); *Loeb Indus.,* 306 F.3d at 483 ("Unlike *Illinois Brick*, the harms incurred in the physical market during a market manipulation . . . form a separate and compensable injury.") (citing *Sanner* 62 F.3d at 929).   As the *Sanner* Court explained, the "close and continuous link between the cash and futures markets" supports standing because anticompetitive acts "directed at the futures market . . . predictably would have impacted the cash market as well."   *Sanner* 62 F.3d at 929.

*Sanner* and *Loeb Indus.,* are particularly instructive because, as detailed in the Complaint, the market for authentication of Warhol works is "closely and inextricably linked" to the market for sale of those works.   ¶206.   The authentication process provides "valuable information that the buying and investing public depends upon when determining whether to buy, and ***how much to pay***, for a given work of art."   ¶210 (emphasis added).   Since provenance is a component of ***all*** pricing decisions in the market for Warhol artwork, anticompetitive acts directed at the authentication process directly impact ***all*** prices, as well.   This is especially true where the monopolist exercises total control over standard setting for an entire industry, as defendants do for authentication of all Warhol artwork.   Indeed, the analogy to standard setting is so strong that the court in *Loeb Indus.,* actually predicted the basic scenario presented by this case:

> Here, however, we have a conspiracy to rig prices for the entire physical market, accomplished through manipulation of the Comex futures market. ***Another possible analogy might be to rigging product standards, which affects everyone who tries to participate in a particular product market.*** In the latter case, the defendants who manipulated the standards cannot be heard to complain that they should be immune from damages for a product they did not sell.

306 F.3d at 483 n.*** (emphasis added).

Defendants point to cases that purportedly reject the "umbrella" antitrust standing endorsed in the (more recent) authority cited above by plaintiff.  D. Mem. at 30 (citing *Mid-West Paper Prods. Co. v. Continental Group, Inc.,* 596 F.2d 573 (3d Cir. 1979); *F.T.C. v. Mylan Labs.,* 62 F. Supp. 2d 25, 39 (D.D.C. 1999); *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig..* 691 F. 2d 1335 (9th Cir. 1982); *Gross v. New Balance Athletic Shoe, Inc.,* 955 F. Supp. 242 (S.D.N.Y. 1997)).  The decisions that defendants cite, however, are readily distinguishable because the plaintiffs therein could not establish direct links between the prices they paid and the conspiracies alleged.  Characteristic is *Gross*, in which plaintiffs alleged a conspiracy to fix the prices charged by "'certain,' not all, of New Balance's retailers."  955 F. Supp. at 245.  The court found that plaintiffs lacked standing to pursue price-fixing claims because they had purchased their shoes from retailers who were not part of the conspiracy.  Since these non-conspiring retailers were not the target of New Balance's anti-competitive conduct, the causal connection between the prices they charged and the conspiracy alleged was too tenuous and indirect.  As the court noted, such "retailers may have independently raised or maintained their prices for any number of reasons, or may even have lowered their prices."  *Id.* at 247; *see also Mid-West Paper Prods.,* 596 F.2d at 584-85 ("[I]t cannot readily be said with any degree of economic certitude to what extent, if indeed at all, purchasers from a competitor of the price-fixers have been injured by the illegal overcharge.").[29]

In this case, by contrast, plaintiff pleads a clear and direct causal link between defendants' abuse of the authentication process and the price of Warhol works, irrespective of

---

[29] *See also In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d at 1341 ("Under an umbrella theory, the result of any attempt to ascertain with reasonable probability whether the non-conspirators' prices resulted from the defendants' purported price-fixing conspiracy or from numerous other pricing considerations would be speculative to some degree."); *Mylan Labs,* 62 F. Supp. 2d at 39 ("There are numerous pricing variables which this Court would be bound to consider to approximate the correct measure of damages, including the cost of production, marketing strategy, elasticity of demand, and the price of comparable items.") (citing *Gross,* 955 F. Supp. at 246).

