Gary D. Sesser
Ronald D. Spencer
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, New York 10005
(212) 732-3200
*Attorneys for The Andy Warhol Foundation for the Visual Arts, Inc.,*
*Vincent Fremont, Vincent Fremont Enterprises, and The Andy Warhol*
*Art Authentication Board, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

| | | |
|---|---|---|
| JOE SIMON-WHELAN, Individually and on Behalf of All Others Similarly Situated, | : | Index No. 07 CV 6423 (LTS) (AJP) |
| | : | |
| | : | ECF CASE |
| Plaintiff, | : | |
| | : | |
| - against - | : | |
| | : | |
| THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC., THE ESTATE OF ANDY WARHOL, VINCENT FREMONT, Individually and Successor Executor for the Estate of Andy Warhol, VINCENT FREMONT ENTERPRISES, THE ANDY WARHOL ART AUTHENTICATION BOARD, INC., JOHN DOES 1-20, JANE DOES 1-10, and RICHARD ROES 1-10, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------X


**DEFENDANTS' REPLY MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**

6275690.6

# TABLE OF CONTENTS

INTRODUCTION ..............................................................................................................1

POINT ONE

SIMON'S ANTITRUST CONSPIRACY CLAIMS ARE IMPLAUSIBLE AND
MUST BE DISMISSED UNDER *BELL ATLANTIC V. TWOMBLY* .................................1

1.  No Scarcity of Warhol Art ....................................................................................2

2.  Discount Pricing Is Inconsistent With the Conspiracy Alleged .................................4

3.  Defendants' Conduct Is Entirely Consistent with Lawful Objectives ........................7

4.  Defendants Had No Plausible Motive to Conspire As Alleged ..................................8

5.  Discovery Cannot Be Justified On the Basis of An Implausible Conspiracy .............9

POINT TWO:

SIMON LACKS STANDING TO ASSERT THE  ANTITRUST CLAIMS IN
COUNTS ONE AND TWO .........................................................................................10

1.  Simon Lacks Standing to Pursue His Antitrust Claims ...........................................10

2.  Simon Lacks Standing under *Illinois Brick* .......................................................11

3.  Courts in this Circuit Reject the "Umbrella Theory" of Standing ............................12

POINT THREE:

THE ANTITRUST CLAIMS ARE TIME-BARRED .....................................................13

1.  Simon's Claims Are Barred by the Statute of Limitations .......................................13

2.  Simon Fails to Demonstrate a "Continuing Conspiracy" .........................................14

3.  Simon Fails to Show "Fraudulent Concealment" by the Defendants ........................15

POINT FOUR:

    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UNDER THE
    LANHAM ACT ..................................................................................................17

POINT FIVE:

    THE FRAUD AND ANTITRUST CLAIMS ARE NOT PLED WITH
    PARTICULARITY AS REQUIRED BY FED. R. CIV. P. 9(B) ......................19

    1.    Simon Fails to Address the Numerous Deficiencies in His Fraud Pleadings...........19

    2.    The Particularity Requirement Applies to Simon's Antitrust Claim.......................20

    3.    The "Richard Roe" Allegations Must Be Disregarded ..............................................21

    4.    Simon's Allegations of Fraud and Fraudulent Conduct Are Deficient.....................23

POINT SIX:

    THE COMPLAINT MUST BE DISMISSED BECAUSE SIMON TWICE
    AGREED IN WRITING NOT TO SUE BASED UPON THE AUTHENTICATION
    BOARD'S OPINION...........................................................................................25

POINT SEVEN:

    THE UNJUST ENRICHMENT CLAIM MUST BE DISMISSED ...................28

POINT EIGHT:

    PLAINTIFF CONCEDES THAT THE CLAIMS AGAINST FREMONT AS
    "SUCCESSOR EXECUTOR" MUST BE DISMISSED ..................................30

CONCLUSION....................................................................................................30

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Abbott Labs. Norvir Antitrust Litig.*, Nos. C 04-1511, C 04-4203, 2007 WL 1689899 (N.D. Cal. June 11, 2007) .......................................................................29

*Armstrong v. McAlpin*, 699 F.2d 79 (2d Cir. 1983)..........................................................16

*Assoc. Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519 (1983)..........................................................................................................10

*Avon Products, Inc. v. S.C. Johnson & Son, Inc.*, 984 F. Supp. 768 (S.D.N.Y. 1997) .........................................................................................................................18

*Bell Atlantic v. Twombly*, 127 S. Ct. 1955 (2007) ....................................................1, 8, 9

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573 (2d Cir. 2006) ......................................................................................28

*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) .......................................11, 12

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) ...........7

*Boule v. Hutton*, 328 F.3d 84 (2d Cir. 2003) ...................................................................18

*Cargill, Inc. v. Montfort of Ky., Inc.*, 479 U.S. 104 (1986) .................................................7

*In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007)...........................................................................................20

*de Atucha v. Commodity Exch., Inc.*, 608 F. Supp. 510 (S.D.N.Y. 1985) .............11, 12, 13

*Doe v. Abbott Labs.*, No. C 04-1511, 2004 WL 3639688 (N.D. Cal. Oct. 21, 2004) .........................................................................................................................29

*Donahue v. Pendleton Woolen Mills, Inc.*, 633 F. Supp. 1423 (S.D.N.Y. 1986) ..............16

*Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992) ........................7

*Galerie Gmurzynska v. Hutton*, 355 F.3d 206 (2d Cir. 2004) ...........................................19

*Garshman v. Universal Res. Holding Inc.*, 824 F.2d 233, 230 (3d Cir. 1987) .................23

*GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170 (4th Cir. 2007)...............................16

*Goldin Associates, LLC v. Donaldson, Lufkin & Jenrette*, No. 00 Civ. 8688, 2003 WL 22218643 (S.D.N.Y. Sept 25, 2003)........................................................24

*Groden v. Random House, Inc.*, 61 F.3d 1045 (2d Cir. 1995).....................................17, 19

*Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242 (S.D.N.Y. 1997)................12

*Heart Disease Research Found. v. Gen. Motors Corp.*, 463 F.2d 98 (2d Cir. 1972) ........................................................................................................................23

*Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299 (9th Cir. 1986)......................14

*Hershfang v. Citicorp*, 767 F. Supp. 1251 (S.D.N.Y. 1991) ..............................................3

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) .....................................................10, 12

*Int'l Paint Co, Inc.. v. Grow Group, Inc.*, 648 F. Supp. 729, 730 (S.D.N.Y.1986) ..........19

*Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250 (S.D.N.Y. 1995) .................5, 8, 25

*Int'l Motor Sports Group, Inc. v. Gordon*, No. 98 Civ. 5611, 1999 WL 619633 (S.D.N.Y. Aug. 16, 1999) ...........................................................................................24

*Int'l Paint Co, Inc.. v. Grow Group, Inc.*, 648 F. Supp. 729 (S.D.N.Y.1986) .................19

*In re Linerboard Antitrust Litig.*, No. MDL 1261, Civ. A 98-5055, Civ. A. 99-1000, Civ. A 1341, 2004 WL 1221350 (E.D. Pa. June 2, 2004), *amended on other grounds by* 2004 WL 1240775 (June 4, 2004)........................................9

*Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002) ...............................10

*Lum v. Bank of America*, 361 F.3d 217 (3d Cir. 2004)....................................................20

*Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)..........3, 4, 7, 8

*Medinol, Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575 (S.D.N.Y. 2004)..............28

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429 (S.D.N.Y. 2003) ...........................................................................................................16

*Monsanto v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984) ..............................................8

*In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329 (N.D. Ga. 2000).............9

*Net2Globe Int'l, Inc. v. Time Warner Telecom of New York*, 273 F. Supp. 2d 436 (S.D.N.Y. 2003)...........................................................................................................26

*Ocean View Capital, Inc. v. Sumitomo Corp. of America*, No. 98 Civ. 4067, 1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999) ...................................................................12

*Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 00 Civ. 8688, 2002 WL 362794 (S.D.N.Y. Mar. 6, 2002) .......................23

*Pickwick Commc'ns, Inc. v. Weinberg*, No. 91 Civ. 1642, 1994 WL. 620950 (S.D.N.Y. Nov. 8, 1994), *aff'd Pickwick v. Weinberg*, 89 F.3d 825 (2d Cir. 1995) ...........................................................................................................................26

*Pollock v. Citrus Assoc. of the New York Cotton Exch., Inc.*, 512 F. Supp. 711 (S.D.N.Y. 1981) ...........................................................................................................12

*Redtail Leasing, Inc. v. Bellezza*, No. 95 Civ. 5191, 1997 WL 603496 (S.D.N.Y. Sept. 30, 1997) .........................................................................................................29

*Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918 (7th Cir. 1995)...........................10

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) .................................20, 24

*Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231 (S.D.N.Y. 2006)...................28

*Stratton v. City of Boston*, 731 F. Supp. 42 (D. Mass. 1989)..............................................22

*Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383 (2d Cir. 2002) .........................................................................................................................17

*Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097 (9th Cir. 2003) ..........................................21