origin.  As explained previously, the price of all Warhol works, without exception, depends in part on their authentication.  Since the price of all Warhol works is tied directly to their provenance, "this directness between plaintiff's injury and the market restraint is a factor in plaintiff's favor."  *In re Copper Antitrust Litig.*, 98 F. Supp. 2d 1039, 1051 (W.D. Wis. 2000) (distinguishing *Gross* on this basis).  All of the cases relied up by defendants assume an ordinary cartel case, "in which cartel members A and B sell to customers X and Y, and then non-cartel member firm C makes sales at or near the enhanced cartel price to customer Z."  *Loeb Indus.,* 306 F.3d at 484 n.***.  By contrast, plaintiff alleges a conspiracy to rig prices for the entire Warhol market through manipulation of the standard-setting process for authentication.  The explanatory priority is thus reversed from the cases cited by defendants.  Creation of a price umbrella is not an indirect side effect of defendants' conspiracy.  To the contrary, it is a "necessary step in effecting the ends of the alleged illegal conspiracy."  *McCready*, 457 U.S. at 479; *Sanner* 62 F.3d at 930 ("And the farmers have suggested that an impact in both the cash and futures markets was necessary to effect the competitive scheme.").  Any and all benefits to defendants ***presuppose*** creation of this general umbrella of inflation, which raises the price of all works, including those owned by the Foundation.[30]

Given the foregoing, plaintiff is an ideal party to bring suit because his plight underscores how directly pervasively the authentication process affects the pricing of all Warhol artwork. Plaintiff's willingness to pay $195,000 for Double Denied, when other paintings from the same series were available for a mere $22,000, was partly a reflection of its provenance, which included Fred Hughes' certification and the stamped signature of Andy Warhol evidencing authentication by Warhol's Estate.  ¶¶130, 133-34.  Additionally, the Authentication Board's

---

[30] Stated another way, this is not a case where defendants' overcharges create a price umbrella, ***indirectly*** injuring purchasers from non-conspiring competitors.  Here, defendants create the umbrella through manipulation of the authentication process, then benefit, among other ways, by charging the same inflated market price as competitors. The abuse of the authentication process thus ***directly*** injures all purchasers of Warhols.

subsequent rejection of Double Denied, despite these (and other) indicia of its authenticity, demonstrates how defendants abused the authentication process to inflate the value of Warhol artwork generally by arbitrarily excluding competing paintings the marketplace.

### 3.    Plaintiff's Antitrust Claims Are Timely

Defendants object that plaintiff's antitrust claims are time-barred by the four-year statute of limitations under the Sherman Act.  D. Mem. at 31 (quoting 15 U.S.C. § 15(b)).  More specifically, defendants argue that plaintiff's "overcharge claim accrued 18 years ago" and "expired in 1993."  D. Mem. at 31-32.  Similarly, defendants contend that plaintiff's claim for exclusion of Double Denied from the marketplace accrued in 2002, when the Authentication Board first rejected the painting, more than four years before plaintiff brought suit.  *Id.* at 32. But both of defendants' objections suffer from their failure to acknowledge that the Complaint alleges separate antitrust violations within the past four years that toll the limitations period. Defendants also fail to demonstrate that plaintiff's reasonable exercise of due diligence would have uncovered the conspiracy in the face of defendants' fraudulent concealment.

Surprisingly, defendants neither cite nor discuss *Vitale*,[31] the case in this District that is arguably most relevant to several issues raised by their motion, including timeliness.  Aside from confirming that the Complaint successfully alleges a plausible product market,[32] *Vitale* also clarifies that the Sherman Act's statute of limitations can be tolled where, as here, plaintiff pleads "continued, separate antitrust violations within the limitations period."  *Vitale,* 1994 WL 654494 at *5 (quoting *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1301 (9th Cir.), *cert. denied*, 479 U.S. 886 (1986)); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 228 (E.D.N.Y. 2003) (quoting *Vitale* with approval).  As Judge Leisure explained in *Vitale*, "to restart the statute of limitations plaintiff must allege an overt act which (1) is a

---

[31] *Vitale v. Marlborough Gallery*, No. 93 Civ. 6276, 1994 WL 654494 (S.D.N.Y. July 5, 1994).
[32] *See* Section III.B.1.c.