*Vitale v. Marlborough Gallery*, No. 93 Civ. 6276, 1994 WL 654494 (S.D.N.Y. July 5, 1994)........................................................................................................14, 15

*Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256 (2d Cir. 2001) .................7

*Volk v. Liggett Group, Inc.*, No. 96 Civ. 1921, 1997 WL 107458 (S.D.N.Y. March 11, 1997).........................................................................................................26

*Warren v. Goord*, 476 F. Supp. 2d 407 (S.D.N.Y. 2007) ...................................................22

*Wellnx Life Sciences, Inc. v. Iovate Health Sciences, Inc.*, 516 F. Supp. 2d 270 (S.D.N.Y. 2007)..............................................................................................................17

*Wexner v. First Manhattan Co.*, 902 F.2d 169 (2d Cir. 1990) ...........................................24

*Wolf v. Wagner Spray Tech Corp.*, 715 F. Supp. 504 (S.D.N.Y. 1989) ............................16

# STATE CASES

*Chimart v. Paul*, 66 N.Y.2d 570 (1986) ...............................................................27

*In re Determination of Legal Fees Payable by the Estate of Andy Warhol*, 1994
    N.Y. Misc. LEXIS 687 (Surr. Ct. N.Y. County 1994)........................................6

*Sperry v. Crompton Corp.*, 8 N.Y.3d 204 (2007) ...........................................29

# FEDERAL STATUTES

Fed. R. Civ. P. 8(a) ...........................................................................................23

Fed. R. Civ. P. 9(b) ..............................................................21, 22, 23, 24, 26

Fed. R. Civ. P. 10(a) .........................................................................................22

Fed. R. Civ. P. 12(b)(6)................................................................................ *passim*

# MISCELLANEOUS

Christie's, Auction Catalogue, *Post-War and Contemporary Art Evening Sale,
    Wednesday May 16, 2007* ..........................................................................3, 38

*Andy Warhol* (Rainer Crone, ed., 1970) ..........................................................24

Kelly Crow, *The Man With 800 Warhols*, Wall St. J., Jan. 4, 2008, at W1.........................5

1 *Andy Warhol Catalogue Raisonné: Paintings and Sculpture 1961–1963* (Georg
    Frei & Neil Printz eds., 2001; ...................................................................2

2A-2B *Andy Warhol Catalogue Raisonne: Paintings and Sculpture 1964-1969*
    (Frei & Printz, eds.) ..........................................................................2, 18, 24

*Andy Warhol Prints: A Catalogue Raisonné 1962–1987* (Frayda Feldman & Jorg
    Schellman eds., 4th ed. 2003) (revised and expanded by Frayda Feldman and
    Claudia Defendi)..................................................................................2, 18

5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
    §27:71 (4th ed.) ..........................................................................................19

Richard Polsky, *I Bought Andy Warhol* (2003) ................................................22

Michael Schnayerson, *Judging Andy*, Vanity Fair, Nov. 2003...................15, 27

Defendants The Andy Warhol Foundation for the Visual Arts, Inc. (the "Foundation"), Vincent Fremont,[1] Vincent Fremont Enterprises, and The Andy Warhol Art Authentication Board, Inc. (the "Board") (collectively, "Defendants") submit this reply memorandum in support of their motion to dismiss the Amended Complaint, pursuant to Fed. R. Civ. P. 12(b)(6).

## INTRODUCTION

Plaintiff's opposition brief confirms what was already obvious from the Complaint and the Amended Complaint: Joe Simon-Whelan ("Simon") is enraged by the Board's opinion that his Self-Portrait is not an authentic work of Andy Warhol and is thrashing about for a viable legal theory with which to punish the Defendants. Simon's motives are transparent and his conspiracy theory—involving numerous unidentified galleries and dealers as co-conspirators—is patently implausible. The Supreme Court has made it clear that someone with a "largely groundless claim" should not be permitted "to take up the time of a number of other people" with time-consuming and expensive antitrust discovery. *See Bell Atlantic v. Twombly*, 127 S. Ct. 1955, 1966 (2007) (internal citations omitted). That rationale is all the more compelling in this case, where litigation costs will drain resources otherwise earmarked for charitable endeavors and where Simon twice agreed in writing not to sue based on the Board's opinion.

## ARGUMENT

## POINT ONE

### SIMON'S ANTITRUST CONSPIRACY CLAIMS ARE IMPLAUSIBLE AND MUST BE DISMISSED UNDER *BELL ATLANTIC V. TWOMBLY*

Simon's claim of a twenty-year conspiracy to manufacture an "artificial scarcity" of Warhol art so that the Foundation could charge "inflated prices" for its collection of Warhol art

---

[1] Although Fremont is named in the caption as "Successor Executor For the Estate of Andy Warhol," he never qualified as successor executor of the Warhol Estate after the death of the original executor, Fred Hughes. Defendants' motion to dismiss the claims against Fremont in his capacity as successor executor is unopposed in Plaintiff's Opposition to Defendants' Motion to Dismiss ("Simon Opp."). *See* Point Eight, *infra*.

is implausible on every level: (1) there is no credible showing of an "artificial scarcity" of Warhol art; (2) there is no showing that the Foundation charged "inflated prices" for Warhol art (quite the opposite); and (3) there is no plausible motive for defendants to conspire as alleged in the Amended Complaint.

### 1.     No Scarcity of Warhol Art

Simon's brief elects not to address the fact that there are far in excess of 100,000 works of art in the relevant market defined in the Amended Complaint and that, according to the very sources cited in the Amended Complaint, only a few hundred, at most, have received negative authentication opinions from the Board.  It does not address the fact that tens of thousands of Warhol works have been "informally authenticate[d]" by inclusion in the various Andy Warhol Catalogues Raisonné ("Catalogues Raisonné") (*see* Amended Complaint ("Am. Compl.") ¶65), and that additional volumes are in progress or planned.[2]  It does not address the fact that fakes and forgeries are a particular problem in the so-called Warhol market, according to sources cited in the Amended Complaint. And, while heaping abuse on the Foundation and the Board, Simon's brief simply ignores the fact that Simon himself submitted a fake work (the "Dollar Bills" collage) for authentication to the Board during the relevant period.[3]

---

[2] Approximately 82,000 works are listed in the volumes of the Catalogues Raisonné published to date.  The volumes published on painting and sculpture list all known authentic works created from 1961 through 1969; works created before 1961 and after 1969 are to be addressed in future volumes. The index attached as Exhibit K to the Sesser Declaration lists the 2,110 Warhol paintings and sculpture included in volumes 1, 2A, and 2B, each with a unique catalogue number, and for many works, the name of the current owner of the work.  1 *Andy Warhol Catalogue Raisonné:  Paintings and Sculpture 1961–1963* (Georg Frei & Neil Printz eds., 2001); 2A–2B *Andy Warhol Catalogue Raisonné:  Paintings and Sculpture 1964–1969* (Georg Frei & Neil Printz eds., Sally King-Nero exec. ed., 2004).  The volume on prints lists all known authentic Warhol prints. The chapter attached as Exhibit L to the Sesser Declaration identifies approximately 80,000 published prints, which are usually signed and numbered; other chapters identify representative examples of Warhol's unpublished prints, which include personal projects, commissioned projects, and portraits. *Andy Warhol Prints:  A Catalogue Raisonné 1962–1987* (Frayda Feldman & Jorg Schellman eds., 4th ed. 2003) (revised and expanded by Frayda Feldman and Claudia Defendi).  *See* Declaration of Gary D. Sesser in Support of Motion to Dismiss, Nov. 30, 2007 ("Sesser Decl."), ¶ 12-13, Exh. K-L.

[3] Simon apparently concedes that his "Dollar Bills" collage is a fake because it is not included in his claims in the Amended Complaint.

In summary, the admitted facts Simon has chosen to avoid or ignore in his brief establish that the number of "legitimate" Warhols which have been "excluded" could not possibly be more than a miniscule fraction of the enormous number of works in the relevant market defined in the Amended Complaint. Accordingly, authentication opinions—correct or incorrect—could not conceivably have had an effect on competition or prices. Simon does not question or dispute these numbers, all of which came from the Amended Complaint or sources cited in the Amended Complaint. He just pretends these numbers do not exist. But they do exist, and they clearly show there is no "scarcity" of Warhol art. As the Supreme Court has stated, "[t]he alleged conspiracy's failure to achieve its ends in the two decades of its asserted operation is strong evidence that the conspiracy does not in fact exist." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 592 (1986).