'new and independent act that is not merely a reaffirmation of a previous act'; and (2) 'inflict[s] new and accumulating injury on the plaintiff.'"  *Vitale,* 1994 WL 654494 at *5 (quoting *Pace Industries, Inc. v. Three Phoenix Co.*, 813 F.2d 234 (9th Cir.1987)); *In re Ciprofloxacin,* 261 F. Supp. 2d at 228 (quoting *Vitale* with approval).

In *Vitale*, the plaintiff alleged a plausible product market, but her claims were held to be time-barred because she failed to plead any overt act consistent with the foregoing two-part definition.  *Vitale,* 1994 WL 654494 at *4-5.  Plaintiff could only point to were mere reaffirmations of defendants' initial refusal to deal, which had been final.  *Id.* at *5 ("If an initial refusal to deal with a party is final, the statute of limitations begins to run and does not restart when the plaintiff makes subsequent unsuccessful efforts to deal with the defendant.").  In this case, by contrast, defendants expressly represented to plaintiff that the first rejection of Double Denied was not final, inviting him to resubmit the painting on at least two occasions.  ¶¶158-59.[33]  Accordingly, defendants cannot now credibly claim that their initial refusal to deal was final.

Even more importantly, the Complaint specifically alleges that defendants committed subsequent acts that inflicted new and distinct harm upon plaintiff within the four-year period prior to filing suit.  One example is the second rejection of Double Denied, which was communicated to plaintiff exactly four years before plaintiff originally filed suit, and was "far more than a mere affirmation of the First Rejection."  ¶165.  As the Complaint explains, the second rejection "was a separate act with a related but distinct purpose – to attempt to insulate defendants from liability for their complete failure to conduct any examination whatsoever of Double Denied prior to the First Rejection."  *Id.*  The Complaint further alleges the "effects of the

---

[33] "Following the unexpected rejection of Double Denied, plaintiff contacted The Authentication Board directly.  He reached assistant secretary Claudia Defendi, who informed plaintiff that he was welcome to resubmit Double Denied with more documentation."  ¶158.  At a lunch shortly thereafter, defendant "Fremont urged plaintiff to resubmit Double Denied after researching and documenting its history more fully."  ¶159.

Second Rejection were also distinct from the First Rejection." ¶166. Whereas the initial rejection cost plaintiff his sale of Double Denied, the second rejection "blackballed him within the community of Warhol collectors," forcing Simon "to use third-parties to sell his Warhols at a fraction of their fair market value." *Id.*

Another related but distinct act that inflicted fresh harm upon plaintiff within the four-year period was the Authentication Board's May 18, 2004 letter in which the Board finally purported to explain the reasons for its rejections of Double Denied. The Complaint characterizes this letter, too, as "no mere reaffirmation of the First Rejection, containing several misleading statements about Double Denied, and several statements about Warhols generally that are unequivocally false." ¶168. For example:

- The May 18, 2004 letter cites various physical characteristics of Double Denied (*e.g.*, that it is made of "cotton") that supposedly indicate the painting is not an authentic Warhol. ¶169. In fact, these cited characteristics lack objective merit and were selected mainly to distinguish Double Denied from similar Warhol self-portraits owned by defendants and their co-conspirators (*e.g.*, that were made of linen). ¶¶170-71.

- The May 18, 2004 letter falsely states that "The Board knows of no independently verifiable documentation from the period in question, 1964 through 1965, to indicate or to suggest that Warhol sanctioned or authorized anyone to make the work that you submitted for review or the nine identical examples [from the series of Ekstract Paintings]." ¶172. In fact, "as defendants were well aware, plaintiff had submitted statements from Morrissey, Name and Cutrone, as well as transcripts of statements by Warhol himself, all of which independently verified the authenticity of Double Denied. ¶173.

- The May 18, 2004 letter misleadingly suggests that, in contrast to Double Denied, "during the 1960s Warhol's paintings were made in his studio." ¶172. In fact, "as defendants were also aware, "Warhol worked in precisely the manner that the letter denies – both at the time that Double Denied was created and with increasing frequency until his death in 1987." ¶176.