Simon argues strenuously that there is a relevant market limited to works of art by Andy Warhol. Simon Opp. at 24-26. Even accepting that relevant market for purposes of argument, it certainly includes far more than the 100,000 works in Warhol's estate at the time of his death. *See* Am. Compl. ¶38. Simon's only so-called support for his contention of "scarcity" are ambiguous comments from dealers Mnuchin and Prouty, lifted from magazine articles, to the effect that "quality" Warhols are scarce. Am. Compl. ¶215; Simon Opp. at 6. These comments bear no specific relation to the relevant market alleged, which includes "paintings, sculptures, collaborations, drawings, prints and photographs." Am. Compl. ¶38. At best, these comments are unremarkable (and possibly self-interested) observations from art dealers concerning certain specific kinds of works.[4] That is hardly enough to plausibly establish "scarcity" in the relevant market alleged. *Cf., Hershfang v. Citicorp*, 767 F. Supp. 1251, 1259 (S.D.N.Y. 1991)

---

[4] The catalog for the Christie's "evening sale" at which the *Green Car Crash* and *Lemon Marilyn* were sold (Sesser Decl., Exh. M), shows there were ten Warhol works for sale that day—just one auction, one of several per year, by one auction house, in one of many cities in which it operates.

(dismissing class-action complaint where "[p]laintiffs . . . stitched together a patchwork of newspaper clippings and proclaimed the result a tale of securities fraud.").

### 2.    Discount Pricing Is Inconsistent With the Conspiracy Alleged

Manufacturing "scarcity" of Warhol art, even if possible, is not an end unto itself. The alleged objective of Simon's conspiracy is to permit the Foundation to charge "artificially high prices" for Warhol art, supposedly to meet a "desperate" need for cash. Yet the very sources cited in the Amended Complaint state the opposite: that the Foundation (through Fremont) charged "artificially low prices" for the art it sold.

Confronted with the inconvenient truth that his own sources state that the Foundation sold art at a discount, Simon now tells us that "discounts are crucial to defendants' scheme" and "discounts are actually a principal means by which defendants . . . exclude competing Warhol artwork from the marketplace." Simon Opp. at 18–19. Yet, if discounts were so crucial to the alleged conspiracy, one would think this would have been explained in the fifty-five page Amended Complaint. In fact, Simon appears to be making up these arguments as he goes along.

Simon's theory that discounts are a "principal means" to further a conspiracy to charge artificially high prices makes no economic sense in the context of this case. The most instructive line of cases do not involve standard-setting, as Simon claims, but rather predatory pricing. In predatory pricing, the defendant prices below cost to drive its competitors out of the market. The monopolist thereafter collects anticompetitive overcharges from consumers once its competitors have been driven from the market. For a predatory pricing scheme to make economic sense, it must be demonstrated that the defendant could reasonably expect to recoup its losses from below-cost pricing, plus interest, by a sustained period of pricing above the competitive level. *See Matsushita*, 475 U.S. at 592 ("Since the losses in such a conspiracy accrue before the gains, they must be 'repaid' with interest."). Because this is unlikely absent special circumstances, the

6275690.6                                                    4

Supreme Court has stated that "predatory pricing schemes are rarely tried, and even more rarely successful." *Matsushita*, 475 U.S. at 589.

In this case, Simon cannot *coherently* explain how the Foundation's discount pricing comports with an alleged scheme to charge "artificially high" prices. The Foundation is obviously foregoing income by charging below-market discount prices. Unexplained by Simon is how the Foundation would recoup those "losses" by charging above market prices to others. There are well over one hundred thousand Warhols in the relevant market defined by Simon, an ever increasing proportion of which is owned by others.[5] Tens of thousands of Warhol works have been "informally authenticated" by the various Catalogues Raisonné published to date. Am. Compl. ¶65. In the face of that competition, any attempt by the Foundation to charge "above market" prices for its Warhol art would be futile. Competition would drive the price down to the competitive level. Hence, if the Foundation's objective was to make more money by charging "artificially high" prices, it would not be selling art at a discount, as Simon admits it does, because there is no reasonable prospect of recoupment.

Simon's assertion that "elite" galleries and dealers receive a discount in exchange for an agreement not to sell "for a period of years" does not help to make sense of Simon's confused ("sell low in order to sell high") theory. No matter how attractive the Foundation's pricing may be, galleries and dealers would not buy unless they are able to re-sell. They are in business to make money. Simon cites Polsky for the proposition that dealers and galleries who receive discounts must agree not to re-sell for two years. Am. Compl. ¶114. Given that the Foundation has been selling art for almost two decades, it is unclear how such limited agreements, even if they existed, would create any "artificial scarcity" of Warhol art. *See Kramer v. Pollock-*

---

[5] *See, e.g.,* Kelly Crow, *The Man With 800 Warhols*, Wall St. J., Jan. 4, 2008, at W1 (describing collector José Mugrabi's collection of over 800 Warhol works).

*Krasner Found.*, 890 F. Supp. 250, 256 (S.D.N.Y. 1995) (complaint alleging conspiracy dismissed because "it present[ed] no coherent theory of participation" by auction houses). Moreover, if Simon took the trouble to read the sources cited in the Amended Complaint, he would see that Polsky himself received substantial discounts from Fremont on Warhol art even though he clearly did not abide by any agreement not to re-sell.[6]

Thus, the admitted discount pricing by the Foundation conclusively undermines Simon's contention that the Foundation conspired to charge "artificially high" prices. Not surprisingly, the Amended Complaint *does not identify a single buyer* who claims to have been charged an "artificially high" price by the Foundation. Certainly Simon can make no such claim. He purchased his work in 1989, two years before the Foundation owned any art and six years before the Board was formed. According to Surrogate Preminger, $132 million of Warhol art was sold "in a competitive market" between 1987 and 1993. *In re Determination of Legal Fees Payable by the Estate of Andy Warhol*, 1994 N.Y. Misc. LEXIS 687 at *20 (Surr. Ct. N.Y. County 1994). There obviously was no "scarcity" of Warhol art when Simon acquired his work in 1989.

While the Amended Complaint cites a handful of persons purportedly aggrieved by the Board's authentication opinions—hardly unusual in the world of art authentication—it cites *no one* who was injured by paying an "artificially high" price to the Foundation—the supposed objective of the conspiracy. Simon repeatedly cites the fact that the Foundation has sold $240 million of Warhol art over the past two decades, as if that figure were somehow proof that the Foundation charged "artificially high" prices. However, his own Amended Complaint shows that two Warhol paintings (*Green Car Crash* and *Lemon Marilyn*) *alone* sold for $100 million at

---

[6] Sesser Decl., Exh. G (Polsky, *I Bought Andy Warhol*), at 18–23, 229–31.

auction in May 2007.  Am. Compl. ¶2.  The Foundation had nothing to do with those sales.
Works of other artists have sold for similarly breathtaking amounts.  Hence, the gross amount of
the Foundation's art sales over two decades is probative of nothing, certainly not "artificially
inflated" pricing caused by a conspiracy.

### 3.    Defendants' Conduct Is Entirely Consistent with Lawful Objectives

Simon's conspiracy theory is most clearly exposed as a sham by his counter-intuitive
assertion that the Foundation's discount pricing should be considered a "plus factor" in
determining whether it is plausible that defendants conspired to charge "artificially high" prices.
Simon Opp. at 21-22.  Discount pricing can *never* be a "plus factor" in an antitrust conspiracy
case.  Courts have recognized that "cutting prices in order to increase business is often the very
essence of competition," and that mistaken inferences of conspiracy drawn from such behavior
"are especially costly, because they chill the very conduct the antitrust laws are designed to
protect."  *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226 (1993)
(*quoting Cargill, Inc. v. Montfort of Ky., Inc.,* 479 U.S. 104, 122 n. 17 (1986)); *Matsushita*, 475
U.S. at 594; *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 269 (2d Cir. 2001)
(*quoting Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992)).  For that
reason, Simon has not—and cannot—cite a single case in which discount pricing is identified as
a "plus factor"  to support an inference that there was a conspiracy to *overcharge* consumers.

Viewing the art world through his conspiracy prism, Simon suggests that the Foundation
had no rational economic motive to charge discount prices to elite galleries and dealers.  Simon
Opp. at 19-20.  Simon forgets that the Foundation is a *charitable* organization, formed to benefit
charitable causes and to protect and promote the artistic legacy of Andy Warhol.  Encouraging
influential dealers and galleries to acquire and promote Warhol works is actually quite consistent
with that mission.  So too is selling Warhol works to museums at a discount, and establishing

and donating millions of dollars of Warhol art to the Andy Warhol Museum in Pittsburgh. All of these legitimate activities enhance the reputation of Warhol and the value of his art.

### 4.    Defendants Had No Plausible Motive to Conspire As Alleged

The supposed "financial motive" of the defendants to participate in the conspiracy suggested by Simon (Simon Opp. at 21-22) is wholly unpersuasive. If the Foundation "desperately" needed money (*id.* at 7), it would be more likely to sell art at a *discount* than to attempt to sell art at inflated prices. Similarly, Fremont, as a sales agent, was more likely to sell at a discount to earn commissions rather than to sit on overpriced inventory. Real estate brokers eager to earn commissions typically encourage sellers to *lower* their prices, not raise them. Moreover, retaining knowledgeable sales agents and paying sales commissions is common in the art world. Like Simon's repeated references to the Foundation's receipt of $240 million from Warhol art sales, Simon's heavy reliance on the sales commissions earned by Fremont is telling. The sales commissions themselves are plainly irrelevant, but Simon's reliance on them—as if sales commissions were somehow suggestive of wrongdoing—demonstrates how little of substance there is to the Amended Complaint.