These and other false and misleading statements that defendants made about Double Denied make the May 18, 2004 letter itself an overt act sufficient to reset the statute of limitations. *See Santana Prods., Inc. v. Sylvester & Associates, Ltd.*, 121 F. Supp. 2d 729, 735 (E.D.N.Y. 1999)

(defendants' "false and misleading statements . . . regarding plaintiff's product" constituted overt acts in the limitations period); *In re Ciprofloxacin.*, 261 F. Supp. 2d at 229 (distinguishing *Santana Products* on that basis).

Many of the same facts that support plaintiff's continuing conspiracy claim also support their related but distinct allegation of fraudulent concealment. A party seeking to establish fraudulent concealment must plead "three elements: (1) wrongful concealment by the defendant, (2) which prevented the plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing discovery of the claim." *Alevizopoulos & Assocs., Inc. v. Comcast Int'l Holdings, Inc.,* 100 F. Supp. 2d 178, 183 (S.D.N.Y. 2000) (citations omitted). The Complaint pleads "wrongful concealment" by referencing the aforementioned conversations with Claudia Defendi and Vincent Fremont in which they urged plaintiff to research further and resubmit, despite knowing that denial was a foregone conclusion. ¶¶158-59, 219(g). The Complaint further describes how subsequent conversations with Fremont and various Board employees "prevented plaintiff from discovery" of his claim by sending him on a "wild goose chase" that included, among other things, questionnaires seeking "information about Double Denied that The Board already knew." ¶161. Plaintiff fulfilled all of defendants' demands "at great professional detriment and financial sacrifice." ¶160. He also submitted his painting twice for review, signing sweeping submission agreements each time. This detrimental reliance clearly shows that plaintiff had no reason to know about defendants' secret conspiracy. *See Omni Food Sales v. Boan,* No. 06 Civ. 119, 2007 WL 2435163 at *7 (S.D.N.Y. Aug. 24, 2007) ("Omni had no reason to know that Greenberg was inappropriately involved in the Omni/Cargill contract termination until 2004 when these "secret payments" came to light at the arbitration.").

Defendants point to plaintiff's participation in the November 2003 Vanity Fair exposé of the Authentication Board, which states that he and Ekstract are contemplating "legal action." D.

Mem. at 32. Since the article was published within four years of plaintiff's suit, it cannot support the argument that his claims are time barred. And defendants' vague conjecture that "Simon spoke to the author of the article well before the November 2003 publication date," D. Mem. at 33, is unpersuasive. If anything, the quotes that defendants cite concerning possible legal action signal plaintiff's due diligence in pursuing his claim. *See Omni Food Sales,* 2007 WL 2435163 at *7 ("By pursuing the arbitration against Cargill, and thereby attempting to discover the underlying facts of the contract termination, Omni exercised the required due diligence.").

### C. The Complaint States A Valid Claim For Declaratory Relief

Plaintiff has alleged a valid claim for declaratory relief from the sweeping covenant not to sue contained in the Authentication Board's non-negotiable submission agreement. It is well established that a party may sue for declaratory relief from an unenforceable contract or clause within an agreement. *Wurtsbaugh v. Banc of America Sec. LLC*, No. 05 CIV. 6220, 2006 WL 1683416 (S.D.N.Y. June 20, 2006) (denying motion to dismiss plaintiff's claim for "a declaratory judgment that the covenants not-to-compete in the Agreement and the Employment Letter are unconscionable, commercially unreasonable, and unenforceable"); *see also Packer v. TDI Systems, Inc.*, 959 F. Supp. 192 (S.D.N.Y. 1997) (denying motion to dismiss for lack of jurisdiction claim that a letter agreement was "unenforceable by reason of duress").