Conduct which is as consistent with independent action as with illegal conspiracy does not support an inference of conspiracy. *Matsushita*, 475 U.S. at 588 (citing *Monsanto v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). A plaintiff needs evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. *Matsushita*, 475 U.S. at 588. Conspiracy claims under the Sherman Act will fail where "the defendants' allegedly conspiratorial actions could equally have been prompted by lawful, independent goals which do not constitute a conspiracy." *Twombly*, 127 S. Ct. at 1971 (*quoting Kramer*, 890 F. Supp. at 256). None of the conduct identified in the Amended Complaint excludes the possibility that the defendants acted in an entirely lawful manner.

6275690.6

8

### 5.    Discovery Cannot Be Justified On the Basis of An Implausible Conspiracy

On the basis of an obviously speculative conspiracy theory, Simon implores the Court to permit him to take discovery, making the patently false promise that discovery will be neither expensive nor burdensome. Simon Opp. at 24. Apparently forgetting that he has alleged a twenty-year conspiracy involving not only the named defendants, but also twenty "John Does," ten "Jane Does," and ten "Richard Roes," Simon claims that the risk of "costly discovery" will be "minimized" because the Foundation and Board are small private organizations who have been represented by the same counsel for many years. *Id.* Yet Simon's brief makes it clear that numerous unidentified "Richard Roes" in particular played a central role in the conspiracy alleged. *See, e.g.*, Simon Opp. at 2, 5, 8–9, 15, 19, 21. Merely identifying the alleged "co-conspirators" would be a burdensome and expensive exercise. Moreover, it is no secret that "[a]n antitrust class action is arguably the most complex action to prosecute." *In re Linerboard Antitrust Litig.*, No. MDL 1261, Civ. A 98-5055, Civ. A. 99-1000, Civ. A 1341, 2004 WL 1221350, at *10 (E.D. Pa. June 2, 2004) (quoting *In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000)), *amended on other grounds by* 2004 WL 1240775 (June 4, 2004). In *Twombly*, the Supreme Court gave short shrift to the suggestion that the cost of antitrust discovery can be kept under control by case management techniques. 127 S. Ct. at 1967 n.6. Simon's representation that discovery will not be costly in this antitrust class action is no more credible than the implausible conspiracy theory he asks the Court to accept.[7]

---

[7] Some of the discovery Simon proposes to take is revealed in his brief. Simon argues that "*[a]t a minimum,* plaintiff should be able to explore whether [the Foundation's charitable] donations were meant (even if only partly) to have an anti-competitive effect, and to what degree they accomplished that goal." Simon Opp. at 22 (emphasis supplied). It is hard to imagine a more egregious waste of time and money than discovery concerning whether gifts of art to museums, made by a charitable foundation dedicated to promoting the visual arts, are anticompetitive. Allowing such discovery to consume assets that otherwise would be used for charitable purposes clearly implicates one of the Supreme Court's principal concerns in *Twombly, i.e.* that setting the bar too low to survive a motion to dismiss allows litigants with implausible claims to use the cost and burden of antitrust discovery to extract an undeserved settlement. *See Twombly*, 127 S. Ct. at 1966.

**POINT TWO**

**SIMON LACKS STANDING TO ASSERT THE
ANTITRUST CLAIMS IN COUNTS ONE AND TWO**

1.      **Simon Lacks Standing to Pursue His Antitrust Claims**

Regardless of whether Simon presents his conspiracy theory as one in which the

Defendants allegedly "abuse[] the standard-setting . . . process," as he does in attempting to

make a case for antitrust standing, or as one in which the Defendants leverage their supposed

monopoly power in the authentication market to overcharge consumers in the Warhol market, as

he does in the Amended Complaint, it is clear that Simon lacks standing under *Illinois Brick*, 431

U.S. 720 (1977), and the controlling decisions in this Circuit.  The cases that Simon cites are

either readily distinguishable on their facts, or rely on theories of liability that have been rejected

by courts in the Southern District of New York.

The Supreme Court has identified five factors that are relevant in determining whether a

plaintiff has antitrust standing:

> (1) the causal connection between an antitrust violation and the harm suffered by
> the plaintiff, and the intent of the defendants to cause that harm; (2) whether the
> plaintiff suffered antitrust injury; (3) the directness of the asserted injury to the
> plaintiff; (4) the existence of more direct victims of the antitrust violation; and (5)
> the potential for duplicative recovery or complex apportionment of damages.

*Assoc. Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 537–

45 (1983).

In the Motion to Dismiss, Defendants demonstrated that Simon lacks standing under

*Illinois Brick*.  In response, Simon claims standing under the "umbrella theory."  *See* Simon Opp.

at 31–33 (citing *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002) and *Sanner v.*

*Bd. of Trade of City of Chicago*, 62 F.3d 918 (7th Cir. 1995)).  But the *Illinois Brick* analysis is

responsive to the fourth and fifth standing factors, while the umbrella theory embraced by *Loeb*

and *Sanner* corresponds to the "[a]nalytically distinct" and "conceptually more difficult" issue of the "directness of the injury" embodied in the third factor. *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 476–78 (1982); *de Atucha v. Commodity Exch., Inc.*, 608 F. Supp. 510, 514–15 & nn.14, 15 (S.D.N.Y. 1985). In his attempt to salvage antitrust standing, Simon confuses the third, fourth and fifth factors of the Supreme Court's standing analysis.

### 2.    Simon Lacks Standing under *Illinois Brick*

Simon argues that he has standing to pursue his antitrust claims under *McCready*, in which the Supreme Court found that a plaintiff who had purchased health insurance through her employer and alleged that her healthcare claims were not reimbursed due to an antitrust conspiracy between the insurance company and certain mental health providers had standing. In that case, the Court first discussed the policies underlying its decision in *Illinois Brick*—the unacceptable risk of duplicative recovery if indirect purchasers were permitted to claim damages, the unduly burdensome litigation that such claims would engender, and the existence of injured parties who were more likely to pursue their claims with vigor. *McCready*, 457 U.S. at 474. The Court then found that McCready's injury—the inability to recoup her healthcare costs—was completely different than any harm that her employer may have suffered and, therefore, allowing her suit to proceed would not pose the "slightest possibility" of a duplicative recovery, the litigation of her suit would not be unduly burdensome, and there were no plaintiffs better suited to pursue her claims. *Id.* at 475–76 & n.11. *McCready* is nothing like the case at bar.

In fact, Simon's position appears indistinguishable from that of the indirect purchasers denied standing in *Illinois Brick*. Simon claims that the alleged conspiracy began on February 22, 1987. Am. Compl. ¶196. Simon also claims that he purchased the supposed Warhol self-portrait on August 25, 1989 from dealers Michael Hue-Williams and Lang & O'Hara, who purchased it at some point in 1988 or 1989 from Richard Polsky, who purchased it at some point

in 1988 from Aldis Browne Gallery, who purchased it "in or about May 1988" from Ronald Feldman, who purchased it "in or about March 1988" from Daniel Templon, who purchased it "[o]n or about November 4, 1987" from Herman Myers.  Am. Compl. ¶124–33.  Since the claimed inception of the alleged conspiracy there have been no less than six[8] purchasers of this single painting, five of whom are better situated to pursue an overcharge claim than is Simon. *See Illinois Brick*, 431 U.S. at 735.  Thousands of other Warhol works also have surely passed through a multitude of hands in the two decades since the alleged conspiracy supposedly began. The sheer number of competing claims that would undoubtedly emerge if the Court were to disregard the *Illinois Brick* doctrine in this case would cause a clear and unacceptable risk of duplicative recovery and give new meaning to the phrase "unduly burdensome litigation."

### 3.    Courts in this Circuit Reject the "Umbrella Theory" of Standing

As noted above, Simon suggests that he has standing under the "umbrella theory" embraced by the Seventh Circuit in *Loeb* and *Sanner*. *See* Simon Opp. at 31–33.  The umbrella theory is relevant to the Supreme Court's third standing factor—the directness of the plaintiff's alleged injury—which is implicated when a plaintiff claims to have suffered harm in a different market than the one in which the defendant is alleged to have acted. *See, e.g., McCready*, 457 U.S. at 476–78; *de Atucha*, 608 F. Supp. at 514–16.

Courts in the Southern District of New York, however, have consistently and unequivocally rejected the umbrella theory of standing. *See, e.g., Ocean View Capital, Inc. v. Sumitomo Corp. of America*, No. 98 Civ. 4067, 1999 WL 1201701, at * 5 (S.D.N.Y. Dec. 15, 1999); *Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 245–47 (S.D.N.Y. 1997); *de Atucha*, 608 F. Supp. at 514-18; *see also Pollock v. Citrus Assoc. of the New York Cotton Exch.*,

---

[8] The Amended Complaint describes Myers as the painting's "first recipient" but does not state when Myers obtained the painting or whether he obtained it through purchase, gift or other means. ¶124.