Defendants object that plaintiff "twice agreed in writing not to sue based upon the Board's opinion of the authenticity of his work." D. Mem. at 40. They argue that this agreement not to sue "is enforceable according to its terms." *Id.* (citing cases). It is well established, however, that a party may not invoke such an agreement to insulate itself from intentional wrongdoing like that alleged in this case. *E.g., Kalisch-Jarcho, Inc. v. City of New York*, 448 N.E.2d 413 (N.Y. 1983) (citations omitted); *see also Jordan (Bermuda) Investment Co., Ltd. v. Hunter Green Investments, Ltd.,* No. 00 Civ. 9214, 2003 WL 1751780 (S.D.N.Y. April 1, 2003)

(refusing to apply covenant not to sue in case involving financial fraud). "This can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith. Or when, as in gross negligence, it betokens a reckless indifference to the rights of others, it may be implicit." *Kalisch*, 448 N.E.2d at 416-17. Since plaintiff clearly alleges intentional wrongdoing by defendants generally, perpetrated in part by the submission agreement specifically, they are entitled to declaratory relief from the covenant therein not to sue.

As described in the Complaint, this submission agreement, which was originally drafted by the same law firm that now represents defendants in this case, plays a central role in the conspiracy alleged. ¶¶91-109. Specifically, the submission agreement's sweeping legal indemnity clause purports to insulate not only defendants, but anyone who has ever acted in any capacity for the Foundation or the Estate, from any and all liability associated with the Board's rulings. ¶¶108-09. Between this agreement not to sue and the Authentication Board's general policy of not explaining the reasons for its decisions, defendants have carte blanche to base authentication decisions on factors that lack objective merit – including their own naked self interest. ¶107. Indeed, other class members and parties aggrieved by defendants' conspiracy are not willing to take any formal role in this litigation for fear they may have to pay defendants' legal fees pursuant to the covenant not to sue.

### D.    The Complaint Pleads Fraud With Requisite Particularity

Pursuant to Fed. R. Civ. P. 9(b), a complaint alleging fraud must provide fair and reasonable notice of the time, place, speaker, and content of the alleged misrepresentation or omission. *Goldin Assocs.,* 2003 WL 22218643, at *6; *see generally* Section II.A, *supra*. Plaintiff alleges fraud against Fremont and the Authentication Board with the particularity required by Rule 9(b).

Whether intentionally or not, defendants confuse the issue by simultaneously addressing the impact of Rule 9(b) on plaintiff's antitrust and fraud claims. D. Mem. at 37. Those claims, however, are not based upon the identical operative facts. The antitrust claim concerns a wide-ranging two decade conspiracy among all defendants and certain unknown parties that damaged plaintiff and the putative class, while the fraud claim concerns specific statements by Fremont and the Authentication Board in connection with plaintiff's submissions of his painting to the Authentication Board in 2001 and 2003. Also, as clarified previously, a complaint alleging fraud in addition to other claims need only plead actual averments of fraud with particularity. *See, e.g., Vess*, 317 F.3d at 1105. Thus, much of defendants' Rule 9(b) argument is wholly irrelevant to plaintiff's fraud claim.[34]

An examination of the allegations that are central to plaintiff's fraud claim reveals that those allegations contain adequate information to give defendants fair and reasonable notice of the time period and speaker. The Complaint describes how, in July 2001, Fremont intervened in plaintiff's sale of Double Denied, and fraudulently induced plaintiff in conversations from July through December 2001 to resubmit the painting for authentication. ¶¶148-49, 242. The Complaint alleges that Fremont did so despite knowing that plaintiff would rely on his statements (which plaintiff did) and that the Authentication Board would reject Double Denied no matter what. ¶¶150 243, 245, 247. In February 2002, after the first rejection, Fremont fraudulently induced plaintiff to research Double Denied further and resubmit to the Authentication Board. ¶¶159, 249. The Complaint alleges that Fremont did so despite knowing that plaintiff would rely on his statements (which plaintiff did at great personal and professional

---

[34] *See, e.g.,* D. Mem. at 39 (argument concerning unattributed sources that cites to numerous paragraphs that relate to the alleged antitrust conspiracy, but do not discuss plaintiff's submission of his painting); *id.* at 38 (argument that references to defendants and conspirators are not sufficiently particular that cites exclusively to paragraphs that do not discuss plaintiff's submission of his painting).