*Inc.*, 512 F. Supp. 711, 719 n.9 (S.D.N.Y. 1981) (permitting suit to go forward because the "severe difficulties attendant with proving damages in an 'umbrella' pricing situation" were not present). In *Ocean View*, for example, the Southern District specifically discussed, and rejected, the Seventh Circuit line of cases upon which Simon relies. 1999 WL 1201701, at * 5–6 (finding *Sanner* not controlling because "in this Circuit . . . only those who actually participate in the same market as the defendant have standing").

The Southern District's rejection of the umbrella theory is based on the fact that the theory "depends upon a complicated series of market interactions" in which "the actions of innumerable individual decision-makers must be reconstructed" in order to establish causation. *de Atucha*, 608 F. Supp. at 515–16. To find antitrust damages in such a case, a court would be required to engage in "hopeless speculation" regarding the effect of an alleged conspiracy in one market on prices in another market, "where countless other market variables could have intervened to affect those pricing decisions." *Id.* at 516. Based on prevailing case law in the Southern District, Simon's attempt to assert standing under the umbrella theory must fail.

### POINT THREE

### THE ANTITRUST CLAIMS ARE TIME-BARRED

**1.      Simon's Claims Are Barred by the Statute of Limitations**

Simon relies on two theories to argue that the statute of limitations did not expire in the eighteen years since he was allegedly overcharged for his painting, or in the six years since he was allegedly excluded from the market for Warhol artwork. First, Simon argues that "the [Amended] Complaint alleges separate antitrust violations within the past four years that toll the limitations period." Simon Opp. at 35. Second, he argues that the Foundation has "fail[ed] to demonstrate that plaintiff's reasonable exercise of due diligence would have uncovered the conspiracy in the face of defendants' fraudulent concealment." *Id.* He is wrong on both counts.

**2.    Simon Fails to Demonstrate a "Continuing Conspiracy"**

If the Amended Complaint asserted plausible claims for "separate antitrust violations" accruing within the past four years, each new act that caused fresh injury to Simon would start a new limitations period *as to that act*, but would not have the effect of reviving claims that already were time barred.  *See Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1300 (9th Cir. 1986).  In order to establish a "continuing conspiracy" claim, the plaintiff must assert "an overt act which (1) is a new and independent act that is not merely a reaffirmation of a previous act; and (2) inflict[s] new and accumulating injury on the plaintiff."  *Vitale v. Marlborough Gallery*, No. 93 Civ. 6276, 1994 WL 654494, at *5 (S.D.N.Y. July 5, 1994) (internal quotation marks omitted).  The only acts by which Simon claims to have been harmed within the four-year statute of limitations are the Board's *second* rejection of his supposed Warhol self-portrait, and the May 18, 2004 letter that the Board sent to Simon—at Simon's repeated urging—explaining the reasons for its opinion.  Both acts were simply reaffirmations of the Board's initial opinion that Simon's painting was not an authentic Warhol, and neither inflicted a new and accumulating injury on Simon.

Simon himself maintains that the Board's second rejection of his painting was an attempt to cover up the Board's first rejection—a decision which Simon alleges the Board reached without actually examining the painting—and that the second rejection was "a fait accompli." Am. Compl. ¶¶21, 165.  Accepting those allegations as true, the Board's initial decision to reject Simon's painting was "irrevocable, immutable, permanent and final."  *See Hennegan*, 787 F.2d at 1301.  The only characterization that is consistent with the conspiracy theory alleged in the Amended Complaint is that the second rejection was merely a reaffirmation of the Board's previous decision to deny the authenticity of Simon's painting, not a "new and independent act." *See Vitale*, 1994 WL 654494, at *5.  Nor did the second rejection inflict a "new and

accumulating" injury on Simon. *Id.* Simon does not even attempt to explain how a *confidential* opinion that was disclosed *only* to Simon could possibly have the effect of "blackballing" him in the art world, or how the second rejection could have had that effect if the first rejection did not.[9]

Likewise, May 18, 2004 letter cannot possibly be construed as "a new and independent act that is not merely a reaffirmation of a previous act." *See Vitale*, 1994 WL 654494, at *5. That letter, which set forth the Board's reasons for its opinion that Simon's painting was not an authentic Warhol, was clearly a reaffirmation of the Board's February 2002 opinion to that effect. Nor can Simon point to any injury that he suffered as a result of the Board's letter. He claims that the letter contained "false and misleading" statements, but does not explain how these statements—disclosed in a *confidential* letter to Simon *alone*—could have caused a "new and accumulating" injury. *Id.* In addition, Simon's insistence that the letter constitutes a separate "harm" is inconsistent with his allegations in the Amended Complaint that the Board's "policy of never explaining the reasons for its denials" is an integral part of the alleged conspiracy to reduce the supply of Warhol works. Am. Compl. ¶¶18, 101. Now, in support of his effort to revive stale claims, Simon alleges that when the Board *does* provide reasons for its denials, this act constitutes a separate antitrust violation. Simon cannot have it both ways.

### 3.    Simon Fails to Show "Fraudulent Concealment" by the Defendants

It is not Defendants' burden to "demonstrate that plaintiff's reasonable exercise of due diligence would have uncovered the conspiracy," as Simon argues. *See* Simon Opp. at 35. Rather, the burden of establishing each element of a fraudulent concealment claim lies with

---

[9] If Simon has indeed been "blackballed" in the art world, this occurred as a result of the media coverage that Simon *himself* instigated. Through the numerous articles for which Simon gave interviews—many of which are cited in the Amended Complaint—the public became aware not only that Simon's supposed Warhol self-portrait had been deemed inauthentic, but also that Simon also sought to have an obviously fake "Dollar Bills" collage authenticated as a Warhol—a fact that would not enhance his stature with serious collectors of Warhol artwork. *See, e.g.*, Sesser Decl., Exh. E (Michael Schnayerson, *Judging Andy*, Vanity Fair, Nov. 2003, pp. 196, 218–19).

Simon, the party asserting fraudulent concealment. *Wolf v. Wagner Spray Tech Corp.*, 715 F. Supp. 504, 508 (S.D.N.Y. 1989); *Donahue v. Pendleton Woolen Mills, Inc.*, 633 F. Supp. 1423, 1443 (S.D.N.Y. 1986). In order to prevail on his fraudulent concealment claim, Simon must establish "(1) wrongful concealment of their actions by defendants, (2) failure of the plaintiff to discover the operative acts that are the basis of his cause of action within the limitations period and (3) plaintiff's due diligence until discovery of the facts." *Wolf*, 715 F. Supp. at 508.[10]

Simon cannot establish these elements by merely "referencing . . . conversations with Claudia Defendi and Vincent Fremont in which they urged plaintiff to research further and resubmit" his painting, or conversations with Fremont and "various [unnamed] Board employees" in which they allegedly sent him "on a 'wild goose chase.'" *See* Simon Opp. at 38. Neither a defendant's failure to reveal purportedly illegal conduct to the plaintiff nor a defendant's overt denials of wrongdoing will support a claim of fraudulent concealment. *See GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 179 (4th Cir. 2007); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 433 (S.D.N.Y. 2003). Instead, the plaintiff must identify, with the particularity required by Rule 9(b), specific fraudulent acts by the defendants "to conceal the antitrust violation that forms the basis of plaintiffs' antitrust claim." *Donahue*, 633 F. Supp. at 1443. In addition, the plaintiff "must make distinct averments as to the time when the fraud, mistake, concealment, or misrepresentation was discovered, and what the discovery is, so that the court may clearly see, whether, by the exercise of ordinary diligence, the discovery might not have been before made." *Armstrong v. McAlpin*, 699 F.2d 79, 89 (2d Cir. 1983) (internal quotation marks omitted).

---

[10] The acts that Simon alleges in support of his fraudulent concealment argument occurred well after 1993, when the statute of limitations for any overcharge claim expired. Simon's overcharge claim is therefore time-barred under any circumstances.

Simon does none of this.  He fails to explain how the defendants' acts of urging him to resubmit his painting or sending him on a "wild goose chase" were fraudulent, how these acts prevented him from discovering his cause of action despite his exercise of due diligence, which of the Defendants' alleged acts underlying his cause of action he failed to discover due to the supposed fraudulent concealment, or when he ultimately did discover those facts.

## POINT FOUR

### THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UNDER THE LANHAM ACT

The allegations in the Amended Complaint fail to establish the basic elements of a Lanham Act claim, and Simon's opposition does not demonstrate otherwise.  First, Simon has no response to Defendants' argument that his claim is barred by the doctrine of "estoppel by acquiescence," since he (twice) asked the Board to issue the very opinion of which he now complains.  *See* Defendants' Memorandum of Law in Support of Motion to Dismiss ("Def. Memo.") at 35.  For that reason alone, his Lanham Act claim must be dismissed.  *See Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 395 (2d Cir. 2002).