41

cost) and that rejection by the Authentication Board was a fait accompli. ¶¶160, 249-50.[35]  Also

in February 2002, the Authentication Board's agent (Claudia Defendi) fraudulently urged

plaintiff to research Double Denied further and resubmit to the Board.  Like Fremont, Defendi

did so despite knowing that plaintiff would rely on her statements (which plaintiff did at great

personal and professional cost) and that rejection by the Authentication Board was a foregone

conclusion.  ¶¶160, 254-55.  The same is true with respect to the fraudulent solicitations for more

information made by Defendi and two other Authentication Board agents (Sally King Nero and

Bibi Khan) during the period from February 2002 through July 2003.  ¶161.

Defendants' primary argument concerning the allegations of fraud regarding plaintiff's

submission of his painting to the authentication board is that those allegations refer, in some

instances, to time periods of several months.  D. Mem. at 38 (citing *Lomaglio Associates Inc. v.

LBK Marketing Corp.*, 876 F. Supp. 41, 44 (S.D.N.Y. 1995)).  But numerous courts have

rejected such arguments because "Rule 9(b) does not require that a complaint plead fraud with

the detail of a desk calendar or a street map."  *Gelles v. TDA Industries, Inc.,* No. 90 Civ. 5133,

1991 WL 39673, at *6 (S.D.N.Y. Mar. 18, 1991); *Bangkok Crafts Corp. v. Capitolo Di San

Pietro in Vaticano*, No. 03 Civ. 0015, 2006 WL 1997628, at *5 (S.D.N.Y. July 18, 2006)

(quoting *Gelles* with approval)*; Goldin Assocs.,* 2003 WL 22218643, at *6 (same); *Int'l Motor

Sports Group*, 1999 WL 619633, at *4 (same).  Indeed, "a plaintiff need not plead dates, times

and places with absolute precision, so long as the complaint 'gives fair and reasonable notice to

defendants of the claim and the grounds upon which it is based.'"  *Int'l Motor Sports Group*,

1999 WL 619633, at *3; *Goldin Assocs., L.L.C.,* 2003 WL 22218643, at *6.  Defendants' citation

to *Lomaglio Associates* is  unpersuasive  because  there  "the  plaintiff  alleged  that  the

---

[35] The Complaint also pleads facts giving rise to a strong inference of fraud.  For example, the Complaint alleges that plaintiff received a telephone call from Paul Morrissey on February 12, 2003.  According to Morrissey, Fremont had informed him over dinner the night before that plaintiff's painting had been denied a second time.  ¶163.  The Authentication Board, however, had not yet met to consider plaintiff's Second Submission at the time of Fremont's conversation with Morrissey – one Board member was in London and another in Colorado.  ¶164.

misrepresentations 'may have been made at any date prior to and/or including September 1, 1993.'" *Bangkok Crafts Corp.*, 2006 WL 1997628, at *5 (quoting and distinguishing *Lomaglio Associates*). Plaintiff thus pleads his fraud claim with the requisite particularity.

### E.    The Complaint States Valid Lanham Act Claims

Plaintiff has stated valid Lanham Act Claims based upon defendants' false representations in the Authentication Board's May 18, 2004 letter and elsewhere concerning the authenticity of Double Denied. Defendants counter that the Lanham Act does not impose liability for mere statements of opinion and non-commercial speech. D. Mem. at 35-36. Defendants' statements, however, amount to far more than "opinion," as that term is used in the case law, and their characterization of the advertising at issue (*i.e.*, the Warhol Catalogue Raisonné) as "non-commercial" cannot be squared with reality.

It is clear from the cases that defendants cite that the term "opinion" is reserved for extreme statements that "could not reasonably be seen as stating or implying provable facts." *Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*, 516 F. Supp. 2d 270, 285 (S.D.N.Y. 2007); *see also Groden v. Random House, Inc.*, 61 F.3d 1045, 1051-52 (2d Cir. 1995) (analogizing opinion to "'rhetorical hyperbole' that 'does not state actual facts about an individual' and 'cannot be proven true or false'") (quoting *Lane v. Random House, Inc.*, 985 F. Supp. 141, 150 (D.D.C. 1995)). This is a far cry from the purportedly "expert" opinions rendered by the Authentication Board and Catalogue Raisonné. Additionally, the Board's May 18, 2004 letter, which defendants admit made reference to the physical characteristics of Double Denied, is filled with statements of supposedly provable facts concerning the painting and Warhol's artwork generally. Defendants disingenuously suggest that plaintiff concedes the literal truth of these statements. D. Mem. at 35. As the Complaint makes clear, plaintiff alleges

that the statements in the May 18, 2004 were literally true but still misleading, triggering Lanham Act liability. *Groden v. Random House, Inc*., 61 F.3d at 1051.