Second, Simon does not, nor can he, deny that statements of opinion are not actionable under the Lanham Act.  Rather, Simon argues that Defendants' opinion that his artwork is not an authentic Warhol "amount[s] to far more than 'opinion,' as that term is used in the case law."  The cases cited by Simon define an "opinion" as a "representation that could not reasonably be seen as stating or implying a provable fact," *see Wellnx Life Sciences, Inc. v. Iovate Health Sciences, Inc.*, 516 F. Supp. 2d 270, 285 (S.D.N.Y. 2007); *Groden v. Random House, Inc.*, 61 F.3d 1045, 1051–52 (2d Cir. 1995), which is precisely what was issued here.  When Simon submitted his work to the Authentication Board seeking the opinion, he acknowledged that "an opinion as to the authenticity of a work purporting to be by Andy Warhol is often very difficult

and will in most cases *depend upon subjective criteria which are not capable of proof or certainty,* and the conclusion, if any, reached by the Authentication Board respecting the work is an opinion only...." Am. Compl., Exh. B (emphasis added). The subsequent opinion letters issued by the Board were just that, expressions of "opinion" rather than representations of fact. *See* Exh. D ("It is the opinion of the Authentication Board that said work is <u>not</u> the work of Andy Warhol.") (underline in original); Exh. E ("It is the opinion of the [Board] that the work you submitted ... is not a work by Andy Warhol ...").

Indeed, this case is even stronger than *Boule v. Hutton,* 328 F.3d 84 (2d Cir. 2003), a case cited by Defendants, which Plaintiff did not address, in which a "Repudiation Letter" issued by defendants challenging the legitimacy of the art work in question was deemed by the court "not actionable" under the Lanham Act "because the statements were not factual assertions about another's goods" but rather a "statement of opinion." *Id.* at 92; Def. Memo. at 36. Likewise, the Board's statements here were expressions of opinion not actionable under the Lanham Act.

Third, Simon claims, without any legal support, that the omission of his work from the Catalogues Raisonné constitutes "commercial speech" under the Lanham Act because the Catalogues Raisonné are a resource consulted when artwork is bought and sold, thus giving the catalogues an "undeniable commercial dimension." Simon Opp. at 44.[11] As an initial matter, Simon does not respond to Defendants' argument, Def. Memo. at 36, that a Lanham Act claim cannot be brought based on this alleged "omission" rather than an alleged affirmative misstatement. *See Avon Products, Inc. v. S.C. Johnson & Son, Inc.,* 984 F. Supp. 768, 798

---

[11] Works are often offered for sale, even at public auction, without reference to the Catalogues Raisonné or the opinion of the Authentication Board, as is shown by the catalog for the auction at which the *Green Car Crash* and *Lemon Marilyn* were sold. *See* Point VI, *infra,* at 27; Sesser Decl. ¶14, Exh. M. Nor do the Catalogues Raisonné purport to be final and definitive. *See* 2A *Andy Warhol Catalogue Raisonné: Paintings and Sculpture 1964–1969* at 12 ("A final volume has been reserved as a supplement; it will include newly found works, revised, updated, and newly found information" and the like); *Andy Warhol Prints: A Catalogue Raisonné 1962–1987* at 7–9 (describing the development of four editions of that publication).

(S.D.N.Y. 1997) ("Avon cannot be held liable under the Lanham Act for failing to state publicly that SSS is not an effective insect repellent."); *Int'l Paint Co, Inc.. v. Grow Group, Inc.*, 648 F. Supp. 729, 730 (S.D.N.Y.1986) (Lanham Act "impos[es] no affirmative duty of disclosure.").

In any event, the Catalogues Raisonné are scholarly publications listing thousands of works, including thousands which are not owned by the Defendants. Thus, by their very nature, they are not "commercial advertising or promotion," and the "statements" made in the pages are not made for the purpose of influencing a consumer to buy Defendants' goods or services as required under the Lanham Act. *See Galerie Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004). Furthermore, to apply the Lanham Act to a scholarly publication would expand the statute far beyond its intended application, with the effect of chilling scholarly expression of opinion protected by the First Amendment. *See* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:71 (4th ed.) (legislative history shows that the word "commercial" was included to "describe advertising or promotion for business purposes" and "should not be read in any way to limit . . . constitutionally protected material"). Courts in this Circuit have consistently refrained from an overly broad application of the Lanham Act to limit such speech. *See, e.g., Groden*, 61 F.3d at 1052; *Galerie Gmurzynska*, 355 F.3d at 210–211. Thus, the Lanham Act claims must be dismissed.

## POINT FIVE

### THE FRAUD AND ANTITRUST CLAIMS ARE NOT PLED WITH PARTICULARITY AS REQUIRED BY FED. R. CIV. P. 9(B)

#### 1.      Simon Fails to Address the Numerous Deficiencies in His Fraud Pleadings

Simon fails to address the numerous shortcomings in his pleadings of fraud and fraudulent conduct, including the failure to allege the place, date, and participants in alleged conversations; group pleadings failing to distinguish among Defendants; pleading impliedly

based on information and belief without any factual basis for such belief stated; and failure to specifically allege fraudulent concealment. *See* Def. Memo. at 37-40, *citing, e.g., Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124 (2d Cir. 1994).

> **2.    The Particularity Requirement Applies to Simon's Antitrust Claim**

Simon first argues that FRCP 9(b) is not relevant to his antitrust causes of action because the "misrepresentations . . . comprise a comparatively minor part of defendants' antitrust scheme." Simon Opp. at 14 n.6.  However, in that same paragraph, Simon makes it clear that the crux of his theory is that Defendants make "false declarations" about the authenticity of Warhol works in order to increase scarcity and prices.  This is a fraud allegation, albeit a vague and deficient one, and if an antitrust claim is based on fraudulent conduct, the plaintiff must plead fraud allegations with particularity.  *See Lum v. Bank of America,* 361 F.3d 217, 228 (3d Cir. 2004) ("Because plaintiffs allege that the defendants accomplished the goal of their conspiracy through fraud, the Amended Complaint is subject to Rule 9(b)."); *see also In re Crude Oil Commodity Litig.,* No. 06 Civ. 6677, 2007 WL 1946553, at * 4–5 (S.D.N.Y. June 28, 2007).

Here, Simon's fraud and antitrust allegations are intertwined and mutually dependent. His antitrust argument is that Defendants systematically engaged in frauds like the one he alleges vis-à-vis his painting, yet the only apparent basis for Simon's supposition that his work was not examined is rumors about other people's works.  The Amended Complaint opens with the allegation that "[t]his action arises out of a 20-year scheme of fraud, collusion and manipulation by, between and among defendants to control the market in works of art by the late Andy Warhol." Am. Compl. ¶1. All allegations in paragraphs 36 through 190, including those explicitly alleging fraudulent conduct, are repeated and realleged in each cause of action  *See* Am. Compl. ¶¶200, 223, 231, 235, 241, 257;  *see also* Def. Memo. at 37 (noting allegations of fraudulent conduct at Am. Compl. ¶¶13, 17, 19, 31–34, 60, 170, 217–20). Simon's dismissive

and inaccurate response that these allegations of fraudulent conduct are a "minor part" of his theory appears to concede that the allegations in his antitrust causes of action do not satisfy FRCP 9(b).    As even cases cited by Simon hold, the remedy is to strip the inadequate allegations—as catalogued in Point Five of Defendants' initial Memorandum of Law—from the Amended Complaint and, ultimately, to dismiss his claims.  *Vess v. Ciba-Geigy Corp, USA*, 317 F.3d 1097, 1103–08 (9th Cir. 2003) (holding that a plaintiff can rely on allegations of a course of fraudulent conduct even if fraud is not a required element of the claim, but that fraud allegations must satisfy FRCP 9(b) or be stripped from the claim; when an entire claim or complaint is grounded in fraud and fails to satisfy FRCP 9(b), dismissal is warranted).

### 3.    The "Richard Roe" Allegations Must Be Disregarded

The allegations pertaining to the "Richard Roes" deserve particular attention.  Faced with the challenge of constructing a plausible antitrust conspiracy, Simon highlights the critical role of the unidentified "Richard Roes" in the fraudulent scheme, referring to them more than ten times in his brief.  *See* Simon Opp. at 2, 9, 15, 18–21.  These are the individuals who Simon alluded to in the Amended Complaint, along with Fremont and the John and Jane Does, as the "enforcers" of the alleged conspiracy who "patrol the art world," "lure" owners into having artwork reviewed, and "blackball" and "ostracize" those who fail to comply.  *See* Am. Compl ¶¶110–19.

Although the image of an elite squad of art dealers employing all their wiles to carry out a secret master plan might be an amusing or intriguing idea for a novel or film, simply dreaming up this scenario fails to satisfy FRCP 9(b).  Because allegations of fraud underly the entire Amended Complaint, which includes the involvement of "Richard Roes" in "the fraudulent and manipulative acts alleged herein," the "Richard Roe" allegations must be pled with particularity. *See* Am. Compl. ¶33. Yet even though the Amended Complaint says the investigation "included interviewing a significant number of people who are knowledgeable about defendants'

conspiracy," it does not report even secondhand knowledge of specific actions by "Richard Roes" in connection with his own artwork, much less for the alleged twenty-year conspiracy involving all Warhol works.[12]  *See* Am. Compl. at p. 3 (unnumbered paragraph). This shortcoming is also at odds with his fraudulent concealment argument, of which a necessary component is that at *some* point *some*thing was revealed. *See* Point Three, *supra*.