Additionally, the Warhol Catalogue Raisonné qualifies as commercial speech for purposes of the Lanham Act. As described in the Complaint, the Catalogue Raisonné claims to be an authoritative listing of all Warhol artwork in existence, and is the only other source of authentication for Warhol artwork besides the Authentication Board. ¶17. By defendants' own admission, artwork is bought and sold pursuant to the Catalogue Raisonné, giving it an undeniable commercial dimension. It is fair to say, for example, that the sales of Lemon Marilyn and Green Car Crash would not have occurred if each work had not been listed in the Catalogue Raisonné – certainly not if the Authentication Board had raised the slightest question. That clear commercial dimension distinguishes the Catalogue Raisonné from a mere museum catalogue like that at issue in *Galerie Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004), relied upon by defendants. Accordingly, the omission of Double Denied from the Warhol Catalogue Raisonné can support a claim under the Lanham Act.

### F.    The Complaint Successfully States Class Claims For Unjust Enrichment

Plaintiff pleads claims on behalf of the class for unjust enrichment based upon defendants' artificial inflation of the price of all Warhol works during the class period. Defendants again mischaracterize plaintiff's allegations, this time by characterizing the unjust enrichment claim as individual. D. Mem. at 44-45. They argue that plaintiff cannot bring an unjust enrichment claim because he was never a direct purchaser of artwork from the Foundation or any of the Richard Roe defendants. *Id.* at 45. Courts, however, have permitted a class to pursue common law unjust enrichment claims, despite the fact that some state laws precluded such claims by indirect purchasers. *See, e.g., Doe v. Abbott Labs*., No. C 04-1511, 2004 WL

3639688 (N.D. Cal. Oct. 21, 2004) (denying motion to dismiss); *In re Abbott Labs. Norvir*, Nos. C 04-1511, C 04-4203, 2007 WL 1689899 (N.D. Cal. June 11, 2007) (certifying class).

For example, in *Doe,* plaintiffs sued on behalf of a class of drug consumers who challenged defendants' efforts to use their existing monopoly in one market to monopolize a second related market by effectively raising the price of competitors' drugs. *Abbott Labs.*, 2004 WL 3639688, at *3. The court applied a three-part test to their unjust enrichment claims: "(1) a benefit conferred upon the defendant, (2) the defendant's appreciation or knowledge of the benefit, and (3) retention of the benefit under such circumstances as to make the retention inequitable." *Id.* at *6 (citing *United States for Use & Benefit of Walton Tech., Inc. v. Weststar Eng'g. Inc.*, 290 F.3d 1199, 1204 (9th Cir. 2002)). The court concluded that plaintiff had adequately pled common law unjust enrichment claim by alleging "that defendant knowingly benefited in the boosted market from its Norvir price increase, and that it would be unfair to allow defendant to retain that benefit." *Id.* The court subsequently certified a class that included indirect purchasers despite acknowledging that some states might not allow such claims. *In re Abbott Labs. Norvir*, 2007 WL 1689899 at **8-9. The benefits reaped by defendants from their price inflation clearly meet the foregoing three-part definition of a benefit conferred, with defendant's knowledge, under inequitable circumstances. Accordingly, plaintiff's class unjust enrichment claims are valid.

## IV.   Conclusion

For the foregoing, defendants' motion to dismiss should be denied in its entirety.

Dated:  New York, New York
        January 10, 2008

                                        Respectfully submitted,

                                        **DREIER LLP**

                                        _____/s/_____

Lee A. Weiss (LW-1130)
Brian C. Kerr (BK-6074)
499 Park Avenue
New York, New York 10022
212.328.6100

**REDNISS & ASSOCIATES LLC**
Seth Redniss (SR-7988)
185 Franklin Street, 5th Floor
New York, New York 10013
212.334.9200

*Counsel for Plaintiff*