The "Richard Roes" defined in the Amended Complaint—ten "past and present agents" of the Foundation and Board who "knowingly participated in, or willfully ignored, the fraudulent and manipulative acts alleged herein" could be anyone—owners or employees of virtually any gallery, museum, or collector. *See* Am. Compl. ¶33. Either Simon has particular defendants and actions in mind but prefers not to reveal them, which is not an excuse for noncompliance with FRCP 9(b), or he needs to take discovery from the entire art world, including charitable gift recipients. His opposition memorandum indicates the latter. *See* Simon Opp. at 21–22.[13]

Pleading against unnamed defendants is problematic even under a general pleading standard. *See* FRCP 10(a) (pleadings must list names of parties). Simon does not explain his inability to identify the Richard Roes. *See Warren v. Goord*, 476 F. Supp. 2d 407, 413 (S.D.N.Y. 2007) (stating that "[a] plaintiff generally cannot bring a claim against an unidentified person," but rule not strictly applied to pro se prisoner); s*ee also Stratton v. City of Boston*, 731 F. Supp. 42 (D. Mass. 1989) (dismissing claims against unnamed police officers where it appeared plaintiffs could have inquired and obtained names of officers on duty). His restraint is curious because, unlike his claims against the named Defendants, Simon presumably could sue

---

[12] Even the sources on which Simon relies, such as the Polsky book from June 2003, at Am. Compl. ¶¶114, 132, are inexplicably silent about key aspects of the alleged scheme. Polsky claims to have purchased works at low prices from the Foundation, but does *not* say that low prices were a *quid pro quo* for a campaign to "blackball" owners who did not have works reviewed by the Board. *See* Sesser Decl., Exh. G (providing excerpts from Polsky's book).

[13] Simon obtained permission at the January 18, 2007 pretrial conference to serve document preservation notices on third parties, further indication that he is either concealing the identity of planned defendants or flying blind.

22

the "Richard Roes" without facing a counterclaim for attorneys' fees based on his covenants not to sue. Nor is it a secret who Warhol dealers are—Simon quotes some, without specifying whether they are part of the alleged conspiracy. *See* Am. Compl. ¶215; Simon Opp. at 6.

A factual basis is required for a conspiracy allegation, even when fraud is not alleged, and even in pre-*Twombly* decisions. In *Official Committee of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Securities Corp.*, a case cited by Simon on the issue of the pleading requirements for fraud and conspiracy, the court held that "overly generalized" group pleading against named defendants failed to satisfy FRCP 8(a). No. 00 Civ. 8688, 2002 WL 362794, at *6-7 (S.D.N.Y. Mar. 6, 2002); *see* Simon Opp. at 14. Claims dependent on the "Richard Roe" allegations must be dismissed because "a bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal." *Heart Disease Research Found. v. Gen. Motors Corp.*, 463 F.2d 98, 100 (2d Cir. 1972); *see also Garshman v. Universal Res. Holding Inc.*, 824 F.2d 233, 230 (3d Cir. 1987) ("The allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act."). At the heart of Simon's rebuttal are allegations of acts by unnamed persons at unspecified times in furtherance of an alleged conspiracy. Because Simon alleges a course of fraudulent conduct throughout the Amended Complaint, his pleadings must satisfy FRCP 9(b). Instead, they do not even meet the generally applicable pleading standard of Rule 8.

### 4.    Simon's Allegations of Fraud and Fraudulent Conduct Are Deficient

Even where he concedes that FRCP 9(b) applies, Simon seeks to evade the particularity requirement by pointing to distinguishable cases where just one flaw—the failure to allege a specific time—was not fatal because other information was sufficiently specific. *See* Simon Opp. at 42, *citing Int'l Motor Sports Group, Inc. v. Gordon*, No. 98 Civ. 5611, 1999 WL 619633

(S.D.N.Y. Aug. 16, 1999) (involving discrete period of negotiation between two parties); *Goldin Assocs., LLC v. Donaldson, Lufkin & Jenrette*, No. 00 Civ. 8688, 2003 WL 22218643 at *6 (S.D.N.Y. Sept 25, 2003) (finding pleadings alleged specific content of misrepresentation, to whom made and when, and why false).    However, Simon's pleadings are deficient in so many ways that he fails to provide notice of what is alleged.

Simon's allegations of fraudulent conduct are comprised of conclusory allegations of alleged omissions by Fremont and Defendi[14] which are insufficient under *Wexner v. First Manhattan Co.*, 902 F.2d 169, 174 (2d Cir. 1990), *see* Def. Memo. at 39–40; vague allegations such as that Fremont "had conversations with other persons" in an effort to have Simon submit his painting (Am. Compl. ¶246) that do not specify names, dates, or what was said; allegations apparently on information and belief without any indication of the factual basis for his belief;[15] and insubstantial snippets of publicly disclosed[16] or inaccurate[17] information about the Foundation.    Simon goes so far as to allege that Board members such as Robert Rosenblum were systematically bribed without offering specifics that would allow Defendants to address this baseless and damaging allegation.    Am. Compl. at ¶75; Simon Opp. at 18, n. 14.    *See Shields*, 25 F.3d at 1128 (a purpose of the particularity requirement is to safeguard a defendant's reputation

---

[14] Apparently, Simon's position is that it is a violation of the Lanham Act for the Board to provide him with an explanation (that he requested) of its opinion of his work, and it is fraud not to disclose to him the Board's opinions of Ekstract-related works owned by *other* individuals.

[15] *See, e.g.,* the allegation that the Board never examined Simon's painting.    Am. Compl. ¶156.

[16] *See, e.g.,* Simon's allegations regarding the relationship between the Board and Foundation.    Simon Opp. at 8.

[17] Space limits do not permit Defendants to address all Simon's errors with publications appropriate for judicial notice.    As one example, Simon alleges, and emphasizes in his opposition, Simon Opp. at 5, 28, that the Catalogues Raisonné "inexplicably" reduced the estimated number of "Flowers" paintings.    The earlier estimate was by Rainer Crone, not (as Simon alleges) Warhol, and volume 2B of the painting catalogue raisonné includes a seven-page explanation of the cataloguing of that series.    *Compare Andy Warhol* (Rainer Crone ed. 1970), at 370 ("[s]ince the smaller formats appeared in large numbers, it proved impossible to catalogue them" thus "approximate numbers are given") *with* 2B *Andy Warhol Catalogue Raisonne: Paintings and Sculpture 1964-1969* (Frei & Printz eds.), at 24–27 ("Crone's . . . estimates of the overall number of works are disproportionately large . . . he recorded each series in a double entry—one for [the] Sonnabend [exhibition], and one for additional works, that tends to double (or triple) the number from the Sonnabend exhibition.").

from unfounded fraud allegations, as well as to protect defendants from strike suits and to provide defendants with notice). The failure to plead with particularity also prevents Defendants from receiving sufficient notice to fully explore the inconsistencies in the Amended Complaint.[18] Moreover, the Court could never determine that a plausible conspiracy has been alleged without knowing even the identity of co-conspirators ("Richard Roes") who supposedly played such a central role in the alleged plot. *See, e.g., Kramer*, 890 F. Supp. at 256 (complaint alleging conspiracy dismissed because "it present[ed] no coherent theory of participation" by auction houses). Simon's vague and conclusory allegations do not satisfy FRCP 9(b) and are insufficient to support allegations of fraud or of a fraudulent conspiracy.

## POINT SIX

### THE COMPLAINT MUST BE DISMISSED BECAUSE SIMON TWICE AGREED IN WRITING NOT TO SUE BASED UPON THE AUTHENTICATION BOARD'S OPINION

Simon seeks to invalidate the covenants not to sue based on generalized fraud allegations on behalf of the class, contrary to his statements elsewhere that the antitrust cause of action is not based on fraud and should not be subject to FRCP 9(b). *See* Am. Compl. ¶259 (alleging agreement "is a mechanism used to perpetuate the fraudulent conduct of the Warhol Conspirators"); Simon Opp. at 40 ("defendants have carte blanche to base authentication decisions on … their own naked self interest."). This is indicative of Simon's improvisational approach to pleading. While he contends in his opposition that fraud allegations play a minor part in his antitrust causes of action (*supra* at 20; Simon Opp. at 14 n.6), in his declaratory judgment cause of action he explicitly alleges fraudulent conduct affecting the entire class.

---

[18] Simon alleges that he had his unnamed potential buyer contact Frei for an opinion and that Frei referred the buyer to the Board review process. Am. Compl. ¶151. This undermines Simon's allegation that he requested the Board's opinion due to a campaign by the mysterious unidentified Richard Roes rather than at his buyer's insistence.

This sleight-of-hand does not pass muster. Simon cannot seek to have the court invalidate all the agreements signed by members of the purported class based on non-particularized fraud allegations, while elsewhere asserting that his pleadings are not required to satisfy FRCP 9(b). Non-specific fraud allegations and implausible antitrust allegations are insufficient to meet the burden to provide a "high order of evidence" that the New York Court of Appeals required in *Chimart v. Paul*, 66 N.Y.2d 570, 574 (1986). In *Net2Globe Int'l, Inc. v. Time Warner Telecom of New York*, the court held that "the far higher mark at which New York courts place the bar and, also, the effects of wrongful conduct sufficient as a matter of law to nullify a limitations of liability clause in contract—demand[] nothing short of . . . a compelling demonstration of egregious intentional misbehavior evincing extreme culpability" to invalidate a contractual limitation of liability provision. 273 F. Supp. 2d 436, 454 (S.D.N.Y. 2003). Claims that fall short of the pleading standard do not meet this test. *See, e.g., Volk v. Liggett Group, Inc.*, No. 96 Civ. 1921, 1997 WL 107458, *3–5 (S.D.N.Y. March 11, 1997) (holding that allegations of misrepresentations of intent to perform were not sufficient to support claim for fraud, and that waiver, whether characterized as a release or covenant not to sue, barred claims).

In fact, Simon induced the Board to issue an opinion without charge by signing the letter agreement, with the apparent intent not to abide by it in the event of a negative opinion. New York courts have granted summary judgment barring fraud claims where defendants accepted benefits while granting a release pursuant to a written agreement. *Pickwick Commc'ns, Inc. v. Weinberg*, No. 91 Civ. 1642, 1994 WL 620950, *11-12 (S.D.N.Y. Nov. 8, 1994), *aff'd Pickwick v. Weinberg*, 89 F.3d 825 (2d Cir. 1995). Before he signed the letter agreement multiple times, and induced the Board to act, Simon could have filed a declaratory judgment action. Simon should not be permitted to assert a fraud claim based on matters he was informed about and

expressly agreed to in the letter agreement: *i.e.*, that the Board would issue "an opinion"; that it may be based on subjective criteria, and that an opinion letter may not provide reasons. Am. Compl. Exh. B (letter agreement). The Amended Complaint shows that Simon was well aware of the risk of a negative opinion *before* he signed the initial letter agreement, when the Foundation "would not stand by its prior authentication." Am. Compl. ¶151.[19]

The Amended Complaint does not support the argument that the Board intentionally declined to authenticate an indisputably authentic work by Warhol. In fact, the Amended Complaint reflects doubts expressed about the Ekstract series from early as 1989. Am. Compl. ¶¶135, 138. Contrary to Simon's suggestion that the Ekstract works were created in a manner typical of Warhol, the sources relied upon in the Amended Complaint, quote Warhol's studio assistant during the period Simon's painting was created in 1965 as stating that "The Ekstract situation was an anomaly . . . We never farmed out another job at that point."[20] *See* Simon Opp. at 10 n.3. Although the art world can debate whether a work produced under such unusual circumstances should be considered "authentic," a legitimate difference of opinion concerning the so-called authenticity of the Ekstract works does not invalidate the covenant not to sue.

Simon concedes in the Amended Complaint that he was able to sell his works of art without Board authentication. *See* Am. Compl. ¶166. His allegation that a work can be sold only with Board authentication or publication in the Catalogues Raisonné, Simon Opp. at 15, n.7, is also contradicted by Christie's catalog for the auction at which *Green Car Crash* and *Lemon Marilyn* were sold, which lists works that have neither a Board opinion number nor a cite to the

---

[19] That allegation also highlights the fact that Simon's grievance is not with the Board's negative opinion—because he had fair notice that a negative opinion was a possibility—but with an earlier *positive* opinion, and with his purchase allegedly based on that earlier authentication, which also noted the wrong date (1964) for the painting. *Compare* Am. Compl ¶19 *with* ¶120. Simon may possibly have had a warranty claim against his seller or others, under U.S., French, or British law. In any event, no such claim has been asserted in this action.

[20] Sesser Decl., Exh. E (Michael Schnayerson, *Judging Andy*, Vanity Fair, Nov. 2003, pp. 196, 204).

Catalogues Raisonné.  Sesser Decl. ¶14, Exh. M.  Simon's ability to sell his works also shows

that the letter agreement is not a contract of adhesion.[21]  Nevertheless, it is not surprising that a

buyer would insist on a Board opinion for *Simon's* work, which apparently first appeared on the

market in 1987, the year of Andy Warhol's death. *See* Am. Compl. ¶124.

## POINT SEVEN

### THE UNJUST ENRICHMENT
### CLAIM MUST BE DISMISSED

In his Opposition, Simon does not explain why his unjust enrichment claim should not be

dismissed, since the transaction in question is governed by a written contract—the letter

agreement which he twice signed in relation to his supposed Warhol self-portrait.  Def. Memo. at

45 (citing *Soft Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 249 (S.D.N.Y. 2006)

("[N]o claim for unjust enrichment lies where the subject matter of the claim is covered by a

written contract")).  This alone mandates dismissal of Simon's unjust enrichment claim.

To the extent that Simon's unjust enrichment claim is based not on his submission of his

painting to the Board, but rather on Defendants' alleged "price inflation" activity in the overall

Warhol art market, *see* Simon Opp. at 45, the harm Simon alleges is far too attenuated to any

alleged benefit here to support an unjust enrichment claim under applicable law.

To state a claim for unjust enrichment under New York law, a plaintiff must allege that:

(1) the defendant benefited; (2) *the benefit was at the expense of the plaintiff*; and (3) that equity

and good conscience require restitution. *See Beth Israel Med. Ctr. v. Horizon Blue Cross &  Blue

Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (emphasis supplied).  As noted

*supra* at pp. 11-12, Simon alleges that there have been at least five intervening purchasers of his

---

[21] The letter agreement is not a contract of adhesion, for the reasons set forth at Def. Memo. at 41. *Medinol, Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575, 623 (S.D.N.Y. 2004).

painting before him.  Furthermore, Simon readily admits that no Defendant (or even Warhol himself, for that matter) ever possessed his Self-Portrait, much less profited in any way from its sale at any point in time.  *See* Am. Compl. ¶121.  Thus, Defendants cannot be said to have benefited in any direct way "at the expense of" Simon from any transaction involving Simon's work, and therefore cannot bring a claim for unjust enrichment under New York law.  *See Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 216 (2007) ("Here, the connection between the purchaser of tires and the producers of chemicals used in the rubber-making process is simply too attenuated to support such a claim" for unjust enrichment); *Redtail Leasing, Inc. v. Bellezza*, No. 95 Civ. 5191, 1997 WL 603496, at \*8 (S.D.N.Y. Sept. 30, 1997) (stating that unjust enrichment claim "requires some type of direct dealing or actual, substantive relationship with a defendant").

The two unpublished opinions from the same case in the Northern District of California that Simon cites for support, Simon Opp. at 44–45, involved claims brought by users of a prescription drug against the manufacturer of the drug, where the users purchased the drug through intermediary insurance programs.  The court there permitted the unjust enrichment claims only after first finding that underlying antitrust claims were sufficiently pled, concluding that the connection between the manufacturer of the product and the ultimate purchasers was not too remote under the applicable state law (California, not New York).  *Doe v. Abbott Labs.*, No. C 04-1511, 2004 WL 3639688 (N.D. Cal. Oct. 21, 2004); *In re Abbott Labs. Norvir Antitrust Litig.*, Nos. C 04-1511, C 04-4203, 2007 WL 1689899 (N.D. Cal. June 11, 2007).  Even so, the court acknowledged that many states would not permit such a claim to proceed.  *In re Abbott Labs. Norvir*, 2007 WL 1689899 at \*8-9.  Here, Defendants never even possessed Simon's Self-Portrait, much less "benefited" in any way at the expense of Simon with respect to any sale of it.  Accordingly, under New York law, Simon's unjust enrichment claim must be dismissed.

## POINT EIGHT

## PLAINTIFF CONCEDES THAT THE CLAIMS AGAINST FREMONT AS "SUCCESSOR EXECUTOR" MUST BE DISMISSED

Simon fails to offer any response to Point Seven of Defendants' memorandum of law that Vincent Fremont cannot be sued here as "alternate" or "successor" executor of the Estate of Andy Warhol. As noted, only the court-appointed executor of an estate can be held as the personal representative of the Estate and be sued. *See* Def. Mem. at 43. Fremont was never so named and therefore cannot be responsible for any claims made against the Estate. Simon's claims against Fremont in his capacity as alleged "successor executor" of the Warhol Estate therefore must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that the Amended Complaint must be dismissed, with costs awarded to Defendants.

Dated: New York, New York
February 7, 2008

CARTER LEDYARD & MILBURN LLP

By: _____
   Gary D. Sesser
   Ronald D. Spencer
   2 Wall Street
   New York, New York  10005
   (212) 732-3200

   *Attorneys for Defendants The Andy Warhol*
   *Foundation For The Visual Arts, Inc., Vincent*
   *Fremont, Vincent Fremont Enterprises, and The Andy*
   *Warhol Art Authentication Board, Inc.*

On the brief:
Kenneth S. Levine
Laura A. Reeds
Pamela J. Shelinsky
Judith Wallace

6275690.6

30